Ca91mar1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   MARLEN MARTINEZ,

4                   Plaintiff,

5           v.                          10-CV-5163 (CM)

6   ST. BARNABAS HOSPITAL,

7                   Defendant.          Jury Trial

8   ------------------------------x
                                        New York, N.Y.
9                                       October 9, 2012
                                        11:00 a.m.
10
    Before:
11
                    HON. COLLEEN McMAHON,
12
                                        District Judge
13
                        APPEARANCES
14
    LAW OFFICES OF LEE NUWESRA
15       Attorneys for Plaintiff
    BY:  LEE S. NUWESRA, ESQ.
16
    EPSTEIN BECKER & GREEN, P.C.
17       Attorneys for Defendant
    BY:  DAVID W. GARLAND, ESQ.
18       JOHN F. FULLERTON, III, ESQ.

19  ALSO PRESENT:  KEITH WOLF,
                    Senior Vice President & General Counsel
20                  ST. BARNABAS HOSPITAL

21

22

23

24

25

Ca91mar1

| | |
|---|---|
| 1 | (In open court; case called) |
| 2 | THE CLERK:  Would counsel state their appearances, |
| 3 | please. |
| 4 | MR. NUWESRA:  Good morning, your Honor.  My name is |
| 5 | Lee Nuwesra.  I'm here with plaintiff, and on behalf of |
| 6 | plaintiff. |
| 7 | THE COURT:  Good morning, Mr. Nuwesra. |
| 8 | MR. GARLAND:  Good morning, your Honor.  David Garland |
| 9 | and John Fullerton, Epstein Becker & Green, on behalf of St. |
| 10 | Barnabas Hospital, and the general counsel of St. Barnabas |
| 11 | Hospital, Keith Wolf, is here at counsel table with us. |
| 12 | THE COURT:  Okay.  Could I ask Mr. Nuwesra and your |
| 13 | client to switch places, because I'm used to looking at the |
| 14 | lawyer on the end of the table. |
| 15 | MR. NUWESRA:  Yes. |
| 16 | THE COURT:  It's my convenience.  So have a seat. |
| 17 | This is, without question, the latest that I've gotten jurors |
| 18 | in living memory, but I gather that Judge Preska had a 90-juror |
| 19 | call for a multidefendant, multiweek trial, and criminal trials |
| 20 | come ahead of the civil trials, so we just had to wait and keep |
| 21 | our fingers crossed.  But we seem to have our jurors. |
| 22 | So literally Jim will call out their names and bring |
| 23 | them in. |
| 24 | THE CLERK:  The parties did have something, your |
| 25 | Honor. |

1        THE COURT:  Yes?  Something we need to do before we

2   pick the jury?

3        MR. NUWESRA:  Yes, your Honor.  There were two

4   questions I had.  One is, we don't -- in accordance with your

5   rules, there is no trial on Friday?  I just want to make sure

6   that --

7        THE COURT:  There will certainly be no trial this

8   Friday because I've got conferences out the wazoo, so yes.

9        MR. NUWESRA:  Another issue, your Honor, that's

10  still -- which you reserved judgment on is the back wages,

11  whether you're going to allow the jury to hear it or whether

12  you're not.

13       THE COURT:  It's probably the last thing you're going

14  to put on on your case; right?

15       MR. NUWESRA:  Yes.  I just want to make sure that --

16       THE COURT:  I mean, I'll let the jury hear anything.

17  The question is whether they're going to decide it.  So --

18       MR. NUWESRA:  Okay.  Oh, that's fine, your Honor.

19  That answers my question.  It's usually in the damages part,

20  but --

21       THE COURT:  Right.  Okay.  Oh, did somebody have a

22  problem with cellphones?  I apologize.  We have these very,

23  very stringent rules imposed by certain of my colleagues, who

24  shall be nameless.  They would not be the rules I would impose.

25  I would let all lawyers or members of the bar, in trying a

Ca91mar1

1    case, bring their cellphones, but when we passed it, it was a

2    compromise.

3              (Discussion off the record)

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CA9BMAR2

1          (In open court)

2          (Jury present)

3          THE COURT:  Okay.  The case on trial continues.

4    Parties are present.  Jurors are not present.

5          We had begun having an off-the-record discussion of

6    cause challenges.  The parties mutually agreed that juror

7    number 19 should be stricken for cause.  Juror number 19

8    approached us at her request at sidebar very early in the voir

9    dire to report that she had quite recently experienced

10   harassment in her workplace, which led her to feel compelled to

11   resign, constructively discharged, what have you.  She didn't

12   use the legal terminology.

13         She has not actually filed a claim, though she said

14   she wishes she had, but she was obviously shaken.  She thought

15   that the matter was too similar to her own situation and did

16   not think that she could be fair.  I think all counsel agree

17   that she should not sit as a juror.

18         Plaintiff, I believe, has no other challenges for

19   cause.

20         MR. NUWESRA:  No, I don't, but I just have one inquiry

21   of the Court, your Honor.

22         THE COURT:  An inquiry of the Court?  The only thing

23   I'm prepared to listen to at this moment is a challenge for

24   cause.  Do you have a challenge for cause?

25         MR. NUWESRA:  No, your Honor.

1          THE COURT:  Thank you.  Then have a seat.

2          All right.  So the defense had begun to articulate

3    challenges for cause and had challenged juror number 1.  Go

4    ahead, put your reasons on the record, then I'll hear

5    objections to the challenge and then we'll go on to the next.

6          MR. GARLAND:  Thank you, your Honor.  The reason for

7    challenging juror number 1 is that his wife works as a nurse at

8    Lincoln Hospital.  The plaintiff has and may still work as a

9    nurse at Lincoln Hospital.  The juror was not voir dired about

10   whether or not there was any relationship between the two.  We

11   don't know.  And I didn't want to be in a position where we

12   found out down the road that somehow they had worked together,

13   knew each other.  So that was the reason for the challenge to

14   juror number 1.

15         THE COURT:  The juror indicated that he did not know

16   the plaintiff; that his wife was a nurse at Lincoln Hospital.

17   He also indicated, when asked repeatedly, that he could be a

18   fair and impartial juror.  I'm disallowing that challenge.

19         Next.

20         MR. GARLAND:  Number 13, your Honor, Frances Torres.

21   The reason for that challenge is at one point during the voir

22   dire of Ms. Torres, she wasn't sure whether or not she could be

23   fair and impartial.  At another point, she thought that she

24   could be.  I'm not sure which it is.

25         THE COURT:  Well, I think it's important to articulate

1    the reasons why.  I'm unsure about the fair and impartial.  I

2    believe what Ms. Torres said was that over the course of the

3    last summer, the last few months, she had had an experience

4    that sounded to me remarkably similar to the experience that

5    will be discussed at this trial.  She had been accused, she

6    believed wrongfully, of making a mistake she doesn't think she

7    had made and she was told by her employer not to bother to come

8    back.

9            Is that what you heard?  That's what I heard.

10           MR. GARLAND:  Yes, your Honor.

11           THE COURT:  I'll hear the plaintiff.

12           MR. NUWESRA:  Well, your Honor, there is no question

13   that she mentioned that with regard to one specific question,

14   but when the Court at the end asked each and every one whether

15   they can be fair and impartial without any doubt, everybody

16   said yes except for number 19.

17           THE COURT:  Okay.  Here's the problem, relying

18   strictly on that, is that I said at the beginning:  I've asked

19   you a lot of questions and there may be something I've

20   forgotten.  So can you think of any reason in the world why you

21   couldn't be a fair and impartial juror?

22           In my experience, jurors who have come up here and

23   sobbed at the sidebar about how they can't be fair and

24   impartial answer that question in the room by saying, yes, they

25   can't.

1    I'm going to allow a cause challenge to juror number

2    13 simply because the facts of her case are so eerily,

3    uncannily similar to the facts of Ms. Martinez's case.  And the

4    occurrence was so recent in time, within the last few months,

5    that when the juror said she didn't know if she could be fair

6    and impartial, I think she was telling the absolute truth.

7    That was my read of the juror, of what she said and of how she

8    said it.  So I will allow a cause challenge for juror number

9    13.

10        Are there any other cause challenges?

11        MR. GARLAND:  No, your Honor.

12        THE COURT:  Now, I've done cause challenges.

13        Mr. Nuwesra, do you want to say anything else before I

14    give you all the board and you guys pick your jury?

15        MR. NUWESRA:  No, your Honor.  But it behooves me, the

16    attorney who works for Wilson, Elser and Moskowitz, I do not

17    recall whether she specifically said which department she

18    worked for or which unit.

19        THE COURT:  She said she was a litigation attorney.

20        MR. NUWESRA:  Right.  I do regularly have cases with

21    that law firm with that unit that does the labor and employment

22    and defense discrimination claims.

23        THE COURT:  I never strike lawyers unless they know

24    the other lawyers.  I never strike lawyers who tell me that

25    they can be fair and impartial and will follow my instructions

1    of law.  I would be shocked if some peremptory challenges

2    weren't used on lawyers.  Lawyers always challenge other

3    lawyers.  But I wouldn't even care if she were an employment

4    lawyer.  That would not in my mind disqualify her from being a

5    fair and impartial juror.

6         MR. NUWESRA:  My question is not for cause.  My

7    question is so I can make up my mind whether I want to do it

8    peremptorily.  That's the inquiry that I was making.

9         THE COURT:  Mr. O'Neill, would you mind going out and

10   seeing if juror number 21 is there, Ms. Denenberg, and bring

11   her back in?  And if she is, just for a moment.

12        I should put on the record I have a copy of some

13   stipulations of fact that you all agree to after the final

14   pretrial conference.  Great.  That's good.  Thank you.

15        (Juror present)

16        THE COURT:  Ms. Denenberg, you don't have to come far.

17   Ms. Denenberg, what kind of litigation do you do?

18        THE JUROR:  Mostly general liability and products.

19        THE COURT:  Thank you, ma'am.  Bye.

20        (Juror excused).

21        THE COURT:  All right.  Be my guest.  Pick your jury.

22   I'll be back in a moment.

23        (Recess)

24        THE DEPUTY CLERK:  The following peremptory challenges

25   were exercised by the plaintiff and defendant:  Round one,

CA9BMAR2

1  Danilo Sulit; for the defendant, Mahama Osman.

2          Round two, for the plaintiff, Steven Cadicamo; for the

3  defendant, Tama Robertson.

4          Round three, Leslie Mazza, and the defendant waived.

5          Round four, Sanjeev Desai; for the defendant, Janet

6  Tejeda.

7          Case on trial continues.  The parties have made their

8  peremptory challenges.

9          THE COURT:  There can't be four Batson challenges

10 unless the last juror was the one who was Batsoned.  Was she?

11         THE DEPUTY CLERK:  Yes.  Okay.

12         THE COURT:  Okay.  There's been a Batson challenge by

13 whom to what?

14         MR. NUWESRA:  By the plaintiff, your Honor.  It seems

15 that the defendant has a pattern of striking the only two

16 minorities that represent my client's race and/or national

17 origin, number one, which is black, and, finally, number 14,

18 which is Hispanic.

19         THE COURT:  Okay.  Well, I know what the neutral

20 reason is for striking Mr. Osman, because there was a cause

21 challenge.  Have a seat.  There was a cause challenge to

22 Mr. Osman on the grounds that his wife worked as a nurse at the

23 same hospital, and that is a race-neutral factor.  Convince me

24 that that is a pretext.  Can you convince me that that's a

25 pretext?

1          MR. NUWESRA:  Your Honor, I did the Batson one when he

2     did Ms. Tejeda, who is Hispanic, because I figured, okay, maybe

3     one minority representative of my client's race and/or national

4     origin may not be apparent.  And when he only did the two --

5          THE COURT:  Here's what you have to do.  You have to

6     convince me there's a pattern here or you're going to have to

7     convince me that the challenge to Mr. Osman is pretextual.

8          MR. NUWESRA:  Well, your Honor, again, as the Court

9     had alluded to earlier and observed, he does not know my

10    client.  There is no connection that his wife ever worked with

11    my client.

12         THE COURT:  Well, as far as I'm concerned, the

13    challenge to Mr. Osman is a perfectly fine challenge that I

14    would have made if I were a defense lawyer.  His wife is a

15    nurse.  She and your client have worked in the same place.  The

16    fact that he cannot be challenged for cause does not mean that

17    those are not factors that St. Barnabas Hospital might

18    reasonably consider in deciding whether somebody can't sit on a

19    jury.  So I certainly don't see any problem with them having

20    challenged Mr. Osman, particularly because they issued a cause

21    challenge to him indicating that they had a problem with that

22    juror and they were going to try to get him off the jury one

23    way or another.

24         So now we come to the last challenge and they

25    challenged juror number 14, Janet Tejeda.  I will listen to

1    Ms. Tejeda is a Hispanic juror.  I will say that my memory of

2    Ms. Martinez's complaints were that she was a black American

3    being discriminated against by black Hondurans.  But, okay,

4    Ms. Martinez is also Hispanic.  You throw in the kitchen sink

5    in these cases.

6            So why did you all challenge Ms. Tejeda?  Have a seat,

7    please.

8            MR. GARLAND:  Your Honor, I think I mentioned

9    Ms. Tejeda before we had a reporter come and go on the record.

10   My concern was, you may recall, St. Barnabas physicians may

11   have been on the faculty of where she had worked and I was

12   concerned about that.  That's why I had raised that.

13           THE COURT:  I see.  And I told you I thought that was

14   pretty silly, it is, however, a perfectly race-neutral

15   explanation.  Explain to me why it's pretextual, Mr. Nuwesra.

16   You have to convince me that it's pretext.

17           MR. NUWESRA:  Your Honor, if I recall, she works -- as

18   I recall, her relationship with one of the directors of the

19   Columbian medical orthopedic surgeons, I believe she mentioned

20   it was, she was only an administrative assistant to him.  There

21   has been no-- she never said she knew anybody at St. Barnabas

22   or that she talked to anybody at St. Barnabas or anybody from

23   St. Barnabas ever interacted with her.

24           And just for the record, your Honor, my client is a

25   black Hispanic.  She's the one from Honduras.  It's not that

1    Honduran blacks had discriminated against her.

2           THE COURT:  I apologize for having misspoken.

3           Frankly, I think the challenge is pretextual.  I think

4    the challenge is pretextual.  The juror indicated that she

5    could be fair.  There was no discussion that she worked for

6    anyone who had any affiliation with St. Barnabas Hospital.  She

7    certainly did not volunteer that she had any affiliation with

8    St. Barnabas Hospital.  Contrary to the situation with

9    Mr. Osman, where I can quite understand, given not just the

10   overlap in profession, but the overlap in hospital affiliation

11   for at least some period of time, why-- and obviously when

12   Ms. Martinez gets on the stand, she's going to testify that

13   she's worked at Lincoln Hospital and that would register with

14   Mr. Osman.

15          So I can quite understand why the defendants would

16   want to get Mr. Osman off the jury.  It's perfectly

17   comprehensible and utterly credible that it would have no

18   racial component.  But Ms. Tejeda, that is the most pretextual

19   explanation that I think I have ever heard.

20          MR. GARLAND:  Your Honor, I must say, I've been doing

21   this for a number of years.  I've never had a Batson challenge.

22   I can represent to the Court it was anything but pretextual.

23   My concern, your Honor -- and this has happened to me in doing

24   this over the years -- is that we get a juror who says, yes,

25   I-- during the voir dire-- we didn't even voir dire her in this

1    case about what relationship with the St. Barnabas doctors she

2    had.  So during the lunch break, when I learned about that, I

3    thought it was appropriate to raise it.  And, your Honor, I did

4    raise it earlier, before I made the challenge, the peremptory

5    challenge.

6           So I've heard your Honor's ruling.  I want the Court

7    to know that I disagree with it.  It wasn't in any way, shape

8    or form intended to be pretextual.

9           THE COURT:  Okay.  So that being the case, it looks to

10   me like the jurors are juror number 3, Ms. DaSilva.

11          THE DEPUTY CLERK:  Two.

12          THE COURT:  Two has been challenged.  Oh, that was 12.

13   I'm sorry.

14          Juror number 2, Mr. Catanzaro; juror number 3,

15   Ms. DaSilva; juror number 5, Mr. --

16          THE DEPUTY CLERK:  No.

17          THE COURT:  Excuse me?  Oh, he's been challenged.

18          Juror number 6, Mr. Carpenter; juror number 7,

19   Mr. Goldstein; juror number 8, Ms. Anderson; juror number 10,

20   Ms. Tartaglia; juror number 11, Ms. Waller; and juror number

21   14, Ms. Tejeda.

22          THE DEPUTY CLERK:  Bring in the jurors, your Honor?

23          THE COURT:  Yes.

24          (Jury panel present)

25          THE COURT:  Okay.  Welcome back.  Sorry it took a

1    little longer than I thought, but I hope you had a good lunch.

2    We have picked a jury and we're going to seat those jurors and

3    swear them and we're going to get going on this trial.

4         I really do like voir dire.  I enjoy it because I do

5    get to meet groups of my fellow citizens in batches of 25 and

6    30.  It's a superficial meeting, but it's never less than

7    interesting and I appreciate having had the opportunity to get

8    know each of you in a little way.

9         Ben, would you like to call the jurors up?  Jurors

10   number 1 through 4 will sit in the first four seats in the

11   front row, and jurors number 5 through 8 in the second row.

12            THE CLERK:  Juror number 2, Anthony Catanzaro.

13            THE COURT:  No, he's now juror number 1.

14            THE CLERK:  Juror number 1.  The new juror number 2,

15   Jean DaSilva; juror number 3, Thomas Carpenter; juror number 4,

16   Stephen Goldstein; juror number 5, Helen Anderson; juror number

17   6, Barbara Tartaglia; juror number 7, Dana Waller; and juror

18   number 8, Janet Tejeda.

19            THE COURT:  Are the remaining jurors acceptable to

20   plaintiff?

21            MR. NUWESRA:  Yes, your Honor.

22            THE COURT:  And the defendant?

23            MR. GARLAND:  Yes, your Honor.

24            THE COURT:  Would you all please stand?

25            (A jury of eight was duly empaneled and sworn)

1          THE COURT:  Thank you.

2          So, ladies and gentlemen, as I told you, it's your

3   function to decide the issues of fact in this case and your

4   decision on those facts is to be based solely on the evidence.

5   Now, remember that nothing that I say to you is evidence.

6   Nothing that the lawyers say to you is evidence.  The questions

7   the lawyers ask are not evidence.  A question is just words in

8   the air until it is answered, and then it is the question and

9   answer together that are the evidence.

10          Objections that the lawyers make to the other side's

11  questions are not evidence.  Those are efforts by the lawyers

12  to get me to act like an umpire and to enforce the rules.  And

13  the lawyers are bound when they feel that there's been some

14  violation of the rules, the technical rules on how we ask

15  questions in a courtroom, to call that fact to my attention.

16  So you shouldn't read anything into an objection or any ruling

17  that I make on an objection.

18          Sometimes a witness will say something and I will

19  direct that the testimony be stricken because it was not

20  responsive to the question or for some other reason.  If I do

21  that, it's as though the witness never said those words and you

22  are to disregard them.

23          Everything that's left is evidence.  The evidence

24  consists of the testimony of the witnesses who will get on the

25  stand and they will talk to you and they will talk to you in

1   the form of answering questions that are put to them by the

2   lawyers.

3           Evidence consists of exhibits, documents or things

4   that will be placed before you, shown to you.  You will be

5   allowed to read them.  One of the wonderful things that the

6   lawyers have done in this case is they gave me a list of

7   proposed exhibits and their objections to those proposed

8   exhibits before the trial so that we could duke it out before

9   the trial and get most of that stuff taken care of so that we

10  don't have to waste your time.

11          There are also in this case some facts that have been

12  stipulated.  Stipulated means they've been agreed to by the

13  lawyers.  The lawyers agree that these things are proved.  They

14  don't need any more evidence to prove them; these things are

15  proved.  After the lawyers are done with their opening

16  statements, I'm going to read to you what those facts are.

17  You're to accept those facts as having been proved and then

18  you'll move on and decide the facts that are in dispute.

19          There are two kinds of evidence in a case:  There's

20  direct evidence and there's circumstantial evidence.  Direct

21  evidence is direct proof of a fact, like the testimony of an

22  eyewitness:  I saw the car run the red light.  I heard the

23  brakes squeal.  I smelled smoke.  That's direct evidence.

24          Circumstantial evidence is direct evidence about Fact

25  A from which you can draw the conclusion that Fact B exists.

1   The classic example used by almost all judges everywhere is

2   let's assume this room were hermetically sealed off from the

3   outside world so you couldn't see or hear what the weather was

4   outside.  Now, we all know that when we came in from lunch, it

5   was not raining.  Perhaps over the course of the afternoon the

6   door will open and someone will walk in with a wet raincoat on,

7   shaking an umbrella, hair plastered down to his head.

8          Well, you have direct evidence that a wet person

9   carrying an umbrella and wearing rain gear walked into the

10  room.  From that fact you could draw the conclusion that the

11  weather had changed outside and that it had begun to rain even

12  though you have no direct evidence of that fact.  You can't see

13  outside, you can't hear outside, so you can't observe for

14  yourself that the weather has changed.  That's all there is to

15  circumstantial evidence.

16         I will give you further instructions on these matters

17  at the end of the case, but bear in mind that you can consider

18  direct evidence or circumstantial evidence, both of them, as

19  you reach your verdict.

20         How do you decide what you believe and what you don't

21  believe?  Well, you listen to the witnesses.  You watch and

22  observe them and then you decide whether you believe or

23  disbelieve them in the same way that you decide such questions

24  in your ordinary, everyday life.  You say to yourself, does

25  that person sound like she knows what she's talking about?

1   Does he seem to be exaggerating or distorting what he's saying

2   to me?  Does that person strike me as being candid and open

3   with me?  You use your common sense and your good judgment to

4   evaluate the testimony that you hear based on all the

5   circumstances of the case.

6           Now, it's very important that you keep an open mind

7   throughout this case.  Don't make any judgments until all of

8   the evidence is in and the case has been submitted to you.

9   Remember, evidence comes in step by step.  First, a witness

10  will testify on direct examination and from the questions of

11  the lawyer who called that witness.  When that witness is

12  finished, the other side's lawyer will have an opportunity to

13  cross-examine the witness and to ask questions to try to shake

14  or undermine details of the witness's testimony.

15          First, the plaintiff will put on all of her witnesses

16  and then the defendants will put on any witnesses that they

17  wish to put on.  Now, this being a civil trial, to the extent

18  that both sides want the same people to testify, and they do,

19  we're only going to have them testify one time.  All right?  So

20  those people will begin their testimony and end their testimony

21  during what is technically plaintiff's case, but the defendants

22  will be putting them on as well.

23          Just remember, there can be two sides to a story, and

24  you're not going to be in a position to form any judgment until

25  you've heard all the evidence in the case.  If you have friends

1    or relatives who know you're on jury duty and want to watch the

2    trial, they are certainly welcome in this public courtroom, but

3    do let Ben know.  Do let Ben know if there's someone that you

4    know who's sitting out there in the peanut gallery, as I still

5    call it, and a few of you look like you're old enough to know

6    what I'm talking about.  That gives us an opportunity to remind

7    the people out there that you can't talk about the case with

8    them.

9         Let me reinforce the instruction I gave you before

10   lunch:  Do not discuss the case; "discussed" used in the

11   broadest sense of the word.  Do not communicate in any manner,

12   shape or form about this case with any other human being on the

13   planet until you've reached your verdict.  After you've reached

14   your verdict, you can talk to anybody you like about the case,

15   but before then keep your thoughts to yourself.

16        Now, this is an unnatural request that we make of you

17   and I appreciate that it's an unnatural request, but we do it

18   for a reason.  There's a fair amount of research that shows

19   that when people start to talk about something, even in a

20   casual way, opinions begin to form and harden.  And we don't

21   want you to form opinions until you've heard all of the

22   evidence and the arguments of the lawyers who have to have a

23   fair opportunity to tell you how they think you ought to look

24   at the evidence and until you've heard the instructions of law

25   that I will give you at the end of the case.  That's why we ask

1    you not to discuss the case.  There really is a reason for it.

2              I can't imagine that there's anything you're going to

3    see or hear in the press or on the internet or if anyone's

4    going to approach you outside of the courtroom to talk to you

5    about this case.  But if you should see or hear anything about

6    this case outside the courtroom, turn the page, turn the

7    channel, turn away, turn it off, walk away.  Don't have any

8    kind of communication.

9              Just like I said that you shouldn't be a legislator

10   and try to rewrite the law when you're back reaching your

11   verdict, you're not Sherlock Holmes either.  It's not your job

12   to solve the case.  You should not be going on the internet and

13   looking up the names of any of the people in this case who are

14   going to testify, for example.  That's not your job.  It would

15   be inappropriate for you to do that.  It's only appropriate for

16   you to decide the case based on the information that's given to

17   you here in the courtroom while you're sitting in that jury

18   box.  That's part of the oath that you've taken, is to decide

19   the case solely on that basis and that means you don't do any

20   research on your own.

21             If someone were to try to approach you or if there

22   were a newspaper story about this case, which, as I said, I

23   can't imagine that there will be, but if there were to be such

24   a thing and you would see it, of course you would throw the

25   newspaper to one side and of course you would walk away from

that person.  Tell Ben as soon as you come to court the next

time what happened so that the lawyers and I can have a chance

to chat about it and figure out what, if anything, needs to be

done.

Now, we have notebooks for you, and we're going to

pass those notebooks out as soon as the lawyers have finished

their opening statements.  You may take notes as the testimony

comes in, as the evidence comes in.  Some of you will have been

jurors in the New York State Supreme Court and the judge will

not have allowed you to take notes.  That is an unfortunate

practice in New York State Supreme Court, which some of us,

when we were judges over there, ignored.  But you're the ones

who will decide I'm going to take notes.  But I don't get to

decide the case.  You're going to decide the case.  It seems

you should be the ones who are allowed to take notes.

Now, there's a caveat to that.  Your notes are to help

you refresh your recollection about some point that you thought

was important.  Your notes are not a substitute for the

official record in the case.  We have a court reporter.  The

court reporter is the most astonishing of people.  She will

listen to what's said and she will, using her own strange

hieroglyphics, take it down and then she will be able to parrot

right back to us miraculously.  I don't know how these people

do it.  They are the most astonishing people in our court

system.  And she is the repository of the record in this case.

1     So if, when you're deliberating, you all have a point

2  of disagreement about the record and somebody says, "I have a

3  note about that," you don't look at that person's notes.  You

4  send me a note that says "I would like to hear from the court

5  reporter what was said on this point or that point," and we

6  will do that for you.

7     Now, this is a lovely courthouse.  A beautiful,

8  elegant, ostentatious perhaps, courthouse.  But it was built

9  just before they changed the design standards for courthouses.

10  In more modern courthouses, there's a separate entrance for

11  jurors and a separate elevator for jurors that goes right to a

12  jury room.  And that gives you privacy and that isolates you

13  from the lawyers and from the parties and from the witnesses --

14  who you don't even know what they look like because they're not

15  here -- and from me.

16     We don't have that, so we're all going to come in the

17  same front door; we're all going to use the same elevators.  As

18  you will learn, the jury room is right back there under the

19  clock.  You will have your own rest room facilities so you

20  won't have to use the rest room facilities in the hall.  But

21  we're likely to run into each other and you're likely to be

22  sharing an elevator with someone who you will never have seen

23  before, but 15 minutes after we begin some morning, that person

24  will take the witness stand.

25     So if you meet the lawyers or myself or the clients,

1    who have been instructed by the lawyers, we're not going to

2    look at you, we're not going to smile at you, we're not going

3    to say good morning to you.  We'll probably run the other way

4    or cast our eyes down.  We've been trained to do that.  We

5    think it's our professional obligation to be rude to you.  And

6    we're not being rude; we're being professional.  Don't hold it

7    against any of us if we don't communicate with you in any way

8    except in this courtroom.  And I know that trial counsel have

9    told their clients exactly the same thing.

10            And don't strike up a conversation with strangers lest

11   you be unwittingly talking to the next guy who's going to get

12   on the witness stand.  You have seven new friends to get to

13   know.  You can talk to those people about everything except, of

14   course, about the case until you start deliberating.

15            So let me explain what's going to happen.  The lawyers

16   are going to have an opportunity to make a little opening

17   statement; a little, short, 10- or 15-minute statement in which

18   they'll summarize what they think the evidence is going to

19   show.  And the lawyers, what they say is not evidence, but it

20   might be a road map that helps you as you go through the

21   evidence, because the evidence, as you know, comes in

22   piecemeal.  You don't get the whole story all at once.

23            After the opening statements, the plaintiff will call

24   her witnesses and those witnesses will testify.  Then we will

25   excuse you from the room when the plaintiff rests her case.  I

am required by the rules to have a discussion out of your

hearing with the lawyers at that time.  Then we'll bring you

back in the room and the defendant will call any additional

witnesses the defense wishes to call and those witnesses will

testify.

Then I will excuse you and I will have another

conference with the lawyers, this one about the charge which

I'm supposed to have outside of your presence.  And then you

will come back and you will listen as the lawyers sum up, as

they argue their case, as they talk to you about what the

evidence actually did show and how you ought to interpret it.

Then I will charge you on the law and I will release you to the

jury room and you will be free to deliberate and reach your

verdict.

At the conclusion of the trial, I will tell you in

great detail what the plaintiff, Ms. Martinez, must prove in

order to recover on the claims she has asserted against the

defendant, St. Barnabas Hospital.  For the moment, let me just

say a party with a burden of proof has to prove her claim by

what we call a preponderance of the evidence.  A preponderance

of the evidence is 50 percent plus a smidgen.  A preponderance

of the evidence is enough evidence to tip the scale of justice,

which right now is evenly balanced between the plaintiff and

the defendant.  A preponderance of the evidence is enough to

tip the scale in the favor of the plaintiff.

CA9BMAR2

1          Now, it doesn't matter if the scale tips a little in

2     favor of the plaintiff or a lot in the favor of the plaintiff.

3     That doesn't make any difference.  The plaintiff's obligation

4     is to tip that scale in her favor.  If at the end of the

5     evidence the evidence tips in favor of the defendant, the

6     hospital, and the plaintiff has not met her burden of proof,

7     then you will find for the defendant.

8          And if at the end of all of the evidence and the

9     argument, everything, you think the scale is still evenly

10    balanced, 50/50, the defendant wins because the plaintiff has

11    the burden of proof and the burden of proof requires the

12    plaintiff to tip the scale in her favor.

13         All right.  That's a little preliminary instructions

14    for all of you.

15         Is the plaintiff ready?

16         MR. NUWESRA:  Yes, your Honor, the plaintiff is ready.

17         THE COURT:  Is the defendant ready?

18         MR. GARLAND:  Yes, your Honor.

19         THE COURT:  In that case, we will hear opening

20    statements, first from Mr. Nuwesra.

21         MR. NUWESRA:  Thank you, your Honor.

22         May it please the Court.  Good morning, your Honor--

23    good afternoon, your Honor.

24         THE COURT:  Good afternoon, Mr. Nuwesra.

25         MR. NUWESRA:  Good afternoon, Counsel.  Good

1   afternoon, Ms. Martinez.  Good afternoon to all of you ladies

2   and gentlemen.

3           Ladies and gentlemen, my name is Lee Nuwesra.  I'm a

4   solo practitioner that practices in the Bronx.  I would like to

5   take this opportunity initially to thank you for serving on

6   this jury.  I am sure that the defendant's counsel shares my

7   thanks to you.

8           As the Court said earlier, this case is basically

9   about my client, and the evidence will show that she is black

10  and of a Hispanic Central American background.  The evidence

11  will also show that she is a single mom; that she came here at

12  a young age; that she struggled; she became a professional, she

13  got her license to practice nursing.  And she always wanted to

14  be able to serve her community, which is the South Bronx.

15  That's where she was brought up when she came to this country.

16  She elected to work for the defendant, which is St. Barnabas

17  Hospital that is located in the Bronx.

18          The evidence will also show that she began in July of

19  2002 and worked through September of 2009 and that there was no

20  issues whatsoever at her place of work; that she even was

21  recognized sometime in the spring of 2009, I believe it was

22  April of 2009, for her good work and her participation and the

23  good will she had for the hospital and her patients.  Not only

24  that, but she also wanted to better herself in her place of

25  work by going for a master's program at night; by continuing to

1   volunteer for what is known as -- and it's a very important

2   term -- a charge nurse.  She wanted higher training.  She

3   wanted to make more money like most of us do.

4           Within accordance of the hospital policy -- she felt

5   at one point that there was a discrimination and the

6   discrimination was meted out by Filipino supervisors to the

7   benefit of other Filipino nurses.  So in accordance with-- the

8   evidence will show, in accordance with the hospital's policy,

9   she used her chain of command as a professional registered

10  nurse to grieve what she felt was discriminatory treatment.

11  And so she, amongst many people, approached her immediate

12  supervisor, she approached the night shift supervisor, she

13  approached some of the directors and associate directors, and

14  all the way to the top, Ms. Graham -- you heard that name

15  before -- which was the senior vice president of nursing.  What

16  she wanted was the same equal treatment just like her similarly

17  situated, her co-equals as far as nursing is concerned, nursing

18  staff is concerned, of the Filipino background.

19          Instead of remedying, instead of taking care of and

20  taking her complaints of discrimination seriously, you will

21  hear testimony that the supervisors, mostly Filipinos, began to

22  retaliate against her.  You will hear testimony that that

23  retaliatory conduct-- and there will be testimony, I'm not

24  going to bore you with the details at this point, that she was

25  forewarned at least by one African-American female nursing

 1    manager that at this place of business, if you tried to bring

 2    discrimination claims forward or make a discrimination claim,

 3    you will be retaliated against.

 4          You will find that the hospital had a policy of doing

 5    performance evaluations on an annual basis.  Hers was

 6    August/September.  Sometimes they fall behind, and so they had.

 7    The testimony will show through evidence and documentary

 8    evidence that at the end of August or early September of 2009,

 9    while she was meeting with her African-American manager, that

10    she brought the same concerns she had brought since the summer

11    of 2009, as far as giving the opportunity of better training,

12    better shifts.

13          She is a single mom.  Her son was becoming a teenager.

14    The evidence will also show that her shift was three days a

15    week, 7 a.m. to 7 or 7:30 p.m.  She wanted what other similarly

16    situated Filipino moms, single or otherwise, were having, which

17    was Mondays through Fridays, 9 to 5.

18          Again, instead of remedying the situation, an

19    incident, and only one incident, happened at her unit.  Her

20    unit is the I.C.U., intensive care unit.  She was in the

21    sub-unit of D3.  And the documentary evidence, as well as the

22    testimony, will show that there were four registered nurses

23    involved.  The other three were Filipinos.  My client, who is

24    of black and Hispanic background, was the fourth one.

25          There was a claim, and this claim incidentally-- the

1    evidence will show that this claim incidentally was made by one

2    of the Filipino nurses, staff nurses, that was the only one --

3    the only one who received Morphine to place in the medicine

4    cabinet that day.  She was the only one who dispensed Morphine

5    on that day.  My client or the other two did not.  You will see

6    that the same Filipino, the name is Ms. AnaRicca Libran-Danao,

7    was the one who discovered -- and that will be on

8    documentations -- discovered between 6 p.m. and 7 p.m. on

9    September 14th, 2009, that at least two vials of Morphine were

10   missing.  The evidence will show that she did not complain of

11   those two missing Morphine vials and she dispensed another one

12   at 7 p.m.

13        Now, another group of Filipino nurses came up at the

14   end of the day, around 7:30, to make sure that they accounted

15   for all the medication, since this is narcotics.  This is the

16   stuff that should be controlled.  They were missing three vials

17   of Morphine.  They bring that to Ms. Libran's attention.  The

18   evidence will show what does Ms. Libran do?  She goes forward

19   and she puts under 7 p.m. that the third vial was missing as

20   well, became missing as well.

21        The evidence will show that my client never dispensed

22   any Morphine or opiates on that day, as I understand it, and

23   that there was an investigation, what my client felt was a

24   perfunctory one.  And she will testify about all the details.

25   I will not bore you with those at this point.

1          But what's important is you will hear testimony from

2     staff nurses that are Filipinos who will tell you that during

3     their tenure at St. Barnabas Hospital, they did similar or

4     worse infractions, but they were either not disciplined for it

5     or got a slap on the hand.  I believe the word for that is

6     "root cause analysis."

7          So all the evidence will show that in this perfunctory

8     investigation, between the four nurses -- three were Filipinos;

9     my client was non-Filipino -- that they decided the missing

10    medication was the fault of my client.

11         My client, like the other three, gave a written

12    statement.  She was searched by security.  She was questioned

13    and she went home.  The next day she comes into work, she works

14    her shift from 7 to 7:30.  At around 2 o'clock, maybe 3 o'clock

15    in the afternoon -- this is September 15, 2009 -- she's called

16    to a conference, an investigative meeting.

17              (Continued on next page)

18

19

20

21

22

23

24

25

1      MR. NUWESRA: And who's there? The supervisors that

2  she had complained about discrimination to. There was one I

3  believe associate director of pharmacy that she never

4  complained to, but she was there doing the investigation.

5      During the investigation, my client voluntarily told

6  the associate director of pharmacy and the other two

7  supervisors -- an interestingly, the reason she said it is

8  because they wanted to know whom she took the keys from every

9  time that she went into the medicine cabinet. And you will

10  hear testimony not only from my client but from other staff

11  nurses that it's very hectic in the ICU, they have to rush,

12  rush, rush, they have to take care of sick patients. That's

13  conceded. So what happens is, she could only remember the last

14  time she received the keys to dispense of what's known as

15  Ativan -- nonopiate, nonmorphine -- three vials of -- I believe

16  was 2 milligrams. And she remembered whom she took it from

17  because when she went -- when she went to log the time and what

18  she was dispensing to her patient as per doctor's orders, she

19  noticed that that nurse, who also happens to be Filipino, had

20  put in the wrong time. She was retrieving the medication at

21  5:00 to give it to Patient N, who needed it so that that

22  patient would go for an MRI procedure. When she saw the wrong

23  time, she was also trying to protect herself, because you can't

24  retrieve medicine at 5:00 and put it after 6 p.m. She

25  corrected the time for that nurse. Her name is Miss Fischer.

1   You'll hear from Miss Fischer and you'll hear from my client

2   about that.  Miss Fischer thanked her.

3           Now when she mentioned -- when she was asked by the

4   associate director of pharmacy, "How come you only remember

5   this time," and she said, "Because I corrected the time facts,

6   and that's why I can remember it very vividly -- vividly."

7           They take that and they decide -- just before that --

8   they interview Ms. Fischer after that.  Ms. Fischer lied.  The

9   evidence will show that Ms. Fischer lied and said that it was

10  her who corrected her own entry.  And so, rightfully so, they

11  suspend both of them pending further investigation.  And there

12  is no issue with that.

13          The difference, however, is again, disparate

14  treatment.  They bring back Ms. Fischer after two days, they

15  keep my client out in the cold, and in the interim, she

16  continues to complain of discrimination and disparate,

17  differential treatment as far as the discipline.

18          You will hear also testimony that within two to three

19  weeks of her continued complaining of discrimination, the

20  senior vice president of nursing sends her a letter dated

21  October 12th, 2009, mailed out to her on the 13th of

22  October, 2009, by return receipt requested, signature required.

23  My client, who was dealing with whatever issues and had a

24  teenage son, gets to go to the post office and retrieve it on

25  the 20th of October 2009.

1    What happens?  The next day, on the 21st of October,

2    2009, one of the upper managers -- I believe his last name is

3    Mr. Wolf, I can't think of his first name now -- sends her a

4    letter of termination.

5         Now you will also hear evidence that throughout the

6    disciplinary process, my client kept on letting the -- the

7    organization St. Barnabas know that she was interested in her

8    position, she wanted to go back sooner rather than later and

9    resolve it, and she was remorseful about her changing the time

10   to the correct time of Ms. Fischer, concededly, and apparently

11   she should have brought it to a manager's attention or at least

12   initialed it.  However, the dichotomy of it is, when other

13   Filipino nurses did the same thing, including Ms. Libiran, who

14   found the missing -- allegedly the missing morphine between 6

15   and 7, she never initialed that she put those entries.  Yet,

16   nothing happened to her.

17        In sum and substance -- and I will let you view the

18   documentary evidence and hear it more succinctly and more

19   particularly from my client and other witnesses -- my client

20   believes that she had been the subject of discrimination in

21   relation to other similarly situated Filipino staff nurses.

22   And that discrimination was meted out by other Filipino

23   supervisors, and the retaliation was done by all the managers

24   that were above her whom she had complained of discrimination

25   for, which she felt that that was what was happening.

1          Before I close, this is -- this is my only opportunity

2    before the closing argument, before you hear all the testimony

3    and things of that nature, and see and review other evidence.

4    I want to just ask you on behalf of my client and everybody

5    concerned here that you do keep an open mind, that you wait

6    until all the evidence is in before you come to your

7    conclusion.  And in closing, I would like to thank you once

8    again, and God bless.

9          THE COURT:  For the defendant?

10          MR. GARLAND:  Thank you, your Honor.

11          (Discussion off the record)

12          MR. GARLAND:  While that warms up, let me say good

13    afternoon, ladies and gentlemen.  My name is David Garland, and

14    I'm pleased to be able to represent St. Barnabas Hospital

15    during the course of this case, with my colleague John

16    Fullerton.

17          I want to now give you what I think the judge referred

18    to as the road map of the evidence as I think that you will see

19    it presented during the course of the next few days.

20          Let me begin by telling you a little bit about what

21    you're going to learn about St. Barnabas Hospital.  St.

22    Barnabas Hospital is a nonprofit hospital serving the Bronx

23    community.  It's a state designated stroke center, it's a state

24    designated AIDS center, it's a national center of excellence in

25    women's health, and it's a teaching hospital.

1      You're also going to learn a little bit about its

2   mission, which is improving the health of the community which

3   it serves, the Bronx community.  Part of its mission, you will

4   learn, is providing healthcare in a safe environment where the

5   patient -- the patient -- comes first.  And you'll also learn

6   that part of the St. Barnabas mission is to provide healthcare

7   regardless of a patient's ability to pay.

8      Now during the course of the trial, you're going to

9   learn -- you've already heard about it -- the St. Barnabas

10  policy against discrimination.  You will see in evidence an

11  employee handbook distributed to employees which articulates,

12  which sets forth, which explains the hospital policy against

13  discrimination, where it expressly states that discrimination

14  against any employee for, among other reasons, that employee's

15  race, color, or national origin is illegal and prohibited.  And

16  the same policy also prohibits -- prohibits, prevents -- it

17  states that St. Barnabas will not tolerate anyone retaliating

18  against an individual, an employee, who makes a complaint of

19  discrimination.

20     Now you've heard from Ms. Martinez' counsel that there

21  was discrimination and retaliation.  Ladies and gentlemen, I

22  submit when you listen to the evidence, when you listen to the

23  witnesses, when you look at the documents, when you look at the

24  investigation documents, you will conclude, the evidence will

25  show, that St. Barnabas did not -- did not -- discriminate

 1   against Ms. Martinez when it terminated her employment.  In

 2   addition, the evidence will show -- the witnesses, the

 3   documents -- listen to the witnesses, look at the documents.

 4   They will show that St. Barnabas did not retaliate against

 5   Ms. Martinez when it terminated her employment.

 6           The evidence, ladies and gentlemen, will show why --

 7   why the hospital terminated her employment.  You've heard about

 8   an investigation.  Plaintiff's counsel, Ms. Martinez' counsel

 9   suggested to you that there was a perfunctory investigation.

10   You'll listen to what was done in the investigation, who was

11   involved, who was spoken to, what statements were collected.

12   But there was an investigation.  That investigation concluded

13   that a patient under Ms. Martinez' care had morphine in her

14   urine and that morphine was not prescribed for that patient and

15   should not have been administered to that patient.  The

16   evidence will also show that, on the narcotics control sheet --

17   and you'll see this narcotics control sheet and you'll learn

18   about what a narcotics control sheet is and what a nurse must

19   do and write and record on a narcotics control sheet when that

20   nurse goes into a secure room where narcotics are kept and what

21   the nurse has to do when removing narcotics and what the nurse

22   has to record.  You will see in evidence a narcotics control

23   sheet where Ms. Martinez changed the entry made by another

24   nurse.  And you will also see in evidence that once she was

25   placed on suspension that she did not respond to the repeated

 1    requests by Cathy Graham, Catherine Graham, to meet with her.

 2    You'll learn more about this as I explain what follows.

 3            Now you've heard a little bit about Ms. Martinez.  She

 4    began working at St. Barnabas in July 2002.  She was a member

 5    of the union representing the nurses at the hospital.  She was

 6    assigned to the intensive care unit.  You'll hear that referred

 7    to sometimes as the ICU.  And also, the hospital had no issue,

 8    no issue with Ms. Martinez' performance before -- before

 9    September 14, 2009.  And in this case you will come to learn

10    that there really are two days, two days where most of the

11    events occurred leading to the decision to terminate

12    Ms. Martinez' employment -- September 14th and the following

13    day, September 15th.

14            Now nurses administer medication at the hospital.

15    You'll also learn during the course of the trial that the

16    hospital has what's referred to as a medication error policy.

17    And that policy is really rather simple and straightforward.

18    It says that if a mistake -- if a nurse makes a mistake in

19    administering medications to a patient, then the nurse should

20    make superiors aware that that mistake has been made.  You'll

21    learn that St. Barnabas considers that policy what they call

22    nonpunitive.  In other words, the hospital wants mistakes to be

23    reported because if a mistake's been made, then something's got

24    to be done to deal with the patient.  But also, with the same

25    policy, which you will see -- it's part of the evidence -- the

1    senior vice president for nursing reserves the right to

2    discipline a nurse for violation of the policy, including

3    terminating the employment of that nurse.

4         Now you heard some names.  Let's put some faces with

5    the names.  You'll be doing that throughout the course of the

6    trial.  Let me introduce you to the St. Barnabas witnesses that

7    you'll be seeing.  The first is Nurse Libiran.  And you will

8    learn that on September 14th, she is the nurse that

9    discovered that morphine was missing from the medication room

10   in the ICU.

11        You'll meet one of her supervisors, Nursing Supervisor

12   Ondoy.  Ms. Libiran reported the missing morphine to Norma

13   Ondoy.

14        She ended up reporting it up the chain of command to

15   her supervisor, one of whom was Pauline Frances-Lattery.  And

16   Ms. Frances-Lattery was part of the group of people who -- at

17   the hospital who investigated, tried to find out what happened

18   to the morphine.

19        You'll meet the associate director of pharmacy,

20   Patricia Byrne.  She worked at the hospital.  She doesn't now.

21   But she was part of the investigation team, and she discovered

22   that the entry had been changed on the narcotics control sheet.

23   She also thought that it made sense to test -- to have the

24   urine tested of the patient under Nurse Martinez' care.

25        Dr. Adler gave the verbal order to do that, and that

1   came back showing positive for opiates or morphine.

2           And you'll meet the senior vice president and chief

3   nursing officer, Cathy Graham.  She is the hospital's employee

4   who made the decision to discharge Ms. Martinez.

5           Now I told you September 14th and 15th are the two

6   days that you're going to hear a lot about during the course of

7   this trial.  Let's just quickly give you a little bit of a road

8   map of what you're going to see on those days.

9           You're going to learn that the patient -- and we're

10  going to call the patient throughout the trial Patient N -- was

11  under the care of Nurse Martinez in the intensive care unit.

12          THE COURT:  Let me interrupt.  Ladies and gentlemen,

13  we're doing that to protect the patient's privacy, okay?  I

14  just want you to understand it's not some kind of trick or

15  sleight of hand.  We're doing this actually to comply with the

16  law and to protect the patient's privacy.

17          MR. GARLAND:  Thank you, your Honor.

18          You're going to see in evidence a test, urine screen

19  that's going to show that this Patient N who was under

20  Ms. Martinez' care on the 14th of September, around

21  4:30 p.m., the test showed no opiates in the urine, no opiates

22  in the system.  And opiates -- morphine is part of the opiate

23  family.  You'll see that Ms. Martinez says that at around

24  5 p.m. she administered a different drug to this patient,

25  Patient N, called Ativan.  And that patient was supposed to go

1    for an MRI around 6:00 that day, but when she was taken to have

2    the MRI done, her blood pressure had dropped and she was very

3    agitated and restless, so the MRI was canceled as of 6:00.

4            At 7:00 -- at 7:00, Nurse Libiran, the first person

5    whose photo I showed you a moment ago, discovered in the ICU

6    medicine -- medication cabinet that morphine was missing.

7            Following that, beginning that evening, the evening of

8    the 14th, an investigation began.  Statements were taken,

9    written statements were provided by all of the nurses in that

10   area.  Security was called.  The pharmacy was called.  Before

11   they -- before the nurses could leave that evening, each one of

12   them had their purses looked at by security.  You'll hear that.

13   All of the nurses in that area.  And the written statements

14   were collected that evening.  And in Ms. Martinez' statement,

15   she maintained that none of the patients assigned to her had an

16   order of morphine sulfate.  You'll hear it referred to as

17   morphine or morphine sulfate.

18           The next day, on the 15th, you'll learn, among other

19   things, that the narcotics control sheet time was -- had been

20   changed on the day before.  That was noticed by one of the

21   investigators.  You'll also learn that they tested the urine

22   again of the same patient the following day, so on the 15th,

23   trying to find out what happened to the morphine.  And on the

24   15th, the same patient who had tested negative the day before

25   now tested positive for having opiates or morphine in her

1    system.

2         Now you're going to hear from the -- and you've heard

3    a little bit about another nurse, a Nurse Fischer, and there

4    was some back-and-forth between Ms. Fischer and Ms. Martinez

5    about who actually made the change to the narcotics control

6    sheet time.  They both ended up getting suspended.  You'll see

7    the suspension notice.  You'll also see that on Ms. Martinez'

8    suspension notice, it makes reference to the fact that the

9    morphine -- there was evidence that morphine was found in her

10   patient when morphine had not been prescribed for that patient.

11        Now while they were on suspension, pending

12   investigation, Ms. Graham reaches out to both of them, both --

13   Ms. Fischer and also with Ms. Martinez.  Ms. Fischer comes in

14   and meets with Ms. Graham, and as a result of her coming in and

15   meeting with her, Ms. Graham decides -- and you'll hear from

16   Ms. Graham -- to return Nurse Fischer to work, ends the

17   suspension.  But when Ms. Martinez was called by Ms. Graham's

18   office, she didn't come in.  She did not respond to Ms. Graham.

19   You'll hear further from Ms. Graham that she reached out to the

20   union and asked the union to reach out to Ms. Martinez to have

21   Ms. Martinez come in and meet with her.  But Ms. Martinez did

22   not.  You'll -- I think you've already heard a little bit about

23   it already.  You'll see evidence of the letter that Ms. Graham

24   then sends Ms. Martinez saying, "Contact me."  There was no

25   response.

1      And so finally, at that point, Ms. Graham decides to

2  terminate Ms. Martinez' employment.  And the letter goes out on

3  October 21 saying that, "Your employment is terminated back to

4  September 15th."

5      So ladies and gentlemen, in sum, the evidence will

6  show that Ms. Martinez' race, color, national origin had

7  absolutely nothing to do with the hospital's decision to

8  terminate her employment.  The evidence will show that the

9  hospital did not -- did not -- retaliate against Nurse Martinez

10  when it terminated her employment.  And the evidence will show

11  that, based on the evidence, which was anything but

12  perfunctory, and Ms. Martinez' failure to come in and see

13  Ms. Graham, the decision was made to terminate Ms. Martinez'

14  employment.

15      Ladies and gentlemen, thank you again in advance for

16  listening throughout the course of the trial and being

17  attentive, and I look forward to speaking to you again at the

18  end of the trial.

19      Thank you, your Honor.

20      THE COURT:  Okay.  Can we pass out the notebooks and

21  the pens to the jurors.

22      (Pause)

23      THE COURT:  You'll keep your notebooks in the jury

24  room.  At night they'll be locked in there.  Nobody will be

25  able to get them.  We'll destroy everything you write at the

Ca91mar3

1     end of the trial.

2              JUROR:  Would you repeat that.  I missed it.

3              THE COURT:  I'm sorry.  I said you'll keep these

4     notebooks in the jury room overnight during the trial.  They'll

5     be locked in there so no one can get to them.  And we will

6     destroy anything you write at the conclusion of the trial.

7     Okay?

8              Let me start by reading you the stipulated facts.

9     These are facts that you are to consider proved.  All that

10    means, the lawyers agree on these things.  The weight you give

11    to these facts and how you factor them into your decision is up

12    to you.  But these things are proven.

13             Fact 1.  On March 21, 2001, plaintiff received --

14    that's Ms. Martinez, plaintiff -- received her license from the

15    State of New York Education Department and became registered to

16    practice in the State of New York as a Registered Professional

17    Nurse.

18             Fact 2.  The hospital -- that's St. Barnabas

19    Hospital -- has an equal employment opportunity policy that

20    prohibits all forms of unlawful discrimination and retaliation.

21             Fact 3.  On July 1, 2002, plaintiff began her

22    employment with the hospital as an RN.

23             Fact 4.  Plaintiff was trained to work in the

24    hospital's intensive care unit, the ICU, to monitor critically

25    ill patients.

1        Fact 5.  Catherine Graham is an RN who was employed by

2   the hospital as a senior vice president and chief nursing

3   officer for the hospital in 2009.  As such, she was responsible

4   for the nursing department in which plaintiff worked.

5        6.  At 5 p.m. on September 14, 2009, it's stipulated

6   that the plaintiff claims that she removed three 2-milligram

7   containers of the medication Ativan -- A-T-I-V-A-N -- from the

8   locked cabinet and gave the medication to Patient N, who needed

9   an emergent MRI.

10       Fact 7.  AnaRicca Libiran-Danao is an RN employed by

11  the hospital in its ICU and was responsible for counting the

12  narcotics in the ICU on the evening of September 14th, 2009.

13       8.  Plaintiff and the other four nurses on duty during

14  her shift gave the hospital written statements concerning the

15  missing medication.

16       9.  On October 21, 2009, the hospital informed

17  plaintiff that her employment as an RN at the hospital was

18  terminated effective September 15, 2009.

19       Fact 10.  Plaintiff filed a charge of discrimination

20  with the Equal Employment Opportunity Commission dated

21  January 18, 2010.

22       Fact 11.  On July 5, 2010, plaintiff filed her

23  complaint in this court.

24       And fact 12.  On October 19, 2010, the hospital filed

25  its answer and affirmative defenses, which denied the

1  allegations of the complaint.

2           And then we have some additional stipulations, so

3  we'll go fact 13.  On or about September 27, 2009, Keith Wolf,

4  the hospital's general counsel, received a letter from Lee

5  Nuwesra, counsel for plaintiff, which has been marked and

6  admitted into evidence as Plaintiff's Exhibit 2.

7           Fact 14.  On or about October 12, 2009, James Frank,

8  the hospital's outside counsel, received a letter from

9  Mr. Nuwesra, which has been marked and admitted as Plaintiff's

10  Exhibit 3.

11           Fact 15.  On September 12, 2009, it was recorded on

12  the continuous observation record for Patient N that between

13  1 a.m. and 2 a.m. Patient N was "very restless."

14           Fact 16.  On September 13, 2009, it was recorded on

15  the continuous observation record for Patient N that between

16  7 a.m. and 8 a.m. Patient N was "highly agitated," between

17  3 p.m. and 4 p.m. Patient N was "restless, agitated," between

18  4 p.m. and 5 p.m. Patient N was "restless," and between 5 p.m.

19  and 6 p.m. Patient N was "restless," and between 1 a.m. and

20  2 a.m. Patient N was "very restless."

21           Fact 17.  On September 14, 2009, it was recorded on

22  Patient N's critical care flow sheet at 10:30 p.m. that Patient

23  N was "very restless."

24           Fact 18.  On September 15, 2009 it was recorded on

25  Patient N's critical care flow sheet at 7 a.m. that Patient N

Ca91mar3

was "restless," and at 8:45 a.m. that Patient N was "restless, agitated."

Fact 19. Ativan was ordered for and recorded as having been administered to Patient N throughout her stay at the hospital at various times on September 12, 13, 14, 15, 16, 17, 19, and 20, 2009.

Fact 20. On September 14, 2009, at approximately 4:30 p.m., Dr. Harish Nandipati wrote in the physician's orders for Patient N, "Please send the patient to MRI with monitor, Ativan 6 milligrams IVP-(now push)."

Fact 21. On September 14, 2009, at approximately 5 p.m., plaintiff wrote on Patient N's critical care flow sheet, "Patient transported to radiology for MRI of head. Medicated with Ativan 6-milligram IVP -- "  Can we stipulate that means intravenous push?

MR. NUWESRA:  Yes, your Honor.

THE COURT:  Thank you.  "-- prior to transportation. Awaiting return.  Left with MD nursing attendant and transporter on cardiac monitor."

Fact 22. On September 14, 2009, at approximately 6:30 p.m., Dr. Harish Nandipati wrote on Patient N's progress notes, "Patient was taken to MRI, given 6 milligrams Ativan IVP with 2 milligrams Ativan for emergency use.  After going to radiology, patient was agitated and was not still.  The intern who was babysitting the patient could not give Ativan because

1    of low BP --" that's blood pressure "-- 80/40, so MRI has been

2    temporarily held."

3            And fact 23.  On September 14, 2009, at approximately

4    6 p.m., plaintiff Martinez wrote on Patient N's critical care

5    flow sheet, "Patient returned.  MRI not done.  2 degree to

6    restlessness.  MD made aware to F/U."

7            And you will appreciate that this last group of facts

8    are information that the lawyers have painstakingly taken out

9    of Patient N's medical records so as to protect, to the maximum

10   extent possible, Patient N's privacy.  Okay?

11           All right.  Call your first witness, please.

12           MR. NUWESRA:  Your Honor, plaintiff calls Ms. Martinez

13   to the stand.

14           THE CLERK:  Please raise your right hand.

15           (Witness sworn)

16           THE CLERK:  State your name for the record and spell

17   it.

18           THE WITNESS:  Marlen Martinez.  M-A-R-L-E-N,

19   M-A-R-T-I-N-E-Z.

20           THE COURT:  Have a seat, Ms. Martinez.

21           THE WITNESS:  Thank you.

22           THE COURT:  Those are the folks that you're talking

23   to.

24           MR. NUWESRA:  Thank you.

25

1    MARLEN MARTINEZ,

2        the Plaintiff,

3        having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. NUWESRA:

6    Q.  Good afternoon, Ms. Martinez.

7    A.  Good afternoon, Mr. Nuwesra.

8    Q.  Ms. Martinez, would you please tell the jury what is your

9    marital status.

10   A.  I'm divorced.  And I'm a proud single mom of an 18-year-old

11   who's currently a senior in high school.  We're also looking

12   into colleges at this point in time.  He's going to start

13   college next September.  And for the past 17 years, I had him

14   by my -- on my own, since he was 1 years old.

15   Q.  Can you please tell us for the record what you consider

16   your race and origin ethnicity to be.

17   A.  I'm a black Hispanic.  I'm originally from Honduras, a

18   country in Central America.

19   Q.  And when did you immigrate to this country?

20   A.  Back in 1976, with my parents.

21   Q.  Can you tell us, I know you can't tell us your address.

22   Can you tell us, in relation to the Bronx, where do you live?

23   A.  I live in the Soundview area of the Bronx.

24   Q.  For how long have you been a resident of the Soundview

25   area?

A.  Since 1990.  Prior to that I was in the Washington/Webster

area of the Bronx.  I've always been in the Bronx since I came

from Honduras.

Q.  Would you briefly tell us about your educational background

post high school -- starting with high school.

A.  Okay.  I went to Monsignor Scanlan High School.  That's a

Catholic high school, located by the Hutchinson River Parkway.

          Post high school I went to Fordham University, where I

obtained my BS in biology in 1990.

          After Fordham University, I went to Bronx Community

College, where I obtained my associate degree in registered

nursing.

          And I wanted to be able to ultimately go for my

master's, so I continued at St. Francis College, where I

obtained my BS in nursing, as a second degree, because I

already had a BS in biology from Fordham.

          And then I continued and obtained my master's in

nursing.  That was in 2010.

          So my highest level of education is master's in

nursing, but I'm also critical care certified.  I got that in

2007.

Q.  Where did you obtain your master's in 2010?

A.  Lehman College.

Q.  And how long was that master's program?  When did you start

it?

1   A.   That was a two-year program, so I started in 2008.

2   Q.   Can you tell the jurors who sponsored -- or how was this

3   program sponsored?

4   A.   That program was sponsored -- working full time at St.

5   Barnabas Hospital, they basically paid for your education for

6   the master's program.

7   Q.   And who was it that paid for it?

8   A.   Toward the end I ended up paying for it, but initially it

9   was St. Barnabas Hospital that paid for it, until I was

10  terminated, and then I ended up paying for it.

11  Q.   I want you to talk to us about your work history within the

12  nursing field specifically.  Take your time and slow down.

13  A.   Okay.  I worked at -- my first job as a RN was in

14  St. Vincent de Paul Residence.  Like I said, I grew up in the

15  Bronx, I was -- I went to school in the Bronx, so I too want to

16  give back to my community.  I've always wanted to work around

17  my community with the disadvantaged, underprivileged people.

18  So my first job was at St. Vincent de Paul Residence, which is

19  like a nursing home/rehab kind of facility.  And that was as a

20  registered nurse.  I worked as a charge nurse.  I was in charge

21  of my unit.

22  Q.   Can you tell the jurors the distinction between an RN staff

23  nurse and a charge nurse.

24  A.   An RN staff nurse is -- take care of the patient, you know,

25  she's a regular staff nurse.  A charge nurse actually overlooks

1   and controls what goes on on the unit.  She's in charge of the

2   nurses, she's in charge -- if you're working with an LPN,

3   licensed practical nurses, she's in charge of the licensed

4   practical nurse.  She's in charge of the nursing attending or

5   the PCT.  She controls basically the admission and discharges

6   and the whole -- it's more like a leadership kind of position

7   on the unit.

8   Q.  And for how long did you -- were you employed at

9   St. Vincent de Paul?

10  A.  I started working at St. Vincent de Paul in '95 as a

11  licensed practical nurse prior to my RN.  So from '95 to 2001.

12  Actually 2002.

13  Q.  And when was it -- just to refresh your memory, when was it

14  that you became an RN?

15  A.  In 2001.

16  Q.  What month?

17  A.  March 2001.  I completed the program in December 2000, but

18  then with the paperwork and sitting for the boards and passing

19  the boards and preparation for the boards, I took the boards in

20  March 2001 and I passed it.

21  Q.  Okay.  And when did you leave the St. Vincent institution?

22  A.  I left St. Vincent de Paul in around June 2010 -- or 2002.

23  Sorry.  2002.

24  Q.  And then where was your next position?

25  A.  St. Barnabas Hospital.

1   Q.  And you began -- just to refresh the memory, you began St.

2   Barnabas Hospital on?

3   A.  I began my employment at St. Barnabas Hospital July 1st,

4   2002.

5   Q.  And can you tell us, initially what position did you have

6   at St. Barnabas Hospital?

7   A.  I was hired as a staff nurse.

8   Q.  And were you assigned to any unit?

9   A.  I was assigned to a medical surgical unit.

10  Q.  And can you tell us what the duties and responsibilities of

11  the medical surgical unit are.

12  A.  Okay.  As a staff nurse in a medical surgical unit, a

13  registered nurse is responsible for admitting a patient, taking

14  care of the patient, of course, and following orders of --

15  written orders of a physician.  You are to assess the patient,

16  you are to monitor the patient, you are to assist the patient

17  in activity of daily living, washing them, feeding them, also

18  assisting nursing attendant with moving the patient maybe from

19  out of bed to a chair, assisting the interdisciplinary teams

20  like the rehab or the dietary, you know, when they come and do

21  the consult, and any other doctor, cardiology consult that

22  might come in that might need your assistance with the patient.

23  Q.  Anything else?

24  A.  Administering medication.  You have to administer

25  medication, of course written by the doctor.  The medication

1   has to be written by a physician.  So we basically follow

2   orders written by the physician that's following the patient.

3   Q.  And did there ever come a time, after joining St. Barnabas,

4   where you did not work at the medical surgical unit?

5   A.  A year later.

6   Q.  Okay.  What happened a year later?

7   A.  I was allowed -- I requested to be trained to intensive

8   care unit, so I started my training and I started working in

9   intensive care unit.

10  Q.  Can you tell us what intensive care unit is.

11  A.  Intensive care unit is a medical unit in the hospital where

12  the critically ill patients go.  Medical surgical -- usually on

13  the floor with the medical surgical unit, the nurses have seven

14  to eight, maybe even ten patients.  In the critical care unit

15  the ratio is usually two to one, because the patients are

16  critically ill.  You're monitoring everything pertaining to

17  that patient.  You do a thorough assessment from head to toe.

18  Patients are usually very critical.  You're doing vital signs

19  every hour.  You're monitoring urine output every hour.  You're

20  giving drips, you're titrating medication drips, based on the

21  patient condition.  But usually the patients in intensive care

22  unit are critical.  They're critical patients.

23  Q.  And you said this was about a year after you joined them?

24  Would that bring us to 2003 sometime?

25  A.  Correct.  That was in 2003.

Q.  And can you just briefly or as need be describe to the
jurors what the intensive care unit at St. Barnabas looks like
and the various units or subunits.  Just identify that for us,
please.

A.  The intensive care unit at St. Barnabas is located on the
fifth floor, and when you walk in, you have what is considered
District 1.  It's composed of three districts -- District 1,
District 2, and District 3.

        District 1 is considered the main ICU.  That's what
they call it, main ICU.  It's actually a one-bed room and it
comprises of ten rooms, and it's -- usually the critical
patients go there, but also we utilize it for isolation
patients, because obviously they cannot room and board with
other patients because they are in isolation.

        District 2 is supposedly -- and I say supposedly -- a
step-down unit, and that's comprised of from -- I would say
District 1 is from bed 1 to bed 10, and District 2 is -- it
goes 501 - 510, and District 2 is like 511 to 514, and District
2 is usually considered a step-down.  The reason I say
considered, because after a while you realize that the acuity
of the patients in District 1 were basically the acuity in
District 2.  Same critical patients.  It wasn't really a
step-down.  But those were two-bed rooms.  They were two-bed
rooms.  So if you wanted to put a patient in isolation, once
again you have to move them out to D1.

1          And District 3 was considered more like a telemetry

2    kind of unit, which means patients needing monitoring, because

3    there was still a monitor, but they were a little bit more

4    ambulatory, they were -- they were -- they were stable enough

5    not to be in step -- in District 1 or District 2 but not stable

6    enough to go to the general floor.  So we usually maintained

7    them in the telemetry unit where you can still monitor, but as

8    opposed to District 1 and District 2, where you monitor every

9    hour, in District 3 you were monitoring vital signs -- you

10   monitor them continually because they're on a monitor, but the

11   vital signs is recorded every four hours, and of course it's

12   not isolation patients, because it's a two-bed room.

13   Q.  Now prior to joining the ICU at St. Barnabas, did you have

14   any training in intensive care care?

15   A.  The training was provided by St. Barnabas.

16   Q.  And how long was that training?

17   A.  Actually it was like four months.

18   Q.  And for how long were you assigned to the ICU at St.

19   Barnabas?

20   A.  From 2003 to the time I was terminated, unlawfully

21   terminated, in 2009.

22   Q.  2009?  As an ICU nurse, did you have to cover all different

23   districts?

24   A.  As an ICU nurse, we floated to all three districts.

25   Q.  Incidentally, during your tenure between '03 and '09 at St.

1  Barnabas, were you employed anywhere else?

2  A.  I was floated also to different areas in the hospital.  I

3  was floated to a medical surgical floor, I was floated to the

4  emergency room, I was floated to ambulatory surgery, I was

5  floated to the recovery room, and that was basically it.  And

6  also a respiratory floor, which was on the seventh floor, 7

7  South.

8  Q.  How were the duties and responsibilities of staff nurses at

9  St. Barnabas different in relation to the emergency room?

10  Please explain to the jury.

11  A.  The emergency room is -- when we did the training, when

12  they offered the training, they basically separated the ICU

13  nurses from the emergency room nurses, 'cause it was two

14  different trainings.  So -- but for some reason ICU nurses, or

15  I particularly, ended up floating to all those different areas

16  of the hospital.  ER nurses were trained for trauma,

17  stabilizing patients when they come in.  They dealt with

18  patients, EDP patients that was like agitated.  They had an

19  area that was like a psych area, like a room where they kept

20  all the psych patients, so they were basically -- it was a

21  high -- stressful environment, because you never knew what

22  could walk in any minute.  And they did have different training

23  from the ICU nurses.

24  Q.  They had what?

25  A.  They had different training.  The ER nurses had a different

1   training from the ICU nurses.

2   Q.  And where did you receive the training to work in the

3   emergency room at St. Barnabas?

4   A.  I was never -- I was never trained to work in the emergency

5   room at St. Barnabas.  I was trained for the ICU.

6   Q.  Can you tell the jurors, besides the three different

7   districts that are located within the ICU on the fifth floor at

8   St. Barnabas, whether there is anything else pertaining to

9   patient care on that floor.

10  A.  In District 1 and District 2, the ratio patient to nurse

11  was two to one.  And in District 3, the ratio patient to nurse

12  was one to five.  It was five patients to one nurse.

13  Q.  Did the ICU unit on the fifth floor have its own -- what

14  else was located on the fifth floor of St. Barnabas?

15  A.  The pharmacy.  The pharmacy was located on the fifth floor

16  of St. Barnabas, right next to the ICU.  It was right on --

17  walking distance.  Not even two minutes.

18  Q.  And can you tell the jurors, when it came to the ICU on the

19  fifth floor, how would a staff nurse get the medication so as

20  to administer said medication?  Tell the jurors, please.

21  A.  The doctor, of course, would write the orders for the

22  patient.  All the orders have to be specifically written for

23  you to follow it, from the activity of the patient, if he

24  wanted out of bed to chair has to be written, the diet of the

25  patient have to be written, 'cause the patient could have been

1    NPO, which is nothing by mouth, either for procedure or because

2    of any condition.  Like for example, a person who has a

3    gastrointestinal bleeding would not be able to eat, obviously.

4    A person would come in with abdominal pain would not be able to

5    eat because of abdominal pain pending tests.  So when it comes

6    to medication orders, the doctor have to write the order for

7    medication.  If you didn't have the medication -- and we have

8    nonnarcotic medication, you have narcotic medication.  The

9    doctor would write the orders, and if it's a narcotic or

10   because the pharmacy was there, if you didn't have it, you can

11   easily call the pharmacy so they can prepare it for you and

12   just kind of run over and get the medication so that the

13   patient can get the medication.

14   Q.  Just for our edification, what is the difference between

15   narcotic and nonnarcotic, and for the record?

16   A.  Narcotic medication is medication that are controlled

17   substance.  That's another word we use it.  And it's usually

18   medication that is locked up in a double-locked cabinet door,

19   and we had a key that gave us, the staff nurses, access.  Staff

20   nurses meaning employed by the hospital as opposed to nurses

21   coming from outside from the agency or not employed by the

22   hospital.  The agency nurses had no access to the narcotic

23   cabinet, but the staff nurses did.  So it was locked up in a

24   double cabinet, and what -- the procedure was that when you

25   come in in the morning, the -- one of the outgoing nurses who's

1   assigned with the incoming nurse -- the shift is 7 to 7.  A

2   nurse coming in at 7 p.m. will count with the nurse that's

3   leaving at 7 p.m., from the day shift or the night shift.

4   Night shift was considered 7 p.m. to 7 a.m., and the day shift

5   was considered 7 a.m. to 7 p.m.  So one nurse from each shift

6   will count to verify that the count is correct coming in and

7   going out.  And they go through opiates, which are medications

8   like morphine, hydromorphone, Tylenol #3, Percocet.  Those are

9   considered like example of opiates, as opposed to

10  benzodiazepine, which is like Ativan.  You have diazepam, you

11  have -- those are examples of benzodiazepine.  So one nurse

12  going and one nurse coming usually counts.

13  Q.  Did your training as a registered nurse involve any

14  pharmacology training or classes?  And if so, please tell us

15  that.

16  A.  In nursing school, you take pharmacology courses.  I

17  took -- it was one semester, actually, in nursing school, that

18  you take pharmacology courses, but then you also have to take

19  math calculation courses.  Pharmacology courses were basically

20  medication, side effects of medication, indication for such

21  medication, what is a generic as opposed to the trade name of

22  the medication, adverse reactions of the medication.  So it

23  allows you to kind of familiarize yourself with the medication

24  and be able to know what you're looking for in a patient if

25  they were receiving such medication.

1   Q.  Now while employed at St. Barnabas were you assigned a

2   specific shift and days?

3   A.  I was assigned a 7A to 7P and it was three days a week.

4   Q.  Did those days change or were they always the same?

5   A.  No.  Those days changed.  And we worked every other

6   weekend.

7   Q.  Now you mentioned something about double-locked cabinets.

8   Where are these located within the ICU unit?

9   A.  Okay.  You have a medication room with a narcotic cabinet

10  in the District 1 area and you have another -- excuse me --

11  medication room with a double-locked narcotic cabinet in the

12  District 3 area.

13  Q.  Does District 2 have any medication, double-locked --

14  A.  No.  They have the regular medication cart with no narcotic

15  cabinet.

16  Q.  And what's the difference between the medication cart --

17  what is the difference?

18  A.  Okay.  The medication cart basically where -- it's more

19  like a trolley.  It's like a cart that basically the pharmacist

20  put in the patient -- they know which patients are -- for

21  example, the medication cart like in District 1 will have the

22  patients' names that are located in District 1, and then it has

23  like little cassettes that has the patient's name, and those

24  basically have the -- like aspirin, for example.  Those are the

25  nonnarcotics.  The nonnarcotic orders for such medication will

1    go into those cassettes, into those medication carts.

2    Q.  And how were these double-locked medication closets -- how

3    were they -- how were they situated, or how were they

4    organized?

5    A.  The District 1 medication had -- they had more drips

6    because the patients in District 1 and District 2 was more

7    acutely ill.  They were more critical.  So for example, I had

8    mentioned previously that the patients in District 3 were

9    patients that require more monitoring, but they were not

10   basically intubated patients, intubated meaning that patient

11   couldn't breathe on their own.  They had to get the mechanical

12   ventilator, which is the machine.  You actually intubate the

13   patient.  They use an endotracheal tube or tracheostomy tube,

14   and they actually put it in a patient's mouth and connect it to

15   the ventilator to assist the patient in breathing because

16   they're so critical that they need to be sedated, they need

17   multiple drips to get better, so actually the machine actually

18   breathes for them, which allows them to get better.

19                   (Continued on next page)

20

21

22

23

24

25

1    And that's with any kind of diseases.  It could be pulmonary,

2    it could be-- for example, St. Barnabas Hospital is also a

3    trauma center.  We were dealing with people with gunshots, stab

4    wounds.  Stroke patients bleeding inside the head that had,

5    like, a ventriculostomy, which was the tubing coming down that

6    drains.

7            So District 1 area basically had more medication than

8    District 3 areas when it comes to narcotics.  They basically

9    have most of the drips.  Like versed drip, Fentanyl drip for

10   sedation and Propofol drip for the neuro patients.  We have

11   more drips.  The one thing is that District 1 had more

12   medication than District 3.  So more medication was in the

13   narcotic cabinet in District 1 than in District 3.

14   Q.  Did any of these medications require any refrigeration?

15   A.  Yes.

16   Q.  Okay.  Could you please tell us about it?

17   A.  Ativan requires-- the narcotics, in District 1 we had a

18   refrigerator at the bottom of the medication room.  A little,

19   tiny refrigerator that housed the medication that needed to be

20   refrigerated like Ativan.  There was some, like, paralytics

21   that needed to be refrigerated.  So some medication needed

22   refrigeration.  That's the only two that comes to my mind right

23   now.

24   Q.  Okay.  Did you --

25   A.  Ativan and paralytics.

1    Q.   Did you have any refrigeration at the District 3?

2    A.   No, sir, there was no refrigerator in the District 3.

3    Q.   Did you carry the same kind of medications that were

4    refrigerated in District 1 and District 3?

5    A.   Yes.

6    Q.   Can you give us what they were?

7    A.   We had Ativan in District 3.

8    Q.   Can you tell us -- when you initially joined the I.C.U.

9    unit at St. Barnabas, can you tell us who your supervisors

10   were?

11   A.   When I joined the I.C.U. at St. Barnabas, a Ms. Pauline

12   Frances-Lattery; Ms. Agnes Lucero was an I.C.U. educator/PCM,

13   patient care manager and supervisor in I.C.U.  I had Ms. Norma

14   Ondoy.  I had I.C.U. coordinator, Evelyn Castillo, which also

15   supervised from time to time in the I.C.U.  I had Ms. Dolly

16   Dominoes.  I had-- for the night you had Ms. Costa Rica, and

17   then you had Ms. Mutia for the night supervisor of I.C.U.

18   Q.   Was the shift and hours different for supervisors and

19   managers versus staff nurses?

20   A.   Yes.

21   Q.   How were they different?

22   A.   The supervisors basically worked seven-and-a-half to

23   eight-hour shifts.  So for the morning we usually had

24   Ms. Pauline Frances-Lattery from 8 to 4, approximately, and

25   then we had Agnes Lucero.  And then from, like, 3 to 11 we had

1   Ms. Dolly Dominoes and Ms. Norma Ondoy.  Then for the night you

2   had Ms. Costa Rica and Ms. Mutia.

3   Q.  Did you ever work under Ms. Mutia and Ms. Costa Rica?

4   A.  No, I never really worked-- I met them when I was coming in

5   and they were ready to leave.

6   Q.  I see.

7        Would you tell the jurors, what is the race of

8   Ms. Pauline Lattery?

9   A.  Ms. Pauline Lattery is African-American.

10  Q.  And I believe you said Ms. Agnes Lucero--

11  A.  Ms. Agnes Lucero is Filipino.

12  Q.  And Ms. Norma Ondoy?

13  A.  Ms. Norma Ondoy is Filipino.

14  Q.  Ms. Evelyn Castillo?

15  A.  Ms. Evelyn Castillo is Filipino.

16       MR. GARLAND:  Objection.  Castillo is not testifying

17  and it's hearsay on what her race is.

18       THE COURT:  The objection is overruled.

19  Q.  Ms. Dolly Dominoes?

20  A.  Ms. Dolly Dominoes is Filipino.

21  Q.  And I believe you said Ms. Costa Rica?

22  A.  Ms. Costa Rica is also Filipino.

23  Q.  Can you tell us who was in charge while you were at the

24  I.C.U.?  Who was in charge of the entire nursing department at

25  St. Barnabas?

1   A.  Ms. Catherine Graham was the senior vice president.

2   Q.  Can you tell us for the record what her race is?

3   A.  I believe she's Caucasian.  I don't know if she's Italian.

4   I don't know, but she's Caucasian.

5   Q.  And were you supervised by other people while you were

6   working at St. Barnabas?  Between Ms. Graham and the immediate

7   supervisor, did you have any other supervisor level that

8   oversaw you?

9   A.  Yes.  Ms. Frances Lattery-- the associate directors.  We

10  had associate directors before the senior vice president.  And

11  the associate director was Mr. Alvarado and Ms. Quinones.

12  Q.  And can you tell the jury --

13  A.  And also Ms. Gomez.

14  Q.  Ms. Gomez?

15  A.  Ms. Gomez, G-o-m-e-z.  She was also an associate director.

16  Q.  Can you tell the jurors the race of Mr. Alvarado?

17  A.  Alvarado?  Mr. Alvarado was Filipino.

18  Q.  And Ms. Quinones?

19  A.  Ms. Quinones is also Filipino.

20  Q.  And I believe you said Ms. Gomez?

21  A.  Ms. Gomez is also Filipino.

22  Q.  Did your duties and responsibilities differ when you

23  joined-- besides what you testified about, as far as the

24  procedure that you followed, were they different once you

25  became a member of the I.C.U. unit?

1    A.   Procedure in terms of what, sir?

2    Q.   Let me rephrase the question.

3         Can you tell us, as an I.C.U. staff nurse, what were

4    your duties and responsibilities?

5    A.   As an I.C.U. staff nurse, my duties and responsibilities,

6    aside from-- assessing the patient when I came in.  Getting the

7    report, assessing the patient.  Making sure that the orders was

8    in place for the patient, including monitoring the patient.

9    You have to have orders for vital signs every 15 minutes aside

10   from every hour, because it was customary for it to be every

11   hour.  So if they need it sooner than that or more frequent

12   than that, they needed to write an order for that.

13        We also had to round with the physicians in I.C.U.

14   When the doctor rounded on the patient, as an I.C.U. nurse, you

15   were-- it was your duty and it was expected and it was

16   mandatory that you rounded with the doctor in the I.C.U.

17   Q.   Did you administer any medication?

18   A.   Yes.

19   Q.   Okay.

20   A.   We had to follow doctors' orders in order to administer

21   medication for the patient.  Doctors' written orders.

22   Q.   Did you draw blood?

23   A.   We drew blood in an I.C.U. setting.  In the District 3

24   area, the phlebotomist can come around and draw the blood.  In

25   the District 3 area, once again those are the most stable

1   patients.  They need to be monitored, but they're most stable.

2   But in the District 1 and 2 areas, the nurses were expected to

3   draw their blood.

4   Q.  Can you tell us whether, as a staff nurse, you can order

5   any kind of diagnostic or lab results?

6   A.  No, sir.  As a staff nurse, we're required to follow

7   doctors' written orders.  We're not-- we are not authorized by

8   the state to write orders.

9   Q.  And what --

10  A.  Any kind of orders.

11  Q.  Well, give us examples of these orders that, as a staff

12  nurse, you're not authorized by the state to do.

13  A.  You can't write-- you cannot write orders for medication.

14  We don't have prescription privileges.  Only the doctors do.

15  We cannot write lab orders.  You know, we cannot take it upon

16  ourselves to do labs.  The doctor has to write an order and

17  then you follow through on what the doctor orders.  You cannot

18  prescribe any medication that you feel the patient might need.

19  You have to bring whatever your concern is to the doctor's

20  attention.  The doctor evaluates the patient and then writes

21  the orders and then you follow through on those orders.  That's

22  including studies.

23  Q.  What?

24  A.  Studies.  Laboratory studies, x-rays, MRIs, VQ scan, CAT

25  scan, and any procedures.

1  Q.  Can you tell the jurors what was the policy and/or the

2  procedure when it came to ordering any of those enumerated lab

3  studies or lab orders?  Tell the jurors what was required of

4  the staff nurse.

5  A.  Basically the doctor wrote the orders and as a staff

6  nurse-- the doctor would usually flag the order and then the

7  staff nurse would see the flag.  It will alert you to that

8  there's an order.  In St. Barnabas they had like-- it's like a

9  roll on the chart.  They will roll it to different colors and

10  you would know there's orders pending and for you to check it.

11  I believe it was red.  It's been two years, two to three years.

12  It was red.  So then you would know that, okay, there's a new

13  order in place, let me look at it.

14          Then, once you look at it, depending on what the

15  orders were -- if it was a medication, you would take the

16  order, you would sign it, like picked up that will acknowledge

17  that you saw the orders, and then you will fax it to the

18  pharmacy so the pharmacy can deliver it; or you will call the

19  pharmacy if it was a stat order and you will go pick up the

20  medications so it can be delivered to the patient in a timely

21  fashion.

22  Q.  What was the policy and/or the procedure when it came to

23  doing urine samples?

24  A.  You needed to write-- you needed to have a written order by

25  a doctor to collect urine samples.

1   Q.  Did the policy of St. Barnabas allow for verbal orders of

2   urine samples?

3   A.  St. Barnabas does not allow any verbal orders, period.

4   Their policy does not allow any verbal orders.

5   Q.  How does a staff nurse effectuate a written order by a

6   physician?  Take us through the process.

7   A.  You will look at the order.  Like I said, they have this

8   flagging system so you will know there's a new order.  You will

9   go into the patient's chart, you will see what the order is.

10  And if it was medication, you will see the order.  Like, for

11  example, if it's aspirin, it will have to tell you the dose,

12  what kind of aspirin.  Because it could be chewable aspirin, it

13  could be 325 milligrams, it could be the baby aspirin, 81

14  milligrams.  It could be aspirin Eco, Ecotrin, which it's

15  called, the terminology.  And it's usually aspirin that is not

16  going to be digested in the stomach.  It's going to be digested

17  in the small intestine for patients that are compromised.

18         So you will see the orders, you will see what

19  medication the doctor wants.  You will make notation of such

20  order.  You will transcribe that order in the physician order,

21  the patient medication administration record, which is called

22  an MRI.  And then, of course, you will fax the order to the

23  pharmacy so that you can get the medication.

24         And then, once you get the medication, you will go and

25  check again the medication.  You will check the patient, make

1   sure that it's the right dosage, the right name, the right

2   medication, the right route, which it could be through the OG,

3   which is the tube that you put through the mouth of the people

4   that are vented.  Or if it's PO, by mouth, for the patients

5   that are able to swallow.  And then you will ascertain that

6   this is the right patient, the right medication, the right

7   dosage, the right route, and give the medication to the

8   patient.

9           And then, of course, once the medication is given, you

10  sign and initial that the medication was, indeed, given.

11  Q.  Are you familiar with St. Barnabas's medication error

12  policy?

13  A.  Yes.

14  Q.  Okay.  How did you learn of that policy?

15  A.  I learned of that policy when I was first oriented in 2002

16  in St. Barnabas.  When we were oriented-- and, again, it was

17  reinforced when I trained for I.C.U. in 2003, because I.C.U.,

18  we had classes, but we also had speakers that come in.  And we

19  had had a speaker from pharmacy that came in to kind of tell us

20  the different medication, like medication that was basically

21  specifically for I.C.U., and also the medication policy,

22  hospital medication error policy.

23  Q.  And when you were trained at orientation in 2002 and

24  subsequently in 2003, when you joined the I.C.U., what did your

25  trainers tell you about that policy?

1   A.   The pharmacist that did the training at the seminar

2   basically told us that it was a nonpunitive.  If you were to

3   make a mistake in administering the medication to a patient,

4   the nurse that made the mistake was to report the mistake to

5   the superiors.  It could be to the manager, of course to the

6   doctor, and you will not be penalized for reporting that error.

7   And the reason you reported to the doctor or reported to the

8   management is that you're able to monitor the patient

9   subsequently for possible side effects of the medication error

10  that you made.

11  Q.   Okay.  And do you recall who the pharmacist was that

12  trained you with regard to this policy?  Who was it?

13  A.   It was Dr. Mervyn Richardson that did the training.

14  Q.   And do you know, at the time of your separation from

15  St. Barnabas, what was his position, his title at the hospital?

16  A.   Dr. Mervyn Richardson was the assistant director of

17  pharmacy at St. Barnabas Hospital at the time.

18  Q.   You mentioned earlier that you rounded with physicians.

19  Can you educate the jurors as to what that entailed?

20  A.   When you rounded with the physician in the I.C.U., the

21  rounding consisted of the medical residents that was taking

22  care of the patients in I.C.U.  And that applied to District 1,

23  District 2 and District 3.  There was an I.C.U. attending

24  assigned to each district on a weekly basis.

25           So if you were rounding with -- the attending that was

1   assigned to him also attended -- the attending that was

2   assigned, you would round with the medical resident, the nurse,

3   and the pharmacist that was assigned to the I.C.U., which is

4   Dr. Mervyn Richardson.

5   Q.  Was Dr. Richardson exclusively assigned to the I.C.U.?  Was

6   he the only pharmacist that was assigned to round at the

7   I.C.U.?

8   A.  Yes, Dr. Richardson was the only pharmacist that was

9   assigned to round at the I.C.U.

10  Q.  And was that throughout your tenure at the I.C.U. from 2003

11  to 2009?

12  A.  Yes.

13  Q.  Now, did there ever come a time between '03 and '09 when

14  your supervisory-- that your supervisors were changed, were

15  different?

16  A.  No.

17  Q.  So from '03 to '09, you basically had the same supervisors.

18  Is that your testimony?

19  A.  Yes.

20  Q.  You mentioned earlier or you testified earlier that I

21  believe in '07 you got some kind of a special certification?

22  A.  Critical care certification.

23  Q.  Okay.  Can you please tell us what that is?

24  A.  The critical care certification is an exam that is

25  comprised of 175 critical care questions and is very extensive.

1    And it actually certifies you as a critical care nurse.

2    Q.  Did you have to have any special training for it or

3    seminars before you took the test?

4    A.  I did.  I did.

5    Q.  Okay.  Would you please tell the jury about that?

6    A.  There's a lot of instructors that come into the city and

7    they have specialized books that you can purchase to review and

8    study for the exam.  The exam is a three-hour-long exam, and

9    it's expensive, too.  It's like a $325 exam.

10   Q.  Okay.  And how long was the training before you took the

11   exam?

12   A.  No, the seminars is-- you can take it as-- once you decide

13   you want to take the exam, you could go to those seminars.

14   It's like a two-day, three-day seminar.  The instructors come

15   in from different states and you register for the seminars.

16   Then most of the work, you've got to do it on your own.  You

17   buy the review books, you study the review books, and you go

18   for the tests.  And they give you three months after you

19   initially register to go for the test.

20   Q.  Did St. Barnabas have any policies with regard to the

21   evaluation of its staff nurses while you worked there?

22   A.  St. Barnabas evaluated the staff nurses annually.  On your

23   anniversary date, give or take, they did an evaluation.  The

24   managers did evaluations of the employees.  Like mine basically

25   was every-- it ranges from July, August or September, give or

1  take, because my anniversary was July.

2  Q.  Who typically evaluated you at St. Barnabas in, say, the

3  last five years you were there?

4  A.  Ms. Frances-Lattery.

5  Q.  Did Ms. Graham have any input with regard to your

6  evaluations?

7  A.  I don't know.

8  Q.  Did you ever meet with Ms. Graham-- withdrawn.

9          Can you tell the jury what's involved in the

10  performance-- in an annual performance evaluation?  Tell the

11  jurors, please.

12  A.  In that annual performance evaluation, the manager sits

13  down and she goes through every area, how knowledgeable you

14  are, how you take things upon or you go beyond the call of

15  duty, how a team player-- how you are as a team player, how you

16  communicate with the doctors, your rapport with the physicians

17  or interdisciplinary team.  Your overall performance.  How you

18  are with taking care of the patient.

19          And at that time, of course, you can voice your

20  concern to the managers if you have any concerns.

21  Q.  Did part of this evaluation entail documentations and other

22  similar things like that?

23  A.  It covered everything.  It covered documentation, it

24  covered your performance, it covered your rapport with the

25  interdisciplinary teams, it covers your knowledge.  It covers

1    even-- I'm looking for the word -- even, like, different

2    equipment that you're allowed to-- that you're supposed to be

3    familiar with in the I.C.U. setting, you know.  The different

4    equipments used for the different patients.  They kind of

5    ascertain and they go over are you familiar, you know.  They

6    verify your equipment knowledge.

7    Q.  When was the last time before your separation with

8    St. Barnabas that you had one of these sit-downs with

9    Ms. Lattery, the last time?

10   A.  The last time I had was right before my termination.  This

11   was in August of 2009.

12   Q.  And can you share with the jurors, between 2003 and 2009,

13   what was your rating with regard to your performance?

14   A.  Oh, satisfactory and above satisfactory.

15   Q.  How was your time and attendance evaluated?

16   A.  Excellent.  Excellent.  Actually, the word terminology used

17   light was "exemplary."

18   Q.  Did there ever come a time where you learned that

19   St. Barnabas, besides on-the-job training such as when you

20   joined the I.C.U. for about four months of training, did they

21   have any other kind of trainings that were ancillary to your

22   duties as a staff nurse?

23   A.  Yes.

24   Q.  Can you tell the jurors what some of those trainings are?

25   Just tell us the various trainings.

1   A.   I knew they trained for cardiac cath, cardiac

2   catheterization training.

3   Q.   Anything else?

4   A.   I know they trained for-- they had a position called

5   interventional radiology.

6   Q.   And what's that, interventional radiology?

7   A.   Interventional radiology is a nurse that assists the

8   doctor, but he needs to be an I.C.U. nurse.  And then you get,

9   like, a little training and you basically assist the doctors

10   with special procedures in a radiology room.

11   Q.   And who sponsored this training?

12   A.   If you were interested, they would let the manager-- you

13   will let the manager know that you were interested and they

14   will basically cross-train you there.

15   Q.   What I'm trying to get at is, was this in-house training or

16   did they have to send you outside?

17   A.   For the cardiac cath-- the intervention radiology was

18   basically in-house.  The cardiac catheterization training was

19   conducted in New York Presbyterian for a long period of time.

20   It was months.

21   Q.   Did there ever come a time during your employment at

22   St. Barnabas where you voiced an interest in any of those two

23   different trainings that you just mentioned?

24   A.   I was interested in cardiac catheterization training in

25   April.  And I remember April because I had received an award

1    for performing or taking part in root cause analysis grand

2    rounds that the hospital often did.  But it was a root cause

3    analysis because there had been an issue that happened in the

4    hospital, in the I.C.U. setting, with one of the patients.

5           There was a nurse of the I.C.U., Laurie Verzonilla,

6    that was involved in that incident that, unfortunately, didn't

7    end well with the patient.  So as a result, the attending and

8    the nurse manager basically-- firsthand knowledge I knew about

9    it, because they came to the nurses and they wanted nurses to

10   volunteer to present the root cause analysis.  And the whole

11   idea of the root cause analysis was to prevent whatever

12   transpired from happening again.  That was the whole purpose of

13   it.

14          And because I volunteered and I took part in that

15   presentation-- it was a presentation.  You had to research it.

16   A PowerPoint presentation.  You had to present it.  How do you

17   prevent this from happening?  What could have caused it?  A

18   root cause analysis.

19   Q.  I'm sorry, did you say April of what year?

20   A.  April of 2009.

21   Q.  Okay.  Sorry.  I just wanted to make sure we got the time

22   right.

23   A.  This was April 2009.

24   Q.  All right.

25   A.  So after I received that -- and I was already halfway

1    through my master's program, because I had studied before.  It

2    was a two-year program -- I approached Ms. Lattery and I told

3    Ms. Lattery this is my award and I'm almost halfway through my

4    master's program.  Why can't I get some of the privileges that

5    the Filipino nurses are getting here with the cardiac cath

6    training and the charge nurse-- and the charge nurse

7    privileges?

8    Q.   Okay.  We'll get into the charge nurse privileges.

9    A.   But that I succinctly remember because I brought it up with

10   the cardiac cath training at that point because, you know, it

11   was-- it was a specialized training and they were considering

12   opening a cardiac cath unit.  And I was interested and the

13   hours were favorable.

14   Q.   What do you mean by that?

15   A.   The hours was Monday to Friday, 8 to 4, and all weekends

16   off and all holidays off.

17   Q.   Why were you interested in that?

18   A.   Because at that time my son was becoming, like, 14 or 15

19   and he just started high school.  I wanted to keep a close eye

20   because he's the only one I got and I wanted to make sure that

21   everything was A-okay with him.  And I wanted to be able to

22   come home when he was coming home from school and keep an eye

23   on him.

24   Q.   And, incidentally, your son, he's still in high school?

25   A.   My son is a senior in Monsignor Scanlan Catholic High

1    School.

2    Q.  And did that cardiac catheterization unit or new

3    department, did it ever come to fruition while you were working

4    there?

5    A.  Yes.

6    Q.  When was that?

7    A.  Shortly after.  A couple months after the training.

8    Q.  Okay.

9    A.  And actually the coordinator for I.C.U., I believe I

10   mentioned her name, Evelyn Castillo, became the manager for

11   cardiac cath.

12   Q.  Did you ever express an interest to Ms. Castillo about

13   joining that team or becoming a part of it?

14   A.  Actually she was still a coordinator when they were

15   training for it.  So my interest was verbalized to Ms. Lattery,

16   but Ms. Lattery with Ms. Castillo along with the

17   administration, the associate directors, decided on who was

18   going to train for the cardiac catheterization.

19   Q.  And who's the associate director?

20   A.  Ms. Quinones and Mr. Alvarado.

21   Q.  And how did you learn of that?

22   A.  That they decided on who was going to be going for the

23   training?

24   Q.  Yes.

25   A.  Ms. Lattery verbalized it.

1   Q.  Did there ever come a time where you were selected for that

2   candidacy or for that training?

3   A.  No.  Actually all of the trainees were Filipinos.

4   Q.  Okay.  And did you verbalize or relate that concern to

5   anybody within the hospital?

6   A.  I verbalized that concern to Ms. Frances-Lattery right

7   after I got my award for my presentation in the root cause

8   analysis because it came to my attention that there was a

9   training, there was going to be a training.  So I figured I had

10  my certification for excellent work done on these grand rounds

11  and I'm halfway through my master's program, so why not make my

12  specialized training?  The more training, the better and the

13  more possibility you have to advance in a facility.  And that

14  was my ultimate goal.

15  Q.  To advance within the facility?

16  A.  Yes.

17  Q.  What positions were you interested in?

18  A.  I would have loved to be a manager.

19  Q.  Now, you mentioned previously about the ground round and

20  its involving another staff nurse.  Just tell me the name

21  again.

22  A.  Laurie Verzonilla.

23  Q.  Can you tell me who was-- can you tell me who was in

24  attendance at that conference or that meeting or that

25  presentation you made?

1    A.   Ground rounds is a presentation in which Ms. Pauline

2    Lattery and Ms. Agnes Lucero along with I.C.U. attendings

3    basically brought to her attention, the nurses in I.C.U., me

4    included directly, that there was an incident that occurred

5    with a patient and the reason why they think the incident

6    occurred.  And they needed a presentation to-- in an effort to

7    prevent this incident from happening again.

8    Q.   Without telling us the identity of the patient, what was

9    the sum and substance of what they told her-- told you?  I'm

10   sorry.  Just share that with the jurors in your own words.

11   A.   This patient was an asthmatic patient that came in.  The

12   patient had a BiBap machine.  A BiBap machine is a machine that

13   administers oxygen and it's ordered by a physician and it's

14   placed by a respiratory therapist.  And it delivers oxygen

15   noninvasively because the endotracheal tube goes inside.  This

16   is more like a mask, that it could be naso or it could cover

17   your mouth and your nose and it administers oxygen.

18            And apparently during the night, for lack of

19   monitoring, the patient, while being cleaned or washed by

20   Ms. Laurie Verzonilla, desaturated, became hypoxic.  Lack of

21   oxygen brought the O2 saturation down and the patient coded,

22   cardiac arrest, and died.

23   Q.   Do you know whether this staff nurse still works for the

24   hospital?

25   A.   She's still there.

1    Q.  Do you know whether she was ever disciplined for that

2    incident?

3    A.  She was made to give in-services to the staff.

4    Q.  What does that mean, for us lay people?

5    A.  Actually, what the management made her do is, I guess,

6    acknowledge that there was a mistake in monitoring, or whatever

7    it is the mistake that she did, and actually went in and gave

8    in-services, classes, lectures, to the nurses in I.C.U.

9    Q.  Did you attend any of these lectures?

10   A.  She works nights, so I did my root course analysis day

11   shifts.  So I didn't attend her lecture, no.

12   Q.  And who from these three individuals that shared that

13   presentation with you advised you of what happened, what took

14   place?

15   A.  Actually, Agnes Lucero, Ms. Frances-Lattery and a couple of

16   the attendings, if I'm not mistaken, was the one that brought

17   it to our attention, because Agnes Lucero was the one who said

18   we need to do-- because she's the I.C.U. educator.  So she

19   wanted a volunteer and those that didn't volunteer, she

20   actually asked, "Can you be part of this?  Can you be part of

21   that?  We need to do a presentation on root cause analysis.

22   This is the topic.  This is what needs to be covered."

23          So Agnes Lucero, actually firsthand knowledge, told me

24   and the I.C.U. staff with Ms. Frances-Lattery.

25   Q.  Can you tell us, based on your experience at St. Barnabas,

1    what does an I.C.U. educator do?

2    A.   An I.C.U. educator actually does the orientation for the

3    I.C.U. cross-training.  If you're in the medical-surgical unit,

4    you have an I.C.U. educator, you have an ER educator.  This is

5    the reason why -- and I'm basically reiterating what I had said

6    before -- we had two different trainings.

7         The trainings started on the same day, but then they

8    took the emergency room potential nurses to a different

9    classroom and the I.C.U. nurses stayed in a different

10   classroom.  Agnes Lucero was the I.C.U. educator and ER had a

11   different educator.  The I.C.U. educator basically gave you the

12   classes of the material or the information needed to properly

13   take care of a critically ill patient.  That was from EKG

14   interpretation to medication you're going to administer to

15   potential side effects -- and that's reinforced by the

16   pharmacists that come in and do lectures -- to the machines,

17   the ventilator settings.  If the alarm on the ventilator goes

18   off, what are you looking for?  Is it that the patient is

19   biting on the tube?  Is it that there's increased secretions in

20   the tube?  Is it that the tube is kinked?

21        So she basically goes through that and then she has a

22   speaker from respiratory therapy.  So she basically coordinates

23   the whole I.C.U. training, and then she's on the floor just in

24   case you have any questions as well.  And aside from that, she

25   managed.  She did the management positions when Mrs. Lattery

1   was off.

2   Q.  Can you explain that to us?

3   A.  Agnes Lucero, when Ms. Lattery was off, was the I.C.U.

4   manager that covered the floor.

5   Q.  Did she have the authority to give instructions or orders

6   as a manager?

7   A.  No, she didn't.  She's a nurse, a registered nurse.

8   Q.  Okay.  So how did she cover Ms. Lattery if she didn't give

9   any instructions or orders?

10  A.  She basically oversees us as nurses.  She used to come in

11  and oversee the floor.  The floor, if there was a patient that

12  needed to come in for admission, she kind of assisted the

13  charge nurse in moving the patient out.  She took the report

14  for the floor.  Like, you know, who came in, who had a cardiac

15  arrest, who was intubated today.  So she basically did the

16  management work on the floor.

17  Q.  You just mentioned the term "charge nurse."  Can you tell

18  us, in your own words, what does a charge nurse at St. Barnabas

19  do?  Tell the jury, please.

20  A.  The charge nurse in St. Barnabas's I.C.U. did not have

21  patients.  She basically was free to kind of run the floor.

22  She maneuvered-- she worked with the doctors, she rounded with

23  the physician to know what was going on with every patient, and

24  she also kind of controlled the coming and the outgoing of the

25  patients inside the I.C.U. setting.  If there was a patient

1    that needed to be moved out because they were stable, then she

2    kind of, like, expedited that process so the patient that was

3    critical could come in.  When she didn't have any patients, she

4    was free to assist the nurses that needed assistance with their

5    patients.

6              She had extra pay.  The charge nurse has extra pay.

7    It was more like a leadership.  It prepared you to be a leader,

8    because you were basically leading the I.C.U. team.

9    Q.  Did there ever come a time while you were employed by

10   St. Barnabas that you sought or you expressed an interest in

11   being or becoming a charge nurse?

12   A.  Yes.

13   Q.  All right.  Tell me about it.

14   A.  In April after my-- going back to April, after my

15   commendation for a job well done, I asked Ms. Lattery why

16   wasn't I allowed to be a charge nurse like the rest of the

17   Filipino nurses.

18   Q.  What was her response?

19   A.  Actually, she really didn't say much in April.

20   Q.  Okay.  Did you-- did there ever come a time after April

21   where you continued or you did express an interest in being a

22   charge nurse again?

23   A.  When I did my annual evaluation in August, when I sat down,

24   I revisited the charge nurse and I revisited when are they

25   going to send additional nurses for the cardiac cath training,

1   because I was really interested.  And she basically told me

2   that that was based on seniority for the charge nurse training,

3   and I knew that wasn't true.

4   Q.  Why did you know that?

5   A.  Because one nurse in particular had been charge multiple

6   times while I was there and she came way after me.  She came

7   maybe two to three years later after me, and she wasn't in a

8   master's program at all.  She had not started it.  She was

9   planning on going to a master's program because they were going

10  to bring in a master's program to the school-- to the hospital.

11  They were actively recruiting people for that master's program.

12  So we were fully aware, because they made it open for people

13  who was interested in attending that master's program.  So we

14  knew on the floor who was interested, who was going to start

15  that master's program.  And they hadn't started and she was

16  already charging.

17  Q.  And who is this nurse?

18  A.  AnaRicca Libran-Danao.

19  Q.  Was she one of the individuals whose picture we saw

20  earlier?

21  A.  Yes.

22  Q.  Did there ever come a time where you spoke to anybody else

23  that was in a management position that worked at the I.C.U.,

24  was assigned to the I.C.U., about any of your discrimination

25  claims or averments?

1   A.  In the I.C.U., I spoke to Ms. Frances-Lattery.  I spoke to

2   Dr. Mervyn Richardson.  I mentioned it to Agnes Lucero one

3   time.  I mentioned it to Norma Ondoy also one time.  And I

4   mentioned it to Cathy Graham at one point, as well.

5   Q.  Okay.  Is that the same Dr. Mervyn Richardson that was the

6   assistant director of --

7   A.  Pharmacy.

8   Q.  -- pharmacy?

9   A.  Yes.

10  Q.  And do you know when in relation to your separation from

11  the hospital that you spoke with Dr. Richardson about your

12  claim of discrimination?

13  A.  Around-- shortly before-- around July/August.

14  Q.  What year?

15  A.  2009.

16  Q.  Okay.  Would you kindly tell the jurors in your own words

17  what was it exactly that you related, that you said to

18  Dr. Richardson about your discrimination claims?

19  A.  We were working in the I.C.U. that day.  And the

20  circumstances specifically I don't remember, but I remember I

21  told them that this is so-- I feel like I'm being

22  discriminated.  And they was in conversation.

23      I believe I had two heavy, heavy patients and the

24  other nurses were just-- had light patients and one had only

25  one patient and I had two trauma patients.  Usually what we do

1   in I.C.U., what I noticed the nurses in charge doing was they

2   wouldn't give you two trauma patients because they were just

3   too heavy.  It was just too hard.  The trauma patients would go

4   for multiple procedures.  You're basically transfusing

5   continuously, you're basically monitoring closely.  So you

6   wouldn't technically have two trauma patients.

7           And I believe that was my assignment that day and I

8   was just kind of overwhelmed.  And I said this is so

9   discriminating because there's a nurse there sitting with one

10  patient with one bed empty and I have two trauma patients that

11  could have been split so that I wouldn't be so overwhelmed.

12  And that charge nurse was not helping me.

13          So that was in that conversation.  I said "I feel

14  overwhelmed.  I feel overwhelmed."  So this is discrimination.

15  There's no reason why I have two trauma patients when one nurse

16  is sitting around without having another patient.

17  Q.  Who was that nurse?

18  A.  Right now I don't remember, but I know that that was my

19  complaint, per say, that day because I had two trauma patients.

20  And I was running.  I was really busy.  And usually I know that

21  throughout my tenure, when it was a Filipino nurse, either the

22  charge nurse would be there with that nurse to do the other

23  patient and assist her so that it wouldn't be so overwhelming,

24  or they will actually come up to another nurse and say,

25  "Listen, I want you to pick up this patient because I'm going

1    to split the assignment.  It's just too much."

2           Ultimately the goal is patient care, safe patient

3    care.  And if you have two trauma patients, you can't really

4    adequately have safe patient care because you're going to

5    multiple procedures, either CAT scan, you're giving multiple

6    medication, you're monitoring both closely every hour, and

7    you're hoping that nothing negative goes wrong for that day.

8           It was an unfair assignment that was given that day.

9    Q.  Did you ever express any concern to Dr. Richardson about

10   not being allowed to be a charge nurse?

11   A.  Yes.

12   Q.  Please tell the jury in your own words, in sum and

13   substance, what you --

14           MR. GARLAND:  Objection, but it's gone, so.

15           THE COURT:  Yeah.  Please tell the jury in your own

16   words what happened.  What happened?

17   A.  It was-- actually he asked, you know, how come he never

18   sees me charging.  And I basically verbalized to him that I had

19   asked to be charged, but I'm not assigned to charge and the

20   decision was made by upper management for who can be charged

21   and who's not going to be charging.  Apparently I didn't make

22   the list.  And it was made by upper management again.  It was

23   Agnes Lucero and Frances-Lattery in administration deciding who

24   was going to be charge nurse in I.C.U.  According to

25   Frances-Lattery, as I said before, it was based on seniority,

CA9BMAR4                    Martinez - direct

1     which I knew was not true.

2             THE COURT:  Are we at a point where we could stop for

3     the day?

4             MR. NUWESRA:  This would be a beautiful point, Judge.

5             THE COURT:  It's a beautiful point?  Okay.  It's a

6     beautiful point.

7             So what we're going to do is Ben is going to take you

8     back to your jury room and introduce you to your space.  That's

9     where you will go in the morning when you arrive.  I believe

10    when you come into the courtroom, there's a door to the jury

11    room right out there in the lobby and you will go in there.  As

12    you will see, there's lots of space, lots of light, really nice

13    view, two restrooms.  Feel free to bring in breakfast.  Make it

14    your space, because that's where you're going to spend some

15    time over the course of the next week.

16            Don't discuss the case tonight.  "Discuss," using that

17    broadest sense of the term.  No communicating in any form.

18    Keep an open mind.  This is the beginning of the story.  I will

19    see you tomorrow morning.  If you all can be here at 5:30,

20    we'll begin as soon as you get here.

21            (Jury excused)

22            THE COURT:  Okay.  You can step down.  So I'll see you

23    all in the morning.

24            MR. NUWESRA:  Thank you, your Honor.

25            MR. GARLAND:  Thank you, your Honor.

1                (Adjourned to October 10, 2012 at 9:30 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    MARLEN MARTINEZ

4    Direct By Mr. Nuwesra  . . . . . . . . . . . .49

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25