CAABMAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARLEN MARTINEZ,

                  Plaintiff,

            v.                        10-CV-5163 (CM)

ST. BARNABAS HOSPITAL,

                  Defendant.          Jury Trial

------------------------------x
                                      New York, N.Y.
                                      October 10, 2012
                                      9:59 a.m.

Before:

                  HON. COLLEEN McMAHON,

                                      District Judge

                        APPEARANCES

LAW OFFICES OF LEE NUWESRA
      Attorneys for Plaintiff
BY:   LEE S. NUWESRA, ESQ.

EPSTEIN BECKER & GREEN, P.C.
      Attorneys for Defendant
BY:   DAVID W. GARLAND, ESQ.
      JOHN F. FULLERTON, III, ESQ.

ALSO PRESENT:  KEITH WOLF,
               Senior Vice President & General Counsel
               ST. BARNABAS HOSPITAL

1    (Trial resumed)

2    (In open court; jury not present)

3    THE DEPUTY CLERK:  Case on trial is *Martinez v.*

4    *St. Barnabas Hospital*.  Plaintiff is here, Defendant is here,

5    jurors are in the jury room.

6    THE COURT:  Okay.  Have a seat.  I hear somebody

7    sensibly made exhibit binders.  That's fine.  Great.  I

8    encourage that always.

9    I will instruct the jury that they're not to look at

10    the exhibits until I tell them that they can look at a

11    particular exhibit.  That happens to be, I think, a very smart

12    way to handle the exhibit issue, especially since the courtroom

13    is rather ill-equipped for audio-video.

14    MR. NUWESRA:  Your Honor, they only brought the

15    defendants' exhibits.

16    THE COURT:  They don't have to copy your exhibits.

17    MR. NUWESRA:  I'll bring in my exhibits.

18    THE COURT:  You can do whatever you want.

19    MR. NUWESRA:  Okay.

20    THE COURT:  Okay.  Are you ready to go?

21    THE WITNESS:  I'm sorry, your Honor?

22    THE COURT:  Are you ready to go?

23    THE WITNESS:  Yes, ma'am.

24    THE COURT:  Then get back up here.

25    (Jury present)

CAABMAR1

1          THE COURT:  Okay.  Good morning.  Have a seat.  Good

2    morning, everyone.  We're ready to go.

3          Ms. Martinez, you are still under oath.  You're still

4    on direct.  You may begin.

5          MR. NUWESRA:  Good morning, your Honor.

6          THE COURT:  Good morning, sir.

7     MARLEN MARTINEZ, resumed.

8    DIRECT EXAMINATION CONTINUED

9    BY MR. NUWESRA:

10   Q.  Good morning, Ms. Martinez.

11   A.  Good morning, Mr. Nuwesra.

12   Q.  Before we broke for the day yesterday, you were testifying

13   about certain discrimination complaints you were making and you

14   mentioned a bunch of-- the names of a bunch of people.  We

15   started by talking about-- or you were testifying about

16   Dr. Richardson and when you made such complaints to him.

17          Do you recall that, ma'am?

18   A.  Yes, sir.

19   Q.  All right.  With regard to yesterday's testimony, can you

20   tell us when was it in relation to 2009 -- what month, what

21   time period -- in relation to your employment of 2009?

22   A.  I complained to Dr. Richardson around July/August of 2009.

23   Q.  Okay.  And on how many occasions did you complain to

24   Dr. Richardson around July or August of 2009?

25   A.  One time.

1  Q.  The other person that you mentioned that you complained to

2  was Ms. Agnes Lucero.  Do you recall that?

3  A.  Yes, sir.

4  Q.  Can you tell us when in 2009 you complained to Ms. Lucero?

5  A.  About the same time, sir.

6  Q.  That's July or August of 2009?

7  A.  Yes, sir.

8  Q.  And what was it that-- what was the nature of your

9  complaints to Ms. Lucero in July or August of 2009?  Please

10 tell the jurors.

11 A.  I complained to Ms. Lucero of the fact that I wasn't

12 allowed to be charge nurse on an I.C.U.  I also complained to

13 Ms. Lucero about the fact that she specifically told me not to

14 speak the Spanish language on the unit.  However, I noted that

15 she will come on the unit, when she was supervisor, and she

16 will speak to the Filipino nurses in Tagalog and she would get

17 her report in Tagalog.

18 Q.  And for us those of us who are not familiar, what is that?

19 A.  That's the Filipino language.

20 Q.  And what was it about the charge nurse issue that you

21 complained to her about?

22 A.  I complained to Ms. Lucero about the fact that I had been

23 there for seven years and I had the qualifications of being

24 charge nurse.  And she was one of the individuals who actually

25 made the list of the people assigned to be charge nurses in

1    I.C.U., which was exclusively Filipino nurses.

2    Q.  Another name you mentioned yesterday was Ms. Norma Ondoy.

3    Do you recall that testimony?

4    A.  Yes, sir.

5    Q.  When was it in 2009 that you complained to Ms. Ondoy of

6    discrimination?

7    A.  Around June/July 2009, sir.

8    Q.  And what was it that you complained to Ms. Ondoy about?

9    Tell the jurors in your own words.

10   A.  The Spanish language.  She was another supervisor that

11   actually told me I was not to speak Spanish on the unit.  She

12   came in and spoke in Tagalog and greeted the nursing staff, the

13   Filipino nursing staff, in Tagalog and actually got her report

14   in Tagalog as well.

15   Q.  Did you complain to Ms. Ondoy in June or July about

16   anything else that you felt was discriminatory?

17   A.  The charge nurses.  The charge nurse assignment, as well.

18   Q.  Okay.  What was it that you said to Ms. Ondoy regarding the

19   charge nurses?  Please tell the jurors.

20   A.  Ms. Ondoy-- the supervisors were involved in making the

21   list of who was going to be charge nurses on the unit.  And I

22   was just kind of curious as to how come my name wasn't there

23   since I was there for seven years and I was already halfway

24   through my master's program.

25   Q.  You also mentioned that you complained to Ms. Cathy Graham

CAABMAR1                    Martinez - direct

1    about your discriminatory treatment at the workplace.  Do you

2    recall-- do you recall saying that last time you were here?

3    A.  Yes, sir.

4    Q.  When was it that you complained to Ms. Graham?

5    A.  I complained to Ms. Graham around the end of August 2009.

6            MR. NUWESRA:  That may be a witness.

7            THE COURT:  She's most definitely not.  Mr. O'Neill

8    will be speaking to Ms. Todd.  I can tell you she's not a

9    witness.

10            MR. NUWESRA:  Okay.  Thank you, your Honor.

11            THE COURT:  She's a lawyer.

12            MR. NUWESRA:  I'm sorry.

13   Q.  With regard to Ms. Graham, when was it that you complained

14   to her?

15   A.  I complained to Ms. Graham around the end of August

16   2009/beginning of September.

17   Q.  What did you complain to Ms. Graham about at the end of

18   August/beginning of September 2009?

19   A.  I went to Ms. Graham's office on advisement of

20   Ms. Frances-Lattery after I had spoken to Ms. Frances-Lattery

21   and I had told her that I felt that I was being discriminated

22   against because I was black, Hispanic, and from Honduran

23   descent; that I was born there.

24            She told me that she-- I told her about the

25   disparaging treatment; that from April to August, I had noticed

1    that the Filipino supervisor was giving preferential treatments

2    to the Filipino staff nurses.  I told them about the charge

3    nurse assignment; that it was basically the Filipino

4    supervisors that made the list and it was only exclusively

5    Filipino charge nurses that were assigned to charge.  No

6    minorities, no black or Hispanic.

7            I also told her about the cardiac cath training that I

8    had told Ms. Frances-Lattery that I was interested in.  That

9    basically the Filipino supervisor, Ms. Castillo, along with the

10   other supervisors, actually made the list of who could train

11   for cardiac cath training, which was exclusively all Filipino.

12   There was no Latin, there was no Hispanic, there was no black.

13           And the fact that I was prohibited from speaking

14   Spanish on the unit when the supervisor -- and I witnessed and

15   I saw it and I heard it -- will come on the unit and speak to

16   the Filipino nurses in Tagalog, in their language, and get the

17   report in Tagalog.  And I told Ms. Cathy Graham that I felt

18   that I was being discriminated because I was black, I was

19   Hispanic and I was Honduran and I was not Filipino.

20   Q.  Besides telling you to talk to Ms. Graham, did Ms. Lattery

21   respond in any way, shape or form when you complained to her?

22   A.  Ms. Lattery acknowledged my complaint, my concern.  She

23   actually acknowledged my concern.  She told me-- sorry.  She

24   told me that upper management-- that continued complaining of

25   discrimination was not going to help me and that upper

1    management were aware; that she had told the associate director

2    and Cathy Graham about my complaints and that it was not going

3    to help me and to be careful about my continued complaints of

4    discrimination.

5    Q.  Did Ms. Lattery share with you the identity of the

6    associate director that she brought your concerns to?

7    A.  She mentioned Ms. Quinones and Mr. Alvarado.

8    Q.  Now, Ms. Martinez, I want to talk to you about the incident

9    of 9/14/2009.  Were you scheduled to work on 9/14/2009?

10   A.  I was called in because they were short of staff, to come

11   in and do overtime that day.

12   Q.  And did you, in fact, work on that day?

13   A.  Yes, sir.

14   Q.  And what shift did you work on?

15   A.  I worked the day shift, 7A to 7P.

16   Q.  That's 7 a.m. to 7 p.m.?

17   A.  Yes, correct, sir.

18   Q.  And can you tell me, who were the supervisors on that day?

19   A.  It was Ms. Agnes Lucero.

20   Q.  Did Ms. Libiran-Danao work on that day?

21   A.  No, she didn't, sir.

22   Q.  Did Ms. Graham work on that day?

23   A.  Ms. Graham was there.

24   Q.  Did there ever come a time where you had to care for a

25   patient that has been identified at trial as Patient N?

1    A.  Yes, sir.

2    Q.  Can you tell the jurors, when did you take charge or when

3    did you start caring for Patient N on that day?

4    A.  I started caring for Patient N on 9/14 at approximately

5    1:30, 2 o'clock p.m. that afternoon, sir.

6    Q.  Okay.  Would you please tell the jurors in your own words

7    what transpired at around between 1:30 to 2 o'clock that caused

8    Patient N to come to your unit and be under your care?

9    A.  Around 1:30, 2 o'clock, Patient N was on the sixth floor,

10   which is a medical-surgical floor.  Apparently she had been

11   agitated and restless all morning.  They had medicated her, and

12   then she started having seizures so they decided to bring her

13   to the intensive care unit, telemetry side, for closer

14   monitoring because of the seizures.

15   Q.  And to the best of your recollection, did you have any

16   other patients to care for on that day?

17   A.  Yes, sir.  I had four other patients to care for on that

18   day.  The telemetry side, it's 5 to 1.  Five patients to one

19   nurse.

20   Q.  Okay.  And did there ever come a time where there were any

21   special instructions given to you by any of the attendings or

22   other doctors that you worked under on that day with regard to

23   Patient N?

24   A.  Patient N came to the unit because of continuous seizures.

25   So when she got on the unit, the physician told me that they

1    were going to order an EEG for her to be done, which is an

2    electroencephalogram, to find out the monitoring of the

3    activity of the brain, to check the seizure activity.  They

4    were going to order a lumbar puncture for her, which is an LP

5    which actually checks if there's any bacteria, and check the

6    spinal fluid that was taken from the spinal cord to see if

7    there was anything going on in the brain.  And that they were

8    going to order an MRI for the patient, another study for the

9    brain to see what's going on in her brain.

10   Q.  And who was this physician?

11   A.  Dr. Nandipati.

12   Q.  And did there ever come a time when Dr. Nandipati gave any

13   orders with regard to the MRI?

14   A.  Dr. Nandipati wrote some admission orders.  Usually when

15   the patient comes from another floor, the doctor that's taking

16   care of her, that's accepting her-- the attending accepts her,

17   goes to the floor and accepts the patient and then sends her to

18   either District 1, District 2 or District 3.

19            So on the consult, when the doctor from the floor

20   calls and says, "We think this is an I.C.U. patient," the

21   attending will go upstairs and evaluate the patient and say I

22   accept to any one of those districts.

23            So Ms. N was accepted to District 3.  When she got on

24   the unit, there's a resident that's in charge of taking care of

25   the patient.  So the resident assigned was Dr. Nandipati.  So

1    he had to do some admission orders when the patient comes on

2    the unit.  And he wrote "Patient took over to MRI, 6

3    milligrams" -- he ordered some medication, 6 milligrams of

4    Ativan, intravenous push now.  And the admitting orders was-- I

5    believe it was 1:30 or 2 o'clock.  I don't really recall.  But

6    the orders-- she was scheduled to go to MRI at 5:00.  So it was

7    to be given prior to going to MRI so she could be sedated.

8    Q.  And did there ever come a time where you administered the

9    doctor's orders with regard to the medication?

10   A.  Yes, sir.

11   Q.  Please tell the jurors what you did and when was it that

12   you did it in order to effectuate that.

13   A.  I saw the order.  The doctor verbalized it to me.  I went

14   and verified the order because everything that the doctor

15   verbalizes, you've got to follow through with an order.  You

16   cannot give a medication without an actual order.  I checked

17   the order.  I saw that it was 6 milligrams of Ativan.

18          I got the key.  And I remembered that Ms. Cora Fischer

19   was coming from the medication room, so I got the key from

20   Ms. Cora Fischer.  It was approximately 5:00.  I went in, got

21   my two -- three vials of Ativan, because it was 2 milligrams

22   per vial and the order was 6 milligrams.  I got 3 milligrams--

23   three 2-milligrams-of-Ativan vials.  I put it in a syringe,

24   went to the patient's bedside, rechecked my order, checked the

25   patient that it was the right patient, the right dosage, and it

1    was IV pushed.  I made sure the IV was working.  I flushed it

2    initially to make sure that it was fastened, and I gave her 6

3    milligrams of Ativan at 5:00.

4    Q.  You mentioned earlier or you testified earlier that

5    Dr. Nandipati gave you the verbal order and your words were you

6    have to check for an actual order.  Can you tell us what you

7    meant by that?

8    A.  St. Barnabas doesn't allow any verbal orders.  It's against

9    their policy.  So in order for me to follow through on an order

10   given by a physician, I had to make sure that there was

11   actually a written order in the chart for me to go and get the

12   medication and actually give it to the patient.

13   Q.  Is this written order committed exclusively to medication

14   orders at St. Barnabas or does it involve other kinds of

15   orders?

16   A.  It involves everything that has to do with the patient.  It

17   involves laboratory, it involves activity of the patient, if

18   you want the patient to be out of bed or on bedrest, in bed

19   exclusively.  It involved medication, narcotics or

20   nonnarcotics.  It involved procedures for the patient.

21   Q.  When you went to retrieve the medication for Patient N, did

22   you have to do anything at the medication area?

23   A.  I had to-- we have an administration, drug administration

24   narcotic log-in sheets that you have to document what

25   medication you are taking out.

1   Q.  Okay.  And is this log-in sheet known by any other name?

2   A.  It's narcotic administration medication sheet.

3   Q.  And what did you have to do in logging in the medication?

4   Just tell the jurors what you had to do.

5   A.  You've got to write in the patient's name.  You've got to

6   write in the time that you're taking out the medication.

7   You've got to check off -- because the medication is itemized

8   in columns.  You've got to check off how many medications you

9   took, how many medications was there to begin with, subtract so

10  you could see how many balance is there.  You've got to sign

11  your name and then you've got to sign the attending physician's

12  name or the doctor's name at the side.

13  Q.  You sign them or you initial them?

14  A.  You have to sign-- well, not sign.  You write the name of

15  the doctor that's ordered the medication, but you would write

16  your name.  And at the bottom of the sheet -- all the nurses in

17  St. Barnabas had a stamp.  They gave us a stamp because not

18  everybody's signature is legible.  So they give you a stamp so

19  that they'll know whose signature belongs to what nurse so you

20  can identify.

21  Q.  Incidentally, Patient N, when she came to your area to care

22  for, what district were you assigned to on that day?

23  A.  District 3.

24  Q.  And when you went to get the keys from Ms. Fischer, was it

25  in District 3 that you got it?

1   A.  Yes, sir.

2   Q.  She was working in District 3 on that day, Ms. Fischer?

3   A.  No, Ms. Fischer was working in District 1.

4   Q.  I see.

5        Was Ms. Fischer in District 3 when you retrieved the

6   keys, or where was she?

7   A.  She was coming out of the medication room in District 3.

8   Q.  I see.

9        So she was retrieving the medication from District 3?

10  A.  She was retrieving the medication from the narcotic--

11  narcotic bin in District 3 because she had the narcotic keys.

12  Q.  Did District 1 have their own medication area where they

13  can get their own medications?

14  A.  Yes.  District 1 has narcotic medication.

15  Q.  Did they have the same or similar medications in District 1

16  like they had in District 3?

17  A.  Yes, even more so.  They have more medication in District

18  1, but they had all the medication in District 3 plus more.

19  Q.  I see.

20       Now, when you checked out this medication and signed

21  out for it, did you observe anything on that narcotic

22  administration sheet?

23  A.  I observed that Ms. Cora Fischer had documented her

24  medication at 6:00 and it was actually 5:00.

25  Q.  What do you mean?  Please tell the jury.

1   A.  When I went in to take out my medication, I knew it was

2   5:00, because the patient was scheduled to go to MRI at 5:00.

3   And I knew it was 5:00 because Ms. Agnes Lucero was the

4   supervisor and the nurse that was assigned to be in MRI, in the

5   radiology department.  Usually when an I.C.U. patient goes off

6   the unit, the nurse have to go with the patient because the

7   patient is on cardiac monitor.  And there's a nurse assigned to

8   the radiology department for the radiological procedures:

9   X-ray, CAT scan, MRI.

10          So it was 5:00, because the nurse was supposed to

11  leave at 5:00.  And I knew it was almost 5:00 because I asked

12  Ms. Lucero if she could call the supervisor in radiology,

13  Mrs. Grantham, to call and to see if the nurse in radiology

14  could stay longer, an hour longer, so the MRI could be done for

15  the patient because I couldn't leave.  I had four other

16  patients in the back I need to monitor.

17          So Ms. Lucero called and asked the manager in

18  radiology if she could allow Ming -- that's the name of the

19  nurse, another Filipino nurse, in radiology.  The supervisor

20  was also Filipino.  -- if she could allow Ming to stay longer

21  so she could monitor my patient.  That's how I knew it was

22  actually 5:00.

23  Q.  Did you do anything when you realized that Ms. Fischer had

24  checked out at 6 p.m. rather than the time that you were there?

25  A.  Yes, I did.  Yes, I did, regretfully so.  Yes, I did.

1   Q.   What did you do?

2   A.   I changed Ms. Fischer's time.  I corrected it.  It was

3   5:00.  She had put 6, and I corrected it to reflect the right

4   time.  So I changed it from 6 to 5, because I had taken my

5   medication at 5:00 and I knew it was 5:00.

6   Q.   Now, why did you do that?

7   A.   Because the narcotic administration record needs to reflect

8   the real time when you take out medication.  And they were very

9   diligent with the instruction, in in-service given at

10  St. Barnabas about that.  So after they did that, she was in

11  District 1, which is the main I.C.U.  She had two patients.

12  She must have been emergently needing that medication and she

13  inadvertently put 6:00 instead of 5.  So I thought I was

14  helping her.

15  Q.   In relation to your entry on that sheet, where was her

16  entry in relation?

17  A.   It was above my entry.

18  Q.   Directly above it?

19  A.   Directly above my entry.  Hers was right before my entry.

20  Q.   Now, after you administered the Ativan to Patient N, did

21  you have to do anything with regard to recording such

22  administration of medication?

23  A.   On the medication record -- every patient has a medication

24  record.  And I mentioned that yesterday, that when the doctor

25  writes an order, they usually flag it.  And you're able to go

1  look at the order and you have to go pick it up.  Pick up

2  meaning that you need to transcribe it into the medication

3  administration record.  That's part of the medical record.  And

4  in the back you have to document, you know, what was given.

5  And it starts again with your initial, the time, the

6  medication, and what time it was given.

7  Q.  Is this medical record that you just testified about

8  different than the narcotic administration sheet?

9  A.  Yes.

10  Q.  How is it different?

11  A.  The narcotic administration sheet logs in the medication

12  that you take out of the narcotic cabinet and it keeps track of

13  the narcotic medication taken out of the narcotic cabinet.  And

14  the medication administration record actually documents the

15  medication that you give a patient and at what time you gave it

16  to the patient.

17  Q.  Where is the narcotic administration record kept?

18  A.  In the medication room.

19  Q.  Okay.  Where was the medical record that you had to look to

20  for flagging and so on located?

21  A.  In the med-- in the patient's chart.

22  Q.  And where is that patient chart located?

23  A.  At the nurses' station.

24  Q.  Now, you mentioned earlier that you had Ms. Lucero contact

25  the radiology department to do the MRI for 6:00.

1          Did there ever come a time where you did effectuate

2     Dr. Nandipati's order for the MRI?

3     A.   The patient went for an MRI.  The patient went with the

4     transporter.  There was a physician that accompanied the

5     patient to the MRI and a nursing attendant that accompanied the

6     patient to the MRI for safety reasons, because she was agitated

7     and restless initially and she was having seizures.

8     Q.   And what time-- what time was Patient N presented at the

9     MRI location?

10    A.   The patient left the unit at five and the MRI is right

11    below the fifth floor.  We're on the fifth floor in M.I.C.U.

12    and the MRI is on the fifth floor, radiology department.

13    Q.   So in relation to 9/14/2009-- and I'm just trying to make

14    sure that I understand the time line-- Patient N left your unit

15    at 5:00 to get her MRI at six?

16    A.   The MRI was actually ordered at five.  It says "Patient to

17    go to MRI at 5:00 to get Ativan 6 milligrams IV push" at that

18    time before going to MRI.  So the patient left -- I gave her

19    the medication and by 5:00 she was gone.

20    Q.   Okay.  Did anything happen to Patient N while she was at

21    the MRI location at the radiology department?

22    A.   At the radiology department, the resident that went with

23    the patient and the radiologist called and said that the

24    patient was still restless and she was agitated and she

25    couldn't keep still to do the MRI, and that her pressure had

1  dropped to 80/40, if I'm not mistaken.

2        So I advised the patient-- the doctor, the resident--

3  because she had taken Ativan on the go, just in case they

4  needed another Ativan to give to the patient so that the

5  procedure would be completed.  So when she told me that the

6  blood pressure had dropped to 80/40, I advised her-- and she

7  didn't feel comfortable.  She said, "I don't feel comfortable

8  giving this additional Ativan."  And I advised her to bring the

9  patient back and that the test will have to be rescheduled

10 because I didn't want the patient to decompensate further in

11 the MRI.

12 Q.  And this Ativan that the patient-- when you said that there

13 was an Ativan on the go in case the patient needed it, can you

14 tell us what that means?

15 A.  The Dr. Nandipati ordered to give 6 milligrams Ativan IV

16 push now for MRI, and then he ordered to give to-- he

17 instructed to give 2 milligrams additional Ativan to the doctor

18 on the go to Ativan-- on MRI to-- on the go to MRI just in case

19 the patient needed it.

20 Q.  So this is above and beyond the six that you administered,

21 6 milligrams?

22        (Continued on next page)

23

24

25

1    BY MR. NUWESRA:

2    Q.  And what happened after you learned that the MRI wasn't

3    going to happen on that day?

4    A.  The patient came back to the unit and the patient was

5    placed back on the bag, she was placed back on the monitor, she

6    was monitored -- I assessed her, and I notified the physician

7    and the resident also told the physician the MRI could not be

8    done because the patient was restless and her blood pressure

9    had dropped, and I documented it.

10   Q.  And where did you document that?

11   A.  In the medical ICU flow sheet of the patient.

12   Q.  Do you know around what time the patient came back to the

13   unit from the MRI?

14   A.  The patient came around 6:00.

15   Q.  Did you work a full shift that day?

16   A.  Yes, sir.

17   Q.  Did anything happen towards the end of your shift on that

18   day?

19   A.  Toward the end of my shift that day Ms. AnaRicca Libiran

20   notified us that there was three vials of morphine missing,

21   from the narcotic cabinet.

22   Q.  Was that unusual?

23   A.  It was unusual.  It was unusual.

24   Q.  Okay.  And just refresh our memory.  Ms. AnaRicca Libiran

25   was another -- what was she?  What was her position at the

1    time?

2    A.  Ms. AnaRicca Libiran, in District 3, she was another staff

3    nurse, registered nurse in MICU.  During the shift that day,

4    there was five of us that had access to the narcotic cabinet.

5    Ms. AnaRicca Libiran -- 'cause I mentioned yesterday that the

6    agency nurse would not have access but the staff nurse have

7    access to the key.  So when I say access, we were able to go

8    into the narcotic cabinet with the narcotic keys and get

9    narcotics out of the cabinet.  In District 3 there was five of

10   us that had access to the narcotic cabinet.  Assigned to work

11   in District 3 was AnaRicca Libiran, Cleo DeJesus, Othilyn

12   Gonzalez, and myself, but in addition, Cora Fischer came from

13   District 1 and got medication from the District 3 cabinet.

14   Q.  Now were any of these other staff nurses nonFilipino

15   besides you?

16   A.  No.  They were all Filipinos except for me.

17   Q.  And can you tell the jurors what happened after you was

18   advised by Ms. AnaRicca Libiran that there was -- I think you

19   said three vials of morphine missing?  Tell the jury what

20   happened.

21   A.  She asked if anybody had to use morphine during the shift

22   aside from herself.  She went through District 1, District 2 to

23   see, 'cause the staff nurses had access, so anybody from any of

24   those two districts could have had gone in there, borrowed the

25   key from anybody and got into the narcotics.  So she actually

1   asked in District 1, District 2, if anybody had gotten morphine

2   from District 3 and forgot to document or didn't document it.

3   She called the manager, because we couldn't -- we looked all

4   over, we couldn't find, and nobody said they used any morphine.

5   She called the manager, and then the manager came down to

6   medical ICU, Ms. Norma Ondoy, and Ms. Norma Ondoy requested for

7   all the nurses in District 3 to write a statement pertaining to

8   who your patient were and what medication you gave to the

9   patient, if you had any use or any patient on morphine sulfate

10  on that shift.

11  Q.  Did you do that?

12  A.  Yes, sir.

13  Q.  All right.  And what happened after you gave that

14  statement?

15  A.  Ms. Norma Ondoy called security and the security came to

16  District 3 area and they went through our purses and basically

17  checked through all our belongings and then we were allowed to

18  go home.

19  Q.  Were you scheduled to work the next day?

20  A.  Yes, I was scheduled to work the next day.

21  Q.  And did you show up to work on the 15th of September

22  2009?

23  A.  Yes, I showed up to work on the 15th.

24  Q.  And were you scheduled to work the same shift you did the

25  day before?

Caa1mar2                    Martinez - direct

1    A.  7 a.m. to 7 p.m., yes.

2    Q.  And where were you assigned on that day?

3    A.  I was assigned in District 2.

4    Q.  District 2.

5    A.  District 2.

6    Q.  Do you know whether Patient N continued to be in District 3

7    on the 15th of September 2009?

8    A.  I wasn't sure until the family members showed up and I was

9    passing by, and they approached me, the mother, to be specific,

10   and the mother asked me -- she apparently have gone to the room

11   where she was at in District 3 and she didn't see her, so she

12   approached me, 'cause I was the nurse and I had a rapport with

13   her from the previous day, and she says, "I don't see her in

14   District 3," you know, "You know what happened to my daughter?"

15   And I recognized her.  So I'm like, "Let me see if I could help

16   you."  So then I looked in the computer to see if they had

17   moved her to another unit or if she had been moved up to any

18   room inside.

19   Q.  And what did you find?

20   A.  She had been moved into District 1, Room 504.

21   Q.  And based on your research do you know what time she was

22   moved or relocated to District 1?

23   A.  Early in the morning.  She was relocated at the

24   beginning -- almost at the beginning of the shift, like around

25   8:30, 8:45.

1    Q.  And did your research indicate whose care she was under on

2    that day, on the 15th of September 2009?

3    A.  I actually walked the mother over to District 1 to where

4    she was at, and she was being taken care of by Cora Fischer.

5    Q.  And this is the same Cora Fischer whose entry you corrected

6    and you got the keys from --

7    A.  Yes.

8    Q.  -- the day before?

9    A.  Yes, same Cora Fischer.

10   Q.  Did anything happen -- after you related that information

11   and took the mother to District 1, did anything happen that was

12   unusual during your shift on that day?

13   A.  At -- towards the end of my shift that day -- I left the

14   mother in District 1 'cause I knew the doctor would approach

15   her, give her the update, and I was able to find out that the

16   patient was moved from District 3, which is a two-bed -- like I

17   say, usually District 1 is for isolation.  So after --

18   apparently after they took out the -- the LP, or the lumbar

19   puncture -- 'cause all that procedure was done in District 3

20   the night before.  The EEG -- the MRI couldn't be done because

21   of the patient blood pressure and restlessness.  They did the

22   lumbar puncture.  Apparently they were ruling out meningitis,

23   and meningitis needed isolation.  So that's why they moved the

24   patient to District 1, for isolation, so she could be in the

25   room by herself.

1          So toward the end of the shift -- during the shift

2    there was an investigation that was going on for the missing

3    morphine from the previous night.  So that's what was happening

4    during the shift.

5    Q.  Incidentally, Ms. Martinez, when you made the correction on

6    Ms. Cora Fischer's entry the night before, did you advise

7    anybody that you did that at the hospital on the 14th of

8    September 2009?

9    A.  I told Cora Fischer.

10   Q.  And how soon after you made the correction you told

11   Ms. Fischer?

12   A.  Shortly afterwards.

13   Q.  And what was her response?

14   A.  She was very thankful that I had corrected her time.

15   Q.  Okay.  So you were saying that towards the end of your

16   shift something happened.

17   A.  Toward the -- during the shift they -- they were

18   interviewing us individually -- they meaning Agnes Lucero -- in

19   the conference room -- Agnes Lucero, Ms. Frances-Lattery was

20   present, and the pharmacist associate director, and another

21   lady, Fran somebody, from the pharmacist as well.  They were

22   interviewing us one by one to find out what transpired the

23   night before.

24   Q.  Okay.  Do you recall what time you were interviewed?

25   A.  Around 2 to 3.

1  Q.  Can you tell the jurors what you were asked and what were

2  your responses during this interview and who did the

3  questioning.

4  A.  The questioning was done by the associate director,

5  Ms. Patricia Byrne of pharmacy.  She asked me if at any given

6  time I remember who I got the keys from, from all the five

7  nurse -- four nurse -- five nurses, we were four plus myself,

8  in the District 3 area -- if I remember any given time during

9  the 12-hour shift who I'd gotten the keys from.  And I was

10  like, I don't remember.  The only person I remember I got the

11  keys from at 5:00 was Ms. Cora Fischer, because I actually

12  corrected her time because she had entered the wrong time, so I

13  know vividly that it was 5:00.  That was the only person I

14  could remember during the whole shift who I had gotten the keys

15  from, and I told the investigating team that.

16  Q.  Incidentally, during that 12-hour shift did you have

17  occasions to retrieve other medications for the other patients?

18  A.  Yes.

19  Q.  Do you recall how many times?

20  A.  Not off the top of my head at this time.

21  Q.  Okay.  And was it you that related the correction of time

22  on Ms. Fischer's entry to the team?

23  A.  Yes.

24  Q.  Okay.  Did anything else happen during this interview

25  besides the interaction you just related to the jury?

Caa1mar2                    Martinez - direct

1   A.  No.  No.  Not that I recall.

2   Q.  Were you alone as far -- were you the only staff nurse that

3   was interviewed by this investigating team?  Were you the only

4   staff nurse at the time or were there other staff nurses being

5   interviewed at the same time with you?

6   A.  No, I was the only one.  It was individually.

7   Q.  And did you get to finish that -- your shift on that day,

8   the 15th of September?

9   A.  Yes.

10  Q.  Did anything happen prior to the end of your shift?

11  A.  Prior to the end of my shift Ms. Frances-Lattery approached

12  me and she told me that I needed to meet her upstairs in a

13  nursing classroom with the union delegate.

14  Q.  Do you know what time she told you this?

15  A.  Like around 6:30.

16  Q.  Okay.  Did you inquire as to why you needed the union

17  delegate with her at that meeting?

18  A.  She told me that she was going to discipline -- she had to

19  issue me a discipline.

20  Q.  Did you respond to that?

21  A.  I told her why, why I was going to get a discipline.

22  Q.  Okay.  Did you say anything else?

23  A.  I asked her -- I, again, asked her why did I needed to get

24  disciplined, or what did I do, and she basically told me that I

25  needed to be -- that she was going to discuss it upstairs, when

 1   I got upstairs with the union delegate.  And I said, "Is this

 2   because I complained of discrimination?  This is, you know --

 3   this is -- this is because I complained, you know, of

 4   discrimination?"  We had that conversation.  And she just said,

 5   "Meet me upstairs with the union delegate."

 6   Q.  And did you have that meeting with the union delegate and

 7   the -- and Ms. Lattery?

 8   A.  Yes.  I went upstairs with the union delegate.

 9   Q.  Can you tell the jury what transpired at this disciplinary

10   meeting.

11   A.  When we got -- when I got upstairs, the union delegate was

12   already there, Ms. Lisa Greene.  And Ms. Norma Ondoy was there

13   and Ms. Frances was there, and Ms. Frances basically said that

14   I was being disciplined because of the inconsistent --

15   inconsistency of the documentation on the narcotics sheet.

16   Q.  Did you inquire what she meant by that?

17   A.  Yes, I did.

18   Q.  What did she say?

19   A.  She told me that -- that -- I -- I asked her what does she

20   mean, and she said that I had said in the investigatory --

21   investigation that I had changed Ms. Cora Fischer's time and

22   that Ms. Cora Fischer had said that she had corrected herself

23   in changing the time on the narcotics sheet, so because there

24   was inconsistency in the story, she decided to discipline me

25   and Cora Fischer.

122

Caa1mar2                    Martinez – direct

Q.  Did she give you any other reason whatsoever besides the

inconsistency of the story for your discipline at that time?

A.  She had also told me that Patient N had came out positive

to opiate that afternoon.  Actually, she told me she was

positive to morphine that afternoon.  That's the word that she

utilized.

Q.  What's the difference between morphine and opiate?

A.  Opiate is the generalized classification of the drug.

Opiate can be hydromorphone, it could be Percocet, it could be

Tylenol #3, and it could inclusively be morphine.  And in order

for you to know if it's morphine, tests have to be specific to

morphine, and she just said that the patient had tested

positive to morphine.

Q.  Did there ever come a time during that day before your

suspension that you found out otherwise -- something other than

what they told you at that -- at that suspension meeting?

A.  Yes.

Q.  Please tell the jury what was it that you found out and

when you found out.

A.  I checked -- when I was looking for the patient to locate

her, you can actually see the lab records and everything about

the patient, and I had checked everything about the patient,

trying to locate the patient for the mom, and I had noted that

the urine toxicology had shown that the patient was positive to

opiates and benzodiazepine, so when Ms. Lattery upstairs told

Caa1mar2                    Martinez - direct

1  me that the patient was positive to opiate -- to actually

2  morphine, she said.  And I said the patient should have been

3  also positive to benzodiazepine, because I gave her Ativan, and

4  Ativan is a benzodiazepine.  And she says, "All I'm telling

5  you, that this says positive, the patient is positive to

6  morphine."

7  Q.  And do you recall what time that urine toxicology was done

8  on the 15th of September 2009?

9  A.  It was 12:50 something, almost 1:00 in the afternoon.

10 Q.  And who was caring for this patient at 1:00 in the

11 afternoon on September 15, 2009?

12 A.  Cora Fischer.  Ms. Cora Fischer.

13 Q.  Now when you were suspended at the end of your shift, did

14 you talk to anybody regarding your suspension on that evening?

15 A.  I called Dr. Mervin Richardson that evening.

16 Q.  Who's that?

17 A.  Dr. Mervin Richardson.

18 Q.  Is that the assistant director of pharmacy?

19 A.  Yes.

20 Q.  And why did you call Dr. Richardson?

21 A.  Dr. Richardson was more like a mentor to me.  He was

22 assigned in ICU, he was very knowledgeable about medication,

23 and I had complained to him before about discrimination.  So I

24 basically called him -- I called him, I was like distraught.

25 I'm like, I can't believe it, I can't believe it, you know,

1   they retaliated, they unjustifiably blamed me for

2   misadministering medication.  This is retaliation.  They're

3   discriminating against me.  And they're retaliating against me.

4   Q.  Did there ever come a time where you returned to St.

5   Barnabas after the 15th of September 2009?

6   A.  No.

7   Q.  Are you a member of any union?

8   A.  1199.

9   Q.  And is that the same union where Ms. Lisa Greene is a

10  delegate there who was at the disciplinary meeting with you?

11  A.  Yes, yes.

12  Q.  Did there ever come a time after your suspension where you

13  contacted her regarding your suspension?

14  A.  Yes.

15  Q.  When was it?

16  A.  She called me.

17  Q.  Okay.

18  A.  On the 17th of September 2009.

19  Q.  All right.  And why did she call you?

20  A.  She called me in the evening of that day and she told me

21  that St. Barnabas had two offers.  Actually, she said that St.

22  Barnabas wanted me to resign and -- or they want to report me

23  to the state for negligence.

24  Q.  Was anybody else privy to this conversation with

25  Ms. Greene?

Caa1mar2                    Martinez - direct

1   A.  My sister.

2   Q.  How was she -- can you tell the jury how she was privy to

3   this conversation.

4   A.  When I was suspended, not only did I call Mervin

5   Richardson, but I called my sister, and I called my sister

6   because she's a licensed attorney in the state of New York, and

7   I had never been in such a situation so I needed to talk to

8   somebody, and she's an attorney, and that's my sister, so I

9   called her.  And when I spoke to Lisa Greene, I had my sister

10  on a conference call with Lisa Greene.

11  Q.  Did Lisa Greene know about that?

12  A.  Yes.  I told Lisa Greene that I was bringing my sister in

13  on the conversation.

14  Q.  Okay.  At the time that Ms. Greene related to you that the

15  hospital would like your resignation, were you interested in

16  that?

17  A.  No.

18  Q.  Why not?

19  A.  I'm a single mom.  I needed my job.  I was interested in

20  getting my job -- I had my child in a private school, I had

21  bills to pay, and I liked working at St. Barnabas.  I was

22  disappointed of being unjustifiably accused of something that I

23  never did, but I liked to work there.  I liked my job.  So no,

24  I wasn't interested in resigning.  I told her I didn't mind if

25  they reported me to the state because I didn't do anything

Caa1mar2                    Martinez - direct

1   wrong.

2   Q.  Did you ask that the union or Ms. Greene ask for your job

3   back?

4   A.  Ms. Greene made it clear that she was going to defend

5   Ms. Cora Fischer.  In the conversation she actually mentioned

6   to my sister and myself that they have resolved Cora Fischer

7   case and that she had met earlier that day with Ms. Cathy

8   Graham and that she was already being reinstated back to her

9   position.

10  Q.  Did Ms. Lisa Greene tell you in any shape or form that you

11  needed to contact Ms. Graham regarding your job?

12  A.  No, she never did.

13  Q.  After you were suspended, when you were on suspension, did

14  you complain to anybody else or relate to anybody else besides

15  Dr. Richardson about your -- what you claimed to be retaliatory

16  suspension, about the hostile treatment of you with regard to

17  that treatment?

18  A.  I complained to Dr. Richard Stumacher.

19  Q.  Can you tell the jurors who contacted who during that

20  complaint -- conversation.

21  A.  Dr. Richard Stumacher called me.  He said that he had came

22  to work and he hadn't seen me for like two days, three days,

23  and he was wondering where I was, so -- and I told him that I

24  complained of discrimination and in retaliation to my complaint

25  of discrimination, I was suspended indefinitely.

Caa1mar2                    Martinez - direct

1    Q.  Was this call made to you after Ms. Fischer had been

2    reinstated?

3    A.  Yes.

4    Q.  Did you share anything else regarding your discrimination

5    concerns by St. Barnabas?

6    A.  I told Dr. Stumacher that I was suspended with Ms. Cora

7    Fischer and I shared with him what I was accused of -- that I

8    was accused of misadministering a narcotic to Patient N, and I

9    was also accused of missing morphine -- blamed for missing

10   morphine, and that I thought it was all retaliatory because I

11   had initially complained of discrimination.

12   Q.  Did you do anything to actively seek your job back from St.

13   Barnabas while you were on suspension?

14   A.  When my sister was privy to the conversation with Lisa

15   Greene, my sister advised me to find a private attorney --

16              MR. GARLAND:  Objection.

17              THE COURT:  The objection is sustained.

18              MR. GARLAND:  Thank you.

19   Q.  Just answer my question, please, all right?

20   A.  Mm-hmm.

21   Q.  After your suspension and after your conversation with

22   Ms. Greene, did you do anything to actively seek your

23   reinstatement by the hospital; yes or no?

24   A.  Yes.

25   Q.  Okay.  What did you do besides talking to your sister?

Caa1mar2                    Martinez - direct

1    What was it that you did?

2    A.   I grieved.  I called my 1199 representative and I grieved

3    the indefinite suspension.

4    Q.   Okay.  Did you talk to anybody from the union during this

5    grievance stage?

6    A.   I spoke to Ms. Nadine Williamson.

7    Q.   And what is her relationship to the union?

8    A.   She's a union organizer.

9    Q.   Does she work for St. Barnabas Hospital?

10   A.   No.

11   Q.   Does Lisa Greene work for St. Barnabas Hospital?

12   A.   She worked at St. Barnabas Hospital, in the emergency room.

13   Q.   Ms. Greene does; right?

14   A.   Yes, and she also work in 1199 headquarters.

15   Q.   Did there ever come a time where Ms. Nadine -- what was her

16   last name?

17   A.   Williamson.

18   Q.   Did there ever come a time where Ms. Williamson related to

19   you during your grievance period that the hospital wanted

20   you -- or Ms. Graham specifically wanted you to contact her?

21   A.   No.

22           MR. GARLAND:  Objection.  Leading, hearsay.

23           THE COURT:  Hang on a second.

24           Yes.  Stricken.  No answer.

25   Q.   Did there ever come a time where you learned from anybody

Caa1mar2                     Martinez - direct

1  at the union that the hospital or Ms. Graham wanted you to

2  contact them?

3  A.  No.

4  Q.  When was it for the first time that you learned or found

5  out that Ms. Graham wanted you to contact her?

6  A.  When I received a letter from Ms. Graham, it was dated the

7  12th, but I received it on the 20, 21st of October.

8  Q.  When?

9  A.  20, 21st of October, 2000 --

10  Q.  The 20th or the 21st of October, 2009?

11  A.  2009.

12  Q.  Do you know -- how was the letter sent to you?

13  A.  It was sent by certified mail that I have to pick up at the

14  post office.

15  Q.  Did you do anything once you received the letter on or

16  about October 20th or October 21st, 2009?

17  A.  I called Ms. Nadine Williamson and I --

18  Q.  And why did you call her?

19  A.  I -- I was telling her that I had just received a letter

20  from St. Barnabas, from Cathy Graham, and that I have received

21  it on that day, on the 20th or the 21st of the month of

22  October, 2009.

23  Q.  Did you share anything about that letter with

24  Ms. Williamson that you thought was unique?

25  A.  I read it to her and I faxed her a copy.  I told -- I told

Caa1mar2                    Martinez - direct

 1   her that it had actually said for me to contact Ms. Cathy

 2   Graham about my position as a RN in St. Barnabas Hospital, but

 3   she was surprised that the letter --

 4              MR. GARLAND:  Objection.

 5              THE COURT:  Read back up to the objection.

 6              (Record read)

 7              THE COURT:  Okay.  "St. Barnabas Hospital," period,

 8   end of answer.

 9              Next question?

10   Q.  So the best of your recollection was this letter that you

11   received about October 20th, was it cc'd to anybody else

12   besides you?  Was it copied to anybody else?

13   A.  No, it was not.

14   Q.  And why did you contact the union regarding it?

15   A.  Because I had asked the union to grieve my indefinite

16   suspension so I wanted her to follow up on the letter.

17   Q.  And what did she say to you?

18              MR. GARLAND:  Objection.

19              THE COURT:  It's sad that I can't figure out whether

20   it qualifies for hearsay or not.  It looks like it's being

21   offered for the truth of the matter asserted so I can't allow

22   it in.  The objection is sustained.

23   Q.  When was it that you found out you were terminated by the

24   hospital?

25   A.  I found that I was terminated around the same time.  Maybe

1  a day later, I received a letter from human resource stating

2  that I was terminated as -- my position was terminated.

3  Q.  Did you grieve that termination as well?

4  A.  Yes.  I called Ms. Williamson again and I told her, "I

5  called you yesterday about this letter, and I received a letter

6  today that I was terminated."

7  Q.  Were you under any specific instructions by the union

8  regarding communication by St. Barnabas in your suspension?

9  A.  No.

10  Q.  How was your communication with the hospital was supposed

11  to be, based on the procedure with the union?

12  A.  The union was supposed to notify -- well, actually, the

13  hospital was supposed to notify me when I needed to go in.

14  They were supposed -- supervisor or somebody was supposed to

15  call me when I needed to go in after the indefinite suspension.

16  Q.  Did there ever come a time where anybody from the hospital

17  contacted you between 9/15/2000 --

18           THE COURT:  You mean September 15th?

19           MR. NUWESRA:  September 15th.

20           THE COURT:  Thank you.

21           MR. NUWESRA:  Sorry, your Honor.

22  Q.  -- between September 15th, 2009 and the day that you

23  received the letter from Ms. Graham?

24  A.  No.

25  Q.  Did you ever authorize me as your attorney to write the

1  hospital on your behalf?

2  A.  Yes.

3  Q.  And if you recall, basically when was it in relation to

4  your suspension that you gave me that authorization to do?

5  A.  It was shortly after my suspension.

6  Q.  Was it days?  I mean --

7  A.  It was days.

8  Q.  In relation to your conversation with Ms. Lisa Greene on

9  the 17th of September, was it before or after you had that

10  conversation with her?

11  A.  It was after.

12  Q.  Then you said that -- and correct me if I'm wrong -- that

13  the reason you did not opt for the resignation option is

14  because you're a single mom and you needed the money.  Do you

15  recall that?

16  A.  Yes.

17  Q.  Would you please tell the jurors what was your annual

18  salary in 2008 when you worked a full year for the hospital at

19  St. Barnabas.

20  A.  99,000 and change.

21  Q.  That's how much you made for that year.

22  A.  Yes.

23  Q.  Okay.  Ms. Martinez, at this time I would like to have you

24  share with the jury what are you seeking in damages in this

25  lawsuit.  Can you first tell me in general terms what you're

1  seeking.

2  A.  I'm seeking economic damages, I'm seeking compensatory

3  damages --

4           THE COURT:  You're using legal terms -- economic

5  damages, compensatory damages.  You've obviously talked to a

6  lawyer about this.  Why don't you tell the jury what you want.

7  A.  When I worked there in 2008, 2007, my annual salary was

8  approximately 99 to a hundred grand a year.  2008 -- 2007 was

9  99 and change.  2008 was 96 and change.  In 2009, it came down

10 to like 72,000.  That's the year I was unjustifiably

11 terminated.  2010, I only made 45,000.

12 Q.  Okay.  Now when you said salary, you mean that's how much

13 you made for that year.

14 A.  Yes.

15 Q.  For those years.  I'm sorry.

16 A.  For those years.

17 Q.  And you only worked through 9/15 in 2009.  That's why you

18 only made $72,000 for that year?

19 A.  Yes.

20 Q.  When was it that you was able to get a job, a full-time job

21 where you started making the same kind of money like you were

22 making at St. Barnabas?

23 A.  September -- when I was hired in my new job, September

24 2010.

25 Q.  And did that new job that you were hired at pay you

Caa1mar2                    Martinez - direct

1   comparable salary as -- as St. Barnabas?

2   A.   Initially, no, but afterwards, yes.

3   Q.   Okay.  When in 2010 did you start making the same kind of

4   money?

5   A.   Maybe three, four months into the year.

6   Q.   Into 2011?

7   A.   Like September.  September, November, October.  Like around

8   January -- actually, it's not -- December 2010 to January 2011.

9   Q.   Okay.  And so you're seeking the difference that you would

10  have made had you continued with St. Barnabas versus the money

11  you made -- you start making as of December 2010; correct?

12  A.   Correct.

13  Q.   And do you have a rough estimate how much is that, based on

14  your calculation?

15  A.   Like 80,000.

16  Q.   Did you lose any other benefits as a result of your

17  termination?

18  A.   I was completing my master's and working full time at St.

19  Barnabas because I was in 1199.  1199 was the union, was paying

20  for my master's, so I had to pay the tuition, and I -- what I

21  needed for that, to complete my master's, so that was like

22  5,000.

23  Q.   $5,000?

24  A.   Yes.

25  Q.   Why should St. Barnabas be responsible for that if your

1  union paid for it?

2  A.  Because I had a full-time job at St. Barnabas, but that was

3  one of my benefits of working full time at St. Barnabas,

4  belonging to the union, working for St. Barnabas, and I lost

5  that because I was terminated.

6  Q.  Okay.  Did you have to be on St. Barnabas' payroll to

7  qualify for the tuition reimbursement by the union?

8  A.  Yes.

9  Q.  And I believe you mentioned when you obtained your

10  master's.  Can you just refresh our memory.

11  A.  May 2010.

12  Q.  May 2010?

13  A.  May 2010.

14  Q.  And now you said that -- you used the word "compensatory

15  damages."  What do you mean by that?

16  A.  I went -- I was depressed, I was anxious, I was angry, I --

17  my self-esteem was shot, I had crying spells, I lost weight.  I

18  was heavier.  I lost sleep.  I actually saw physicians for

19  that.  There were times that I couldn't sleep, and I had to go

20  to my primary doctor and he gave me Ambien --

21              MR. GARLAND:  Objection.

22              THE COURT:  Overruled.  She can say what her doctor

23  gave her.

24  A.  The doctor gave me Ambien to sleep at night because I

25  couldn't sleep.  I had to go see a gastroenterologist because I

Caa1mar2                    Martinez - direct

1   started having heartburns, because I wasn't eating as much.  My

2   appetite decreased so I lost weight, and I started having

3   heartburn.  So my doctor basically related it to stress.

4              MR. GARLAND:  I didn't hear.  Objection to the last --

5              THE COURT:  She was told she had stress.

6              MR. GARLAND:  Objection to that too.

7              THE COURT:  Overruled.

8   Q.  And after you saw your primary doctor, did you see any

9   other health care provider as a result of your termination?

10  A.  Gastroenterologist.

11  Q.  Did you see anybody for your depression and/or your stress

12  and anxiety?

13  A.  I saw a psychologist.

14  Q.  And how long did you treat with a psychologist?

15  A.  I treated with a psychologist for a while.  It was from

16  November 2009 to approximately February 2011.

17  Q.  Did there ever come a time where seeing the psychologist

18  that the visits were interrupted?

19  A.  Yes.

20  Q.  When was that?

21  A.  It was interrupted when the insurance stopped paying for

22  it.  My 1199 insurance paid to -- I believe it was two to three

23  months afterwards, and then I had to pay for it.  So I couldn't

24  pay for it, 'cause I wasn't working full time and I was working

25  part time, and I had my son in school and my bills, and I

Caa1mar2                    Martinez - direct

1    couldn't.  So when I got my full-time job, I went back and saw

2    her again.

3    Q.  Okay.  And why did you stop seeing the psychologist in

4    February 2011?

5    A.  Why did I --

6    Q.  Why did you stop seeing the psychologist in February 2011?

7    A.  She advised me that she was --

8              MR. GARLAND:  Objection.

9              THE COURT:  Not she advised you.  Well, did she tell

10   you to stop coming; yes or no?

11             THE WITNESS:  She retired.

12             THE COURT:  Oh, she retired.  Okay.

13   Q.  Are you seeking anything else besides your lost wages and

14   emotional distress from this lawsuit?

15   A.  Yes.

16   Q.  What is it?

17   A.  I want St. Barnabas to stop discriminating --

18             MR. GARLAND:  Objection.

19             THE COURT:  Overruled.  She thinks she's a victim of

20   discrimination.  Guess what, ladies and gentlemen?  You're

21   going to decide that issue.  So the fact that she says it

22   doesn't mean she was.  Just the way she feels.  You will decide

23   if her feelings are justified or if they are unjustified.

24   Q.  Were you finished with that answer, ma'am?

25   A.  No.

Caa1mar2                        Martinez - direct

1    Q.  Please continue.

2    A.  I want St. Barnabas to be penalized so that they can stop

3    discriminating on the basis of race, on the basis of color, and

4    on the basis of national origin.

5              THE COURT:  Okay.  Now we're getting a little

6    argumentative.  So we don't need that.

7              MR. NUWESRA:  Your Honor, can we take a break so I can

8    figure -- I'm kind of finished.

9              THE COURT:  Well, you should be kind of finished, I

10   would think.

11             MR. NUWESRA:  I just want to make sure I didn't leave

12   anything --

13             THE COURT:  Okay.  We'll take a five-minute break.  I

14   wasn't going to take a break now, but we'll take a five-minute

15   break.  Don't discuss the case, folks.  Keep an open mind.

16   Five-minute break.

17             (Jury excused)

18             (Recess)

19             (In open court; jury present)

20             THE COURT:  Ma'am, you're still under oath.

21             Any further questions for your client?

22             MR. NUWESRA:  No, your Honor.  Thank you.

23             THE COURT:  All right.  Then we will have

24   cross-examination.

25             MR. GARLAND:  Thank you, your Honor.

Caalmar2                    Martinez - cross

1           THE COURT:  That will be done by Mr. Garland.

2   CROSS-EXAMINATION

3   BY MR. GARLAND:

4   Q.  Let's focus on the events of September 14th and 15th,

5   2009.  On the 14th you said that you were working in District

6   3 in the ICU from around 7 in the morning to around 7 in the

7   evening; is that right?

8   A.  Yes.

9   Q.  And during that time, sometime in the afternoon on that

10  shift, you began to be responsible for Patient N's care.

11          THE COURT:  Could you speak up, Mr. Garland.  I'm

12  sorry.

13          MR. GARLAND:  Thank you, your Honor.

14  Q.  During the afternoon of September 14th, 2009, Patient N

15  was assigned to you; correct?

16  A.  She came to the floor.

17          THE COURT:  Was she assigned to you; yes or no?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.  He's going to ask you a lot of

20  questions that can be answered yes or no.  You answer them yes

21  or no.  If there's something else that needs to be brought out,

22  your lawyer will bring it out on redirect.

23          MR. GARLAND:  Thank you, your Honor.

24  Q.  Then at around 5 p.m. on the afternoon of the 14th, you

25  went into the medication room in District 3.

Caa1mar2                    Martinez - cross

1    A.  Yes.

2    Q.  You went into the medication room in District 3 at that

3    time to retrieve medication for Patient N.

4    A.  Yes.

5    Q.  When you went into the medication room in District 3 at

6    that time, you took medication and filled out a form.

7    A.  Yes.

8            MR. GARLAND:  Your Honor, I'd like to place that form

9    in front of the witness and also to share it with the jury.

10   It's Defendant's Exhibit 13 in evidence.

11           THE COURT:  Did I need a speech?  No.

12           MR. GARLAND:  I just want permission to --

13           THE COURT:  You have blanket permission to approach

14   the witness, to show the witness exhibits in evidence, and I

15   believe that you have binders with exhibits in them?

16           MR. GARLAND:  Yes.

17           THE COURT:  Which Mr. Fullerton should pass out to the

18   jurors.

19           Ladies and gentlemen, the hospital has prepared some

20   binders with exhibits that they will be calling to your

21   attention.  As I told you yesterday, we met last week and we

22   went over the objections to the exhibits and got them admitted.

23   We saved time.  Now not to leaf through these books.  When we

24   want you to open the books and look at a particular exhibit,

25   we'll tell you which ones to look at, all right?  And when you

1    go back for breaks, leave these binders on the chairs.  Okay?

2    BY MR. GARLAND:

3    Q.  Ms. Martinez, I'd like you to turn in the binder that I

4    just left on the witness stand to the tab that says DX13 or 13,

5    for Defendant's Exhibit 13.  And in particular, I'd like to ask

6    you to look at the second of the two pages in that exhibit.

7    And let me know when you're there, please.

8    A.  I'm there.

9    Q.  If you look at the top of that page, in the upper left-hand

10   corner it says St. Barnabas Hospital.  Then it has a III, IV,

11   V?

12   A.  Yes.

13   Q.  And this is the drug disposition record that you made

14   entries in on September 14, 2009?

15   A.  Yes.

16   Q.  So let's look at your entry then at 5 p.m. on

17   September 14th, and that's what, about -- 1, 2, 3, 4 -- six

18   lines down, under the word Time?

19   A.  Yes.

20   Q.  And that's your handwriting, 5P?

21   A.  Yes.

22   Q.  And then if you move over to the right under the heading

23   Room, that's your handwriting, 527A, and that's the room number

24   where Patient N was?

25   A.  Yes.

Caa1mar2                    Martinez - cross

1    Q.  Then if you keep moving horizontally to the right, you get

2    to the point where you wrote 3/3?

3    A.  Yes.

4    Q.  What does that indicate?

5    A.  That I took three vials of the 2 milligrams Tubex of

6    Lorazepam and I left three there, because there was six,

7    started out with six count.  I took three vials, so there was

8    three left.

9    Q.  So you know what medication it is because if you look at

10   the 3/3 and you go straight up, you'll have the name of the

11   medication, Lorazepam -- Lorazepam?

12   A.  Yes.

13   Q.  And that's also referred to as Ativan?

14   A.  Yes.

15   Q.  And so it's your testimony that you took three Tubexes of

16   Ativan at 5 p.m.?

17   A.  Yes.

18   Q.  What's a Tubex?

19   A.  It's -- Tubex is the medication -- it's a vial where the

20   medication is.  It's a vial of the medication.

21   Q.  And you took three of those vials.

22   A.  I took three of those vials.

23   Q.  And so then you wrote down you took three, and there were

24   how many left after you took three?

25   A.  Three left.

Caa1mar2                    Martinez - cross

1   Q.   Then if you continue with the 3/3 going horizontally, when

2   you get to the right, you get to the column where it has the

3   heading RN MD Signature Administered, and then you wrote in

4   your name, in that column?

5   A.   The RN, yes.

6            (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  And then to the right, you print the name of the doctor who

2    had given you the order?

3    A.  Yes.

4    Q.  Now, let's look at another entry-- well, actually, let me

5    ask you this:  In fact, you had taken four tubexes, not three.

6    Correct?

7    A.  When the doctor advised me to give one to the resident on

8    call, I went back and the patient was already on her way to

9    radiology.

10   Q.  There's no entry on this record, though, that you had taken

11   a fourth.  Correct?

12   A.  No.

13   Q.  You were never disciplined for not recording accurately

14   that you had taken four and not three.  Correct?

15   A.  You've got to put down --

16            THE COURT:  No, no.  Yes or no?

17            THE WITNESS:  No.

18            THE COURT:  You were not disciplined.  Okay.

19            Next.

20   Q.  Now, let's look at another entry immediately above the one

21   that we just looked at.  So we're on the same page, and above

22   your entry, if you go to the left in the time column again, so

23   it's far left, immediately above your entry of 5 p.m., there

24   had been an entry there that you made a change to?

25   A.  Yes.

1   Q.  So that entry above yours had originally been made by Cora

2   Fischer?

3   A.  Yes.

4   Q.  And when you went into the medication room around 5:00, you

5   changed her entry from 6 p.m. to 5 p.m.?

6   A.  I corrected it, yes.

7   Q.  You changed it.

8   A.  I corrected it.

9           THE COURT:  Ma'am, did you change it?  Yes or no.  I

10  don't care if it was a correction or not.  Did you change it?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.  Answer his question yes or no.

13          THE WITNESS:  Yes.

14          THE COURT:  Do not fight with him, do not spar with

15  him.  Answer the question yes or no.

16  A.  Yes.

17  Q.  And even though you thought you were correcting the time,

18  you knew it was wrong to change somebody else's entry?

19  A.  Yes.

20  Q.  Now, let's continue.  We'll put this document to the side

21  and continue with the time line on September 14th.

22          So after you took the-- or after you left the

23  medication room in District 3, you went back to the room where

24  Patient N was?

25  A.  After I took out the medication from the-- I don't-- repeat

1    the question.  I'm sorry.

2    Q.  After you took the medication from the medication room in

3    District 3, you then went back to the room where Patient N was?

4    A.  Yes.

5    Q.  When you went back to her room, you administered a

6    medication to her?

7    A.  Yes.

8    Q.  Within the next hour, Patient N then had been transported

9    to radiology for the MRI?

10   A.  Yes.

11   Q.  And the patient had been returned to the room because the

12   MRI was not done?

13   A.  Yes.

14   Q.  Then, toward the end of your shift at around 7 p.m. on the

15   14th, AnaRicca Libran made you aware that Morphine was missing

16   from the medication unit in District 3?

17   A.  Yes.  She made everybody aware, the nurses.

18   Q.  So she made all of the nurses in District 3 aware including

19   you?

20   A.  Yes.

21   Q.  And then, at that point, she told you that she had checked

22   elsewhere to see in the other districts where the medication

23   might have been, the missing Morphine?

24   A.  She let-- she let everybody know.  It was chaotic.

25   Everybody was looking all over.  She made-- she made a general

1  announcement.

2  Q.  To you and the other nurses who you said were Filipino?

3  A.  Yes.

4  Q.  And then, as that evening moved forward, you, as well as

5  those other nurses, were asked to provide written statements?

6  A.  Yes.

7  Q.  You did provide a written statement?

8  A.  Yes.

9  Q.  Let's take a look at it.  I'm going to ask to turn in the

10  binder I gave you to Tab 9, Defense Exhibit 9.  Let me know

11  when you're there.

12  A.  I'm there.

13  Q.  Defense Exhibit 9 is the statement that you wrote on the

14  evening of September 14, 2009?

15  A.  Yes.

16  Q.  And you know that the other nurses on your shift in

17  District 3 were asked to also provide written statements just

18  as you did?

19  A.  Yes.

20  Q.  And in your written statement, Defense Exhibit 9, you wrote

21  as follows:  "On this date, I worked from 8 a.m. to 7:30 p.m.

22  in D-3."

23  A.  Yes, that's the shift.

24  Q.  You further wrote that, at 7 p.m., as follows, "I was

25  informed by Ms. Ricca Libiran that three tubexes of Morphine

1   sulfate 2 milligrams was missing."

2   A.  Yes.

3   Q.  You had said earlier that you administered three tubexes of

4   2 milligrams of Ativan to Patient N.

5   A.  Yes.

6   Q.  But it's three tubexes of Morphine sulfate 2 milligrams

7   that was missing?

8   A.  Yes.

9   Q.  And in the same medication room as where you had obtained

10  the three tubexes of 2 milligrams of Ativan, that's where the

11  Morphine sulfate would be kept?

12  A.  Yes.

13  Q.  Then you went on to write, "Throughout my shift, I

14  administered Percocet and Ativan to my patients.  None of the

15  patients assigned to my assignment had an order of Morphine

16  sulfate."

17  A.  Yes.

18  Q.  So in this statement you're denying that you

19  administered -- accidentally or otherwise -- Morphine to

20  Patient N?

21  A.  Yes.

22  Q.  Now, after you provided the statement-- well, let me ask it

23  this way:  To whom did you give that statement after you wrote

24  it?

25  A.  To Ms. Norma Ondoy, the supervisor.

1  Q.  And after you gave the statement to Ms. Ondoy, were you and

2  the other nurses then searched by security?

3  A.  Yes.

4  Q.  When I say "the other nurses," you and the other nurses who

5  had been working in District 3 on the same shift as you.

6  A.  I was searched first and I left.  I suppose that everybody

7  else was searched afterwards, because as you were being

8  searched, you were allowed to leave.

9  Q.  So after you were searched, you then were allowed to leave?

10 A.  Yes.  I was first.

11 Q.  And then you reported to work the next day on the 15th?

12 A.  Yes.

13 Q.  And on the 15th, during the course of your shift, you were

14 asked to meet with a number of people investigating what had

15 happened to the Morphine that had gone missing the night

16 before?

17 A.  Yes.

18 Q.  So you met with Ms. Pauline Frances-Lattery?

19 A.  Yes.

20 Q.  And what was her position?

21 A.  Manager for I.C.U.

22 Q.  You also met at the same time with Patricia Byrne?

23 A.  Yes.

24 Q.  And she was from the pharmacy?

25 A.  Yes.

1   Q.  You also met with someone else from the pharmacy.  Correct?

2   A.  Yes.

3   Q.  That was Fran Gatto?

4   A.  I guess that's her name.  I don't know.

5   Q.  Did you know that Fran Gatto had responsibility for

6   narcotics in the pharmacy?

7   A.  No.

8   Q.  And you also met at the same time with Agnes Lucero?

9   A.  Yes.

10  Q.  She was the I.C.U. educator?

11  A.  Yes.

12  Q.  They asked you -- I'm sorry, go ahead.

13  A.  I'm sorry.  Slash manager for the day in question.

14  Q.  They asked you questions about what had happened the day

15  before?

16  A.  Yes.

17  Q.  You gave them answers?

18  A.  Yes.

19  Q.  After you gave the answers, you went back to work?

20  A.  Yes.

21  Q.  Later that day-- well, was it before or after your meeting

22  with them that you saw that Patient N had tested positive for

23  opiates?

24  A.  I don't really recall what time it was.

25  Q.  But at some point during that day, you learned that on

1   September 15th, Patient N's urine had been tested and that the

2   report had come back that showed it tested positive for

3   opiates?

4   A.   Opiates and benzodiazepine, yes.

5   Q.   Both opiates and benzodiazepine.

6   A.   Yes.

7   Q.   Then, later that day, Pauline Frances-Lattery approached

8   you and asked you to see her with someone from the union?

9   A.   Yes.

10  Q.   And you asked her what was the purpose?

11  A.   I asked her why I needed to have a union present in our

12  meeting.

13  Q.   And she said she would explain when you got to the

14  conference room?

15  A.   She said I was going to be disciplined.

16  Q.   And so if you're going to be disciplined, it's appropriate

17  to have a union representative present?

18  A.   That was the policy.  Yeah, I guess.

19  Q.   By the way, when you were meeting with the four

20  investigators-- Ms. Byrne, Ms. Frances-Lattery, Ms. Gatto and

21  Ms. Lucero -- no one from the union was present for that?

22  A.   No.

23  Q.   And there was no requirement that anyone from the union be

24  present as part of that investigation, was there?

25  A.   I don't know.

1  Q. So you asked-- going back now on the way to the conference

2  room to see someone from the union as well as Ms. Lattery --

3  what was going on. And even before you had an answer as to

4  what the discipline was, you were saying to her-- you said to

5  her "This must be discrimination"?

6  A. I had had meetings with her. I had meetings with her. So

7  the fact that I was targeted and the fact that I was being

8  asked to go upstairs and nobody else was, I said it was

9  discrimination to her.

10 Q. So at that time you didn't know that Cora Fischer was also

11 being asked to meet with the union and Ms. Lattery, did you?

12 A. No, I didn't know.

13 Q. So you right away jumped to the conclusion that you were

14 being discriminated against?

15 A. I was the only one she asked.

16 Q. In fact, you learned that Ms. Fischer was also asked,

17 didn't you?

18 A. When I got upstairs, I saw Ms. Fischer.

19 Q. And Ms. Fischer, like you, was suspended that day, wasn't

20 she?

21 A. Yes.

22 Q. When you met with Ms. Lattery and she told you why you were

23 being suspended, did you see a document as to why you were

24 being suspended?

25 A. No, that was never shown to me. She just verbally said it

1    to me.

2    Q.  Did you ever see it?

3    A.  No, sir.

4    Q.  So you're suspended then on September 15th at the end of

5    your shift?

6    A.  Yes.

7    Q.  And after that day, you didn't reach out and contact

8    anyone-- let me strike that.

9         After that day, you never called Ms. Graham.  Correct?

10   A.  No, sir.

11   Q.  Is what I said correct?

12        Let me ask it this way:  After September 15th, 2009,

13   did you ever call Catherine Graham?

14   A.  No.

15   Q.  Let me ask you now to turn to Exhibit 19 in the Defendant's

16   Exhibits.  Let me know when you're there, please.

17   A.  I'm there.

18   Q.  You spoke earlier about receiving a letter from Ms. Graham

19   on or about October 20, 2009.

20        Is this document, Exhibit 19, that letter?

21   A.  Yes.

22   Q.  That letter from Ms. Graham says as follows:  "Please

23   contact me immediately concerning your employment at

24   St. Barnabas Hospital."  Correct?

25   A.  Yes.

1   Q.  And it also provided a phone number for you to reach

2   Ms. Graham, didn't it?

3   A.  Yes.

4   Q.  You didn't call that number, though, did you?

5   A.  I called the union organizer.

6   Q.  Did you call Ms. Graham?

7   A.  No.

8   Q.  Now, you also mentioned that you received a letter

9   terminating your employment sometime after you received the

10  October 12th letter.  Let me ask you to turn now to Defense

11  Exhibit 20.  Let me know when you're there.

12  A.  I'm there.

13  Q.  That letter, Defense Exhibit 20, is that the letter that

14  you received subsequently notifying you that your employment

15  had been terminated?

16  A.  I received it around the same time, yes.

17  Q.  My question was:  Is that the letter that you received from

18  the hospital notifying you that your employment had been

19  terminated?

20  A.  Yes.

21  Q.  And that letter is dated October 21, 2009?

22  A.  Yes.

23  Q.  You received that letter sometime after October 21, 2009?

24  A.  Like the day after.

25  Q.  The 22nd?

1   A.  Around there, yes.

2   Q.  On September 14th, 2009, Patient N was not supposed to

3   receive Morphine, was she?

4   A.  No.

5   Q.  Making a mistake on a narcotic is a big deal in any

6   hospital, isn't it?

7   A.  Yes.

8           MR. GARLAND:  I may be done, your Honor.  I'll just

9   confer with Mr. Fullerton and see if there's anything else I

10  want to ask.

11          THE COURT:  Certainly.

12          MR. GARLAND:  Nothing further, your Honor.

13          THE COURT:  Any redirect?

14          MR. NUWESRA:  No, your Honor.

15          THE COURT:  Ma'am, you may step down.

16          THE WITNESS:  Thank you, your Honor.

17          (Witness excused)

18          THE COURT:  Call your next witness, please.

19          MR. NUWESRA:  Plaintiff calls Ms. Fischer.

20          THE COURT:  Let's bring in Ms. Fischer.

21          Ma'am, come up here, please.

22          THE DEPUTY CLERK:  Please state and spell your name

23  for the record.

24          THE WITNESS:  My name is Corazon B. Fischer,

25  C-o-r-a-z-o-n  B. F-i-s-c-h-e-r.

1            THE COURT:  You may inquire.

2     CORAZON B. FISCHER,

3         called as a witness by the Plaintiff,

4         having been duly sworn, testified as follows:

5     DIRECT EXAMINATION

6     BY MR. NUWESRA:

7     Q.  Good morning, Ms. Fischer.

8     A.  Good morning, sir.

9     Q.  As you're aware, my name is Lee Nuwesra.  I am the attorney

10    representing Ms. Martinez in this case.

11            How are you doing today?

12    A.  I'm fine, sir.

13    Q.  Ms. Fischer, would you please tell the jurors what you

14    consider your race to be.

15    A.  I came from the Philippines and they call us Orientals or

16    Asians.

17    Q.  Would you briefly tell the jurors about your educational

18    background with regard to college and beyond?

19    A.  I graduated bachelor's degree in nursing and I came to this

20    country.  I'm a registered nurse in New York.

21    Q.  And whom are you employed by?

22    A.  I'm employed by the St. Barnabas Hospital in the Bronx.

23    Q.  And how long have you been employed by St. Barnabas?

24    A.  Since 1983 up to the present I'm employed at St. Barnabas,

25    and that will be 29 years.

1  Q.  And have you always been employed in the capacity of a

2  registered nurse at St. Barnabas?

3  A.  Yes, sir.

4  Q.  What unit at St. Barnabas are you currently assigned to?

5  A.  In the intensive care unit of St. Barnabas Hospital.

6  Q.  And how long have you been assigned to the intensive care

7  unit at St. Barnabas?

8  A.  Since 1985.

9  Q.  And can you tell us briefly what your responsibilities and

10  duties have been at St. Barnabas within the I.C.U. unit?

11  A.  I'm in intensive care unit at St. Barnabas Hospital and our

12  duties is to treat patients, highly critical patients that are

13  very sick, requiring monitoring.  We give medications, we do

14  some dressings, we insert tubes.  We-- we make it a point that

15  the well-being of the patients is taken care of in a highly

16  critical specialized unit, sir.

17  Q.  What is the policy at St. Barnabas with regard to lab

18  tests?

19  A.  Lab tests, sir?

20  Q.  Yes.

21  A.  We follow orders regarding lab tests, sir.

22  Q.  As a registered, nurse, can you take it upon yourself to do

23  any lab tests?

24  A.  No, sir.

25  Q.  And the orders at St. Barnabas, do they have to be in

1  writing with regard to lab tests?

2  A.  Yes, sir.

3  Q.  And is that policy strictly adhered to at St. Barnabas

4  based on your experience?

5  A.  Yes, sir.

6  Q.  Over the past 27 years or so that you've been at I.C.U.,

7  did there ever come a time where you have taken a urine sample

8  from any of your patients without the written orders of a

9  doctor?

10  A.  Yes, sir.

11  Q.  How many occasions?

12  A.  A couple of times, sir.

13  Q.  And have you ever been disciplined for taking urine samples

14  from a patient without the written orders of a doctor?

15  A.  No, sir.

16  Q.  Are you familiar with Patient N?

17  A.  Yes, sir.

18  Q.  Okay.  So throughout these proceedings, for confidentiality

19  purposes, we're going to be referring to that patient as

20  "Patient N."  Okay?

21  A.  Okay.

22  Q.  How did you become aware of Patient N?

23  A.  She was transferred in my care and I received endorsement,

24  verbal report, from the transferring nurse, sir.

25  Q.  Do you recall the date?

1    A.  It was October-- I'm sorry.  It was September 14th, 2009.

2    Q.  Was it --

3    A.  Oh, I'm sorry, sir.  I'm sorry.

4    Q.  It's okay.

5    A.  September 15th, 2009.

6    Q.  And why do you remember that date so succinctly?

7    A.  It's sad to say that I remember it because of all this

8    events.

9    Q.  You were suspended on that day.  Correct?

10   A.  I was not suspended on that date.  It was the following day

11   after the September 15th that I was suspended, sir.

12   Q.  And how-- how did you get to become suspended?  Tell the

13   jurors what happened on September 16th, 2009, that caused you

14   to be suspended.

15   A.  It has nothing to do with the patient care.  It has

16   something to do with something, a discrepancy with the logging

17   and the writing of a time in the narcotic paper.

18   Q.  I see.

19        Can you please take a look at the black booklet in

20   front of you.  Do you see that, the black one?  I believe it's

21   DX 13.  Do you have that?

22   A.  Yes.

23   Q.  There's two pages.

24   A.  Yes.

25   Q.  Is this the documentation that you were referring to just

1    before?

2    A.  Yes, sir.

3    Q.  Okay.  And what was it about the discrepancy of this

4    document that caused you to be suspended?

5    A.  I logged in a time and then, when they asked me about it,

6    there was a discrepancy apparently with what Ms. Marlen

7    Martinez said, later on they found out, to what I said when

8    they asked me about it.

9    Q.  Okay.  And what was it that they told you that Ms. Martinez

10   said?

11   A.  They didn't tell me anything about it, sir.  It was just

12   found out later on, when the investigation went on on that day,

13   but nothing was told to me.  They are just asking me what time

14   did I log it in and who changed the time.

15   Q.  Okay.  And what time did you tell them you logged in?

16   A.  They asked me what time actually you took the medications

17   from the narcotic room.  I told them I was there physically

18   about 5:00.  "And what time did you log it in?"  I told them I

19   logged it in 6:00, sir.

20   Q.  Logging it in at 6:00 instead of 5:00--

21   A.  Yes.

22   Q.  -- when you actually took it was in violation of Bronx

23   Lebanon Hospital's policy.  Correct?

24   A.  St. Barnabas Hospital.

25           MR. GARLAND:  Objection.

1          THE COURT:  I'm sorry, ground for the objection?

2          MR. GARLAND:  You have the wrong hospital.  She fixed

3     it.

4          THE COURT:  Fine.

5          MR. NUWESRA:  I'm sorry.  Can you please read her

6     answer for my edification?

7          (Record read)

8     Q.  So let me ask you again.

9          Logging in 6:00 instead of 5:00, when you actually

10    took it, was in violation of the policy at St. Barnabas

11    Hospital?

12    A.  Yes, sir.

13    Q.  And you were wrong to do that.  Right?

14    A.  Yes, sir.

15    Q.  And when they initially asked you about it, you lied about

16    that, didn't you?

17    A.  I did not lie, sir.

18    Q.  So what was the discrepancy?

19    A.  That it was 5:00 and I logged in 6:00.

20    Q.  So why did you log in 6:00 when it was 5:00?

21    A.  I was telling them that I log in the time that the

22    medication was intended to be given.

23    Q.  So is it your testimony that the medication you took from

24    D3 at 5:00 wasn't going to be given until 6:00 to your patient?

25    A.  Yes, sir.  It was intended to be given at 6:00.

1   Q.  Now, Ms. Fischer, where were you assigned on that day?

2   What district?

3   A.  I was assigned in I.C.U., the main I.C.U. we call District

4   1.

5   Q.  And District 1 has its own medication narcotic box and

6   refrigerator.  Right?

7   A.  Our own narcotic room, our own narcotics in District 1.

8   Q.  And what narcotic did you retrieve at 5:00 from D3, from

9   District 3?

10  A.  I took Valium.

11  Q.  Valium?

12  A.  Yes, sir.

13  Q.  Why didn't you retrieve that from D1?

14  A.  Because at the time there were no Valium in the narcotic

15  cabinets in D1.

16  Q.  Ms. Fischer, that wasn't the only time on that day that you

17  went to D3 and retrieved medication?

18  A.  Correct.

19  Q.  Can you tell us, based on this document, how many other

20  times you went and you retrieved medication from D3?

21  A.  I went-- the first time I went was around 12:00 and I took

22  the same Valium in the narcotic cabinet of District 3.

23  Q.  Did you have that Valium at 12 noon in District 1 in your

24  cabinet?

25  A.  No, sir.

1  Q.  Can you tell me where the pharmacy is located in relation

2  to D1?

3  A.  It is in the same floor, which is in the fifth floor.  And

4  you have to go out of the I.C.U. to go to the pharmacy.  It's

5  in another-- I don't know how to explain this-- another place.

6  Q.  How long would it take a nurse to get from D1 to the

7  pharmacy?

8  A.  Let's see.  From here?

9  Q.  No, from D1.

10  A.  No.

11  Q.  I'm sorry.

12  A.  I'm sorry, I cannot say in a footage place, you know, but I

13  would say from here to past the hallway, to el -- past the

14  elevators.

15          THE COURT:  So all the way literally out the door and

16  across the hall?

17          THE WITNESS:  Yes, ma'am.  Yes, your Honor.

18          THE COURT:  A fair distance.

19          THE WITNESS:  Yes, a fair distance to walk.

20  Q.  Okay.  And is there any reason why you didn't ask for the--

21  why you didn't ask the pharmacy to deliver Valium to your unit

22  between noon and 5 p.m. when you went to retrieve such Valium?

23  A.  I can't say that I did not.  I don't have a recollection.

24  I don't remember.  But in my characteristics, I would say that

25  I made or informed them through telephone.  But the pharmacy

1   will pick up whether we call them or not, because they collect

2   the narcotic paper that was counted last night.  They pick it

3   up around-- there's no routine -- 8:00, 9:00, 10:00.  It

4   depends on their availability to go to the I.C.U.

5            And then it's a protocol or routine that they will see

6   what is missing, what is not missing, and then they will also

7   deliver them.  There is no pattern when will they deliver them.

8   They will just come and whoever is available to receive the

9   narcotic, that will be the person to sign who received the

10  narcotic.  So there will be any-- any information, whether the

11  medication delivered will be known or will be informed to the

12  nurses in the unit at that time.

13  Q.  Was the practice at the time that deliveries are usually

14  done at 12 noon to the different-- the vary-- the different

15  units?

16  A.  There is no pattern, sir.

17  Q.  There is no pattern?

18  A.  No, sir.

19  Q.  Where did you keep the Valium that you received at 5:00 for

20  an hour before you gave it to your patient?

21  A.  I cannot say that I kept it for an hour in my pocket.  I

22  took it from the pharmacy-- I took it from the narcotic

23  cabinet.  I have it in my hand, I put it in my pocket.  And

24  it's allowed that we give narcotic medications an hour before,

25  an hour after.  So since I took it at 5:00, I could have given

1    it 5:15, 5:30, but it's intended to be given at 6 p.m.

2           We have a medication paper that's like a log-in.  Q6

3    hours means every six hours:  6 a.m., 12 noon, 6 p.m., 12

4    midnight.  There are boxes there and then, if you are intending

5    to give it at 6 p.m., there's a date.  You sign it on that

6    certain box.

7           It's allowed, you can give it ahead of time or an hour

8    after.  You don't have to put on the box at 6 p.m.  You don't

9    have to put 5:15, 5:20 or whatever.  It's understandable that

10   you gave it at the intended time of 6 p.m., 12 p.m., 2 p.m.,

11   sir.  So if I took it at 5 p.m. and I gave it at 5:30, I gave

12   it at 5:15, I gave it within the span of time of 5 p.m. to 6

13   p.m. or 6 p.m. delayed.

14          I cannot recall what time I really gave it.  I gave it

15   in the span of time.  I took it from the narcotic cabinet --

16          THE COURT:  Okay.  Enough.  You've answered his

17   question.

18          Next, please.

19          THE WITNESS:  I'm sorry.

20          THE COURT:  Just limit yourself to answering what he

21   asks you.

22          THE WITNESS:  I'm sorry, your Honor.

23   Q.  All right.  So wouldn't there be a conflict as far as

24   documentation if in the patient's chart you show that you gave

25   it at 5:15, yet on this DX 13, you would show that you gave it

1    at 6:00?

2    A.  It's allowed to give it, sir.

3    Q.  I see.

4           Now, ma'am, would it be fair to state that one of the

5    two times that you took a specimen of urine of a patient

6    without a specific written order of a doctor was on the 15th of

7    September, 2009, concerning Patient N?

8    A.  I took the urine with a verbal order, sir.

9    Q.  Right.  But there was nothing in writing in the patient's

10   chart regarding the toxicology of her urine?

11   A.  Not at that time, sir.

12   Q.  And can you tell the jurors, when did you start taking care

13   of Patient N on the 15th of September, 2009?

14   A.  I believe around 9 a.m. in the morning, sir.

15   Q.  Incidentally, on 9/15/2009, what time did-- what shift did

16   you work?

17   A.  From 7-- day shift, sir.

18   Q.  Right.  And what hours?

19   A.  From 7:00 until 7:30, sir.

20   Q.  Three days a week?

21   A.  Three days a week, sir.

22   Q.  And how long after you started your shift did you take care

23   of Patient N?

24   A.  Since she-- since she was transferred in the intensive

25   care, around the time of 9:00, sir.

1   Q.  Okay.  And how long after she was transferred to your unit

2   in D1 did you take the urine sample from Patient N to send for

3   a toxicology report?

4   A.  Around the time, sir, the 9:00, 9:30.  Around that time,

5   sir.

6   Q.  Okay.  Can you just tell the jurors, based upon your

7   experiences, what is involved in taking the urine and then

8   sending it?  What's the process?

9   A.  We collect the urine from a Foley bag.  A Foley bag is a

10  bag with a tube and a catheter that is inserted into a

11  patient's urethra that it collects where the urine passes

12  through to this catheter, to the tube, to the collection bag.

13          And if an order, a verbal order written is made, we

14  collect the urine.  We have a container.  We get it from the

15  Foley bag, because there is a draining system there.  We

16  collect it and it drips to the collecting container.  We seal

17  it, we put the label.  We have a paper that we use.  It's a

18  request form.  We check or we write whatever is requested or

19  ordered by the doctor.  Fold that paper.  We check the label of

20  the patient and the label-- all the labeling is correct.  Fold

21  it, put it in a plastic bag, put it in the collecting basket.

22  And the collecting basket, it will stay there and a transporter

23  or an attendant will pick it up and transport it to the

24  laboratory.

25  Q.  Okay.  And how long does that whole process take?

1   A.  Repeat the question, sir.

2   Q.  How long does that whole process that you just mentioned

3   take?

4   A.  The collecting of the urine will take me only, like,

5   minutes.

6   Q.  Okay.  And filling out the paperwork?

7   A.  Very fast, sir.  Minutes, also.

8   Q.  Okay.  Thank you.

9           Do you know why Patient N was transferred to your unit

10  to be under your care?

11  A.  She was getting unstable, means getting sicker, worsening

12  condition.  That's why she was transferred to District 1,

13  intensive care.

14  Q.  Did the hospital suspect her of having meningitis and they

15  sent her for isolation to your unit at the time?

16  A.  Yes, sir.

17  Q.  Now, ma'am, can you tell me how long of a suspension did

18  you serve when you were suspended on the 16th of September,

19  2009?

20  A.  I believe three days.

21  Q.  Three days?

22  A.  I don't remember that much, but I know it was three days.

23  Q.  Okay.  Can you tell me, how did you learn that you were

24  going back to work after three days?

25  A.  I was told, sir.

1   Q.  Who told you?

2   A.  I don't clearly remember, but I received a call from -- I

3   believe it was Ms. Lisa Greene, sir.

4   Q.  And Ms. Lisa Greene is your union representative.  Right?

5   A.  Yes.

6   Q.  And she's the one that was grieving your case at the time?

7   A.  Presenting my case, sir.

8   Q.  Presenting your case on your behalf?

9   A.  Yes.

10  Q.  So she called you up within three days and told you you

11  could go back to work.  Right?

12  A.  I believe so.

13  Q.  Okay.  Did anybody else from the union contact you to tell

14  you you could go back to work besides Ms. Lisa Greene?

15  A.  No, sir.

16  Q.  Did you have to sign any papers when you went back to work?

17  A.  I don't recall, sir.

18  Q.  All right.  Are you familiar with the different narcotics

19  that are known as opiates as a trained R.N.?

20  A.  I know opiates.  They are like Morphine, hydromorphone.

21  That's how I know opiates.

22  Q.  Are you trained in recognizing the side effects of opiates?

23  A.  We are educated, informed what we expect of them.

24  Q.  All right.  Is your answer yes?

25  A.  Yes, sir.

1  Q.  Okay.  And are you trained to recognize the side effects of

2  what's known as benzodiazepine?

3  A.  Yes, sir.

4  Q.  Do you know what that is?

5  A.  Yes, sir.

6  Q.  What is that?

7  A.  That's Valium, sir.

8  Q.  Okay.  Would Morphine be considered an opiate?  Morphine.

9  A.  Yes, sir.

10 Q.  Do you know whether restlessness is a side effect of

11 Morphine?

12 A.  It could be, sir.  It is.

13 Q.  And do you know-- are you familiar with the drug known as

14 Ativan?

15 A.  Yes, sir.

16 Q.  Would restlessness be a side effect of Ativan?

17 A.  It could be, sir, also.

18 Q.  Is one of the side effects of Morphine low blood pressure?

19 A.  Yes, sir.

20 Q.  Is one of the side effects of Ativan low blood pressure?

21 A.  It could be, sir.

22 Q.  Incidentally, with regard to the investigation as far as

23 the discrepancy or the conflict of the time, I just want to

24 bring your attention back to Exhibit DX 13.

25 A.  Yes.

1    Q.  Did there ever come a time where you became aware that it

2    was my client who corrected the time for that entry from 6:00,

3    what she wrote, to 5:00?

4    A.  No, sir, until she-- not until she told me after the

5    investigation.

6    Q.  Okay.  But was it correct that when she corrected from six

7    to five, that that was the correct time when you took that

8    medicine out of that cabinet?

9    A.  Yes.

10   Q.  And isn't it also a fact that she received the keys to go

11   and retrieve her own medication around 5:00 from you?

12   A.  Yes, sir.

13   Q.  And did she give you back the keys when she finished with

14   them?

15   A.  No, sir.

16   Q.  Do you know who she gave them to?

17   A.  I don't know.

18   Q.  And how far is D1 in relation to D3, distancewise?

19   A.  From here-- from here to those desks over there, sir.

20          THE COURT:  I don't know what you mean.  From the jury

21   box to what desks over where?

22          THE WITNESS:  Where the gentleman is at the back.

23          THE COURT:  The very back of the courtroom?

24          THE WITNESS:  Yes, ma'am.  Yeah.

25          THE COURT:  Okay.  So basically the length of this

1  courtroom, from where you're sitting to the back of the

2  courtroom?

3        THE WITNESS:  Yeah.  Maybe a little bit nearer, too.

4  A.  I'm sorry, sir, maybe a little bit more nearer.  I'm sorry

5  about that.  I'm not-- I should have measured it.

6  Q.  How many rooms are there in D1?

7  A.  Ten rooms, sir.

8  Q.  And how many rooms are there in D3?

9  A.  Three rooms, sir.

10 Q.  And is D2 between D1 and D3?

11 A.  No, sir.  Excuse me, sir.

12       THE COURT:  No, no.  You've answered the question.

13 A.  I did not understand it well.  Can you repeat the question?

14       THE COURT:  Would you repeat your last question,

15 please?

16       MR. NUWESRA:  Sure.

17 Q.  You have three districts in the I.C.U. unit?

18 A.  Yes, sir.

19 Q.  And my question to you, is District 2 between District 1

20 and District 3?

21 A.  Correct, sir.  Yes.

22 Q.  Okay.  And how many rooms does District 2 have?

23 A.  Three rooms, sir.

24 Q.  So there is a total of about 15 rooms?  There is a total of

25 about 15 or 16 rooms?

1   A.  In what area, sir?

2   Q.  In all of them, one, two and three.

3   A.  Thirteen rooms if we are talking about District 1 and

4   District 2.

5   Q.  Okay.  And how many in District 3?

6   A.  We have ten rooms.

7   Q.  So there is about 23 in total?

8   A.  We have ten rooms in District 3, three rooms in District 2,

9   ten rooms in District 1.

10  Q.  Twenty-three rooms.  Okay.

11      Are you familiar with the term "flagging" on a chart?

12  A.  Yes, sir.

13  Q.  What's flagging?

14  A.  Flagging the chart, it is a small, like, device.  You

15  rotate that.  It will give you a color.  If it's red, there's

16  an order.  By color coding, it will tell us if it's a stat,

17  which means emergency.  You take a look at it, the color.  Or

18  means an attention.  That is flagging, sir.

19  Q.  Okay.  And what's the purpose of that?

20  A.  To alert the staff, the nurses, to know that there's an

21  order in the chart.

22  Q.  And when you say "an order," you're referring to the orders

23  the physicians put in writing in the chart.  Right?

24  A.  Yes.

25  Q.  Such as lab orders?

1   A.  Yes.

2   Q.  When you collected the urine of Patient N, was there any

3   flagging on the chart?

4   A.  It was a verbal order, sir.

5   Q.  Just answer my question.  Was there any flagging on the

6   chart?

7   A.  I don't know, sir.

8   Q.  Are you familiar with the term "stat" at your hospital?

9   A.  Yes, sir.

10  Q.  What does that mean?

11  A.  Right now.

12  Q.  Emergency?

13  A.  Yes, sir.

14  Q.  And what's the significance of that?

15  A.  Emergency means an emergency attention.

16  Q.  Okay.

17  A.  Stat means do it right now.

18  Q.  Okay.  And that goes for written orders as well?

19  A.  Written orders and verbal orders, yes, sir.

20  Q.  Was there any written stat on Patient N's chart, medical

21  chart, when you took the urine sample for the toxicology report

22  of that day?

23  A.  I don't remember, sir.

24  Q.  Who writes "stat"?

25  A.  The doctors, sir.

1   Q.  Can you take an order, verbal or otherwise, from just

2   another registered nurse regarding lab test?

3   A.  Yes, sir.

4   Q.  You can?

5   A.  Yes, sir.

6   Q.  Can you tell me the circumstances in which you would do

7   that?

8   A.  The circumstances says that the doctor also told this

9   staff, who is a member of the team, we work as a team, it's

10  acceptable.

11  Q.  I see.

12           And that was your training?

13  A.  Yes, sir.

14  Q.  And so if a doctor tells you to have another registered

15  nurse take a urine sample and send it to the lab, that

16  registered nurse should listen to you and do it?

17  A.  Repeat the question, sir.

18  Q.  Sure.

19           If a nurse comes to you and tells you verbally that a

20  doctor told her to tell you to take a urine sample for a

21  toxicology report, do you have to do that?

22  A.  In the event of my patient's case, yes, sir, we did it.

23           THE COURT:  The question is, under the hospital rules,

24  do you have to do that?  Do you have to take that order from

25  the nurse?

1          THE WITNESS:  Yes, sir.  Yes, your Honor.

2          THE COURT:  Okay.  Next question.

3    Q.  Okay.  And that's a written rule?

4    A.  I don't-- I'm not very sure, sir, whether it's a written

5    rule or not, no.

6    Q.  Were you ever disciplined for doing that?

7    A.  No, sir.

8    Q.  Incidentally, who was it that related to you that you

9    should take a sample of Patient N's urine and send it to the

10   lab at around 9:00 in the morning of September 15th, 2009?

11   A.  She was a registered nurse who was also working in the

12   I.C.U. at the time.

13   Q.  Okay.  Can you give us her name?

14   A.  Her name is Agnes Lucero.

15   Q.  Thank you.

16          Can you tell us who was the attending physician on

17   that day on your floor?

18   A.  He was Dr. Darryl Adler.

19   Q.  Okay.  And how do you know that Dr. Adler was the attending

20   physician on that floor on that day, the 15th of September,

21   2009?

22   A.  He was assigned in the intensive care.  I saw him earlier,

23   before that, and I know that he was the assigned attending.

24   Q.  How many attending physicians are assigned to a district in

25   a given day?

1    A.  One.

2    Q.  One and only one.  Right?

3    A.  In a certain district, yes.

4    Q.  And would a patient's chart indicate to you, if you were to

5    review it, as to whom the attending physician was in District 1

6    in the morning of 9/15/2009?

7    A.  Repeat the question, sir.

8    Q.  Sure.

9        If I was to show you a patient's chart for 9/15/2009

10   for District 1 that took care of Patient N on that date, will

11   you be able to tell who was the attending physician during that

12   shift?

13   A.  Yes.

14       MR. NUWESRA:  May I approach the witness, your Honor?

15       THE COURT:  Yes.

16   Q.  Take a look at this chart and let me know who was the

17   attending physician on the 15th of September.  Please take a

18   look at that chart and tell me who was the attending physician

19   on 9/15/2009 responsible for Patient N in D1.

20       MR. GARLAND:  Excuse me.  Could we just get an exhibit

21   number?

22       MR. NUWESRA:  It's the medical chart.  It would have

23   been 16 in 1, Exhibit 1.

24       MR. GARLAND:  I just wanted to confirm that we were on

25   the same page.

1    A.  Yes, sir.

2    Q.  Who was the attending physician on that day?

3    A.  It's signed here Annie Montilla (ph), Doctor of

4    Osteopathic.

5    Q.  That's not Dr. Adler.  Right?

6    A.  No, sir.

7    Q.  Thank you.

8           MR. NUWESRA:  I have no other questions of this

9    witness at this time, your Honor.

10          THE COURT:  Cross-examination, please.

11          MR. GARLAND:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. GARLAND:

14   Q.  Ms. Fischer, on the 14th of September, you were assigned to

15   District 1?

16   A.  Yes.

17   Q.  Later, during your shift, you became aware that there was

18   Morphine missing from the District 3 medication cabinet?

19   A.  Yes.

20   Q.  You became aware of that because Anna Libiran brought it to

21   your attention?

22   A.  Yes, sir.

23   Q.  Following that being brought to your attention by Anna

24   Libiran, were you asked to prepare a statement that evening?

25   A.  Repeat the question, sir.

1  Q.  Were you asked to provide a statement, written statement,

2  that evening regarding the missing Morphine?

3  A.  Yes, sir.

4  Q.  I'm going to ask you in the binder to turn to Defense

5  Exhibit 29.  It's a black binder that looks like this.  So if

6  you would turn to the tab in that book that has the number 29

7  on it and let me know when you get there, please.

8          Are you there now?

9  A.  (Indicating.)

10 Q.  Yes?

11 A.  Yes.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

Caa1mar4                    Fischer - cross

1    BY MR. GARLAND:

2    Q.   And is that document a copy of the written statement that

3    you prepared on the evening of September 14, 2009?

4    A.   Yes, sir.

5    Q.   This is in your handwriting.  Would you just please read it

6    for the jury.

7    A.   "To Whom it May Concern.  This letter is in reference to

8    the missing three Tubex of 2-milligram morphine sulfate.  At

9    7 p.m. of September 14, 2009 we were told by District 3 nurses

10   Ms. Ricca Libiran, Ms. Cleo DeJesus, Ms. Marlen Martinez, and

11   Ms. Othilyn Gonzalez that there were three Tubex of

12   2 milligrams morphine sulfate missing.  Found at 7 p.m. on same

13   date by Ms. Ricca Libiran.  Since I had an access to the

14   District 3 narcotics keys on this date, I was asked to make

15   this report."

16   Q.   Now you referenced some people in this statement.  Let's

17   just go through them.

18          Ms. Cleo DeJesus, was she a nurse in District 3 on the

19   day shift on September 14?

20   A.   Yes.

21   Q.   Marlen Martinez, was she a nurse working in District 3 on

22   September 14?

23   A.   Yes, sir.

24   Q.   Ms. Gonzalez, was she a nurse working in District 3 on

25   September 14?

Caa1mar4                    Fischer - cross

1   A.  Yes, sir.

2   Q.  Ms. Libiran, was she a nurse working in District 3 on

3   September 14?

4   A.  Yes, sir.

5   Q.  And when you wrote in this statement that there were

6   2 milligrams morphine sulfate missing found at 7 p.m. on same

7   date by Ms. Ricca Libiran, did you mean that she discovered at

8   7 p.m. that there were three Tubexes of morphine sulfate

9   missing?

10  A.  I don't know what time she discovered it, sir.  We were

11  told at 7 p.m.

12  Q.  So you were told that there was morphine sulfate missing at

13  around 7 p.m. on the evening of September 14th?

14  A.  Yes.

15  Q.  And following being told and following preparing this

16  written statement, were you searched by security before you

17  could leave that evening?

18  A.  Yes.

19  Q.  Then you came back in to work on the following day,

20  September 15th, 2009 and you were assigned to District 2?

21  A.  1.

22  Q.  Assigned to District 1 on the 15th; correct?

23  A.  Yes, sir.

24  Q.  And during the course of that shift were you called into a

25  meeting to meet with different people investigating what had

Caa1mar4                    Fischer – cross

1   happened with the missing morphine?

2   A.  It was not about the missing morphine, sir.

3   Q.  Were you called into a meeting with Pauline Frances-Lattery

4   during your shift on the 15th?

5   A.  Yes, sir.

6   Q.  And in that meeting was someone from the pharmacy also

7   there?

8   A.  Yes, sir.

9   Q.  And was Agnes Lucero there; do you remember?

10  A.  Yes, sir.

11  Q.  Was there a fourth person there as well; do you remember?

12  A.  Yes, sir.

13  Q.  And when you were called into that meeting, did those

14  individuals ask you questions?

15  A.  Yes, sir.

16  Q.  And you answered their questions.

17  A.  Yes, sir.

18  Q.  And after you answered their questions, you left and you

19  went back to work on the 15th.

20  A.  Yes, sir.

21  Q.  Later in the day, toward the end of your shift, you were

22  called up to meet with Pauline Frances-Lattery?

23  A.  Yes, sir.

24  Q.  And you learned at that time that your employment was being

25  suspended indefinitely pending investigation.

Caa1mar4                    Fischer - redirect

1    A.  Yes, sir.

2              MR. GARLAND:  One moment, your Honor.

3              THE COURT:  Mm-hmm.

4              (Pause)

5              MR. GARLAND:  No further questions, your Honor.

6              MR. NUWESRA:  Just one or two, your Honor, real quick.

7    REDIRECT EXAMINATION

8    BY MR. NUWESRA:

9    Q.  Ms. Fischer, what time was this meeting on 9/15/09 that you

10   had with Ms. Lattery, Ms. Byrne, and the other individual?

11   What time was it?

12   A.  I don't remember, but it would be before lunch.

13   Q.  Before lunch.

14   A.  Yes.

15   Q.  And you were allowed to continue working until the end of

16   your shift before you were suspended the next day; correct?

17   A.  Yes.

18   Q.  And did they give you more than one reason -- when you were

19   suspended, did they give you more than one reason for your

20   suspension or did they only give you one reason?

21   A.  I don't really remember anymore.

22             MR. NUWESRA:  Okay.  Thank you.  I have no other

23   questions, your Honor.

24             THE COURT:  Okay.  Anything else for this witness?

25             MR. GARLAND:  No, your Honor.

Caa1mar4

1          THE COURT:  Okay.  Ma'am, you may step down.

2          (Witness excused)

3          THE COURT:  Who is your next witness, please?

4          MR. NUWESRA:  Call her?

5          THE COURT:  Who is the next witness?

6          MR. NUWESRA:  Ms. Libiran.

7          THE COURT:  Ms. Libiran.

8          I'll tell you what, folks.  Let's take a lunch break

9    now and be back here at ten of 2, all right?  At ten of 2 we'll

10   resume.  Don't discuss the case over lunch.  Keep an open mind.

11         (Jury excused)

12         THE COURT:  Okay.  So I'll see you at ten of 2.

13         MR. NUWESRA:  Thank you.

14         MR. GARLAND:  Thank you, your Honor.

15         (Luncheon recess)

16

17

18

19

20

21

22

23

24

25

Caa1mar4                    Libiran-Danao – direct

1                        AFTERNOON SESSION

2                           2:02 p.m.

3              (In open court; jury present)

4              MR. NUWESRA:  Good afternoon, your Honor.  Plaintiff

5    calls Ms. Libiran-Danao.

6              THE COURT:  Ma'am, would you please stand up, raise

7    your right hand.

8              (Witness sworn)

9              THE CLERK:  Please state and spell your name for the

10   record.  Thank you.

11             THE COURT:  Go ahead.  Tell us your name.  Put your

12   hand down.

13             THE WITNESS:  Okay.  My name is AnaRicca

14   Libiran-Danao.  A-N-A-R-I-C-C-A, Libiran, L-I-B-I-R-A-N, hyphen

15   D-A-N-A-O.

16             THE COURT:  You may have a seat, ma'am.  And you're

17   going to talk to these people, so use the microphone.

18             THE WITNESS:  Sure.

19             THE COURT:  Thank you.

20    ANARICCA LIBIRAN-DANAO,

21        called as a witness by the Plaintiff,

22        having been duly sworn, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. NUWESRA:

25   Q.  Good afternoon, your Honor.  Good afternoon, Ms. Danao.

Caa1mar4                    Libiran-Danao - direct

1   How are you today?

2   A.  I'm good.  Thank you.

3   Q.  As you know, I'm Lee Nuwesra representing Ms. Martinez in

4   this case.

5        Ma'am, would you kindly tell the jurors what you

6   consider your race to be.

7   A.  I'm Filipino.

8   Q.  And would you kindly tell the jurors your educational

9   background, starting with college.

10  A.  Okay.  I graduated college in the Philippines, bachelor of

11  nursing, in Chinese General Hospital.  I graduated 1992.

12       And then I came -- I worked as a medical

13  representative back home.

14       And then in 2000 I went here, take my boards and

15  passed -- and got -- passed my boards, board exams in 2003, and

16  St. Barnabas sponsored me as an immigrant.

17       And then in 2011 I finished my master's in nursing

18  administration.

19  Q.  Thank you.  The master's degree that you attained in 2011,

20  how was it paid for?

21  A.  It was paid as a benefit, one of the benefits of the

22  hospital, through our union, 1199, so it's a collaboration with

23  St. Barnabas and 1199.

24  Q.  Okay.  Can you tell us whom you're currently employed by.

25  A.  I'm employed by St. Barnabas Hospital.

Caa1mar4                    Libiran-Danao - direct

1   Q.  And in what position?

2   A.  As a registered nurse.

3   Q.  And you mentioned earlier that in '03 you joined them;

4   correct?

5   A.  Correct.

6   Q.  All right.  Would it be fair to state that you continued to

7   work for St. Barnabas from '03 to date?

8   A.  Correct, yes.

9   Q.  Have your duties or responsibilities changed since '03

10  while working at St. Barnabas Hospital?

11  A.  As a registered nurse, it's basically treating the patient

12  needs and also the patient's condition, but in 2005 I was --

13  from medical surgical floor initially, I -- I transferred -- I

14  applied for a critical care training, and that's in 2005 I

15  worked in intensive care unit.

16  Q.  And who did you apply through?  Who did you ask to be

17  transferred?

18  A.  'Cause if -- if there's a training for critical care, you

19  write a request to the director of nursing that -- your

20  intention to -- to be trained as a critical care nurse.

21  Q.  And who is that director of nursing?

22  A.  Back then I wrote for my manager, which is Ms. Brown, and

23  to Miss Cathy Graham is the director of nursing back then.

24  Q.  Is she no longer the director of nursing?

25  A.  Today, no.

Caa1mar4                    Libiran-Danao - direct

1   Q.  And what is her -- what does -- does Ms. Graham still work

2   for St. Barnabas?

3   A.  Yes.

4   Q.  And what position does she hold?

5   A.  I'm not so sure.

6   Q.  Is she involved in any way with nursing?

7   A.  No.

8   Q.  Do you know when she stopped to be involved with nursing?

9   A.  I don't really know the exact date of when she was

10  transferred to a different department.

11  Q.  Would that department be housekeeping?

12  A.  It -- I think it's one of it.  Like I'm not so sure, but

13  I -- what I know, handling pharmacy, housekeeping, rehab, food

14  and nutrition.  It's a lot of departments.

15  Q.  And who replaced her?

16  A.  Ms. Richardson, Denise Richardson.

17  Q.  Now can you tell us how your duties and responsibilities

18  changed after you received the -- or at least after your

19  request was honored to transfer to the ICU.

20  A.  Critical care is very, very challenging work area.  It's

21  basically you're treating the most sickest patients in the

22  hospital.  We take care -- in our -- in St. Barnabas intensive

23  care unit, we take care of the -- not just, unlike different

24  hospital, they have like neurosurgical, but in our critical

25  care, it's basically general, from a simple critical sickness

1   to a really trauma, because our hospital is considered to be a

2   trauma hospital.

3   Q.  Since joining ICU and before attaining your master's

4   degree, did there ever come a time where you served in a

5   capacity of a charge nurse?

6   A.  In critical care area, yes.

7   Q.  Can you tell the jurors the significance of being a charge

8   nurse.

9   A.  Well, as a charge nurse, you have the responsibility of --

10  it's like running the unit for the day.  You assign your

11  coworkers certain responsibility, like to -- to do the

12  medication cart, to check the narcotic count.  You also assign

13  them from -- from the nursing staff to the auxiliary staff,

14  their responsibility, their break times from the morning to the

15  night, from the clerk.  You basically designate the work for

16  the day around the people that on duty that day.

17  Q.  Would it be fair to state that being a charge nurse is a

18  form of leadership position within the unit?

19  A.  It's not a leadership because basically you -- in our case,

20  in St. Barnabas, we have the tracking sheets where you would

21  take as a charge nurse, from senior to least senior.  So of

22  course if the senior around, they are the one who will take the

23  charge -- charge nurse.  So in -- it's like, well, leadership

24  in such a way you practice your -- yourself to be -- you're in

25  the area, like you're handling everybody, you're in command of

Caa1mar4                    Libiran-Danao - direct

1    everything, you're in control of the unit for that day.

2    Q.  And do you get any other benefits with the job besides what

3    you just testified about?  Let me ask it this way.  Do you get

4    extra pay for that?

5    A.  Yes.

6    Q.  Thank you.  And this extra pay, is it per shift, per week,

7    how is it -- is that per shift?

8    A.  It's -- yeah.  When -- when you're in charge, you get 23

9    bucks.

10   Q.  And you mentioned the word "auxiliary."  What does that

11   mean for us laypeople?

12   A.  Auxiliary is housekeeping, the physical therapy, the --

13   even the pharmacy.  If there's a problem, then you need to talk

14   to these people, like if you have problem with -- if one of the

15   staff has a concern, you need to speak like not just with

16   auxiliary staff, with the family members as well before you

17   push the problem up to your manager or your supervisor.

18   Q.  And I believe you mentioned that there was a rotation for

19   the charge nurses at St. Barnabas.  How long has this rotation

20   been in effect?

21   A.  I really don't know, but when I came in 2005, it's been --

22   it's been there.

23   Q.  And when you said it's based on seniority, is that

24   seniority within the unit?

25   A.  Yes, correct.

1    Q.  Are you familiar with the policy regarding getting lab

2    testing done at St. Barnabas?

3    A.  You mean lab testing?  Laboratory?

4    Q.  I'm sorry?

5    A.  Laboratory?

6    Q.  Laboratory.  I'm sorry, yes.  Are you familiar with the

7    policy at St. Barnabas?

8    A.  The doctor needs an orders for it before you send the

9    specimen.

10   Q.  And does this doctor order have to be in writing?

11   A.  Yes.

12   Q.  And violate -- violating this -- how seriously does St.

13   Barnabas take the violation of such policy?

14   A.  I'm not so sure about that.

15   Q.  Have you ever done any lab testing or sent any lab --

16   anything to the labs for testing without a written order from a

17   doctor?

18   A.  No.

19   Q.  You said one of the things you -- as a charge nurse you

20   would be in charge of is the medication cart.  Do you recall

21   that?

22   A.  Yes.

23   Q.  What's a medication cart?  What is it?

24   A.  It's -- because we use the manual medication dispensing so

25   we have these carts that has the -- with specific bins for each

Caa1mar4                    Libiran-Danao - direct

patient.  That's where the pharmacies replenish it every --
every shift.  So they change it every shift and then for each
patient and then there's -- what you need, you push it near the
bedside and that's where you give the medication, coinciding
with their identity and the medication that you give, and the
orders of the doctor.  Glass is there, medication cups is
there, garbage is nearby, and sharp containers are also nearby.
Q.  I'm sorry.  What's the last thing you mentioned?
A.  Sharp containers, like to throw the syringe.  It comes in a
sharp container, not in the regular garbage.
Q.  What was the other thing you said before that?
A.  The regular garbage.
Q.  And what is the sharp container?  What does it facilitate?
A.  It's a red container, garbage container that is being
changed by not housekeeping, from outside company, I believe,
and this is -- they throw -- 'cause it needs to be thrown in a
controlled manner because all the syringes, the sharps are
there so -- and then some narcotics we put in there -- not
some.  The narcotics should be put in there because these are
the controlled substances.
Q.  Would these disposed of narcotics, would they include
morphine?
A.  Yes.
Q.  Would they include Ativan?
A.  Yes.

1   Q.  What is the policy of the hospital with regard to not

2   abiding by that policy where you have to put such syringes and

3   controlled substances in that sharps container, sharp

4   container?

5   A.  I'm not sure really.

6   Q.  Did you ever during your tenure dispose of morphine

7   wrappers in somewhere else besides the sharps container?

8   A.  I believe I -- I didn't do it.  Maybe if I just leave it

9   like when I give medication to the patient, I -- I withdraw the

10  medication from the Tubex and then give the patient and then

11  when I come back there, I should have throwed it to the sharp,

12  but of course you don't know who's in there might throw it

13  somewhere like in the regular garbage or in the -- 'cause you

14  need to give the medication to the patient, and the empty vials

15  or wrappers or -- should be in the medication cart.  So I

16  cannot control who's going to throw it out and whatnot.

17  Q.  I see.  Are you in complete control as a charge nurse of

18  the medication cart for that shift?

19  A.  If I'm a charge nurse, I assign it to somebody else, and

20  they should be in control of their assignment.

21  Q.  Have you worked in all three districts of the ICU during

22  your tenure there?

23  A.  Yes.

24  Q.  Did there ever come a time where -- withdrawn.

25          Did there ever come a time where you worked in the

1  emergency room?

2  A.  Yes.  I floated -- I float some other times in emergency

3  room.

4  Q.  Is the work in the emergency room different than that in

5  the ICU?

6  A.  Completely different.

7  Q.  How is it different?

8  A.  Because in ICU, you have designated patients like for the

9  whole shift.  In emergency room, your patient comes and go.  If

10 you have like 20 patient for the day might be in emergency

11 room.  Depends how busy the emergency room is.  Unlike in ICU

12 you have like -- for the shift, you have maximum five patients,

13 or two patients, and then patients will be transferred.  It's

14 either admit or not.  So it's like you have a definite patient

15 for the whole shift.

16 Q.  I want to bring your attention to the time period of 2009.

17 Are you familiar with a nurse by the name of Lori Verzonilla?

18 A.  Yes.

19 Q.  Did there ever come a time in 2009 that you worked along

20 with her?

21 A.  Yes.

22 Q.  And was it in the emergency room?

23 A.  No.  She worked in ICU night shift.

24 Q.  Night shift.  Speaking of shifts, have you -- have you

25 worked various shifts since you joined the ICU?

Caa1mar4                    Libiran-Danao - direct

1    A.  The first eight months of my career in ICU, like eight

2    months, yeah, I worked night shift, and then I requested for a

3    day shift.

4    Q.  And who did you make that request from?  Who did you make

5    that request to?

6    A.  From my manager.

7    Q.  Who was that?

8    A.  Ms. Pauline Frances-Lattery.

9    Q.  Who is the night shift manager?

10   A.  No.  She is the --

11   Q.  No.  My question is:  Who is the night shift manager?

12   A.  None.

13   Q.  Is there an evening shift manager?

14   A.  None.

15   Q.  There is not?

16   A.  None.

17   Q.  Are you familiar with Ms. Ondoy?

18   A.  She is the supervisor, not the manager.

19   Q.  I see.

20   A.  ICU has one manager but different supervisors, different

21   shifts.

22   Q.  And what shift does Ms. Lattery work at?

23   A.  Oh, she comes mornings, sometimes nighttime.  Depends on

24   the needs of the unit, 'cause she takes -- take look the whole

25   unit as a manager.

Caa1mar4                    Libiran-Danao - direct

1   Q.  Okay.  And what was the process that you have to go through

2   to switch from night to day?

3   A.  You file for your request, which I did when I was like

4   applying for my critical -- like after my critical care

5   training, because of the family issues.

6   Q.  Okay.  And when working with Ms. Verzonilla -- and I want

7   to get your attention -- limit your attention to 2009 -- did

8   there ever come a time where she had to give a service talk?

9   Do you know what a service talk is?

10  A.  In-service, you mean?

11  Q.  In-service.  Sorry.  In-service.

12  A.  In-service?  No.

13  Q.  You don't remember ever having to attend one of her

14  in-services?

15  A.  I heard of it, but she never did it to me.

16  Q.  How did you hear about it?

17  A.  Because I was from vacation, 'cause I came -- I went to the

18  Philippines because I bring my sick dad back home, and then

19  when I come back September, I heard about it.

20  Q.  This is '09?

21  A.  Yes.

22  Q.  And whom did you hear that from, by -- who told you that?

23  A.  The unit.  I mean, the nurses.  I don't -- I don't remember

24  now who I specifically heard it from.

25  Q.  What was it that you learned about it?

1   A.   That we're not supposed to give narcotics on a TBI patient.

2              THE COURT:  On a what patient?

3              THE WITNESS:  TBI.  It's traumatic brain injury

4   patient.

5              THE COURT:  Traumatic brain injury.

6              THE WITNESS:  Yes.

7   Q.   And did you understand at the time that Ms. Verzonilla was

8   involved in that?  Was it your understanding at the time that

9   Ms. Verzonilla was involved in that in-service?

10  A.   No.

11  Q.   What was your understanding?

12  A.   That it's a general knowledge, it's a general in-service,

13  that we need to ask the nurses, inform us that be careful in

14  giving narcotics to those kind of patients with traumatic brain

15  injury because they alter the medication of the patient.

16  Q.   Are you familiar with a nurse by the name of Lucero, Agnes

17  Lucero?

18  A.   She is our education -- educational -- education man -- not

19  manager.  Nurse specialist, something.  But she gives -- taught

20  us.  It's my preceptor during my critical care training.  She

21  is.

22  Q.   And was she one of the people who shared with you when you

23  came back from the Philippines in September of '09 about this

24  TBI in-service?

25  A.   I cannot remember who did.

Caa1mar4                        Libiran-Danao - direct

1    Q.  When in September of '09 you came back?

2    A.  'Cause my son is going back to school then, so probably the

3    first week of September.

4    Q.  Okay.  I want to bring your attention to the middle of

5    September, on or about September 14th, '09.  Do you recall

6    that date?

7    A.  Yes.

8    Q.  And what do you recall of that?

9    A.  It's the incident that we have a missing narcotic.

10   Q.  And that narcotics was?

11   A.  Morphine.

12   Q.  Did there ever come a time prior to that incident where you

13   learned that there were other morphine missing in the emergency

14   room?

15   A.  Oh, I don't -- I don't know.

16   Q.  You don't know or you don't remember?

17   A.  I don't know.

18   Q.  And who was it that initially learned that there was

19   missing morphine on 9/14/2009?

20   A.  It's me who initially found out that there's some missing

21   morphine.

22   Q.  And I want to -- I want you to look at DX13.  Oh.  You see

23   the black -- I'm sorry.  You see the black binder?  Yeah.  Just

24   look on the side, DX13.  Let me know when you have it.  You can

25   turn it around.

1            Okay.  Does this document refresh your memory with

2    regard to this specific incident we're talking about?

3    A.  Yes.

4    Q.  All right.  Does your name appear anywhere in any of these

5    pages?

6    A.  Yes.

7    Q.  Where does it appear?

8    A.  At the bottom where my initial is, A. Libiran.

9    Q.  Okay.  So there's two pages.  The first one, so we can

10   follow it.

11   A.  And also the second one.

12   Q.  Mm-hmm.  And where are you initialing, on the bottom?

13   A.  Yes.  Number 8.  A. Libiran.

14   Q.  And on the second page, where does it appear?

15   A.  Number 8, second page.

16   Q.  Second page as well?

17   A.  Number 9 is the first page and number 8 in the second page.

18   Q.  I got you.  Let me ask you, did you count -- did you count

19   the medication at the end of that night?  Were you one of the

20   people who counted the medication?

21   A.  No.

22   Q.  Who counted the medication?

23   A.  Based on this paper, it's DeJesus, as per the signature

24   here.  It's DeJesus.

25   Q.  Give us the number or the numbers there.  What are you

1    referring to?

2    A.   It's here on the -- my right upper part, RN signature.  It

3    says there DeJesus.  C. DeJesus.  And --

4    Q.   That's signature number 1?

5    A.   Signature number 1, correct.

6    Q.   Okay.  And is she the only one that counted the medication

7    at the end of that evening?

8    A.   That evening she counted it with the incoming evening

9    shift, with J. Panes, number 8 on the first sheet, and

10   number --

11   Q.   What number is on the second page?

12   A.   The second page I cannot see, but he has stopped on the --

13   on the right lower side.

14   Q.   Is there a number next to it so I can follow you?

15   A.   There's not.  Like total use in 24 hours, he has some

16   there.

17   Q.   Now, ma'am, did you have to administer any morphine on that

18   day?

19   A.   Yes.

20   Q.   On how many occasions?

21   A.   Four.  Four.  One, two, three -- four.

22   Q.   Okay.  And were you the individual who received the

23   medication from the pharmacy at 12 noon?

24   A.   Yes, I am.

25   Q.   Okay.  And this is your handwriting that's in red?

1   A.  No.

2   Q.  Whose handwriting is that?

3   A.  It's from the pharmacy.

4   Q.  And the numbers are from the pharmacy too in red?

5   A.  Yes.

6   Q.  And both 10/22 and 10/12 there?

7   A.  Correct.

8   Q.  And who -- who's Wendy?

9   A.  It's the pharmacy who delivered -- pharmacist who delivered

10  narcotic.

11  Q.  And you initialed next to it.

12  A.  Yes.

13  Q.  Is that a man or a woman?

14  A.  It's a she.

15  Q.  And you initialed next to that; right?

16  A.  Yes, correct.

17  Q.  On the bottom where it says 2 a.m. received, do you know

18  who entered that?

19  A.  The 2 a.m.?

20  Q.  Yes.

21  A.  No.

22  Q.  Do you know what that represents?

23  A.  That they delivered the -- 2 a.m. they delivered one

24  Fentanyl PCA.

25              (Continued on next page)

1   Q.  Okay.  And are you familiar with those red initials shown

2   there?

3   A.  No.

4   Q.  And did you-- do you know who wrote-- and correct me if I'm

5   wrong-- in red on top?  It said-- what does that say, DCA or

6   PCA?

7   A.  It's the pharmacy's, I suppose.  I'm not so sure.

8   Q.  What are those letters?

9   A.  PCA is patient control analgesia.

10  Q.  Did you write anything in your handwriting on the second

11  sheet?

12  A.  Yes.

13  Q.  You also received the medication at noon with regard to

14  that medication.  Right?

15  A.  Correct.

16  Q.  That's in red.  When you refer to stat, that you were the

17  only individual that retrieved and administered Morphine for a

18  patient on that day?

19          MR. GARLAND:  Objection to form.

20          THE COURT:  The objection's sustained.

21  Q.  What shift did you work on that day?

22  A.  Seven a.m. to 7 p.m.

23  Q.  Based on your training and knowledge, did anybody else get

24  any Morphine besides you on that day?

25          MR. GARLAND:  Objection.

1    THE COURT:  Ground?

2    MR. GARLAND:  Same form.  He's going to the-- I think

3    it's unclear what he's going to.

4    THE COURT:  Do you understand the question?  Do you

5    understand the question?

6    A.  Can you repeat it?

7    Q.  Sure.

8    Would it-- well, is there anybody else's handwriting

9    in the column of "Morphine" from 8:30 a.m. till 7 p.m. besides

10   the pharmacy?

11   A.  It's only mine.

12   Q.  And for those of us who are not too familiar with this

13   form, would it be fair to state that initially in the morning,

14   there were 12 vials of Morphine of 2 milligram tubexes in that

15   column?

16   A.  Correct.

17   Q.  And that there were 10 other tubexes of 2 milligrams added

18   as of noon?

19   A.  Correct.

20   Q.  So that gives us 22 in total?

21   A.  Correct.

22   Q.  And if you were the one that retrieved, based on your

23   earlier testimony, four tubexes, how much are you supposed to

24   wind up with at the end?

25   A.  Twenty-two minus four is 18.

1  Q.  Eighteen?

2  A.  Yes.

3  Q.  And is that what is reflected there just below 7 p.m., that

4  there were 18 tubexes left?

5  A.  Because I used-- there are different kinds of Morphine.  I

6  used a form-- three 4 milligrams of Morphine and I used 1

7  milligrams of-- one Morphine of 2 milligrams.  So that makes

8  four Morphine tubexes.  It's a different milligram or a

9  different concentration.  So I added as four on a different --

10  how do you say -- different strength, I should say.

11  Q.  Okay.  So let me see if I understand.  There were a need

12  for a total of 4 milligrams to be administered during your

13  shift?

14  A.  During my entire shift, I used four-- three-- three tubexes

15  of 4 milligrams.

16  Q.  Okay.

17  A.  And one Tubex of 2 milligrams.

18  Q.  Okay.

19  A.  That makes four.

20  Q.  All right.  Let's concentrate on the column that you

21  received an additional 10 tubexes of 2 milligrams.

22  A.  Okay.

23  Q.  Can we just concentrate on that column?

24  A.  Sure.

25  Q.  All right.  Can you tell me if between 8:30 a.m--

1  withdrawn -- between 12 p.m. and 7 p.m., if there is-- all

2  those entries are in your handwriting in black?

3  A.  Yes.

4  Q.  And were you assigned to room-- what room were you assigned

5  to based on this document?

6  A.  Based on this document, I'm assigned on 516, 514.

7  That's --

8  Q.  That's it, two rooms?

9  A.  514A and 516A.

10  Q.  Okay.  And would it be fair to state, at least from this

11  document, that you were the one who entered between 6 p.m. and

12  7 p.m.-- is that your handwriting over there between 6 p.m. and

13  7 p.m.?  Is that your handwriting?

14  A.  Yes.

15  Q.  And the room number, that's your handwriting there?

16  A.  Correct.

17  Q.  516A?

18  A.  Correct.

19  Q.  And for 7 p.m., is that your handwriting for 516A, Room

20  516A?

21  A.  Correct.

22  Q.  And is that your handwriting just below 7 p.m. where it

23  says "missing"?

24  A.  Correct.

25  Q.  Can you tell me this:  On this, who was the person who

1   counted the med-- the medicine in the morning of 9/15-- I'm

2   sorry, 9/14/2009?

3   A.  I-- it's C. DeJesus.  I answered.

4   Q.  I'm sorry?

5   A.  C. DeJesus.

6   Q.  Is that the person who also came in at nine?

7   A.  Yes, towards the end of the shift.

8   Q.  And does that apply to the second page?

9   A.  Yes.

10  Q.  Ms. Libiran-Danao, I asked you earlier whether you ever

11  threw Morphine tubexes or other narcotics tubexes in the cart

12  instead of the biohazard cart.  Do you recall that?

13  A.  Yes.

14  Q.  And you stated that you never did that.  Am I correct?

15  A.  Never did on that date or as a practice?

16  Q.  Any time as a practice.

17  A.  As a practice, of course you cannot predict what you're

18  doing on that day.  Like, for example, I have a patient.  I get

19  their narcotic.  I withdraw the medication, I put it on the

20  medication cart.  Maybe I'll get it back, throw it in the bin.

21  Some other time I've totally forgot it.  I attend to my other

22  patient.  Somebody might throw it out.

23          So as a practice, I really cannot guarantee you all

24  the time I'm putting it on the bin-- on the sharps container.

25  Q.  So there could have been other times where you just threw

1    them in the regular cart?

2    A.   Probably so.

3    Q.   Were you ever disciplined for that?

4    A.   No.

5    Q.   Did-- withdrawn.

6         Are you familiar with the practice, based on your

7    experience, of how the pharmacy delivers medication during the

8    course of the day?

9    A.   It is every Wednesday when they deliver narcotics or the

10   controlled substances.  And then whoever has the key, the

11   narcotic key, will receive it.  And then they-- we accounted

12   it.  Like in this sheet, you can see that we-- that pharmacy's

13   total-- totally-- the pharmacy will put in how much they added

14   and then we total it as the total balance of the-- of the

15   narcotics or the controlled substance.  And then we both sign

16   on this sheet so as to acknowledge that we are on the right

17   accounting.

18   Q.   Did there ever come a time where you needed to retrieve

19   medication from the pharmacy?

20   A.   Yes.

21   Q.   How often do you do that in a week?

22   A.   I cannot tell that it's regular.

23   Q.   On those occasions that you did, how long did it take you

24   to go to the pharmacy and retrieve whatever you need?

25   A.   Depends how busy is the pharmacist.

1   Q.  What was the longest?

2   A.  Twenty, 15 minutes.

3   Q.  You would just wait there for 15 to 20 minutes waiting for

4   the pharmacist to dispense the medication to you?

5   A.  Yes.

6   Q.  And did there ever come a time where you had an occasion

7   where you needed to order medication for your unit besides a

8   Wednesday?

9   A.  Yes.

10  Q.  And how often would you have to do that?

11  A.  Depends on the needs of the unit that day.

12  Q.  And how long in those occasions did it take the pharmacy to

13  deliver medications to your unit?

14  A.  It will take a time.

15  Q.  How long?

16  A.  Hours.

17  Q.  What was the longest?

18  A.  Three hours, four hours.

19  Q.  Now, ma'am, with regard to the incident of the missing

20  Morphine on 9/14/2009, were you ever disciplined for the

21  missing Morphine on that day?

22  A.  No.

23  Q.  Did you-- was the missing Morphine investigated?

24  A.  Yes.

25  Q.  Okay.  What unit did you work in on that day?

1  A.  I'm in District 3.

2  Q.  And just tell me in your own words exactly what you had to

3  do, you personally had to do, in the total investigation of the

4  missing Morphine.

5  A.  Okay.  When I discovered that there's a missing Morphine--

6  because around seven I need to give Morphine to my patient.  So

7  I opened the narcotic cabinet, and when I opened it, I saw two

8  boxes of Morphine:  One is sealed and the other one is open.

9  We know that the sealed box contains 10 Tubexes, so that's

10  sealed and that's 10.  So when I look at the other one, it's

11  open, so I took mine.  I took the one that I need, the 2

12  milligrams.  So I counted it, it's 18.

13        But, of course, right after getting it, my next duty

14  is to write it on the narcotics sheet.  And then when I found

15  out when I'm about to write-- that's why I-- when I'm about to

16  write, I saw it's still 22.  So in my mind, somebody took three

17  tubexes of Morphine.  So I put-- I put 1/21, 1/22, and the

18  rest, because I'm thinking that my colleague might do it as a

19  late entry.  But in the meantime I need to write it, write

20  mine, so I leave spaces for my colleagues, whoever got it,

21  because I'm not sure who got it.

22        So I give the medication to my patient, because

23  patient is in pain.  So I gave the 2 milligrams Morphine, and

24  then I go back and ask my colleagues if they're using Morphine.

25  I ask actually twice.  And then I call pharmacy to verify how

1    much is the last count of Morphine from the night just to make

2    sure that the count from the start is right.  And it is right.

3         Then I ask again my colleagues and then nobody said

4    they used it.  So I called my supervisor that we have a problem

5    here in I.C.U. that we are missing Morphine, three Tubexes of

6    Morphine.  So she went down and investigate.  And then, after

7    that, we called security-- she called security and all our

8    pocketbooks were checked.  We were patted if there's really

9    Morphine.  And then they didn't find anything, so we were sent

10   home.

11        But prior to that security incident, they asked me to

12   write a statement how-- what happened to the missing Morphine,

13   how I discovered the missing Morphine.  And, also, I filled out

14   the missing narcotic form which is part of the hospital

15   protocol.

16   Q.  Are you finished with your answer?

17   A.  Yes.

18   Q.  Did you get disciplined for writing between 6 p.m. and 7

19   p.m. that there were two missing Tubexes?

20   A.  No.

21   Q.  What is the policy at St. Barnabas with regard to filling

22   in for any of your colleagues that you were working with at the

23   time?

24   A.  We're not supposed to leave spaces, but at that time I'm

25   like-- I don't know who did-- who took the Morphine.  So I'm

1    presuming-- I presume that my coworkers put it in.  So I put

2    the number because I just found in the bin 19 plus the one I

3    took, that the remaining will be 18.

4    Q.  And besides calling your supervisor and getting searched

5    and then giving the statement, did anybody from the hospital

6    meet with you the following day?

7    A.  Yes.

8    Q.  Who was it?

9    A.  I was called from home.  I was called by my manager,

10   Ms. Pauline Lattery-- Frances-Lattery, to come in.  I was off

11   that day.  She called me to come into the hospital because

12   they're doing an investigation regarding the missing Morphine.

13   Q.  What time was it that you showed up?

14   A.  I know they called me around 9:30, so I need to prepare.  I

15   live from-- I live in Rockland, going down to Bronx, is roughly

16   around an hour, after an hour.  I'm not sure what exact time

17   is.

18   Q.  And who else besides Ms. Libiran-Danao were there?

19   A.  What I remember is Patty Byrne, the pharmacist, and

20   Ms. Libiran-Danao.

21   Q.  Was Ms. Ondoy there?

22   A.  I can't remember.

23   Q.  Incidentally, the supervisor you called the evening before,

24   who was it?

25   A.  It's Ms. Norma Ondoy.

1    Q.  And what's the race of Ms. Ondoy, just to refresh our

2    memory?

3    A.  It's Filipino.

4    Q.  And did Ms. Byrne ask you about why you had to fill in

5    between 6 p.m. and 7 p.m. that there were two missing

6    Morphines-- two missing Morphine Tubexes during that time

7    period?

8    A.  Can you repeat again, sir?

9    Q.  Sure.

10          Did Ms. Byrne ask you, following when they made you

11   come all the way down from Rockland, why you wrote between 6

12   p.m. and 7 p.m. there were two missing Morphine Tubexes?

13   A.  Yes.

14   Q.  And what did you say to her?

15   A.  Like I said to you today, that I presume that my coworker

16   will do the late entry.  That's why I-- out of my thing that I

17   put the numbers out of my own self that I put the numbers for

18   them.

19   Q.  And was Ms. Libiran-Danao there when you said that?

20   A.  Yes.

21   Q.  To all of them you said that?

22   A.  Yes.

23   Q.  They were all there.

24          And did anybody discipline you for doing that?

25   A.  No.

1   Q.  Now, correct me if I'm wrong here, ma'am.  Your entry says

2   that at 7 p.m., right, you retrieved medication for patient in

3   Room 516A, one Tubex of 2 milligrams.  Correct?  Is that what

4   that says?

5   A.  Can you repeat it again?  I'm sorry.

6   Q.  Well, you see where it says 7 p.m.?

7   A.  Correct.

8   Q.  Is that your handwriting?

9   A.  Correct.

10  Q.  And 516A?

11  A.  Correct.

12  Q.  That's the room where your patient that you had to

13  administer the Morphine to was.  Correct?

14  A.  Correct.

15  Q.  And at 7 p.m. you retrieved one Tubex of 2 milligrams for

16  that patient.  Correct?

17  A.  Correct.

18  Q.  And you had 19 left at the time that you retrieved that.

19  Correct?

20  A.  No.  When I opened the cabinet, I see one that is sealed

21  and the other is open, the other box of Morphine.  Right?  So

22  when I took mine and I counted it, it's 18.

23  Q.  So how come you wrote here that as of 7 p.m. there were 19?

24  A.  I-- I don't know why I did that.

25  Q.  Thank you.

1          Going back to Ms.-- I'm sorry, Nurse Verzonilla.

2    Besides the in-service talk, did there ever come a time in

3    September of 2009 that you also learned that there had to be

4    round cause-- root cause analysis?

5    A.   Like I told you, I heard it because is, like, right after

6    my vacation.  So when I come back, they told me about what

7    happened.  And then this is part of the in-service -- the

8    in-service is a result of the root cause analysis.

9    Q.   Were you involved in that root cause analysis?

10   A.   No.

11   Q.   Did you attend it?

12   A.   No.

13   Q.   Do you remember testifying at my offices on November 10,

14   2011, in a deposition?

15   A.   Yeah.

16   Q.   Would you please take a look and let me know if that would

17   refresh your memory as to what you said at my office?

18          THE COURT:  I'm terribly sorry.  She hasn't testified

19   that her memory needs to be refreshed.  If you wish to impeach

20   her, there is a time-honored way of doing it.  And I really

21   insist she doesn't look at anything.  You ask her, "Were you

22   deposed?  Were you asked the following questions and did you

23   give the following answers?"  You give your opponent the page

24   and line from which you are reading and then you do it.

25   Q.   What's a grand round?

1    A.   Grand rounds.

2    Q.   Yes.  What is that?

3    A.   It's basically educating all the unit, the residents, the

4    doctors, regarding certain topics.  Like, there's a grand round

5    for residents, there's a grand round for nurses based on their

6    expertise.

7    Q.   Is that different than in-service talks?

8    A.   Definitely, yes.

9    Q.   So let me ask you this:  Did there ever come a time in

10   September of 2009 where you had attended a grand round

11   regarding an incident that involved Ms. Venezuela?

12   A.   Verzonilla.

13   Q.   Verzonilla.  Sorry.

14   A.   I can't recall.

15   Q.   Now going back to this DX 13, when you met with Ms. Byrne

16   and the other members that were investigating the missing

17   Morphine, were you questioned about this discrepancy between

18   you putting that there were two missing between six and seven

19   and one missing after seven?

20   A.   Yes.

21   Q.   And were you written up with regard to the latter -- the

22   latter entry after 7 p.m.?

23   A.   No.

24   Q.   Were you suspended or disciplined in any shape or form for

25   writing this late entry after 7 p.m.?

1    A.  No.

2              MR. NUWESRA:  Thank you.  I have no other questions,

3    your Honor.

4              THE COURT:  You may inquire.

5              MR. GARLAND:  Thank you, your Honor.

6    CROSS-EXAMINATION

7    BY MR. GARLAND:

8    Q.  You mentioned toward the beginning of your testimony this

9    afternoon that going back to, oh, around 2005, there was a

10   rotation in place where the nurses would take turns being the

11   charging nurse going from most senior to least senior.

12             Going back in that time, was Ms. Martinez the charging

13   nurse at times?

14   A.  Yes.

15             THE COURT:  I'm sorry, is it charging nurse or charge

16   nurse?

17             MR. GARLAND:  Charge.

18             THE COURT:  Charge nurse.  Let's all use the same

19   term.

20             MR. GARLAND:  Charge nurse.

21   Q.  So was Ms. Martinez a charge nurse then at times going back

22   to 2005?

23   A.  Yes.

24   Q.  How do you know that?

25   A.  Because I'm less senior than her.  So if ever she got to be

1    charge, I'm there and I know that she's in charge.  She's-- and

2    I remember that.

3    Q.  Are you saying that there were days that you and she were

4    working --

5    A.  Yes.

6    Q.  -- when she was the charge nurse?

7    A.  Yes.

8    Q.  Were there also days when you and she were working together

9    that you were the charge nurse?

10   A.  Yes.

11   Q.  Let's go back now to Exhibit DX 13, Defense Exhibit 13.

12   And let me know when you're there.  Are you there?

13   A.  Yes.

14   Q.  Okay.  Let's look at the-- make sure we're all on the same

15   page.  The first page at the top, it should say "St. Barnabas

16   Hospital" and then, to the right, roman numeral II.  Do you see

17   that?

18   A.  Yes.

19   Q.  Then, to the right of that, it says "Drug Disposition

20   Record."

21   A.  Yes, I can see.

22   Q.  Now, let's come down a few lines to the line that says

23   "Count Brought Forward."  Do you see that?

24   A.  Correct, I saw it.

25   Q.  Then, if you go to the right of that line or continue on

1   that line horizontally, the first number that you'll come

2   across is the number 5?

3   A.  Yes.

4   Q.  And then keep going across horizontally until you get to

5   the number 12.  Do you see that?

6   A.  Correct.  Yes.

7   Q.  And if you look above the number 12, you see "Morphine

8   sulfate 2 milligrams Tubex"?

9   A.  Yes.

10  Q.  So that means the count being brought forward at the

11  beginning of the shift in the medication cabinet was 12

12  Morphine sulfate 2 milligram Tubexes?

13  A.  Yes, correct.

14  Q.  Let's go over one more in that same line.  "Count brought

15  forward," go over one more until you get to 17.  Do you see

16  that?

17  A.  Yes.

18  Q.  And if you go above 17, you see the words "Morphine sulfate

19  4 milligrams Tubexes"?

20  A.  Yes.

21  Q.  So is that then a different dosage of Morphine sulfate than

22  the one immediately to the left?

23  A.  Yes.

24  Q.  And then the number 17 there means that there were 17

25  Tubexes of Morphine sulfate, 4 milligrams Tubexes, at the

1   beginning of the shift on the 14th of September?

2   A.  Correct.

3   Q.  I should say the day shift, beginning of the day shift.

4   A.  Yes.

5   Q.  And I think you also mentioned Mr. DeJesus's name.

6          So if you continue going to the right of the number

7   17, do you recognize that that's, at the right, Mr. DeJesus's

8   signature?

9   A.  Yes.

10  Q.  And that's verifying the count for the drugs listed on this

11  sheet at the beginning of the day shift on the 14th of

12  September?

13  A.  Yes.

14  Q.  Now, let's look at the column that has at the top "Morphine

15  sulfate 2 milligrams Tubexes."  Then let's go down to 12 p.m.

16  where, on the left, it says "Pharmacy."  Do you see that?

17  A.  Yes.

18  Q.  So we're going to start on the left where it says

19  "Pharmacy" and then move across horizontally until we get to

20  that "Morphine sulfate 2 milligrams Tubexes" column.  Then the

21  numbers 10/22 appear.

22  A.  Yes.

23  Q.  Now, 10/22, does that reflect that at 12 noon on the 14th,

24  that another 10 Tubexes of the 2 milligram Morphine sulfate was

25  put in the medication cabinet in District 3?

1    A.  Yes.

2    Q.  So now, as of 12 noon on the 14th, this record shows a

3    total of 22 Morphine sulfate 2 milligram Tubexes?

4    A.  Yes.

5    Q.  Now let's keep going now.  That same 12 p.m. line where it

6    says "Pharmacy," move over to the right again, and in red

7    there's another 10/12.  Do you see that?

8    A.  Yes.

9    Q.  And that's for yet a different dosage of Morphine sulfate?

10   A.  Yes.

11   Q.  That's for the 30 milligrams?

12   A.  Yes.

13   Q.  And this record indicates that at 12 noon, that an

14   additional 10 of that particular dosage was added to the

15   medication cabinet in District 3?

16   A.  Yes.

17   Q.  Then, moving over to the right, again the same line, "12

18   p.m. Pharmacy."  Moving over to the right, there's the stamp

19   "A. Libiran."

20   A.  Yes.

21   Q.  That's you?

22   A.  Yes.

23   Q.  And you placed the stamp there?

24   A.  Yes.

25   Q.  And then you would put your initials above it?

1   A.  Yes.

2   Q.  And then to the right, immediately to the right, the name

3   "Wendy" appears in red?

4   A.  Yes.

5   Q.  And Wendy, you said, is the pharmacy tech who made the

6   delivery when you were there?

7   A.  Yes, correct.

8   Q.  So you were working with Wendy to corroborate what she was

9   delivering so you could both note it on this record?

10  A.  Yes.

11  Q.  Now, let's again go back now to the column where the

12  heading is "Morphine sulfate 2 milligrams Tubexes."  So we've

13  just looked at what was going on at noon.  Let's continue down

14  that column now and there are four entries:  1/21, 1/20, 1/19

15  and 1/18.  Do you see those?

16  A.  Yes.

17  Q.  Did you make those entries all at the same time?

18  A.  Yes.

19  Q.  And you did that at 7:00, when you went into the medication

20  cabinet to get the one Tubex of 2 milligram Morphine for your

21  patient?

22  A.  Yes.

23  Q.  Now, let's go back to the top and go to a different column,

24  the "Morphine sulfate 4 milligrams Tubexes."

25          During the course of your shift on September 14th, did

1    you also go into the medication cabinet and record that you had

2    taken out that dosage for patients of yours?

3    A.  Four milligrams Morphine, yes.

4    Q.  And you did that three times?

5    A.  Three times.

6    Q.  So the first looks like it was at 8:30 a.m. or 8:20 a.m.?

7    Can you tell the time?

8    A.  Around 8:30, 8:20.  8:30.

9    Q.  And then the handwriting is yours there, 1/16?

10   A.  Correct.

11   Q.  Which indicates that after you took one Tubex of the 4

12   milligrams, there were 16 Tubexes of the 4 milligrams left?

13   A.  Correct.

14   Q.  And if you continue going over horizontally, you initialed

15   that under the heading where it says "R.N. Signature

16   Administering"?

17   A.  Correct.

18   Q.  And to the right of that, is that your handwriting, to the

19   right of your initials?

20   A.  Yes.

21   Q.  And that's the doctor's name?

22   A.  Yes.

23   Q.  The doctor's name who gave the order for that particular

24   drug and dosage?

25   A.  Yes.

1    Q.  Now let's go down to the-- again, stick again to the

2    "Morphine sulfate 4 milligrams" column.  It looks like at

3    around-- is it 12:20 or 12:30, you went into the medication

4    cabinet in District 3 and took out one more Tubex of the 4

5    milligram Morphine sulfate?

6    A.  Yes.

7    Q.  And so then you recorded 1/15 indicating you had taken out

8    one and, after you took out the one, there were 15 left?

9    A.  Correct.

10   Q.  And going over to the right, far right in that same line,

11   you initialed and put the doctor's name in the next box?

12   A.  Yes.

13   Q.  And beneath that, it looks like 5:30 you went into the

14   medication cabinet and took out one Tubex of the Morphine

15   sulfate 4 milligrams that you recorded here.  Is that right?

16   A.  Yes.

17   Q.  And so you put 1/14?

18   A.  Yes.

19   Q.  And that signified that after you took the one out of the 4

20   milligram dosage, there were 14 left?

21   A.  Correct.

22   Q.  And, again, same thing to the right.  You initialed and put

23   the doctor's name?

24   A.  Correct.

25   Q.  Now let's go back to the Morphine sulfate 2 milligrams.  So

1   we're moving over one column to the left and then you've got

2   four entries:  1/21, 1/20, 1/19 and 1/18.  And that reflected

3   after you went in and took out the one at around seven, there

4   were 18 Morphine sulfate 2 milligram Tubexes left?

5   A.  Yes.

6   Q.  Now, you also mentioned that you were asked to write a

7   statement on the evening of the 14th.  Is that right?

8   A.  Yes.

9   Q.  Who asked you to write a statement?

10  A.  It's Ms. Norma Ondoy.

11  Q.  And what was her position again?

12  A.  Nursing supervisor evening shift.

13  Q.  Let me ask you to turn your attention to Exhibit 10 in the

14  binder in front of you, Defendant's Exhibit 10.  Are you there?

15  A.  Yes.

16  Q.  Is that the written statement that you provided to

17  Ms. Ondoy on September 14th?

18  A.  Yes.

19  Q.  Since it's in your handwriting, would you please read for

20  the jury what you wrote?

21  A.  Yes.  "September 14th, 2009.  To:  Ms. Norma Ondoy, Nursing

22  Supervisor, St. Barnabas Hospital.  From:  AnaRicca

23  Libiran-Danao.  Regarding:  Missing narcotic.  Dear Ms. Ondoy,

24  I'm writing this statement regarding the missing narcotic.  At

25  7 p.m. when the doctor (Dr. Nandipati) of 516A ordered a stat

1   dose of Morphine 2 milligrams IV push, I discovered that there

2   were three Tubexes missing so all the staff were notified.

3   Pharmacy made aware and verified the last count.  When

4   everything was done and still with no avail, nursing supervisor

5   was informed and security was called."

6   Q.  Now, you also mentioned in your direct testimony that you

7   filled out a form of some sort.  What kind of form was that?

8   A.  It's missing medication form.

9   Q.  I'm going to ask you to turn to DX-8, the second page.

10  Defendant's Exhibit 8, second page.  Are you there?

11  A.  Yes.

12  Q.  Is that the form you were referring to?

13  A.  Yes.

14  Q.  And is that handwriting on that form yours?

15  A.  Yes.

16  Q.  Again, since it's your handwriting, would you please read

17  it for the jury?

18  A.  Yeah.  The date is 9/14/09.  The shift is 7 a.m. to 7 p.m.

19  The unit is 5 North.  Nursing report.  Controlled substance

20  under investigation:  Morphine 2 milligrams Tubexes.  Time

21  shortage was discovered:  7 p.m.  Name of person discovering

22  shortage," it's me, "AnaRicca Libiran.  Details of the problem:

23  At 7 p.m. the M.D. of 516A ordered one dose stat of Morphine 2

24  milligrams.  When I counted, it was found out that 2 milligrams

25  Tubexes is missing so all the staff was notified.  Name of

1   senior nurse or charge nurse notified:  Elizabeth doctor.  Name

2   of nurse manager or supervisor completing this report:

3   Ms. Norma Ondoy."

4   Q.  Let me just go back in the section "Details of the

5   problem."  Could you just read that one more time, please?  I'm

6   not sure you read all the words.

7   A.  "At 7 p.m. the M.D. of 516A ordered a one stat dose of

8   Morphine 2 milligrams.  When counted, it was found out that the

9   Morphine 2 milligrams Tubexes is missing so all the staff was

10  notified."

11          MR. GARLAND:  Let me just look at my notes, your

12  Honor.  I may be done.

13          THE COURT:  Okay.

14          MR. GARLAND:  I have nothing further of this witness,

15  your Honor.

16          THE COURT:  Any redirect?

17          MR. NUWESRA:  Yes, your Honor, a couple of quick ones.

18  REDIRECT EXAMINATION

19  BY MR. NUWESRA:

20  Q.  Ms. Danao, you stated on cross that when you first in 2005

21  joined I.C.U-- withdrawn.

22          When in 2005-- when in 2005 did you join I.C.U.?

23  A.  I can't remember the exact date.

24  Q.  Can you remember the season?

25  A.  Maybe before May or May.  Around that time.

1  Q.  Around May?

2  A.  April/May.

3  Q.  And on cross-examination, you stated to-- during one of

4  your answers to Mr. Garland's questions that in 2005, when you

5  worked with my client, that you had observed her work as a

6  charge nurse.  Is that correct?

7  A.  Yes.

8  Q.  Let me take your-- let me take your attention to DX 8.  Do

9  you have it?

10  A.  DX-8?  Yes.

11  Q.  When was it that you authored this?  What time was it that

12  you authored this on the 14th of September, '09?

13  A.  DX-8, the one that I wrote?

14  Q.  Yes.

15  A.  Yeah, September 14th, 2009.

16  Q.  When was it?  Was it in the evening?

17  A.  7 p.m.

18  Q.  7 p.m.?

19  A.  Around that time.

20  Q.  Is there any reason why your report states that only one 2

21  milligram Tubex was missing?

22  A.  I didn't state that it's only 1 milligram.  I said "M.D. of

23  516A ordered one dose of stat Morphine 2 milligrams.  When

24  counted, it was found out that Morphine 2 milligrams Tubexes is

25  missing, so the staff nurse were notified."

1   Q.  Well, that the Morphine 2 milligram Tubex is, as in

2   singular.  Correct?

3   A.  Correct, but --

4   Q.  That's all I need to know.

5           And the 2 milligram Tubex is the one that you are

6   testifying about on DX 13 that each Tubex was a 2 milligram

7   Tubex.  Right?

8   A.  Two milligram Tubex, but three missing Tubexes.

9   Q.  But the three were in 2 milligram Tubexes.  Right?

10  A.  Tubexes.

11  Q.  So each milligram was in one Tubex?

12  A.  Two milligrams in each one.

13  Q.  One Tubex.  And when you wrote your report --

14          THE COURT:  I'm sorry, I heard two voices there.

15          MR. NUWESRA:  I'm sorry, your Honor.

16          THE COURT:  Are you saying a single Tubex has 2

17  milligrams in it?

18          THE WITNESS:  Correct.

19          THE COURT:  Thank you.

20  Q.  And in your report, you stated that there was a 2 milligram

21  Tubex is, singularly, missing.  Correct?

22  A.  It is written here, yes, but --

23  Q.  Thank you.

24          MR. NUWESRA:  I have no further questions, your Honor.

25          THE COURT:  Anything else?

1          MR. GARLAND:  Just to follow up on this, if I may,

2     your Honor, real quickly.

3     RECROSS-EXAMINATION

4     BY MR. GARLAND:

5     Q.  Looking at Defendant's Exhibit 8, that form, the reference

6     to the one dose statistic of Morphine, 2 milligrams, did that

7     refer to the Tubex that you were going to get for your patient?

8     A.  Yes.

9     Q.  And then later you wrote that "the Morphine 2 milligrams

10    Tubex is missing."

11         Let me ask this in the following way:  Is English your

12    native tongue?

13    A.  No.

14    Q.  Do you always speak or write English correctly?

15    A.  Not all the time.

16         MR. GARLAND:  Nothing further, your Honor.

17         MR. NUWESRA:  May I, your Honor?

18         THE COURT:  You may.

19    REDIRECT EXAMINATION

20    BY MR. NUWESRA:

21    Q.  At the time that you wrote this, were you in the master's

22    program?

23    A.  Yes, I ...

24         THE COURT:  Yes or no?  Yes or no?

25         THE WITNESS:  Yes.

1    THE COURT:  Thank you.

2  Q.  And were those lectures and those classes, were they given

3  in English?

4  A.  Yes.

5  Q.  And when you were studying in the Philippines, were the

6  classes given in English?

7  A.  Yes.

8  Q.  Thank you.

9    MR. NUWESRA:  I have no other questions.

10    THE COURT:  Anything else?

11    MR. GARLAND:  No, your Honor.

12    THE COURT:  Okay.  You may step down.  Thank you.

13    (Witness excused)

14    THE COURT:  We're going to take a five-minute break

15  and then we're going to come back.  We'll go until 4:30.  I

16  have a sentencing then.  All right?  Thank you.

17    (Recess)

18    (Jury not present)

19    THE COURT:  Okay.

20    (Recess)

21    (In open court; jury not present)

22    THE COURT:  I'm ready.  As long as I'm sitting here,

23  I'm ready to go.  Sorry.

24    (Jury present)

25    THE DEPUTY CLERK:  All right.  Jury present.

1          THE COURT:  Have a seat.  Call your next witness.

2          MR. NUWESRA:  Good afternoon, your Honor.  Plaintiff

3     calls Ms. Lisa Greene.

4          THE COURT:  Ms. Greene, won't you come up, please.

5          (Witness sworn)

6          THE CLERK:  Please state and spell your name for the

7     record.

8          THE WITNESS:  Lisa D. Greene, G-r-e-e-n-e.

9          THE COURT:  You may inquire.

10    LISA D. GREENE,

11         called as a witness by the Plaintiff,

12         having been duly sworn, testified as follows:

13    DIRECT EXAMINATION

14    BY MR. NUWESRA:

15    Q.  Good afternoon, Ms. Greene.

16    A.  Good afternoon.

17    Q.  My name is Lee Nuwesra and I'm the attorney representing

18    Ms. Martinez in this case.

19         Would you kindly tell us whom you're employed by?

20    A.  St. Barnabas Hospital.

21         (Continued on next page)

22

23

24

25

1    BY MR. NUWESRA:

2    Q.  And how long have you been employed by St. Barnabas?

3    A.  27 years in May.

4    Q.  Can you tell us very briefly about your educational

5    background, starting with college, or post high school.

6    A.  I have an associate in applied science.  Currently I'm

7    doing my BS and a master's combined at Mercy College.

8              THE COURT:  At Mercy College?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  If you can speak into the

11   microphone, ma'am, it would help.

12             THE WITNESS:  Better?

13             THE COURT:  Oh.  Much better.  Yes.  I just have some

14   issues, okay?  Thank you so much.

15   BY MR. NUWESRA:

16   Q.  Can you tell me the current position that you have with St.

17   Barnabas.

18   A.  Registered nurse.

19   Q.  And what unit are you assigned to?

20   A.  Emergency department.

21   Q.  How long have you been assigned to the emergency

22   department?

23   A.  Approximately 15 years.

24   Q.  And do you float to any other department -- withdrawn.

25             Have you floated to any other department within St.

1   Barnabas in the last 15 years?  Let's make it shorter.  Within

2   the last five years?

3   A.  No.

4   Q.  Okay.  Are you familiar with the ICU unit?

5   A.  Yes.

6   Q.  What shift do you work?

7   A.  Flex shift, 7A, 7:30.

8   Q.  And 7A as in 7 a.m.?

9   A.  Yes.

10  Q.  That's three days a week?

11  A.  Three days a week, but I wear two hats at St. Barnabas.

12  Q.  And what is the other hat?

13  A.  I'm also the contract administrator for 1199.

14  Q.  And how long have you been the contract administrator for

15  1199?

16  A.  Approximately 15 years.

17  Q.  And for those of us who are not familiar what a contract

18  administrator is, can you explain it to us, please.

19  A.  Contract administrator is a representative of the nurses.

20  There are delegates, and then I'm their support.  What my job

21  is, I enforce the contracts.  When there are violations to the

22  contract, management and I, we sit down and we discuss

23  grievances and things like that.

24          THE COURT:  Can I ask you a question.  Is it fair to

25  say that you're the union representative?  Is that the way to

1    put it, you're the union representative?

2              THE WITNESS:  Well, like delegates are also

3    representatives, but that's fine, yes.

4              THE COURT:  But you're one of the union

5    representatives for the nurses.

6              THE WITNESS:  Exactly, yes.

7              THE COURT:  Thank you.

8              THE WITNESS:  You're welcome.

9    BY MR. NUWESRA:

10   Q.  And do you represent the nurses throughout the hospital or

11   just in different units, specific units?

12   A.  The entire hospital.

13   Q.  Are there any --

14   A.  And clinics.

15   Q.  I'm sorry.

16   A.  And clinics.

17   Q.  Are there any other union representatives, representatives

18   that wear two hats like you at St. Barnabas representing the

19   registered nurses?

20   A.  I'm going to address the question.  The two hats that I

21   talk about -- you asked me before if I work three days a week.

22   I work two days as a nurse in the emergency department.  The

23   other day I work solely as a union representative.  The other

24   representatives don't have that.  They're just delegates, and

25   we call upon them if there's a grievance or something like

Caa1mar6                    Greene - direct

1   that.  So they -- in a way, they wear two hats, but not --

2   they're not paid for the day by the union.  That's what I'm

3   trying to tell you.

4   Q.  Oh, I see.  So you get paid for two days by the hospital,

5   and the other day the union pays you.

6   A.  That's correct.

7   Q.  I see.  Thank you.

8   A.  You're welcome.

9   Q.  And can you -- withdrawn.

10          Would it be fair to state that in having been wearing

11  those two hats at the hospital over the last 15 years, you are

12  pretty familiar with the hospital's policies regarding

13  different things?

14  A.  Yes.

15  Q.  Can you tell the jurors, what is the hospital policy with

16  regard to orders for lab testing?

17  A.  I'm not sure I understand the question.

18  Q.  Let me ask it differently.  As a nurse, as a registered

19  nurse, can you order a lab test?

20  A.  No.

21  Q.  Who at St. Barnabas can order a lab test?

22  A.  The doctors.

23  Q.  In that light, do these lab -- is there a policy with

24  regard to these doctors' lab tests?

25  A.  Yes, there is.

Caa1mar6                    Greene - direct

1    Q.  And what is the policy?

2    A.  The policy on lab testing, if there is a lab test to be

3    done, the doctor order is written and then the nurse or

4    whoever, whether it be the lab technician who will come, draw

5    the blood or take the specimen, whatever the order may be.

6    Q.  And did I hear you correctly?  Did you say written orders?

7    A.  Yeah, written orders.

8    Q.  I see.  Can you share with us an example of what these lab

9    tests might entail that needs written orders by a physician.

10   A.  A patient comes to a unit, any unit, the doctor will order

11   labs.  In light of the fact -- when a nurse has experience, she

12   knows basically what those labs will be, so I just want to say

13   that up front.  When the doctor comes, he will order like

14   chemistry labs, maybe urinalysis, maybe toxicology.  Whatever

15   he feels the patient needs, he will order it.  And then it's up

16   to the nurse to call the proper person, whether it be her --

17   herself or someone else, to draw those labs or urine

18   specimen --

19   Q.  Okay.

20   A.  -- sputum, whatever.

21   Q.  And so that I'm very clear about this, these examples have

22   to be ordered by a physician at St. Barnabas and be in writing;

23   right?

24   A.  Before it's enforced, yes.

25   Q.  Thank you.  I want to bring your attention to -- withdrawn.

1      During the last five years while working in the

2  emergency room, did there ever come a time where there was an

3  incident or incidences of missing morphine there?

4  A.  Yes.

5  Q.  When was that, ma'am?

6  A.  I don't recall.  I'm sorry.

7  Q.  I'm sorry?

8  A.  There was such an incident, but I don't remember when it

9  was.

10  Q.  Was it within the last five years?

11  A.  Yes.

12  Q.  And do you remember an incident that took place which

13  involved my client, Ms. Martinez?

14  A.  Are you talking emergency room?

15  Q.  Any incident that involved --

16  A.  Yes.

17  Q.  Okay.  Do you recall when that happened?

18  A.  Not the exact date.

19  Q.  All right.

20  A.  Approximate.

21          THE COURT:  Approximately when?

22          THE WITNESS:  Two years ago.

23          THE COURT:  Two years ago?  Thank you.

24          THE WITNESS:  A few years.

25          THE COURT:  A few.  I'm sorry.  See, I misheard.

1    Q.  In relation to that incident that involved my client a few

2    years ago, when was it -- was this emergency missing

3    morphine -- did it happen before my client was involved with

4    that incident?

5    A.  I don't recall that.  I don't know if it was before or

6    after, to be honest with you.

7    Q.  Yeah, before or after.  I'm asking you.

8    A.  I don't know.

9    Q.  Oh, you do not know whether it was before or after.

10   A.  No.

11   Q.  Okay.  Can you tell me in sum and substance what the

12   missing morphine in the emergency room entailed.  What

13   happened?

14   A.  There was a miscount in the morphine.  I was not present

15   that day, but when I came back to work, I heard about the

16   incident, and that's how I came to know about it.

17   Q.  Okay.  And were nurses under your jurisdiction as the union

18   representative involved in that incident?

19   A.  Whenever there is a missing narcotic or if there's a

20   miscount of any sort, all the nurses on the unit is involved.

21   Q.  Okay.  And to the best of your recollection was anybody

22   disciplined?  Was any -- were any nurses disciplined with

23   regard to that missing morphine narcotics in the emergency?

24   A.  No.

25   Q.  Were you involved in the investigation of that missing

morphine?

A.  No.

Q.  Now can you explain to the jurors the process when an employee, a nurse that you represent, is involved in the discipline.  What takes place?

A.  One of two things will occur.  Either the management person will call me and tell me that they need my services for a member or -- sorry, can you hear me?  -- or the member will call me directly and say, "I have a issue," and then either way, from that point, the process is the same.  I'll go and I'll speak with the member and find out what the problem is.  After that, if necessary, I have a joint meeting with management.

Q.  And in your capacity as a union representative, once you start in the disciplinary proceedings, do you deal with a certain office of the hospital?

A.  No.

Q.  Who do you deal with?  Let me ask you --

A.  I'm --

Q.  Let me ask you, is there a unit or department at St. Barnabas that's known as the labor relation?

A.  We have labor -- we have a labor management meeting every second Thursday of the month.

Q.  Okay.

A.  I don't know if that's what you're referring to.

Caa1mar6                    Greene - direct

1    Q.  Well, do they have a human resources department?

2    A.  Yes.

3    Q.  When does the human resources department get -- get

4    involved in disciplinary proceedings?

5    A.  They get involved at the third step level.  I'll just

6    explain that.  There are three steps before an arbitration.

7    The first step, if the member comes to me with a grievance, I

8    take it up with the manager, the direct manager.  If I can't

9    get a resolution within a week's time, I will step it up to the

10   head of the department.  If I can't get a resolution at the

11   head of the department, that's when it still goes to human

12   resources.  That's the third step.

13   Q.  Do you recall what department or what unit my client was

14   working at at the time of that incident --

15   A.  Yes.

16   Q.  -- a few years ago?  What unit was it?

17   A.  ICU.

18   Q.  And who is the head of ICU?  Who was the head of ICU?

19   A.  Do you mean the manager?

20   Q.  The manager, yeah.

21   A.  Pauline --

22   Q.  You said direct manager.  I'm sorry.

23   A.  Pauline Frances-Lattery.

24   Q.  And who is the head of the department that oversees the

25   ICU?

1   A.  Cathy Graham.  Catherine Graham.

2   Q.  Do you recall if anybody else was also involved in the

3   disciplinary situation that involved my client, if there was

4   another nurse involved?

5   A.  Yes.

6   Q.  Who was it?

7   A.  Cora Fischer.

8   Q.  Can you tell me about that process with regard to both

9   Ms. Martinez and Ms. Cora Fischer.  To the best of your

10  recollection, what happened?

11  A.  I'm not sure -- you're asking me the process of the

12  grievance process?

13  Q.  Well, when you got involved.  You got involved at one

14  point; right?

15  A.  Mm-hmm.  Okay.  I got a phone call that told me that there

16  was need for representation in the ICU.  There was an issue of

17  narcotics.  When I was able to come, I arrived.  I was able to

18  speak to Ms. Martinez and I was able to speak to Cora Fischer.

19  That's when I find out what happened in this -- in the ICU.

20  Q.  And what was your understanding of what happened?

21  A.  My understanding was that there was missing -- well, there

22  was a discrepancy in the narcotic count.  The two narcotics in

23  question, one was Ativan, the other morphine.  One was over

24  two, one was correct, in other words.  And that's -- it was

25  under two initially and then it corrected itself, the count.

1   Yeah.  That's -- I had the same look.

2   Q.  Okay.  Explain yourself, please.

3   A.  The Ativan that was to be given to the patient, the count

4   was leveled off as correct as -- I mean, I don't want to jump

5   the gun.  I'm answering your question.

6   Q.  Yes.

7   A.  So the morphine apparently was under as if someone removed

8   morphine from the narcotic cabinet, and that's what caused the

9   discrepancy to --

10  Q.  And you used number two under when it came to morphine.

11  Can you tell us what that means in layman's language.

12  A.  Okay.  When you remove narcotics from a narcotic cabinet,

13  there has to be an accounting, and so the nurse has to sign her

14  name and she has to deduct the narcotic and then tally it at

15  the bottom.  Apparently at the end of that shift, there was a

16  discrepancy in that count from what was on the paper and then

17  what's in the narcotic cabinet itself.

18  Q.  And when you mentioned the number two under, what did you

19  mean by that?  Maybe it wasn't the number two you were saying.

20  You said something about two under.

21  A.  Oh.  I was saying the morphine was 2 milligrams.  I'm

22  saying morphine tube.

23  Q.  Okay.  So there was one morphine tube, 2 milligrams

24  missing?

25          MR. GARLAND:  Objection, leading.

1          THE COURT:  We're just trying to get this clarified, I

2     think.

3          MR. NUWESRA:  Yeah, that's all.

4          THE COURT:  Well, I understand.  Otherwise the

5     objection would be well taken.  Let's see if we can get this

6     clarified, then please don't lead the witness.

7     A.   The morphine that was in -- there was a discrepancy in the

8     morphine.  This is what I understand.  And there was

9     discrepancy in the Ativan.  Those two medications were wrong

10    versus -- what's in the narcotic cabinet versus what's on the

11    paper.  Both of those.

12    Q.   Do you remember like how much was missing of each initially

13    or --

14    A.   No.

15    Q.   Okay.  Was there any other reason why Ms. Fischer was

16    involved in this discipline process, besides what you just

17    testified about?

18    A.   Before Ms. Martinez, she was the last one holding the

19    narcotic key, and then there was an issue with Ms. Fischer with

20    some crossing out that she did on a narcotic sheet that was not

21    policy.

22    Q.   What's the policy about that?

23    A.   If you're gonna cross out a medication or anything in a

24    chart, you have to draw a line and you write "Error" on it and

25    you initial it.

Caa1mar6                    Greene - direct

1    Q.   And who is supposed to do that?

2    A.   Whoever made the error.  If I made an error and I deducted

3    wrong or if I put something in the wrong spot, the policy is to

4    draw a line through, "Error," initial.  So the person can still

5    see what happened, in other words.  You're not supposed to like

6    scribble on the paper.

7    Q.   Okay.  And do you know who made that correction in the

8    incident we're -- you're testifying about?  Do you know which

9    one of the two nurses made the correction in that incident?

10   A.   Cora.

11   Q.   Cora made the correction.

12   A.   Mm-hmm.

13   Q.   Did there ever come a time within the last five years that

14   a similar happening took place whereby another nurse in the

15   emergency room or in ICU had made or committed that violation

16   of the policy, besides this one incident?

17   A.   Not that I'm aware of.

18   Q.   And what does the policy dictate if somebody makes the

19   correction and does not initial it?

20   A.   If -- repeat your question?

21   Q.   Sure.  You said that there was a policy that St. Barnabas

22   requires that if somebody makes an error, that they should

23   cross the error and make the corrections and then initial it;

24   right?

25   A.   Yes.

Caa1mar6                    Greene - direct

1  Q.  And so my question to you, under that policy, what if

2  somebody, you know, makes the corrections without crossing and

3  initialing it?  What happens to that person, that nurse?

4  A.  Well, that's a violation of the policy, and what happens is

5  really up to management what they do.  That's where I come in.

6  So if the infraction doesn't fit what they're saying -- for

7  instance, I'll give you an example.

8  Q.  Sure.

9  A.  If they scribbled like they're not supposed to scribble or

10  they did something other than what the policy dictates, it's up

11  to the management what they do about it.  They can pull them in

12  and do something verbal, say, "In the future don't do this," or

13  they can suspend the nurse, or they can do anything they want

14  to do.  If there is a discipline with regard to anything like

15  that, of course that's going to come to my desk and then that's

16  how I see it and then that's when I go and get involved.

17  Q.  Based on your experiences or experience in wearing these

18  two hats at St. Barnabas, did there ever come a time where you

19  heard of the term "progressive discipline"?

20  A.  The what?

21  Q.  Progressive discipline?

22  A.  Yes.

23  Q.  What is that?  Please tell the jury.

24  A.  Progressive discipline is when a first infraction occurs.

25  Using your example, a first infraction, that should be a verbal

1   warning to the nurse.  If it occurs again, that's a written

2   warning.  That's progressive discipline.  If it occurs again,

3   could be a suspension.  If it occurs again -- I mean,

4   suspension, a one-day suspension.  Then it could go to two days

5   and so on.

6   Q.  Okay.  Now with regard to the incident of my client and

7   Ms. Fischer -- and I can say that the record indicates that

8   took place on September 14, 2009.  So keeping that date in

9   mind, make it easier for both of us, do you remember whether

10  Ms. Fischer called you first or my client or was it management

11  that contacted you?

12  A.  No.

13  Q.  How did it -- oh, you don't recall what happened.

14  A.  I don't recall who called me first.

15  Q.  Was there ever a time where a so-called investigation

16  meeting or conference took place where you were involved in?

17  A.  Yes.

18  Q.  Okay.  Can you tell the jurors about that.

19  A.  After I have a conversation with both members and

20  management -- 'cause I have to have all three sides before I

21  can really investigate -- then I go and investigate the facts

22  as it occurred.  According to what Ms. Fischer tell me and

23  according to what Ms. Martinez tell me, I check both sides.  I

24  was -- at that time I was able to look into the chart and those

25  kind of things like that, because they're allowed access during

1    the investigation.  And then that's how I conducted my

2    investigation.  And I also speak to the members.  "What is your

3    recall -- recollection of this?  What do you remember?  Who had

4    the key?  How did this happen?"  I question everything, even

5    the condition of the patient in question.

6    Q.  Okay.  And did there ever come a time, based on your

7    recollection, that either Ms. Martinez or Ms. Fischer were

8    suspended because of that one incident, that one infraction?

9    A.  Yes.

10   Q.  And did either one of them choose to grieve the suspension?

11   A.  Both.

12   Q.  They both sought to grieve the suspension.

13   A.  Yes.

14   Q.  And did you get involved with that?

15   A.  Yes.

16   Q.  Do you know whether Ms. Fischer was ever returned from her

17   suspension?

18   A.  Yes.

19   Q.  And do you know how long her suspension was?

20   A.  Yes.

21   Q.  How long was it?

22   A.  Three days.

23   Q.  And how did Ms. Fischer learn that she should go back to

24   work after the three-day suspension?

25   A.  There was a meeting in management's office.

1    Q.  Was she present?

2    A.  Yes.

3    Q.  You're sure of that.

4    A.  Yes.

5    Q.  Okay.

6    A.  Okay.

7    Q.  And did you represent my client in the grievance of her --

8    in her grievance after she grieved it?

9    A.  Yes.  I started.

10   Q.  You started.

11   A.  Yes.

12   Q.  Why did you stop?

13   A.  Because Ms. Martinez cut off contact.  I could not reach

14   her.

15   Q.  Okay.  And how did you try to reach her?

16   A.  Via telephone and via mail.

17   Q.  Do you remember when you spoke with her after her

18   suspension, if you spoke with her at all?

19   A.  Multiple, multiple times.

20   Q.  And how long after the suspension did you speak with her on

21   multiple, multiple times?

22   A.  How long meaning a week or two weeks?

23   Q.  Yeah.

24   A.  I really can't recall when she cut off contact, but I know

25   we used to talk pretty much daily before contact was cut off.

Caa1mar6                    Greene - direct

1   Q.  And how long did you speak daily?

2   A.  Hours sometimes.

3   Q.  I mean, on how many times, how many occasions?

4   A.  Oh.  More than 15.

5   Q.  Okay.  Did there ever come a time where you had a three-way

6   conference with Ms. Martinez and her sister?

7   A.  I don't recall if it was the sister, but someone, yes.  It

8   was a three-way conversation.

9   Q.  A female?

10  A.  A female, yes.

11  Q.  Did you -- at the time did you understand that that female

12  also happened to be a lawyer?

13  A.  Yes.  She told me.

14  Q.  Okay.  And how long after her suspension did you have that

15  three-way conversation?

16  A.  I don't remember that.

17  Q.  Was it immediately before she cut off communications with

18  you, as you said?

19  A.  No.  It was well before that.

20  Q.  It was before?  Do you recall the sum and substance of this

21  three-way conversation you had with her and this other woman?

22  A.  Do I recall the substance?

23  Q.  Yeah.

24  A.  I believe -- best of my recollection is that she told me

25  that it's her sister and her sister's going to be on the line,

1    if I can explain to her what's going on with the case.

2    Q.  Okay.  And did you explain to her what was going on with

3    the case?

4    A.  Yes, I did.

5    Q.  Did there ever come a time during that conversation where

6    you advised both of them that you felt conflicted in

7    representing both of them?

8    A.  No.  But I can clarify that.

9    Q.  Please.

10   A.  I said that Ms. Martinez and Ms. Fischer were both 1199

11   representatives.  Both their stories were conflicting.  It

12   didn't -- I was not going to represent both of them.  That's

13   the clarity on that.  So of course they will both have

14   representation, but I just would not have done both.

15   Q.  Okay.  And do you know another union delegate or

16   representative by the name of Nadine Williamson?

17   A.  Yes, I do.

18   Q.  Who's Miss Nadine Williamson?

19   A.  She's the organizer and my superior.

20   Q.  Do you recall that during that conference with Ms. Martinez

21   and this other woman that you stated that you would be

22   referring my client to Ms. Nadine Williamson?

23   A.  No.

24   Q.  Did there ever come a time where Ms. Nadine Williamson took

25   over the representation of my client?

Caa1mar6                    Greene - direct

1   A.   No.

2   Q.   Never?

3   A.   Well, we worked together.  She's my superior.  So whatever

4   I'm doing, she's involved in.  And we work together.  So if I

5   call Martinez -- Ms. Martinez or Ms. Fischer, either of us can

6   call because we have the same information.  You understand?

7   Q.   All right.  I hear you.

8   A.   Okay.

9   Q.   After these 15 or so conversations that you had with

10  Ms. Martinez, did there ever come a time when you learned that

11  she had hired her own private attorney?

12  A.   She talked to me about that several times.

13  Q.   Okay.  And can you tell me whether -- withdrawn.

14        Can you tell me what the proper procedure is for

15  management when they're communicating with an employee that is

16  being represented by the union.

17  A.   The job of management, if an employee needs representation,

18  they're not usually -- I'm not saying it doesn't happen

19  sometimes, but not usually are they supposed to engage in any

20  conversation with a member without a rep there -- without a

21  representative there.

22  Q.   Does that also include when they are out on suspension?

23  A.   Yes.

24  Q.   So would it be fair to state that the communication should

25  be directed from management to the union with a copy to the

Caalmar6                    Greene - direct

1   employee?

2   A.  That is correct.

3   Q.  And is that required in every -- in every instance?

4   A.  No.  Every case has its own situation.

5   Q.  Okay.  Can you tell me about the various cases where that

6   would not be required.

7   A.  Where what would not be required, management to contact the

8   union?

9   Q.  No, management to contact the employee without any regard

10  to the union.

11  A.  What I can tell you is the procedure.  I don't know if that

12  ever occurred or do occur.  All I know is that if there is a

13  communication -- if a member is out, whether it be a

14  suspension, a termination, or whatever it is, and then the

15  union is fighting this case, they're supposed to have a

16  communication with the union.  Whether they have a right to

17  have a communication with the member, we all get involved in

18  that.  If management would have a conversation with the member

19  and it had anything to do with a deal, that's a violation, and

20  we call that direct dealing, and they cannot do that.  They

21  have to go through us and then we go through them.

22  Q.  All right.  So would it be fair to state that in order to

23  make any deal with an employee that is being represented by the

24  union, any deal or any offer should be filtered through the

25  union?

1    A.   That's correct.

2    Q.   Did there ever come a time where you related to my client

3    that the hospital was offering her the option of resigning?

4    A.   Yes.

5    Q.   Was this conversation during the telephone conference you

6    had with this other third person?

7    A.   On the three-way conversation?

8    Q.   Yes.

9    A.   On the three-way conversation I explained to her the entire

10   case, all of her options.  Not just an option to resign; all of

11   her options.  She had several options.

12   Q.   Okay.  What were those options?

13   A.   She had the option of coming in, having a conversation with

14   Ms. Graham, who was the VP of nursing at the time.

15   Ms. Martinez never did that.  So -- the second option was the

16   grievance process, to which we could have gone through the

17   third step.

18   Q.   I'm sorry?

19   A.   The second option is that we could have gone through the

20   entire grievance process, where we would have gone through the

21   third step through human resources, heard the case, and then if

22   no resolution, there's the arbitration.  That's the second

23   option.

24         And the third one, of course, was the resignation with

25   a neutral reference.  And by the way, the resignation with a

 1  neutral reference, that isn't always a given.  We have to

 2  negotiate that.

 3  Q.  Did there ever come a time where Ms. Graham told you

 4  personally to contact my client and tell her that she is free

 5  to come back to work?

 6  A.  No.

 7  Q.  To your knowledge did there ever come a time whereby

 8  Ms. Graham advised anybody within your union organization that

 9  they can tell my client that she's free to come back to work?

10  A.  The free to come back to work is the deal that's confusing

11  me a little.  Ms. Graham asked me to contact Ms. Martinez on

12  several occasions, and I was not successful in doing so.

13  Q.  And what was the purpose of you contacting Ms. Martinez?

14  A.  To come in and discuss the case.  We have not done that,

15  sir.  We have not even done the second step.

16  Q.  And what is your usual mode of communications with your

17  members?

18  A.  With a member?

19  Q.  Yeah.

20  A.  It could be any -- I could go to their home, I can talk on

21  the telephone, or via letter.  It depends on, you know,

22  their --

23  Q.  Did you ever send a letter to Ms. Martinez?

24  A.  Yes.  Not personally from my computer but the headquarters,

25  1199.

Caa1mar6                    Greene - direct

1   Q.   Under your signature?

2   A.   No.

3   Q.   Did you address it?

4   A.   No.

5   Q.   Did you dictate it?

6   A.   Yes.

7   Q.   Under whose signature was it?

8   A.   I'm not sure if Nadine signed it or not, but that's where

9   the communication was.

10  Q.   And do you know whether it was during your suspense --

11  during her suspension or whether it was post her termination?

12  A.   Letters were sent before.  We needed to contact Martinez.

13  We were not able to do so.  I tried many times and so did

14  Nadine Williamson.

15  Q.   Did you try to go and see her at home?

16  A.   No.

17  Q.   Why not?

18  A.   I didn't have that -- let's say I didn't -- number one, I

19  didn't have her address.  Not that I couldn't get it, but in

20  order for me to go to someone's home, I need to be invited.  I

21  don't just come.

22  Q.   Did you ever ask Ms. Martinez to invite you to her house?

23  A.   No.

24  Q.   Did there ever come a time where you learned that my client

25  was terminated?

Caa1mar6                    Greene - direct

1    A.   Yes.

2    Q.   When was it?

3    A.   I don't recall the date.

4    Q.   How did you learn of it?

5    A.   I was told.

6    Q.   By?

7    A.   Ms. Graham.

8    Q.   What did she say to you?

9    A.   She said that she attempted to contact Ms. Martinez, as

10   myself, and she was unsuccessful and she didn't respond, so she

11   was going to terminate her.

12   Q.   Did she tell you when she tried to contact Ms. Martinez

13   before her termination?

14   A.   She -- well, when she attempted to contact Ms. Martinez and

15   she was unsuccessful, she would call me and tell me that she

16   tried to reach her and she was not able to do so, for me to try

17   again, and then I would try again, and try.  So I don't

18   remember -- she did say when, but I just don't know the date.

19   I don't know the date.

20   Q.   Did the union ever grieve Ms. Martinez's termination?

21   A.   No.

22   Q.   Did -- do you know whether Ms. Martinez ever asked the

23   union to grieve her termination?

24   A.   No.  She did not.

25   Q.   She never asked that her termination be grieved?

Caa1mar6                    Greene - direct

1    A.  Ms. Martinez, before we cut off communication, tells me

2    that she was going to hire an attorney and do it on the outside

3    basis.  I also advised her that.  You didn't ask me to describe

4    that, but yes.

5    Q.  Go ahead.  Say what?

6    A.  She told me that she was going to hire an outside attorney,

7    and I figured that's why the communication was cut.

8           THE COURT:  I thought you said, "and I figured."  I

9    didn't hear what you said.

10          THE WITNESS:  Which one?

11          THE COURT:  Could you read back her answer.

12          (Record read)

13          THE COURT:  Okay.  In other words, you thought that's

14   why you weren't able to reach her, because --

15          THE WITNESS:  She was doing her thing.

16          THE COURT:  She was doing her thing.  Okay.

17   BY MR. NUWESRA:

18   Q.  As far as you or the union was concerned, did she have the

19   right to do that?

20   A.  Yes.  And there are some procedures with that also.  She

21   has to sign a waiver.

22   Q.  Okay.  And do you know whether she was willing to sign such

23   waiver with the union?

24          MR. GARLAND:  I'm going to object.  I think we're

25   getting rather far afield.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Caa1mar6                    Greene - direct

1            THE COURT:  We are.  This has nothing to do with

2    anything.  Please get back to this case.  Move on.

3            MR. NUWESRA:  May I approach the witness, your Honor?

4            THE COURT:  You may.

5    Q.  And this is DX21.  Please take a look at that.  Let me know

6    when you've finished.

7    A.  Finished.

8            MR. GARLAND:  Objection.

9            THE COURT:  I'm sorry.  Hang on.  There's no question

10   to object to.  He asked her to look at something.  That's all

11   he did.  You have nothing to object to.  He could hand her the

12   telephone book and say, "Look at this."  You have no objection.

13   If he asks an objectionable question, then you can object.

14   Q.  Ma'am, you remember I asked you about five minutes ago

15   whether my client sought the grievance for -- of her

16   termination by the union?

17           THE COURT:  Now are you trying to impeach her with

18   prior inconsistent testimony?

19           Ma'am, give me this thing.

20           I thought I told you how to do that.  I'm not going to

21   take you back to school again.  Either you follow the

22   procedures that are set out for doing that in our evidence

23   courses that we take in law school or you don't do it.  One of

24   the two.

25           MR. NUWESRA:  But she didn't testify, your Honor --

Caa1mar6                    Greene - direct

1          THE COURT:  Excuse me.  Excuse me.  Excuse me.  If

2    that's not what you're doing --

3    BY MR. NUWESRA:

4    Q.  Does the document that you just reviewed --

5          MR. NUWESRA:  I withdraw that question, your Honor.

6          THE COURT:  Are you trying to refresh her

7    recollection?  She hasn't testified that she doesn't recall

8    something, so there's no recollection to refresh.  There's no

9    failure of recollection here.

10   Q.  Okay.  Do you remember when you testified that both you and

11   Ms. Williamson -- that both you and Ms. Williamson were

12   together working, representing my client?

13   A.  I was the one handling the case.  What I said was that

14   she's aware of all cases that I do, so if Ms. Williamson calls

15   Ms. Martinez or any other member, she's able to do so because

16   she's aware of what the case is.  That's what I was trying to

17   say.

18   Q.  And isn't it -- withdrawn.

19         Were there any communications between my client and

20   Ms. Williamson during that time period?

21         THE COURT:  How is she supposed to know?  And that

22   would be hearsay.  So --

23   Q.  When an employer terminates a nurse -- let's talk about St.

24   Barnabas -- are they required to communicate that to the

25   headquarters, to the headquarters in downtown, of 1199?

Caa1mar6                    Greene - direct

1   A.  Yes.

2   Q.  And who would be the RN organizer to contact with regard to

3   that?

4   A.  Nadine Williamson.

5   Q.  Did there ever come a time where you became aware that the

6   hospital contacted Ms. Nadine Williamson regarding my client's

7   termination?

8           THE COURT:  Did you ever become aware of any such

9   communication between the hospital and Ms. Williamson; yes or

10  no?

11          THE WITNESS:  No.

12  Q.  Now would you please tell us what was the outcome of --

13  withdrawn.

14          Can you tell us whether there was ever a meeting that

15  was held between my client, the union, and management.

16  A.  Not at the initial meeting.  One meeting --

17  Q.  I'm sorry?

18  A.  One meeting, not at the --

19  Q.  Any meeting.  Any meeting.

20  A.  The initial meeting where there was the suspension, yes.

21  Q.  Okay.  And when was that?

22  A.  I don't remember the date.

23  Q.  How long after the incident of September 14th was that

24  meeting?

25  A.  How -- repeat the question?

Caa1mar6                    Greene - direct

1    Q.  How long after the incident of September 14th would that

2    have been?

3    A.  Did what?

4    Q.  Did that suspension meeting take place between the union,

5    my client, and management.

6    A.  I don't recall that.

7    Q.  Was it the same day that the meeting with Ms. Fischer,

8    yourself, and management took place?

9    A.  Yes.

10   Q.  Now did both of them attend that meeting or were they

11   separate?

12   A.  They both attended the meeting.

13   Q.  And did they have to sign any acknowledgment as to what the

14   charges against them were or what the violations were?

15   A.  No.

16   Q.  Were they given a written statement as to what the

17   violations were?

18   A.  Yes.

19   Q.  And to the best of your recollection what were they accused

20   of?

21   A.  I don't recall what was on the paper.

22   Q.  Did there ever -- withdrawn.

23        What is the policy with regard to toxicology, urine

24   toxicology at the hospital?  Can a nurse ask another nurse to

25   do it?

1    A.  To collect the specimen?

2    Q.  Yes.

3    A.  Yes.

4    Q.  And would there have to be, even in that incident, or

5    instance, a written order by physician to do so?

6    A.  Yes.

7              THE COURT:  In other words, so I understand, if a

8    doctor wrote an order and communicated that to Nurse Jones,

9    Nurse Jones could say to Nurse Brown, "Go get this sample."

10             THE WITNESS:  Absolutely.

11             THE COURT:  Okay.

12   Q.  Are you familiar with Ms. Lucero?

13   A.  Agnes Lucero?  Yes, I am.

14   Q.  What is her position with the hospital?

15   A.  She's a staff nurse.

16   Q.  And was she also -- did she ever hold a different position

17   back in '09?

18   A.  Yes.

19   Q.  What was that position?

20   A.  She was an educator.

21   Q.  And did she have the right to ask another nurse without a

22   doctor's written order to get a urine toxicology to the lab,

23   urine toxicology report?

24   A.  Not without a doctor's order.

25   Q.  At the time that she was an educator, did she also

1  supervise or manage when Ms. Lattery wasn't there?

2  A.  I don't know.

3  Q.  Was she -- what unit was she assigned to?

4  A.  ICU.

5  Q.  And who is Norma Ondoy?

6  A.  A supervisor.

7  Q.  Incidentally, at that disciplinary meeting that you held

8  with the -- with the employee and management, who was there,

9  from management?

10  A.  Ms. Ondoy and Ms. Pauline Frances-Lattery, myself, and the

11  two members.

12  Q.  And do you know whether Ms. Lattery was working on the day

13  of the incident or not?

14  A.  No.

15  Q.  Can you tell me what is Ms. Catherine Graham's position in

16  the hospital now.

17  A.  Vice president of nursing.

18  Q.  Ms. Graham continues to be the vice president of nursing?

19  A.  No.

20  Q.  What's her position now?

21  A.  She's a vice president but of a different department.

22  Q.  And at the time of this incident what was her full title?

23  A.  Vice president of nursing.

24  Q.  Was she senior vice president of nursing?

25  A.  That's possible.  Yeah, possible -- yeah, senior vice

1 president, yes.

2 Q.  Can you tell me whether St. Barnabas had a policy or

3 practice with regard to charge nurses.

4          THE COURT:  A policy?  Can you just ask her a question

5 so we can get into this.

6 Q.  Does St. Barnabas have a practice with regard to charge

7 nurses?

8 A.  Yes.

9 Q.  What is that practice?

10 A.  Depends on the unit you work.  It varies.

11 Q.  Okay.  And how does it work in the emergency room?

12 A.  We have a charge nurse that --

13          MR. GARLAND:  Objection on relevance to the emergency

14 room.

15          THE COURT:  Objection sustained.

16 Q.  Did there ever come a time where my client floated to the

17 emergency room and worked at the time that she worked there?

18 A.  Yes.

19 Q.  When she worked in the emergency room, what was the policy

20 regarding charge nurse?

21          MR. GARLAND:  Objection again to the emergency room.

22          THE COURT:  No questions about the policy in the

23 emergency room.

24 Q.  Were you familiar with the policy at the ICU with regard to

25 charge nurses?

Caa1mar6                    Greene - direct

1    A.  Yes.

2    Q.  Okay.  What is that policy?

3    A.  Depending upon the census and the staff, the charge nurse

4    does the nursing assignments.  She may or may not have an

5    assignment, depending upon the census.

6            MR. NUWESRA:  I'm sorry.  Can I have that read back

7    for me, your Honor.

8            THE COURT:  Yeah, read it back.

9            (Record read)

10   Q.  Do you know who assigned the charge nursing tasks in ICU?

11           THE COURT:  The charge nursing tasks?

12   Q.  Who assigned the tasks?  Who assigned --

13   A.  It's in the job description for the charge nurse.  She

14   oversees the department, she does the assigning, and if there's

15   an issue in that department, in your case ICU, then she would

16   address that.  That's the charge nurse.

17           MR. NUWESRA:  Your Honor, would this be a good time to

18   stop?

19           THE COURT:  How much more do we have on direct with

20   this witness?

21           MR. NUWESRA:  Maybe another 20 minutes.

22           THE COURT:  You're kidding.  Okay.  Let's stop for the

23   day.  We'll resume at 9:30 tomorrow morning.  Don't discuss the

24   case.  Keep an open mind.  Okay.  Thank you very much.

25           (Jury excused)  (Continued on next page)

1          (In open court; jury not present)

2          THE COURT:  Let's talk for a minute.  Have a seat,

3    everyone, please.  Look, this is the wrong witness to discuss

4    this document with.  She's not copied on the document; she

5    didn't write the document.  If Ms. Williamson is testifying,

6    fine.  If Mr. Wolf is testifying, fine.  It's actually, I

7    think, a Defendant's exhibit in evidence so you can't-- as far

8    as I'm concerned, it's already established in the case that

9    there is such a document because the defendants offered it into

10   evidence themselves, but you can't discuss it with this

11   witness.  She didn't say "I don't remember whether the lady

12   grieved or didn't grieve."  She said she didn't grieve.

13          So, please, you can refresh somebody's recollection

14   when they say "I don't recall," not when they say "no" and you

15   think the answer is yes.  You can impeach someone with a prior

16   inconsistent statement as long as you do it by the book.  And

17   I'm just a total stickler for that.  But this document -- first

18   of all, as far as I could tell, you could make whatever

19   argument you want to make with this document because it's

20   already in, but there's nothing you can ask this lady about

21   with respect to this document.

22          MR. NUWESRA:  I appreciate that, your Honor.  Can I--

23   I would like to make an application that I will be allowed to

24   call Ms. Santiago as witness in this case.

25          THE COURT:  No.  Nobody who's not on your witness

CAABMAR7

1    list.  I'm sorry.

2              MR. NUWESRA:  But she was, your Honor.

3              THE COURT:  No, she wasn't.  We went through the

4    witness list and you said who you were going to call and who

5    you weren't going to call at the final pretrial conference.

6              MR. NUWESRA:  Right.

7              THE COURT:  And you are limited by that.  You're

8    limited by that.

9              MR. NUWESRA:  I understand.

10             THE COURT:  At the final pretrial conference you said

11   "I'm not calling Ms. Santiago."

12             MR. NUWESRA:  I didn't say that, your Honor.  I said

13   I'm calling her.  You asked me why and I said two reasons.  And

14   I have the transcript.

15             THE COURT:  If you said you're calling her, why are

16   you asking me for permission?  Just call her.

17             MR. NUWESRA:  Because for some reason the transcript

18   doesn't say that I can have her.  And I have a copy of the

19   transcript.

20             THE COURT:  I don't understand what you're saying.  If

21   you said "I'm going to call her," then you can call her.  If

22   you said to me "I'm not going to call her," then you can't call

23   her.  Okay?  It's that simple.  It's that simple.

24             MR. NUWESRA:  Okay.

25             THE COURT:  But you can't say to me last week "I'm not

1    going to call her," and then today say "I want to call her."

2              MR. NUWESRA:  Okay.  I did say it.  It's in the

3    transcript, your Honor.

4              THE COURT:  As long as you said "I'm going to call

5    her," you can call her.

6              MR. NUWESRA:  Thank you.  I appreciate it.

7              MR. GARLAND:  Your Honor, I can go back and look at

8    the transcript, but the order says she's out.

9              MR. NUWESRA:  Well, that's the confusion, your Honor.

10   I can hand you the transcript--

11             THE COURT:  Hand me the transcript.  Hand me the

12   transcript.

13             MR. NUWESRA:  Oh, sure.  Sure.

14             THE COURT:  You think I remember?  I don't remember.

15             MR. NUWESRA:  Yes, okay.  Okay.  Okay.

16             THE COURT:  No, furnish me with the page.  I don't

17   want to spend time looking for the page.  I have people here

18   for a sentencing.  I have a lot of work to do.

19             MR. NUWESRA:  May I approach?

20             THE COURT:  Yes.  Give me the page.  Don't make me

21   find it.

22             MR. NUWESRA:  Okay.  No problem.

23             MR. GARLAND:  It looks like page 3 of the transcript,

24   your Honor.

25             THE COURT:  Yes?

CAABMAR7

1          MR. GARLAND:  Line 10.  It starts at line 6 really.

2   Or 4 you ask-- line 4.

3          THE COURT:  I didn't say she couldn't testify.

4          MR. NUWESRA:  Right.

5          THE COURT:  She can testify.

6          MR. NUWESRA:  Thank you, your Honor.  The confusion is

7   on the list.  The confusion is from the list.

8          MR. GARLAND:  But the pretrial order does say she's

9   out.

10          THE COURT:  I don't care.  If I crossed off the wrong

11   name by mistake, I don't care.  I didn't say in the transcript

12   she can't testify.  And now I certainly know why she ought to

13   testify.

14          MR. NUWESRA:  Thank you, your Honor.

15          MR. GARLAND:  Are we dismissed, your Honor?

16          THE COURT:  Yes.

17          (Adjourned to October 11, 2012 at 9:30 a.m.)

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                          Page

3    MARLEN MARTINEZ

4    Direct By Mr. Nuwesra . . . . . . . . . . . . .96

5    Cross By Mr. Garland . . . . . . . . . . . . 139

6    CORAZON B. FISCHER

7    Direct By Mr. Nuwesra . . . . . . . . . . . 156

8    Cross By Mr. Garland . . . . . . . . . . . . 178

9    Redirect By Mr. Nuwesra . . . . . . . . . . 183

10   ANARICCA LIBIRAN-DANAO

11   Direct By Mr. Nuwesra . . . . . . . . . . . 185

12   Cross By Mr. Garland . . . . . . . . . . . . 216

13   Redirect By Mr. Nuwesra . . . . . . . . . . 226

14   Cross By Mr. Garland . . . . . . . . . . . . 229

15   Direct By Mr. Nuwesra . . . . . . . . . . . 229

16   LISA D. GREENE

17   Direct By Mr. Nuwesra . . . . . . . . . . . 231

18

19

20

21

22

23

24

25