Cab1mar1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  MARLEN MARTINEZ,

4               Plaintiff,

5          v.                          10-CV-5163 (CM)

6  ST. BARNABAS HOSPITAL,

7               Defendant.            Jury Trial

8  ------------------------------x
                                      New York, N.Y.
9                                     October 11, 2012
                                      9:48 a.m.
10
   Before:
11
                     HON. COLLEEN McMAHON,
12
                                      District Judge
13
                          APPEARANCES
14
   LAW OFFICES OF LEE NUWESRA
15      Attorneys for Plaintiff
   BY:  LEE S. NUWESRA, ESQ.
16
   EPSTEIN BECKER & GREEN, P.C.
17      Attorneys for Defendant
   BY:  DAVID W. GARLAND, ESQ.
18      JOHN F. FULLERTON, III, ESQ.

19  ALSO PRESENT:  KEITH WOLF,
                    Senior Vice President & General Counsel
20                  ST. BARNABAS HOSPITAL

21

22

23

24

25

Cab1mar1

1          (Trial resumed)

2          (In open court; jury not present

3          THE COURT:  Okay.  What seems to be the problem?

4          MR. GARLAND:  Your Honor, I want to follow up on an

5    issue that came up at the end of the day.

6          THE COURT:  There's nothing to follow up on.  The

7    witness testified.  I don't want to talk about it.

8          MR. GARLAND:  Different issue, your Honor.  The issue

9    is Exhibit -- Defense Exhibit 21, which was the one from --

10         THE COURT:  Yes, yes, right.  You don't want it to be

11   a defendant's exhibit anymore?

12         MR. GARLAND:  We shouldn't have, because --

13         THE COURT:  Too bad.

14         MR. GARLAND:  Let me explain it, if I may, your Honor.

15         THE COURT:  There's no explanation.  Too bad.  And

16   frankly, it's relevant to the case.  If you hadn't introduced

17   it, the plaintiff would have introduced it, I would have let it

18   in.  This document comes in.

19         MR. GARLAND:  Your Honor, just for the record, I don't

20   think it's probative to anything because it's following the

21   termination, and at the pretrial what we did was we --

22         THE COURT:  Excuse me.  Here's the deal.  You can put

23   on any witness you want to explain if you think this is a

24   manufactured exhibit that happened after the termination, that

25   wasn't really a grievance.  You can put on any witness you

Cab1mar1

1    want.  This is in evidence, I've already admitted it, and now

2    I'm making a ruling.  Anybody can call anybody.  As long as I'm

3    charging the jury on Tuesday morning, anybody can call anybody

4    to testify that this was, you know, an after-the-fact, that

5    this was something that was started early on.  I don't care.  I

6    want to hear the whole story and the jury wants to hear the

7    whole story of this piece of paper, but this is a relevant

8    piece of paper.  End of story.

9              MR. GARLAND:  I just want to put on the record, your

10   Honor, my position, and that is that it's not relevant.

11   There's no assertion that it's a phony piece of paper.  At the

12   pretrial we actually went through and didn't admit other

13   documents that related to the posttermination grievance.

14   Whether or not she grieved after her termination is not

15   probative of anything and --

16             THE COURT:  I disagree.  That's the end of the story.

17   And by the way, a lot of things have happened in my life since

18   then.  I don't recall having a conversation in which you argued

19   and I ruled that there was nothing probative about things that

20   happened following Ms. Martinez's termination.  You may have in

21   your head gone through that calculus, but I don't recall having

22   had that conversation.

23             MR. GARLAND:  Well, if I may, your Honor, at the

24   pretrial -- and we can look at the transcript of the pretrial.

25             THE COURT:  Point me to a page.  Point me to a page.

Cab1mar1

1    If there's some ruling I made prior to the trial, I won't go

2    back on it.  But, you know, I happen to think this is a

3    probative document or it's a potentially probative document.  I

4    can also see the problems with the document.  I can see the

5    arguments that you can make that this document does not prove,

6    because of when it was dated, that she tried to grieve her

7    suspension the day after the suspension, like Corazon Fischer

8    did.  Okay?  I can see that.  And maybe you can point that out

9    in closing.  And maybe in closing you can say:  Look at the

10   date.  Look at what she was grieving.  She wasn't grieving her

11   suspension.  After she realized she'd gone too far in ignoring

12   the hospital's efforts to contact her, she finally, finally

13   tried to do something.  It was too late.  She had already been

14   fired.  There's your argument.

15           MR. GARLAND:  Your Honor, we could do that, but I

16   think it would be, respectfully, a waste of the court's time

17   and the jury's time because of the following:  It was the

18   union's grievance, and at the pretrial we withdrew the exhibit

19   immediately following it, that the letter says she didn't show

20   up at the grievance.  So we took that out.

21           THE COURT:  I'll let you put it in.  I'll let you put

22   it in.  You can put it in.  You withdrew it so I didn't rule on

23   it, and I don't think you'll find anything in the pretrial

24   transcript that consists of the discussion that we're having

25   now.  I don't remember having this discussion.  But I'll tell

Cab1mar1

1   you what, I'm letting this in, I'll let that in, you can call

2   any witness, as long as I'm charging the jury Tuesday morning,

3   because I have a criminal trial I have to start next week,

4   'cause I have a lawyer I have to get to somebody else.  So

5   let's get going.

6           MR. GARLAND:  Thank you, your Honor.

7           (Counsel conferring)

8           (Discussion off the record)

9           (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury present)

2              THE COURT:  Have a seat, everybody.

3              Okay.  Good morning.

4              THE JURORS:  Good morning.

5              THE COURT:  Some kind of a snafu.  We're going to

6    interrupt Ms. Greene's testimony, okay, and we're going to call

7    another witness out of turn.

8              Ma'am, won't you come up, please, and stand here.

9              Call your next witness.

10             MR. NUWESRA:  Good morning, your Honor.  Plaintiff

11   calls Ms. Verzonilla.

12             THE COURT:  Who?

13             MR. NUWESRA:  Verzonilla.

14             THE COURT:  Hi.  Ma'am, won't you come stand here and

15   raise your right hand, please.

16             (Witness sworn)

17             THE CLERK:  Please state and spell your name for the

18   record.

19             THE COURT:  Sit down and use this microphone and then

20   we'll all be able to hear you, ma'am.

21             THE WITNESS:  My name is Loreta Verzonilla.

22   L-O-R-E-T-A, and Verzonilla, V-E-R-Z-O-N-I-L-L-A.

23    LORETA VERZONILLA,

24        called as a witness by the Plaintiff,

25        having been duly sworn, testified as follows:

Cab1mar1                    Verzonilla - direct

1   DIRECT EXAMINATION

2   BY MR. NUWESRA:

3   Q.  Good morning, Ms. Verzonilla.  My name is Lee Nuwesra, and

4   I'm the attorney representing Ms. Martinez in this case.

5           Would you kindly tell the jury what you consider your

6   race to be.

7   A.  My race?

8   Q.  Yes.

9   A.  I'm Filipino.

10  Q.  Are you currently employed, ma'am?

11  A.  Yes.

12  Q.  Whom are you employed by?

13  A.  St. Barnabas Hospital.

14  Q.  And how long have you been employed by St. Barnabas

15  Hospital?

16  A.  About 26 years.

17  Q.  What position you have with the hospital?

18  A.  I'm an RN.

19  Q.  And what unit have you been assigned there to in the last

20  ten years?

21  A.  ICU.  Intensive care unit.

22  Q.  Can you tell the jurors briefly your educational

23  background.

24  A.  I'm a bachelor of science in nursing graduate, I graduated

25  in the Philippines in 1980, and I've been working here in the

Cab1mar1                    Verzonilla - direct

1    United States since 1986 -- and that's in St. Barnabas

2    Hospital -- until now, and I have been working in ICU since

3    1989.

4    Q.   What shift are you assigned to in the last five years?

5    A.   I'm working nights, from 7 -- 7P to 7:30 in the morning.

6    Q.   Ma'am, I want to bring your attention to 2009.  Did there

7    ever come a time in 2009 where you had to do an in-service, an

8    in-service root cause analysis?

9    A.   Well, it's an in-service.  It's like it's for education

10   given to my colleagues.

11   Q.   Okay.  And what did that in-service given to your

12   colleagues entail?

13   A.   It's about traumatic brain injury.

14   Q.   Okay.  And without divulging any patient's identity, can

15   you tell us briefly the incident that caused you to give that

16   in-service.

17   A.   Well, I had this patient who was assaulted and so we had

18   this traumatic brain injury.  He was -- so he had traumatic

19   brain injury.  He had this ventriculostomy tube inserted in his

20   brain.  He was intubated, and then he self-extubated, but

21   then --

22            THE COURT:  Self-extubated.

23            THE WITNESS:  Yes.

24            THE COURT:  What does that mean?

25            THE WITNESS:  Like he pulled his tube out --

1          THE COURT:  Ah, thank you.

2          THE WITNESS:  -- by himself.

3    A.   And then like after two days of being extubated, I took

4    care of him, and then that was my first time to take care of

5    him that night.  So he was -- he got out of bed and he insisted

6    to go to the bathroom.  Then he made a bowel movement, and

7    after that he vomited, and then I assisted him going back to

8    his bed.

9          Then the doctor -- the doctor is aware of that.  And

10   then -- then we transferred him to another room.  And then at

11   around 12 he complained of headache and he was given Tylenol,

12   and he complained of nausea and then he was given Reglan as per

13   doctor's order, and the doctor assessed him, and he complained

14   of headache again, and I informed the doctor, and that time, at

15   around 3:15, when he did complain again, he was given Percocet

16   as per doctor's order.

17         So then his neuro check every -- like neuro --

18   neurological assessment every Q2 hours, so we're doing it at

19   even hours, and so he was given -- so Percocet was given at

20   3:15.

21         Then at 4 a.m. he was still, you know -- like mental

22   status is the same.  The pupils are okay.  And at 4:20, his

23   vital signs are okay and he appears asleep.  So I went on my

24   break.  Then somebody was covering me.

25         Then at around -- what time was it? -- I think 5:20,

Cab1mar1                 Verzonilla - direct

1    he -- he -- 'cause I wasn't there.  Somebody was covering me.

2    And they said they suctioned the patient because he had

3    secretions from the mouth.  So when he was getting suctions,

4    the patient's heart rate was very fast.  So they were going to

5    give him something to slow down his -- his heart rate.  You

6    know, the nurse was covering me was getting a medication, when,

7    you know, it progressively changed to -- with his, you know,

8    like -- like an abnormal -- arrhythmia.  So they called for --

9    the patient was coded, but, you know, the patient did not make

10   it.  So the patient died.

11   Q.  Okay.  Were you ever written up regarding that incident?

12   A.  No.

13   Q.  Were you ever disciplined regarding that incident?

14   A.  Well, because of that, it was used for education.  I -- I

15   conducted this -- I gave in-service to my colleagues and I

16   was -- I had done this QI for quality -- the quality

17   improvement, and also the educator was always following me up

18   on my work every after shift.

19   Q.  And who's this educator?

20   A.  Ms. Agnes Lucero.

21   Q.  She's Filipino; right?

22   A.  Yes.

23   Q.  Are you finished?

24   A.  Yes.

25   Q.  Did there ever come a time during that time period where

Cab1mar1                    Verzonilla - direct

1    you had another incident that caused you to have an in-service

2    with regard to an asthmatic patient?

3    A.   No.

4    Q.   Were you ever suspended as a result of this incident?

5    A.   No.

6              MR. NUWESRA:  Thank you.  I have no other questions,

7    your Honor.  Thank you.

8              THE COURT:  Any questions?

9              MR. GARLAND:  No, your Honor.

10             THE COURT:  Thank you, ma'am.  You may step down.

11             (Witness excused)

12             THE COURT:  Call your next witness, please.

13             (Pause)

14             MR. NUWESRA:  At this point, your Honor, I would like

15   to call Dr. Mervyn Richardson to the stand.

16             THE COURT:  Okay.

17             MR. NUWESRA:  And may I approach the stand and place

18   this there, your Honor?

19             THE COURT:  Yes.  Put that there, and can I see

20   counsel over here for a minute.

21             (Discussion held off the record at sidebar)

22             (In open court)

23             MR. NUWESRA:  Your Honor, plaintiff calls Dr. Mervyn

24   Richardson to the stand.

25             THE COURT:  Dr. Richardson.

Cab1mar1

1          (Discussion off the record)

2          THE COURT:  Doctor, I apologize.  We had to interrupt

3     a witness because she was apparently stuck on the line.  I've

4     gotten her off the line.  So let's finish Ms. Greene's

5     testimony, okay, and then we can move on.  Thank you.  I

6     apologize, Doctor.

7          (Pause)

8          MR. GARLAND:  Your Honor, can I just step out a moment

9     to get Mr. Fullerton back in?

10         THE COURT:  Yes.

11         (Pause)

12         THE COURT:  The day is coming, ladies and gentlemen,

13    we hope, when the government will let us build a new entrance

14    along the side of the building which will allow us to have a

15    jurors' entrance, a lawyers' entrance, and a public entrance.

16    And then everything will move much more quickly.

17         (Pause)

18         THE COURT:  Never mind.  Bring the doctor back in.  I

19    don't want to waste the jury's time.  She can wait when she

20    gets here.

21         (Pause)

22         THE COURT:  We changed our mind.  Come on back.

23         Right here, sir.  And would you stand and I'll ask you

24    to raise your right hand.

25         (Witness sworn)

Cab1mar1                    Richardson - direct

1          THE CLERK:  Please state and spell your name for the

2     record.  Have a seat.

3          THE WITNESS:  Mervyn Richardson, M-E-R-V-Y-N,

4     R-I-C-H-A-R-D-S-O-N.

5          THE COURT:  Doctor, if you would please take this

6     seat.  Your audience are these fine folks in the jury box.

7          You may inquire.

8     MERVYN RICHARDSON,

9          called as a witness by the Plaintiff,

10         having been duly sworn, testified as follows:

11    DIRECT EXAMINATION

12    BY MR. NUWESRA:

13    Q.  Good morning, Dr. Richardson.

14    A.  Good morning.

15    Q.  As you are aware, my name is Lee Nuwesra, and I'm the

16    attorney who has been representing Ms. Martinez in this case.

17    A.  Yes, sir.

18    Q.  Doctor, would you kindly tell the jurors of your

19    educational background, starting with college.

20    A.  Okay.  I attended St. John's University, obtained a

21    bachelor's of science in pharmacy; returned to St. John's

22    University and obtained a doctor of pharmacy degree.

23    Q.  And when was that, sir?

24    A.  The bachelor's of science was from 1989 until 1992, and the

25    doctor of pharmacy was from 1992 to 1995.

1   Q.  Would you kindly tell us about your work history since you

2   attained your pharmacy degree.

3   A.  Okay.  In 1993, I got my pharmacy license and practiced as

4   a staff pharmacist per diem at St. Barnabas Hospital until

5   1994, when I was employed at St. Barnabas as a coordinator,

6   clinical coordinator.  From 1994 until 2000, I continued in

7   that job, and then in 2000 I was promoted to assistant director

8   of pharmacy, and I've been that until presently.

9   Q.  Can you tell us what positions you have -- what titles and

10  the responsibilities you have held at St. Barnabas Hospital in

11  1995 when you attained your PhD.

12  A.  I attained my PharmD in 1995 and was clinical coordinator.

13  As clinical coordinator, I was responsible for coordinating

14  things with the staff pharmacist.  What I mean is, if the staff

15  pharmacist had a problem that they couldn't handle, they would

16  come to me.

17          I was also responsible for assisting my director,

18  associate director, in pharmacy department, making policies,

19  rewriting policies, and overall supervision of the staff

20  pharmacists.  That continued until 2000.

21          After 2000, I was promoted to assistant director of

22  pharmacy.  As assistant director of pharmacy, I continued those

23  duties and also rounded in the intensive care unit with the

24  physicians and nurses every morning, Monday to Friday, provided

25  I was available.

Cab1mar1                    Richardson - direct

1          I'm also on numerous committees.  To name a few, the

2     infection control committee, the pharmacy therapeutics

3     committee, the investigational review board committee, just to

4     name a few.  And we meet periodically.  When there is a meeting

5     to be had, we would meet.

6          I mentioned the rounding in the ICU.  And any other

7     duties that my director sees fit to give me, I perform.

8     Q.  Can you tell us what is your title currently.

9     A.  I'm currently assistant director of clinical pharmacy.

10    Q.  And how long have you been the assistant director?

11    A.  From about 2000.

12    Q.  Did your duties and responsibilities change after 2000 in

13    relation to from '95 to 2000?

14    A.  Probably slightly.

15    Q.  Okay.  And can you tell us how they were changed slightly.

16    A.  They were changed slightly in that I started rounding on a

17    regular basis in the intensive care unit.  That was one of the

18    main things.

19    Q.  Now you've used the word "rounding."  Can you tell us what

20    you mean by "rounding."

21    A.  All right.  When I say "rounding," what I mean is, every

22    morning, at around 8:30, 9:00, the attending physician and the

23    residents and the nurses would meet and discuss each patient

24    one by one.

25    Q.  And this has always been at the ICU?

Cab1mar1                    Richardson - direct

1   A.  Yes.

2   Q.  Can you tell us what your shift has been for the last five

3   years.

4   A.  8 a.m. until 4 p.m. Monday through Friday.

5   Q.  Did there ever come a time where you had the occasion to

6   work and round with my client, Ms. Martinez?

7   A.  Yes.

8   Q.  And how often was that?

9   A.  It depends when she was working, because I'm there Monday

10  through Friday and she worked -- could work any day of the

11  week.  But it was on a pretty regular basis.

12  Q.  Okay.  And during those times that you had rounded with

13  her, did you have occasion to observe her work?

14  A.  Yes.

15  Q.  How would you describe her as a registered nurse, her work

16  ethics and work -- work related?

17  A.  I thought she was very professional, I thought she was a

18  capable nurse, I thought she had her patients' welfare at

19  heart, and she did all she could do, I thought, for the

20  patient.

21  Q.  And how would you describe her demeanor and professionalism

22  when it came to interacting with her colleagues and/or

23  superiors, such as a physician attending?

24  A.  What I saw was professional.  I was there from 8 to 12

25  rounding in the ICU.  After that I went back to my office.  So

1  I could only speak for between 8 and about 12.

2  Q.  Now, sir, you mentioned that -- I believe at least you

3  have -- that part of your duties and tasks were to teach as

4  well?

5  A.  I left that out.  I forgot.

6  Q.  Okay.

7  A.  Yes.  The new nurses.

8  Q.  Okay.  Can you tell us about that, those teaching tasks.

9  A.  Okay.  When nurses join the department of nursing at St.

10 Barnabas, I would have to give them an overview of what goes on

11 in the pharmacy and what's expected of them as nurses.  Then

12 when you became a critical care nurse, there were continuing

13 education, and I was responsible for lecturing some of the

14 topics to the intensive care, critical care nurses.

15 Q.  Did there ever come a time where my client was one of your

16 attendees or people who attended your lectures and classes?

17 A.  Yes.  On more than one occasion.

18 Q.  Are you familiar with the hospital's medical error, or

19 medicine error policy?

20 A.  Yes.

21 Q.  Am I using the right word?

22 A.  Medication error.

23 Q.  Okay.  What can you tell us about the medication error

24 policy at St. Barnabas?

25 A.  I do not know it in detail, but what I know is that it is

Cab1mar1                     Richardson - direct

1   supposed to be nonpunitive, so we try to encourage the staff,

2   nurses, everybody, if a medication error is made, to report it,

3   because it is always felt that it's a systems problem why

4   people make errors, and if we get errors reported, then we can

5   try and see how we can fix the system to prevent somebody else

6   making that error again.  That's pretty much in summary what I

7   know about the policy.

8   Q.  Were you instrumental in any way, shape, or form with

9   regard to that policy at St. Barnabas?

10  A.  Instrumental in what way?

11  Q.  In any way.

12  A.  I would bring it up to the nurses when I'm telling them

13  about what's expected at St. Barnabas.

14  Q.  Okay.  But was there a problem or was there classes that

15  emphasized that policy to nurses who were at St. Barnabas?

16  A.  I'm not sure -- besides me mentioning it when I'm giving

17  them the introductory, I don't know if it's mentioned after

18  that.

19  Q.  Okay.  What I'm trying to get at is, does every newly hired

20  nurse have to go through that -- through that program with you

21  or that --

22  A.  Yes.

23  Q.  -- aspect of the program?

24  A.  Yes.

25  Q.  And can you tell us since when you've been involved with

Cab1mar1                    Richardson - direct

1   that teaching aspect of this?

2   A.  I can't remember the exact time, but it's been for a very

3   long time.  But I can't remember the exact year it started,

4   when I started doing it, no, I can't.

5   Q.  Okay.  Let me ask you this:  I believe you testified that

6   you got your PhD in 1995; right?

7   A.  My PharmD, yes.

8   Q.  Yes.  Are you a doctor?

9   A.  A doctor of pharmacy, yes.

10  Q.  Thank you.  Did you teach that class before you got your

11  doctorate?

12  A.  No.

13  Q.  In relation to your attaining the doctorate, can you tell

14  us how long after you attained the doctorate that you started

15  regularly teaching that class?

16  A.  It wasn't too long after.  Probably could have been three

17  years after.

18  Q.  Was my client one of the nurses that attended that class or

19  those courses?

20  A.  Yes.

21  Q.  To your knowledge, since the inception of that policy that

22  you've just been testifying about, did there ever come a time

23  where any of your nurses that have come forward and utilized

24  this policy have been disciplined in any way, shape, or form?

25  A.  I do not know.

Cab1mar1                    Richardson - direct

1   Q.  Are you aware of any --

2            THE COURT:  He says he doesn't know.  Move on, please.

3   Q.  Did you have to teach or orient nurses with regard to

4   medication and the side effects of such medication in the past

5   ten years?

6   A.  Yes.

7   Q.  And do you have any special training with regard to

8   pharmacology and knowing and understanding the different

9   medications and their side effects?

10  A.  Yes.

11  Q.  Can you tell us what different kind of medication are used

12  at the ICU.  Categorywise.

13  A.  Okay.  There are sedatives, analgesics, cardiovascular

14  agents, central nervous system agents, which include things

15  like sedatives, also antiepileptics.  I could probably go on

16  all day.

17  Q.  Okay.  Let me narrow it down.  Are you -- I'm only

18  interested in two general kinds.  Are you familiar with -- or

19  can you tell us what opiates are.

20  A.  Okay.  Opiates are a group of medications that derive from

21  the opium poppy.  There are some that are synthetic, but the

22  actual chemical structure is pretty similar to those that are

23  derived from the opium poppy.

24  Q.  Can you give us examples of what may be considered an

25  opiate.

Cab1mar1                    Richardson - direct

1   A.  Morphine, hydromorphone, Fentanyl, hydrocodone, oxycodone,

2   sufentanil, Percocet, Tylenol #3, Tylenol #4, and it goes on

3   all day.

4   Q.  Okay.  Can you -- have you -- are you familiar with the

5   term benzodiazepine?

6   A.  Yes, I am.

7   Q.  And can you tell the jurors what that is.

8   A.  Benzodiazepine is another class of drug.  They're called

9   benzodiazepine because of their structure, the chemical

10  structure, and most of them end with the word "pam."  Diazepam,

11  lorazepam, medazepam.  So you kind of recognize these

12  medications from their name.

13  Q.  Would Ativan fall under that category?

14  A.  Yes.

15  Q.  Can you tell the jurors, what are the side effects of

16  morphine?

17  A.  Some side effects of morphine are itching, nausea and

18  vomiting, constipation, sedation, hypotension, dizziness --

19  pretty much those are what I can remember off the top of my

20  head right now.

21  Q.  Would restlessness be a side effect of morphine?

22  A.  It can.

23  Q.  How about agitation?

24  A.  Yes.

25  Q.  Can you tell us what the difference between restlessness

Cab1mar1                    Richardson - direct

1    and agitation?

2    A.  I think there's a very fine line between agitation and

3    restlessness.

4    Q.  That's fine.  Can you tell me what some of the side effects

5    of Ativan.

6    A.  Some of the side effects are sedation -- as a matter of

7    fact, I take that back.  Nausea, vomiting, restlessness,

8    hypotension, itching -- that's pretty much all I can remember

9    off the top of my head.

10   Q.  Can you tell us laypeople, what does it mean when you say

11   hypotension?

12   A.  Hypotension means you can have a drop in your blood

13   pressure.

14   Q.  Is that also known or referred to sometimes as low blood

15   pressure?

16   A.  Yes.

17   Q.  And when you were discussing the side effects with

18   morphine, it was hypotension that you said?

19   A.  Yes.

20   Q.  Sir, in your capacity as the assistant director of pharmacy

21   since 2000, did there ever come a time where you were -- where

22   you had experience in reviewing toxicology results of the

23   patient at St. Barnabas?

24   A.  Yes.

25   Q.  Before I get into that, can you tell me, what is the policy

Cab1mar1              Richardson - direct

1   at St. Barnabas with regard to having lab tests done for

2   patients?

3   A.   I do not know what the policy actually states.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  Do you know what the practice is?

2    A.  Yes.

3    Q.  Please tell us, what is that practice?

4    A.  The practice of getting a blood or any lab test done would

5    involve completing-- the physician either verbally and then

6    reducing it to writing later or writing it in the chart.  Then

7    the nurse or the physician filling out a lab requisition form,

8    getting the specimen, sending both or taking both to the

9    laboratory.

10   Q.  Are you familiar with the-- withdrawn.

11           Can you tell us if there is a difference between a

12   urinalysis testing and a urine toxicology testing?

13   A.  The difference-- yes.  The difference is what you're

14   actually looking for.

15   Q.  Okay.  When it comes to urine toxicology testing, what are

16   you looking for?

17   A.  You're looking for certain drugs in the urine.

18   Q.  And based on your experience, how many different tests are

19   there for urine toxicologies?

20   A.  As for a number, I'm not sure.

21   Q.  Are there more than one tests to figure out or to find out

22   what kind of drugs are in the urine specimen?

23   A.  I don't know.  I don't know if I understand the question.

24   Q.  Okay.  Let me see if I can help you out.

25           Do you know-- are you familiar with the term of

1   "analysis" when it comes to drug testing?

2   A.  Yes.

3   Q.  What is that, sir?

4   A.  Analysis is where you get the specimens-- specimen, sorry,

5   and you perform certain tests, whether it's adding reagents,

6   putting it in a machine, et cetera, to see if you can find out

7   if and what drugs are in the specimen.

8   Q.  Based on your experiences at St. Barnabas, is there another

9   test that would only show generally whether the results are

10  opiates versus benzodiazepine?

11  A.  I don't know what test they use.  What I know is they send

12  a specimen to the lab and then we go to the computer, take a

13  look, and we see all these results comes back either positive

14  or negative.  But I don't know what tests they actually do.

15  Q.  During your tenure there, I believe you testified that you

16  had occasion to review some of these lab test reports.  Right?

17  A.  Yes.

18  Q.  Would you please take a look at what has been-- you see the

19  black booklet in front of you?  There are DX numbers on the

20  sides.

21  A.  Okay.

22  Q.  Can you please take a look at DX-12 and let me know when

23  you have the opportunity to review those documents?

24  A.  Yes.

25  Q.  Okay.  Have you ever seen, not these particular pages, but

1    reports like these before?

2    A.  Yes.

3    Q.  Can you explain to the jurors -- take a look at the second

4    page rather than the first page of that.  Can you tell the

5    jurors, explain what that is under the results names?

6    A.  What it's saying here is that the test did not pick up that

7    the patient took cocaine, opiates, THC or barbiturates, but the

8    patient recently got benzodiazepine because the test says it's

9    positive.

10   Q.  And can you tell us what it says on the top there about the

11   date?  You know, where all those little stars are.  Under it,

12   do you see where it says "in"?

13   A.  Right.

14   Q.  Can you tell us what that is?

15   A.  The in -- all right.  The in is the time the lab received

16   the test.  The out is the time the report was done.  And the

17   collection -- the call time means the time the specimen was

18   collected.

19   Q.  Okay.  And would it be fair to state that -- for the

20   remainder of this proceeding we're going to be saying "Patient

21   N" for confidentiality purposes.  So when you hear me say

22   "Patient N," that's what I mean.

23   A.  Okay.

24   Q.  Does this-- would it be fair to state that on 9/14/2009

25   that Patient N's results showed that she was positive for

1  benzodiazepine?

2  A.  Yes.

3  Q.  Now, sir, if you wanted to know exactly what subcategory of

4  that generic narcotic it was, would you have to do something

5  else?

6  A.  Yes.

7  Q.  And what would you have to do?

8  A.  You'd have to perform further tests to delineate which

9  exact benzodiazepine the patient had received recently.

10  Q.  And is that what you were explaining with regard to

11  analysis before?

12  A.  Right.  That could be, yes.

13  Q.  By the way, would Ativan be a member of this

14  benzodiazepine?

15  A.  Yes.

16  Q.  Thank you.

17        Let's take a look at the second page.  Can you tell us

18  the date just for the record?  The date of that.

19  A.  The in/out?

20  Q.  Yes.

21  A.  9/15/09.

22  Q.  That's the date?

23  A.  Yes.

24  Q.  And the time?

25  A.  Oh, 1251.  The out is 9/15/09 1357.

1    Q.   I take it 1357 is military time for 1:57?

2    A.   Yes.

3    Q.   Okay.  And can you tell us what the collection time of that

4    specimen was?

5    A.   Collection time says 1251.

6    Q.   And that would be just before one o'clock in the afternoon?

7    A.   Yes.

8    Q.   Thank you.

9         Can you tell us what the results showed on that day?

10   A.   The results showed that there were two positives:  Opiates

11   were positive and the benzodiazepine was positive.

12   Q.   Does it show that this opiate was Morphine?

13   A.   No.

14   Q.   So it could have been either Morphine or any other

15   subcategory that falls under opiates.  Correct?

16   A.   Yes.

17   Q.   Can you tell us the significance of the note where it says

18   "The positive findings are not confirmed"?

19   A.   You know, I don't know.

20   Q.   Have you ever heard the term "false positive" or "false

21   negative" during your tenure at St. Barnabas?

22   A.   Yes.

23   Q.   Can you tell us what that is?

24   A.   Okay.  A false positive could mean that the test is saying

25   positive, but it is not truthful.  A false negative could be

1   that the test is saying that there is nothing, where in truth

2   and in fact there is something, but the test did not pick it

3   up.

4   Q.  Thank you.

5        Sir, are you aware of when my client was separated

6   from her employment by St. Barnabas, approximately?

7   A.  Yes.

8   Q.  Okay.  To the best of your recollection, when was that?

9   A.  Probably about three years ago.

10  Q.  Okay.  Now, I want to bring your attention to when my

11  client was working there towards the end of her employment.

12       Did there ever come a time when my client shared with

13  you that she felt that there was any kind of discrimination in

14  the workplace?

15            MR. GARLAND:  Objection to the form of that question.

16            THE COURT:  Could you re-ask the question?

17            MR. NUWESRA:  Sure, your Honor.

18  Q.  Was there-- was there ever any occasion where my client

19  discussed with you her work environment at St. Barnabas?

20  A.  Yes.

21  Q.  Can you tell me if any of those conversations --

22            THE COURT:  How about "What did she say?" is a really

23  good question, kind of open-ended.  He could answer it.

24            What did she say to you on that subject?

25            THE WITNESS:  Okay.

1  A.  I remember on one occasion she said that she had her

2  patients she was working on and that there was a patient that

3  came up from the ED who would have needed a lot of attention, a

4  lot of work.  And the nurse supervisor on that day wanted to

5  take one of her patients from her and give her this patient

6  that needed a lot of work to be done and she wanted to give her

7  patients to a Filipino nurse when she already had at least one

8  patient that needed a lot of work, but she wanted to give

9  another one that needed a lot of work, as well, and take one

10 from her that didn't need as much attention.

11 Q.  Did she ever give you any indication that she felt that

12 there was a different and preferential treatment amongst the

13 staffing there?

14          MR. GARLAND:  Objection; leading.

15          THE COURT:  The objection is sustained.  Leading

16 question.

17 Q.  Can you tell me --

18          THE COURT:  What, if anything else, did she say?

19          THE WITNESS:  Okay.

20 A.  I remember her telling me that she did not want to attend

21 an intensive care unit Christmas party because she did not want

22 to be around the Filipino nurses.

23 Q.  Did she explain to you why?

24 A.  I don't remember if she explained.

25 Q.  Did she tell you at any other time anything else about the

CABBMAR2                    Richardson - direct

1   Filipino nurses there?

2   A.  Other than they're always the ones in charge, I can't

3   recall anything else.

4   Q.  Okay.  Thank you.

5           MR. NUWESRA:  I have no other questions at this time,

6   your Honor.

7           THE COURT:  Any cross on this witness?

8           MR. GARLAND:  Very briefly, your Honor.

9   CROSS EXAMINATION

10  BY MR. GARLAND:

11  Q.  Do you know how long-- well, let me ask it this way:  When

12  a urine toxicology test is done, for how long would Morphine be

13  able to be detected by that test after it has been administered

14  to a patient?

15  A.  Could you repeat that question again, please?

16  Q.  I'm trying to understand how long Morphine will remain in

17  the urine of an individual following its having been

18  administered.  So do you know how long Morphine would be in the

19  system or in the urine of a patient who received Morphine?

20  A.  It's a range because-- I should say yes.

21  Q.  You started to say "It's a range."  What's the range?

22  A.  Right.  It's a range because it depends on how frequently

23  the patient takes Morphine.  If it's a one-time dose or a

24  couple of doses, it's going to remain over a shorter period of

25  time than if a patient was a habitual user of the drug.  So it

1    can detect it-- I mean, it can hang around -- if you're

2    somebody who takes it sporadically or you took just one dose,

3    it would probably be hanging around for 48 hours.  If you take

4    it on a regular basis, it could be hanging around-- from the

5    last dose, that is -- it could hang around anywhere 76-- I'm

6    sorry, 72 to 96 hours, or three to five days, after the last

7    dose if you are a habitual user.  But if you got a one-time

8    dose, it would probably hang around for two to three days.

9              MR. GARLAND:  Nothing further, your Honor.

10             THE COURT:  Okay.  Anything else?

11             MR. NUWESRA:  Yes.  Just very briefly, your Honor.

12   REDIRECT EXAMINATION

13   BY MR. NUWESRA:

14   Q.   Sir, would the age and the weight and other background

15   information influence that?  Of the patient, you know, of the

16   individual.

17   A.   I'm not sure if the age and the weight-- let me back up.

18   Influence what?

19   Q.   Sorry?

20   A.   Influence what?

21   Q.   How long the drug would stay in the system of the

22   individual.

23   A.   Yes, the weight can.

24   Q.   Okay.  If a patient was, let's say, 27 years of age and

25   about 60 kilograms -- which I guess that's about, what, 150

1    pounds?

2    A.  132.

3    Q.  132.

4         Would the side effects of certain medications also

5    influence them?

6         THE COURT:  Wait.  Is your question if you have a

7    27-year-old patient who weighs about 132 pounds, would the side

8    effects influence, or are you asking a separate question about

9    side effects?  It's a very confusing question.

10        MR. NUWESRA:  Okay.  Let me see-- let me see if I can

11   simplify it, your Honor.

12        You know what?  I have no other questions at this

13   time.

14        THE COURT:  Okay.  All right.  Anything else?

15        MR. GARLAND:  No, your Honor.

16        THE COURT:  Thank you, Doctor.

17        THE WITNESS:  Can I --

18        THE COURT:  You may.  Thank you, sir.

19        (Witness excused)

20        THE COURT:  Can you now call Ms. Greene?

21        Ms. Greene, come on back up.  Sorry you got stuck on

22   the line.

23        THE WITNESS:  That's okay.

24        THE COURT:  Ma'am, you are still under oath.  Let's

25   get you done.

1           THE WITNESS:  Thank you.

2           THE COURT:  Okay.  Let's resume direct examination of

3    this witness.

4     LISA D. GREENE, resumed.

5    DIRECT EXAMINATION CONTINUED

6    BY MR. NUWESRA:

7    Q.  Good morning, Ms. Greene.

8    A.  Good morning.

9    Q.  Before we ended for the day yesterday, we were talking-- or

10   you were testifying about, in sum and substance, whether the

11   union grieved her suspension or not.

12          Do you recall that?

13   A.  Yes.

14   Q.  What was your-- do you recall saying no to that question?

15   A.  No.  I said no to termination, not to suspension.

16   Q.  Okay.  So let me ask you this:  Did my client ever grieve

17   her suspension?

18   A.  Yes.

19   Q.  When was it that she grieved her suspension?

20   A.  Immediately after the suspension, we started the process of

21   investigation and the grievance process.

22   Q.  Okay.  Would you please take a look at DX-18, which is in

23   the black folder in front of you?  Are you familiar with that

24   document?  Have you looked at it?

25   A.  Yes.

1   Q.  Are you familiar with that document?

2   A.  Yes.

3   Q.  Can you tell the jurors in your own words what that is?

4   A.  This is an official warning notice that has a discipline of

5   suspension.

6   Q.  And this is the grievance you're talking about.  Right?

7   A.  In response to this, yes.

8   Q.  And the date of this is September 18, 2009.  Right?

9   A.  It says the 15th.

10  Q.  The date on top, September 18, 2009.  Are we looking at the

11  same thing?  DX-18.

12  A.  Excuse me.  Yes, September 18th.

13  Q.  Okay.

14          MR. GARLAND:  Objection to foundation as to this

15  document.  Has she seen this one before?

16          THE COURT:  Ma'am, have you ever seen this document

17  before?

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20  Q.  And this is the grievance that the union did on behalf of

21  my client.  Right?

22  A.  Yes.

23  Q.  And this is relative to the charges that were lodged

24  against her by the hospital on the 15th of September.  Right?

25  A.  Yes.

1  Q.  Can you take a look at DX-15, please, that's in the

2  booklet?

3  A.  Okay.

4  Q.  All right.  Does your signature appear anywhere there?

5  A.  Yes.

6  Q.  And you signed this on 9/15/2009?

7  A.  Yeah.  Yes.

8  Q.  Yes.  And you reviewed it before you signed it?

9  A.  Yes.

10  Q.  Okay.  And do you know what time of the day this was?

11  A.  No.

12  Q.  Okay.  Did you-- were you able to read it before you signed

13  it?

14  A.  Yes.

15  Q.  Can you please read it for the jury?

16  A.  "Suspended indefinitely, pending investigation.  Details:

17  Conflicting story - stated she changed the time on the narcotic

18  sheet.  There is evidence of positive opiates on patient in 527

19  who was under her care."

20          I'm having an issue with the second word.

21          THE COURT:  You mean you're having difficulty reading

22  it?

23          THE WITNESS:  Yeah.  Well, I have pink eye in this

24  eye.

25          THE COURT:  Oh, I'm so sorry.

CABBMAR2                    Greene - direct

1             THE WITNESS:  So I'm trying to position it where I
2     could see it.  One second.
3             THE COURT:  Okay.
4             THE WITNESS:  I'm still having an issue.  I can't see
5     that.
6             THE COURT:  Here.  Let me see what you're-- can you
7     point to me where you're looking at?
8             THE WITNESS:  This word here.
9             THE COURT:  Under "Details"?
10            THE WITNESS:  "The" something "procedure."
11            THE COURT:  Can we agree that number 3 under
12    "Details," it says "The scheduled procedure"?
13            MR. GARLAND:  Yes, your Honor.  The person who wrote
14    this will be here later in the trial.
15            THE COURT:  To authenticate it?
16            Is that what it looks like to you, Mr. Nuwesra, "the
17    scheduled procedure"?
18            MR. NUWESRA:  That's a fair reading of it --
19            THE COURT:  We think this says "the scheduled
20    procedure."  You may think so, too, or you may not, but
21    apparently the person who wrote it will be here later.
22            THE WITNESS:  Okay.  The schedule --
23    Q.  I'm sorry.  Go ahead.
24    A.  It's okay.
25    Q.  Go ahead.

1  A.  "The scheduled procedure for the patient was done.  The

2  patient's blood pressure had dropped 80/40.  Please see

3  attached."

4  Q.  Were you aware that there was a drug testing done on

5  Patient N on that day?

6  A.  A lab testing?

7  Q.  Drug, you know.

8  A.  Oh, a drug testing.  No.

9  Q.  You were not?

10  A.  No.

11  Q.  Would you please take a look at DX-17?

12  A.  Okay.

13  Q.  Is that your signature on the bottom?

14  A.  Yes.

15  Q.  And by the way, DX-17, can you tell the jurors what that is

16  in your own words?

17  A.  It's a discipline for an indefinite suspension pending

18  investigation.

19  Q.  Regarding?

20  A.  Regarding conflicting story.

21  Q.  Regarding what individual?

22  A.  Oh, Cora Fischer.

23  Q.  Did you read it before you signed it?

24  A.  Yes.

25  Q.  Can you please read it to the jury?

1    A.  "Suspended indefinitely pending investigation.  Conflicting

2    story" is number 1.  Then, number 2, "Not telling the truth.

3    Stated that she was the one who changed the time on the drug

4    disposition record and 24-hour nursing audit form.  Please see

5    enclosed."

6    Q.  And did the union grieve Ms. Cora Fischer's suspension?

7    A.  Yes.

8    Q.  Now, at one point yesterday you related to us, you

9    testified about the telephone conference that you had with my

10   client and this other female who identified herself as a

11   lawyer.  Right?

12   A.  Yes.

13   Q.  And I believe you said that you gave her three op -- you

14   gave my client during that conference call three options?

15   A.  Yes, I gave her three options.

16   Q.  Can you please just remind us and tell us what those three

17   options were?

18   A.  The three options is that we can go strictly through the

19   grievance process, which is the first, second and third step.

20   That's the first option.

21       The second option is that we can negotiate -- which is

22   what I wanted to do -- negotiate the terms before it even gets

23   to the third step, which would have been the second step with

24   Catherine Graham.

25       The third option is she could take a resignation with

1    references if I can negotiate that.

2    Q.  So when you said "negotiate" with Ms. Graham, the

3    negotiation could have been anything, right, including the

4    resignation that you just testified about?

5    A.  That's correct.

6    Q.  All right.  Now, at one point you also testified

7    yesterday-- withdrawn.

8             Would the fact that the union grieved my client's

9    suspension three days after she was suspended, would that

10   qualify for one of the options you gave her?

11   A.  Can you repeat?

12   Q.  Sure.

13            You said that, correct me if I'm wrong, during that

14   telephone conference, you gave her three options:  One is to

15   grieve it; two is to resign; or, three, negotiate, but part of

16   the negotiation could have been the resignation.  Right?

17   A.  If she wanted that, yes.

18   Q.  Okay.  My question to you is:  Would the fact that the

19   union grieved her suspension three days later, would that

20   satisfy the grievance option you were talking about?

21   A.  I don't understand what you mean by the "three days."  What

22   three days?

23   Q.  Well, she was suspended on the 15th.  Right?

24   A.  Right.

25   Q.  And we already established that the union grieved that

1   suspension on the 18th, which was three days later.  Right?

2   A.   The grievance process starts immediately.  Paperwork may

3   have been distributed three days later.  It starts immediately.

4   Q.   Okay.  So what step of the grievance was that letter that

5   was sent by the union on her behalf?

6   A.   A second step.

7   Q.   All right.  And would it be fair to state that that shows

8   that she chose, at least as of the 18th, to do the grievance

9   process?  Right?

10  A.   Yes.

11  Q.   Okay.  Now, do you recall testifying about the

12  communication between management and the employee?  And correct

13  me if I'm wrong, you testified, in sum and substance, that once

14  the employee elects to go through the grievance process, all

15  communication should be going through the union.  Right?

16  A.   That is correct.

17  Q.   Thank you.

18          Now, during this telephone con-- incidentally, how

19  long was this telephone conference that you had, this three-way

20  telephone conference?

21  A.   I don't recall that.

22  Q.   Okay.  During this telephone conference, do you recall

23  whether my client felt that she was being treated different

24  than Ms. Fischer?

25  A.   No.

1   Q.  Did she ever tell you during this conference that she felt

2   that this was retaliation on behalf of the hospital?

3   A.  No.

4   Q.  Do you recall discussing the incident of the missing

5   Morphine in the emergency room during this three-way telephone

6   conference?

7   A.  No, we didn't have that conversation.

8   Q.  Incidentally, what was the makeup of the employees involved

9   with that Morphine missing in the emergency room?

10  A.  The makeup?

11  Q.  What were they?  Were they nurses?

12  A.  Nurses.

13  Q.  All nurses?

14  A.  Correct.

15          MR. NUWESRA:  I have no other questions, your Honor.

16          THE COURT:  Okay.  We'll have cross-examination of

17  this witness.

18          MR. GARLAND:  Just a few questions, your Honor.

19  CROSS EXAMINATION

20  BY MR. GARLAND:

21  Q.  Ms. Greene, I just want to talk about the grievance process

22  and what it means.  You've been using some terminology, first

23  and second step, et cetera.

24          With regard to Ms. Martinez, was the first step in

25  this process the meeting that was held by Pauline

1    Frances-Lattery that you attended?

2    A.  I did.

3    Q.  So that was the first step?

4    A.  It's not a first step.  A first step is when you have a

5    grievance, and then the first step would be to go to the

6    immediate manager.  Whenever you have an incident where there's

7    a suspension, termination, something serious, I will usually

8    bypass that first step, because it's usually the manager

9    present so she's handing down the discipline.  Chances of

10   negotiation are not good, so I would bump it to the next

11   superior.

12   Q.  So, in this case, Ms. Martinez's case, since the manager

13   met with you and her giving out the discipline, you, as the

14   union representative, skipped the first step?

15   A.  That's correct.

16   Q.  So the second step is then when the union sends out the

17   letter that's Defendant's Exhibit 18?

18   A.  Any time there is a discipline with any member, whether it

19   be suspension, termination, the letter goes out automatically.

20   It's an automatic thing, so it's there.  We talk to the member

21   and we say of course you're going to grieve this if it's a

22   termination or a suspension.

23   Q.  But it's the practice of the union, then, automatically

24   after there's a suspension, to send out the letter that is in

25   front of you as Defendant's Exhibit 18?

1   A.  The letter, yes.  That's an automatic.

2   Q.  Then, after that letter was sent out, after September 18--

3   A.  She --

4   Q.  Let me finish the question.

5           -- you had presented the different options to

6   Ms. Martinez, including going through with the grievance

7   process, and she rejected that.  Correct?

8   A.  That is correct.

9           MR. GARLAND:  No further questions, your Honor.

10          MR. NUWESRA:  No questions.

11          THE COURT:  Ma'am, you're done.

12          THE WITNESS:  Thank you.

13          (Witness excused)

14          MR. NUWESRA:  Let me see if one of my witnesses is out

15  there.

16          THE COURT:  I certainly hope so.

17          MR. NUWESRA:  Yes.

18          (Pause in proceedings)

19          MR. NUWESRA:  Good morning, your Honor.  Plaintiff

20  calls Ms. Mirna Santiago.

21          THE COURT:  Ms. Santiago, won't you come up here,

22  please.

23          (Witness sworn)

24          THE DEPUTY CLERK:  Please state and spell your name

25  for the record.

1           THE WITNESS:  It's Mirna, M-i-r-n-a.  Last name is

2    Santiago, S-a-n-t-i-a-g-o.

3           THE COURT:  You may inquire.

4     MIRNA SANTIAGO,

5        called as a witness by the Plaintiff,

6        having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. NUWESRA:

9    Q.  Good morning, Ms. Santiago.

10   A.  Good morning.

11   Q.  As you're aware, I'm Lee Nuwesra and I represent the

12   plaintiff in this action, Ms. Martinez.

13           Would you please tell the jurors if you have any

14   relationship with Ms. Martinez?

15   A.  Yes.  Marlen's my sister.

16   Q.  Would you please tell the jurors, what do you do for a

17   living?

18   A.  I'm a lawyer.

19   Q.  And can you tell us what area of the law you practice?

20   A.  I practice in insurance coverage.  So I represent insurance

21   companies when they have problems or disputes with their

22   policyholders.

23   Q.  So you defend insurance companies?

24   A.  Yes.

25   Q.  And where did you get your law degree?

1   A.   I went to the State University of New York at Buffalo.

2   Q.   And when did you get your law degree?

3   A.   In 1995.

4   Q.   And are you admitted to the bar of the State of New York?

5   A.   Yes, I am.

6   Q.   And when were you admitted?

7   A.   I was admitted in 1996.

8   Q.   Ma'am, I want to bring to your attention the time period of

9   the middle of September 2009, a little bit over three years

10  ago.

11         Do you recall that period of your life?

12  A.   Yes, I do.

13  Q.   Do you recall that period of your life in relation to

14  Ms. Martinez?

15  A.   Yes, I do.

16  Q.   Can you tell us about that period of your life in relation

17  to your sister that was happening in mid-September 2009?

18  A.   What I remember from that time period, in mid-September

19  2009, was that my sister called me and she told me that she was

20  having some problems at work.  I don't know if you want me to

21  go into what happened at that time or --

22         THE COURT:  No.  She called you, she told you she was

23  having some problems at work.  And?

24         THE WITNESS:  Okay.

25  A.   And she told me that people at work or somebody at work was

1    claiming that there was some Morphine that was missing and that

2    they were saying that she was involved with the missing

3    Morphine and that a union rep had called her just before she

4    called me.  And I remember that Marlen was very upset and she

5    wanted-- she said that she didn't understand exactly what the

6    union rep was telling her about her choices and she wanted an

7    extra set of ears on the conversation.

8    Q.  Okay.  I'm going to tell you that the record indicates that

9    your sister, Ms. Martinez, was suspended on September 15, 2009.

10   So we'll use that as the point.

11   A.  That's fine.

12   Q.  And did there ever come a time where you agreed to be part

13   of that telephone conference?

14   A.  Yes.  I told her I'd be her extra set of ears on the

15   conversation.

16   Q.  Okay.  And do you recall the date of when this happened?

17   A.  I'm sorry, no, I don't.

18   Q.  Okay.  Do you recall how long after your sister was

19   suspended this happened?

20   A.  I think when we spoke, she told me it was about two days

21   after.

22   Q.  All right.  And I just want you to tell the jurors, what

23   was the sum and substance of this three-way conversation

24   between you, your sister-- withdrawn.

25          Do you know who this other union person is, the name?

1   A.  Yes.  Her name was Lisa Greene.

2   Q.  Did you ever meet Ms. Lisa Greene before?

3   A.  I've never met Ms. Greene.

4   Q.  And so this was the only interaction that you had with

5   Ms. Greene?

6   A.  Yes.

7   Q.  All right.  Would you now please tell the jurors what was

8   the sum and substance of this telephone conference with you,

9   your sister, and Ms. Greene?

10  A.  Sure.  After-- while I was still on the phone with my

11  sister and she conferenced in, she third-partied -- I'm not

12  sure what it would be called, but she called Ms. Greene and

13  Ms. Greene joined the conversation with us.  And she, Marlen,

14  told Lisa, "I have my sister on the phone and I want you to

15  repeat to her, please, what you told me, what you just told me

16  about my options with respect to my job."

17  Q.  And did Ms. Greene repeat that?

18  A.  She said, "Fine."  She wanted to know who I was, so I told

19  her my name and I repeated that I was Marlen's sister.  And in

20  the interests of openness, I also told her that I was an

21  attorney, but that I was not representing Marlen for any

22  reason.

23  Q.  Okay.  And, incidentally, do you recall how long this

24  conversation was, this conference?

25  A.  It lasted anywhere from 45 minutes to an hour.

1   Q.  Okay.  During this conversation, did the union relate any

2   offers on behalf of St. Barnabas?

3   A.  Yes.

4   Q.  And what were these offers or these options?

5   A.  Sure.  She said that St. Barnabas was asking Marlen to

6   resign or they would report her to the state authorities and

7   possibly lose her license or she could file a grievance.

8   Q.  And did your sister choose any of these options?

9   A.  Yes.  She said she wanted to file a grievance.

10  Q.  Okay.  Was anything else discussed during this 45 minutes

11  to an hour conference call?

12  A.  Yes.  When-- well, Ms. Greene told Marlen that she could

13  not represent her.  My impression was that she expected her

14  to --

15          THE COURT:  Not your impression.  We're not interested

16  in your impression, ma'am.

17          THE WITNESS:  Okay.  Sorry.

18          THE COURT:  You can say what was said, but that's it.

19          THE WITNESS:  Okay.

20  A.  Well, she was urging Marlen to resign, and she said that

21  she could not represent her in any grievance procedure because

22  she had been selected to represent the other nurse who was also

23  implicated in the Morphine incident.  And that, you know, she

24  felt that the other nurse had a better chance, so she was

25  representing her.

1    Q.  Okay.  Was anything else discussed besides what you just

2    testified about?

3    A.  Yes.

4    Q.  Okay.  Go ahead.

5    A.  When she said that, we inquired-- I don't remember if it

6    was me or Marlen, but I know one of us asked what would happen

7    now if Marlen had no representation, being that Lisa Greene

8    said that she had been selected to represent the other nurse?

9    And, again, I don't remember if it was me or Marlen, but we

10   said could she get her own representation, get an attorney,

11   maybe, to represent her in the grievance process?  And Lisa

12   Greene did not say yes or no, but she said that it had been

13   done before; that it was possible to do it.

14        And then I-- and then Marlen said something to the

15   effect of, you know, she's not surprised this is happening

16   because the other nurse is Filipino and that she was sort of,

17   you know, now on her own having to defend herself.

18        And then Lisa Greene said that, you know, this wasn't

19   the first time she was hearing that, about other people,

20   non-Filipinos, complaining about treatment.  And that a similar

21   incident with Morphine had happened in the emergency room a few

22   weeks before where Morphine had gone missing and no one was

23   disciplined or reprimanded and that all of the nurses

24   implicated in that situation were Filipinos, as well.

25   Q.  Was there anything else --

1              THE COURT:  Hang on.  Is this lady a witness back here

2       who's peeking in the door?

3              MR. NUWESRA:  I don't recognize her, your Honor.

4              MR. GARLAND:  I couldn't see the door.

5              THE COURT:  Okay.

6              MR. NUWESRA:  I'm sorry.

7       Q.  To your recollection, was anything else discussed during

8       this conference?

9       A.  We discussed a lot, but, you know, that's the stuff that

10      jumps out at me right now.

11      Q.  Okay.  With regard to your sister, how close are you to

12      your sister?

13      A.  Well, we're the two-- there's four of us; five with an

14      adopted sister that we have.  And we're the closest in age so

15      we're fairly close.

16      Q.  Okay.  After your sister's suspension, did there ever come

17      a time where you learned of her termination?

18      A.  Yes.

19      Q.  Did your sister relate to you her feelings with regard to

20      her suspension and subsequent termination personally?

21      A.  Yes.  She was-- she was upset, like I said, from the

22      telephone conversation, the first telephone conversation that

23      we had when this was all going on.  She was already upset.  Her

24      voice was hoarse, which I know from experience when she's been

25      crying, she loses her voice.  And it went on from there.  She

1   was upset.  She told me she was embarrassed.  She was

2   humiliated by the whole thing.  She didn't understand what was

3   happening.

4           And after she got suspended, there would be days that

5   I would pop up to see how she was and her eyes would be red,

6   her voice would be gone, she was crying.  You know, she was

7   just upset.

8   Q.  Did you help her in any other way, shape or form besides

9   popping in and talking to her?

10  A.  I tried.  I would take her-- I live Upstate, so I would

11  take her to my house for a couple of days to see if she could

12  feel better about it.  I would take her son on the weekends

13  sometimes, because she just couldn't cope.  You know, there

14  would be days I would pop up, you know, at 3, 4:00.  I would

15  run during my lunchtime to check up on her, and she'd be in

16  bed.  She couldn't get out of bed that morning.

17          It was very upsetting to me because she's always been,

18  like, the strong one.  Like, we look up to her.  She's the

19  fighter.  And to see her kind of reduced to that, it was very

20  upsetting to me and my mother and everybody else in our family,

21  too.

22  Q.  Besides her emotional well-being, did she relate to you

23  about any other physical issues?

24  A.  Yes.  She lost a lot of weight.  She would get heartburn.

25  And, you know, first she wasn't eating because she was so

1  upset.  She wouldn't eat.  Then, after she would force herself

2  to eat, she would start getting heartburn and pain in her

3  chest, so we thought she was getting an ulcer or something.  So

4  I would drive her sometimes to see the doctors.

5  Q.  Okay.  Thank you.

6          MR. NUWESRA:  I have no other questions at this time,

7  your Honor.

8          THE WITNESS:  May I take a tissue?

9          THE COURT:  You may, of course.

10         THE WITNESS:  Thank you.

11         You may inquire.

12         MR. GARLAND:  Thank you, your Honor.

13  CROSS EXAMINATION

14  BY MR. GARLAND:

15  Q.  Let me start by asking you, were you in the courthouse

16  yesterday?

17  A.  Yes, I was.

18  Q.  You were here to see your sister?

19  A.  Yes, I came to lend some support.

20  Q.  And you were also providing support to her back in

21  September 2009, following her suspension?

22  A.  Yes.

23  Q.  And you brought to that support some of your background as

24  a lawyer?

25  A.  I tried.  I don't do employment law.

1   Q.  But you had experience with employment law back in

2   September of 2009.  Right?

3   A.  I had some experience, yes.

4   Q.  And what was that experience?

5   A.  Well, I worked for two years-- a year and a half at the

6   Attorney General's office and my office handled some employment

7   discrimination cases.

8   Q.  Do you have additional experience in employment law outside

9   of that?

10  A.  Yes, I do.

11  Q.  In fact, back in September of 2009, what additional

12  experience in employment law did you have?

13  A.  I'm not sure what you're getting at.  Could you ask --

14          THE COURT:  No.  First of all, that's a very

15  argumentative answer, Counsel.

16          THE WITNESS:  Okay.  I'm sorry.

17          THE COURT:  So try to suspend being a lawyer.  It's

18  very hard.  I was a witness once when I was a lawyer.  We are

19  the worst witnesses in the world.

20          Now, his question is:  Do you have any other kind of

21  experience in employment law?  Did you, back in September of

22  2009 other than the AG's office, have any other experience in

23  employment law?

24  A.  Yes, I have.

25  Q.  What other experience did you have in employment law back

1   in September 2009?

2   A.  I'd been involved in other discrimination cases.

3   Q.  How so?

4   A.  Well, I'd been involved in some of my friends'

5   discrimination cases.  I'd been involved in a discrimination

6   case of my own.

7   Q.  So you were involved in your own discrimination case back

8   in September of 2009?

9   A.  Yes, I was.

10  Q.  And what were you claiming back in September of 2009?

11          MR. NUWESRA:  Objection, your Honor.

12          THE COURT:  The objection is sustained.

13  Q.  Did you share with your sister any of your experience from

14  your own employment discrimination case?

15  A.  No, I did not.

16  Q.  Did you ever talk to her about it?

17  A.  No, I did not.

18  Q.  Even though the two of you were as close as you described,

19  you never once talked to her about your own employment

20  discrimination case when you were supporting her back in

21  September of 2009?

22  A.  I feel it to be very embarrassing and humiliating to be

23  discriminated against.  You feel like there is something wrong

24  with you as a person that whoever is discriminating against you

25  is discriminating against you, and I was embarrassed.  And it

CABBMAR2                    Santiago - cross

1    was only after that point that I was able to tell my sister

2    this is what happened to me.

3    Q.  And at what point did you tell her that?

4    A.  Maybe a year or so later.

5    Q.  At that point in September of 2009, did you refer her to

6    her attorney?

7    A.  Yes, I did.

8    Q.  Who was that attorney?

9    A.  Lee Nuwesra.

10   Q.  And how did you know him?

11   A.  I know Lee socially, I know him from work.

12   Q.  And was he also your attorney?

13   A.  Yes, he was.

14   Q.  And did you share-- when you referred your sister to him,

15   did you explain to your sister how you knew him?

16          MR. NUWESRA:  Objection, your Honor, to the extent

17   that it may be --

18          THE COURT:  The objection is sustained.

19          MR. NUWESRA:  Thank you.

20          THE COURT:  It's not relevant.  Move on, please.

21   Q.  Back in September 2009, were you pursuing your own claim of

22   discrimination against your former employer?

23          MR. NUWESRA:  Objection, your Honor.  Asked and

24   answered.

25          THE COURT:  It's asked and answered.  You've made your

CABBMAR2                    Santiago – cross

1    point.  Move on, please.

2    Q.  Did that same lawsuit also allege retaliation?

3              MR. NUWESRA:  Objection, your Honor.

4              THE COURT:  Objection is sustained.

5              MR. GARLAND:  No further questions, your Honor.

6              THE COURT:  Move on.

7              MR. GARLAND:  No further questions.

8              THE COURT:  Anything else?

9              MR. NUWESRA:  No, your Honor.

10             THE COURT:  Thank you, ma'am.

11             Let's take our morning break, folks.  Ten minutes.

12   Don't discuss the case.  Keep an open mind.

13             THE WITNESS:  Thank you, Judge.

14             (Jury excused.)

15             THE COURT:  Okay.  I'll see you in ten minutes.

16             MR. GARLAND:  Thank you, your Honor.

17             (Recess)

18             (Continued on next page)

19

20

21

22

23

24

25

Cab1mar3                    Stumacher - direct

1          (In open court; jury not present)

2          MR. NUWESRA:  Your Honor, can Ms. Santiago stay?

3          THE COURT:  Yes, of course.  She's already testified.

4          MR. NUWESRA:  Okay.  I just want to make sure.

5          (Jury present)

6          THE COURT:  Okay.  Have a seat.

7          Call your next witness, please.

8          MR. NUWESRA:  Yes.  Good morning, your Honor.

9   Plaintiff calls Dr. Richard Stumacher.

10          THE COURT:  Doctor, come up, please.

11          THE CLERK:  Please raise your right hand.

12          (Witness sworn)

13          THE CLERK:  Please state and spell your name for the

14   record.

15          THE WITNESS:  My name is Richard Stumacher.

16   R-I-C-H-A-R-D, S-T-U-M-A-C-H-E-R.

17          THE COURT:  You may have a seat, Doctor.  Talk to the

18   folks in the jury box.

19          MR. NUWESRA:  Thank you.

20          THE COURT:  You may inquire.

21    RICHARD STUMACHER MD,

22       called as a witness by the Plaintiff,

23       having been duly sworn, testified as follows:

24   DIRECT EXAMINATION

25   BY MR. NUWESRA:

Cab1mar3                    Stumacher - direct

1    Q.  Good morning, Dr. Stumacher.  How are you today?

2    A.  Good.  Thank you.

3    Q.  My name is Lee Nuwesra.  I am the attorney representing

4    Ms. Martinez in this case.

5          Doctor, would you kindly tell the jurors about your

6    professional training from college on.

7    A.  I went to SUNY Binghamton; I went to medical school in

8    Israel at Tel Aviv University Sackler School of Medicine; I did

9    my internal medicine residency at Montefiore Medical Center; I

10   worked as an ER attending between residency and fellowship at

11   Lenox Hill Hospital; and I did my fellowship at Beth Israel

12   Medical Center here in Manhattan in both pulmonary and critical

13   care medicine; and upon graduation I came to work at St.

14   Barnabas and I've been there ever since.

15   Q.  And when was that that you started at St. Barnabas?

16   A.  2002.

17   Q.  And have you -- withdrawn.

18          When you initially joined St. Barnabas, what position

19   did you join them at?

20   A.  Critical care attending.

21   Q.  And what is your position with them now?

22   A.  I'm pulmonary and critical care attending and I do other

23   odd jobs.

24   Q.  Okay.  And for how long were you just a critical care

25   attending, from '02 till when?

1    A.  Approximately five years, and I've kind of grown from just

2    being critical care to both critical care and pulmonary

3    medicine.  I do ethics, I do rehab, I'm in charge of the

4    cardiopulmonary respiratory department.  You know, as I've been

5    there and as I've grown, I've taken on other responsibilities.

6    Q.  Is the other responsibility, like pulmonary and rehab, are

7    they situated in what's known as the ICU --

8    A.  No.

9    Q.  -- in the hospital?

10   A.  No, it's outside of the ICU.

11   Q.  It's the outside.

12   A.  Yeah.

13   Q.  So would it be fair to state that the ICU only dealt with

14   your function as a critical care attendant?

15   A.  Yes.

16   Q.  Okay.  And you continue to work in the ICU as a critical

17   care attendant.

18   A.  Yes.

19   Q.  And what is your shift -- shift -- working shift?

20   A.  I work many different hours 'cause I do more than just

21   critical care.  I'm here today after my 24-hour shift that

22   ended 8:30 this morning.

23   Q.  Okay.  We'll see what we can do to get you out of here

24   early.

25            In 2009 were you assigned to the ICU?

1   A.  Yes.

2   Q.  And during the year of 2009 did you have occasion or

3   occasions to work with my client, Ms. Martinez?

4   A.  Yes.

5   Q.  And what was her position at the time?

6   A.  Nurse.

7   Q.  Registered nurse?

8   A.  Registered nurse.

9   Q.  How would you describe her work ethics and work value while

10  she was there at the same unit?

11  A.  I think she's an excellent nurse.

12  Q.  And did you continuously work with her from '02 to '09 in

13  the ICU?

14  A.  Yeah.  I don't remember if I -- we were both there in 2002,

15  but yes, for many, many years, we worked together.

16  Q.  Okay.  I will tell you that the record indicates she was

17  hired in July of 2001.

18  A.  Excellent.  So she was there before me.

19          MR. GARLAND:  2002.

20          MR. NUWESRA:  2002.  Thank you.

21  A.  Okay.  So we started at the same time.

22  Q.  Okay.  I stand to be corrected.

23          THE COURT:  Okay.  Let's be done with the conversation

24  and let's ask questions.

25  Q.  Doctor, can you explain to the jurors, what does a -- or

1  what did, in 2009, an ICU attendant do, at St. Barnabas, of

2  course?

3  A.  I'm responsible for patients in my district, because we

4  have such a large ICU, we have separate areas, and during the

5  day shifts, you're delegated to just one area and you have

6  patients in that area.  Now patients sometimes leave and new

7  ones come in, so it's not exactly a set number, and if there's

8  something happening in another area or another district, you

9  help out.  So my primary responsibility is patient care during

10  the daytime.

11      My second responsibility and just as important is

12  teaching residents, interns, and students who are on rounds so

13  that they learn how to be doctors as well.

14      In addition, it's talking with family members and

15  giving information.  Those are primarily my critical care

16  responsibilities.

17      The night shifts are a little bit different in that

18  you're responsible for the whole unit, which is I think 36

19  beds, including patients coming in and coming out, and it can

20  get very hectic.  There's a lot less teaching going on but a

21  lot more doing.  And same issues.  My primary responsibility is

22  to all locations.

23  Q.  And what was considered the day shift for an attendant back

24  in 2009?

25  A.  Our day shifts are 8 in the morning to 4 p.m. in the

1   afternoon, and our night shifts start at 4 p.m. and end at 8:00

2   in the morning, but there's overlap because people have to get

3   there, then you have to give signout and explain what's

4   happening to the patients, and if there's anything going on,

5   you don't, you know -- it's not like the bell rings and you

6   walk out the door.

7   Q.  Now when you said that when you worked at -- when you were

8   an attendant in '09 in the ICU, you said that you directly

9   supervised one of the district -- the certain district;

10  correct?

11  A.  Correct.

12  Q.  How many districts are there at the St. Barnabas?

13  A.  There are three districts, and we call them D1, D2, and D3.

14  Q.  Doctor, we will be talking about a certain patient in this

15  proceeding, and I will be referring to her or we will be

16  referring to her as Patient N for confidentiality purposes.

17  A.  Okay.

18  Q.  As the attendant, do you recall where you were assigned on

19  September 15, 2009 as the attendant?

20  A.  No, but I do remember where I was called yesterday, where I

21  was yesterday.

22  Q.  If I have you review the patient's chart that is in front

23  of you, will you be able to find out which district you are

24  assigned to that day?

25  A.  Probably -- probably not.

1  Q.  Why is that?

2  A.  Because it doesn't -- the charts in and of themselves don't

3  say specifically where the patient is.  I might.  If the

4  sticker has their bed number and they happen to -- the sticker

5  happens to be correct with the bed number, I can tell you.  Do

6  you want me to take a look?

7  Q.  Sure.  For September 15.

8  A.  September 15th.

9       September 15th.  And there is my note.

10  Q.  Okay.

11  A.  Hold on a second.

12       I cannot tell what district it is because the top of

13  the -- where the name is, which is exactly where the bed number

14  would be, is removed, redacted.

15  Q.  Okay.  Did you take care of this patient on that day?

16       THE COURT:  First of all, Doctor, do you have any

17  independent recollection as you sit here today of taking care

18  of this particular patient?

19       THE WITNESS:  No, I do not.

20       THE COURT:  All right.  If you consulted your notes,

21  might that refresh your recollection?

22       THE WITNESS:  Probably not, but I could tell you --

23       THE COURT:  Well, the question isn't maybe.  Why don't

24  you consult them and see if that jogs your memory.  If it

25  doesn't, it doesn't.

1          THE WITNESS:  Okay.  Fair enough.

2          THE COURT:  If it doesn't, it doesn't.  But don't read

3   the notes into evidence.

4          THE WITNESS:  Okay.

5   Q.  Doctor, let me see if I can help you.

6          THE COURT:  No, no.  I asked him to consult his

7   notes --

8          MR. NUWESRA:  Okay, okay.

9          THE COURT:  -- because he has no independent

10  recollection of this patient, and to see if it jogs his memory

11  about the patient.  Because he can only testify from his

12  memory.

13  A.  So in reviewing what I see here --

14          THE COURT:  Does it jog your memory?

15          THE WITNESS:  Not the specifics.  Not the specifics of

16  the case.

17          THE COURT:  Thanks.  Okay.

18  BY MR. NUWESRA:

19  Q.  Does it indicate what district you were assigned to on that

20  day?

21  A.  No, it does not.

22  Q.  Would you take a look at SB0438, please.

23  A.  SB04 -- I'm sorry.  I missed the last --

24  Q.  Okay.  I'm sorry.  Let me repeat.  Would you look at

25  SB0676.

Cab1mar3                    Stumacher - direct

1   A.  SB06 --

2   Q.  Can you see those numbers on the bottom?

3   A.  -- 76.  Yes, I see it.

4   Q.  Okay.  Does that now --

5   A.  It's a nursing note.

6   Q.  Okay.  And that note says where the patient was transferred

7   to on that day; right?

8   A.  I'll read it.

9           "Seen and examined by MD, patient for transfer to --"

10          MR. GARLAND:  Objection.  I think he's reading now.

11          THE COURT:  You are.  And you're not to read.  The

12  answer is, does it cause you to recollect anything.  If it does

13  not, then you have nothing to tell us and there's no reason for

14  you to be on the witness stand.  You're not here to read from

15  the exhibits.

16          THE WITNESS:  Okay.  I'm sorry.

17  A.  No, I don't recollect.

18  Q.  Take a look at SB0438.

19  A.  Okay.

20  Q.  Is there anything there that you recognize?

21  A.  Yes, there's my note written.

22  Q.  And the date of that?

23  A.  Is September 15th.

24  Q.  Okay.  And what's the time of your note?

25  A.  I did not document the time.

Cab1mar3                    Stumacher - direct

1    Q.  Can you read that to yourself, what it is right under 9/15.

2    A.  Yes.  It refers to the amount of fluids and what type of

3    fluids I was giving, D5 half normal saline at 75 cc's an hour.

4    Q.  Okay.

5            MR. GARLAND:  Objection.  I think he's reading again.

6            THE COURT:  Indicating that he wrote a particular

7    note.

8    Q.  Okay.  And this was -- can you tell us what district that

9    was in?

10   A.  I'm sorry.  I can't from this note.

11   Q.  Okay.  Does this note indicate that you took care of that

12   patient on that day?

13   A.  Yes.

14   Q.  All right.  And in whatever district she was in, you took

15   care of her on that day; right?

16   A.  Correct.

17   Q.  And if you now refer to SB -- if you look back to 0676, if

18   you look at it, will that give you an idea what district that

19   patient was in?

20   A.  Yes.

21   Q.  Okay.  And what district is that?

22   A.  The patient was transferred from D3 to District 1.

23   Q.  Okay.  Thank you.  So would it be fair to state that you

24   took care of this patient on 9/15 on District 1?

25   A.  I hate to mince hairs here, but I could have -- if this

Cab1mar3                    Stumacher - direct

1    indicates that the patient was traveling from District 3, where

2    patients aren't so critically ill, to District 1, where

3    patients are much more critically ill, and my note, which I can

4    understand and read and I know what I did, which is the purpose

5    of a note, suggests that I was doing things that are more, you

6    know, involved, but I don't know that I was doing them in D3 or

7    in D1.

8              THE COURT:  Fine.  Move on, please, Mr. Nuwesra.

9    Q.  Okay.  Can you tell us, where is Room 544 located, which

10   district?

11   A.  It's in District 1.

12   Q.  Okay.  And the nurse that was taking care of that patient

13   on that day?

14   A.  I don't remember.

15   Q.  Does SB0676 indicate --

16             THE COURT:  Does it refresh your recollection?

17   Q.  Does it refresh your recollection, Doctor?

18             THE COURT:  If you look at that page, does that jog

19   your memory about what nurse was taking care of the patient?

20             THE WITNESS:  No.  I don't have a memory.

21             THE COURT:  It does not refresh his recollection.

22   Therefore, we must move on.  This witness cannot testify.

23   Q.  Now on any given day, if the attendant is assigned to a

24   certain district, would other attendants also work there during

25   the day shift?

1   A.   There's three different individuals.  Each one is assigned

2   to the District 1, District 2, District 3, and then at 4:00, a

3   fourth person comes on, or sometimes if we're working a 24-hour

4   shift, it's somebody that stays.  So no, we're all in our own

5   individual districts.  But as I said before, if someone's ill,

6   if someone's missing, if some, you know, one of my colleagues

7   is at lunch and off the floor and somebody's critically ill in

8   front of me, I'm not calling them on the phone and saying,

9   "Come here."  I'm taking care of them.

10  Q.   Okay.  Can you tell us what the policy is with regards to

11  ordering lab tests at St. Barnabas.

12           THE COURT:  If you understand that question, you can

13  answer it, Doctor.

14  A.   I don't know what the policy is.  I know what I do.

15  Q.   Okay.  Tell us what you do.

16  A.   I let the residents know what tests that I want ordered and

17  then they order them.  I think this is before we went to

18  computer, so they would have to write it down in a chart and

19  handwrite a lab test.  Very frequently, depending on what type

20  of test it is, they would just go draw the blood themselves.

21  Sometimes it would be something that they would place an order

22  and request somebody to come do.  An EKG or an x-ray.

23  Q.   And what is the process to be followed after the attendant

24  gives the resident instructions and so forth?

25  A.   I don't understand.

1   Q.  Well, you said that the way you do it is you let the

2   residents know what kind of test is to be done and the

3   residents write this in the chart before the computer age, at

4   least at St. Barnabas.  And then what happens after that?

5   A.  It depends on which test.

6   Q.  Okay.  Let's talk about a urine toxicology test.

7   A.  Okay.  If I told the resident to order a urine toxicology

8   test, he would write the -- or she would write the order in the

9   chart and would hopefully notify the nurse, if the nurse is the

10  one who collects that specimen.  And then the nurse would

11  collect the specimen.  I believe the nurse would write out the

12  slip.  I don't know if the resident writes out the slip or the

13  nurse writes out the slip.  And then it gets left in a bin, and

14  then somebody comes by regularly and collects whatever

15  specimens are in the bin and they go downstairs.  There are

16  times where I can just ask the nurse directly, "Can you please

17  send a urine toxicology," and skip the resident, in which case

18  the nurse would just grab the urine toxicology and would

19  probably ask the resident to fill out the paperwork.  I'm not a

20  hundred percent sure.  There are times where residents can

21  choose to order a urine toxicology without consulting the

22  attending.  These are still doctors.  They have MDs, they have

23  licenses, and they're allowed to make decisions.  We would hope

24  that they don't make very significant advanced decisions

25  without involvement of somebody senior, but it does happen.

1    Q.  Can you tell me who is currently the director of ICU.

2    A.  Darryl Adler.

3    Q.  And how long has he been the director of ICU?

4    A.  I'm not a hundred percent sure.  Maybe a couple of years,

5    two years, three years.

6    Q.  Was he the director back in 2009?

7    A.  No, he was not.

8    Q.  Who was the director?

9    A.  Ron Ciubotaru.  Dr. Ciubotaru is suffering from pancreatic

10   cancer, and Dr. Adler has been the acting director on and off

11   for the last five years while he battles it.

12   Q.  Okay.  So would it be fair to say that in '09 Dr. Adler was

13   the acting director?

14   A.  Absolutely.

15   Q.  Can you tell me what the director of ICU's duties and

16   responsibilities are?

17   A.  Not really.

18   Q.  Based on your observation and knowledge?

19   A.  He's in charge of the unit, in charge of the schedule, in

20   charge of quality improvement, quality assurance, that patients

21   are being cared for well, dealing with complaints, trying to

22   get us raises.

23            THE COURT:  I'm sure that's the most important part.

24            THE WITNESS:  That's why I left it for last.

25            I'm sorry.  I'm post call so I'm a little giddy.

1    Q.  Is one of those responsibilities to supervise the residency

2    program within that unit?

3    A.  From a vague perspective, I guess I could say yes in that

4    the residency program director is a completely different

5    individual and they're responsible for the education of the

6    residents, and while the residents are in the ICU, it's not the

7    director's job, it's all of our jobs that they're taught.

8    Q.  And would one of the director -- acting director's

9    responsibility is to make sure that the written policy and the

10   regulations of the state are adhered to --

11   A.  Yes.

12   Q.  -- and enforced?

13   A.  Yeah.

14   Q.  Now, Doctor, are you familiar with the -- did you ever have

15   to fill out one of those slips that request a urine toxicology

16   test?  Did you ever have to do that personally?

17   A.  When I was a resident, a zillion times.  I'm higher up the

18   food chain now, so I don't.

19   Q.  But not at St. Barnabas.

20   A.  No.

21   Q.  You were a resident somewhere else; right?

22   A.  Yes.

23   Q.  So you never had to do it --

24   A.  At St. Barnabas, no.

25   Q.  -- at St. Barnabas.  Okay.  Now, sir, I want to bring

1    you -- I want to bring to your attention the time period where

2    my client was suspended from her job.  Do you recall that?

3    A.  Yes.

4    Q.  And was there ever any communication between you and her

5    after she was suspended?

6    A.  I think she called me on the phone once.

7    Q.  Was it she who called you or did you call her to find out

8    why she wasn't there?

9    A.  I definitely wouldn't have called her.

10   Q.  Okay.  At the time that she was suspended, did you miss her

11   presence?

12   A.  Yes.  I thought she was an excellent nurse.

13   Q.  Did you ask about her, what happened to her?

14   A.  I didn't have to ask.  I was told.

15   Q.  Who told you?

16   A.  I don't remember.

17   Q.  What did they say to you?

18            MR. GARLAND:  Objection.

19            THE COURT:  The objection is sustained.

20   Q.  Was it a manager that you spoke with or --

21   A.  Honestly, I don't recollect.

22            THE COURT:  You know, this conversation has nothing to

23   do with advancing the ball of this litigation, so let's just

24   move on.

25   Q.  Can you tell me in sum and substance, whenever that

Cab1mar3                    Stumacher – direct

1    conversation took place after her suspension, what was the

2    nature of it?

3            MR. GARLAND:  Objection.  I'm not sure which

4    conversation, your Honor.

5    Q.  Withdrawn.  How many conversations did you have with my

6    client after she was suspended?

7    A.  I don't recall.  It was at least once.

8    Q.  Okay.  That one that you recall, can you tell me what the

9    sum and substance of that conversation was.

10   A.  I don't remember the particulars.  I remember her being

11   very upset and I remember feeling bad for her.  I remember

12   trying to make her feel better because I like her as a person.

13   She was upset and angry and felt that she was mistreated.

14           MR. NUWESRA:  Thank you.  I have no other questions.

15           THE COURT:  Any questions?

16           MR. GARLAND:  Very briefly.

17   CROSS-EXAMINATION

18   BY MR. GARLAND:

19   Q.  Technically, are you actually employed by St. Barnabas?

20   A.  No.

21   Q.  So technically, why don't you just describe for the jury

22   what your relationship then is to St. Barnabas.

23   A.  Well, we go back about ten years.

24   Q.  Let me be more specific.

25   A.  So when I was hired in 2002, I was hired by a PC called the

1   ICU Associates, who is -- and I don't really understand what

2   their financial or legal interactions with St. Barnabas is, but

3   my understanding is that St. Barnabas Hospital gives money or

4   pays money to the ICU to hire us to work.  So there is a whole

5   layer of distance between us as attendings and workers and the

6   hospital.

7   Q.  So technically you're an employee of this Intensive Care

8   Associates?

9   A.  Correct.

10          MR. GARLAND:  Nothing further, your Honor.

11          MR. NUWESRA:  No questions, your Honor.

12          THE COURT:  Why don't you go home and get some sleep.

13          THE WITNESS:  Thank you.

14          (Witness excused)

15          THE COURT:  Call your next witness.

16          MR. NUWESRA:  Your Honor, plaintiff rests.

17          THE COURT:  Well, ladies and gentlemen, I didn't think

18   that was going to happen this morning.  "Plaintiff rests" are

19   magic words.  That means that we have heard from the plaintiff,

20   from all the witnesses from whom he's going to argue,

21   Mr. Nuwesra, that she has established claims of discrimination

22   and the things that happened to her in her employment, and then

23   her claim that she was fired in retaliation for having

24   complained about the things that were happening on the job.

25   Those are her two claims.

Cab1mar3

1          And we're going to excuse you for a few minutes.  I

2     can't take an early lunch break today.  I am on a committee of

3     the court that meets at 1:00, which means I have to take lunch

4     from 1 to 2, and I don't want to waste your time by taking an

5     extra long lunch.  So give me about ten minutes with the

6     lawyers and then we'll talk about what's going to happen next.

7               (Jury excused)

8               (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cab1mar3

1          (In open court; jury not present)

2          THE COURT:  Okay.  Have a seat.

3          Mr. Garland, you're not going to sit down so you're

4     going to say something?

5          MR. GARLAND:  Yes, your Honor.  At this time I think

6     it's appropriate for defendant to move to dismiss the case

7     under Rule 50, and I wanted to set forth my argument.

8          THE COURT:  You have to set forth your reasons.  I'm

9     going to deny your motion, but you have to set forth your

10    reasons, so --

11         MR. GARLAND:  What I'd like to start with, though, is,

12    up until this point there have been three claims of

13    discrimination.  I'll put retaliation to the side now.  Just

14    talking about race, color, and national origin.

15         THE COURT:  Oh, yeah.  I mean, I'm charging national

16    origin.  Whether I'm charging anything else is very much up in

17    the air.

18         MR. GARLAND:  So that's my application.

19         THE COURT:  Are we perhaps thinking along the same

20    lines?  Filipina, not Filipina?  I mean, that's what this case

21    is about.  Certainly there's no -- I mean, I have perhaps a

22    different understanding of the word "race" than Mr. Nuwesra

23    does, but there is absolutely no color claim that I can charge

24    in this case.  None.  None whatsoever.  There is not a

25    scintilla of evidence that plaintiff's color, the fact that she

Cab1mar3

is black or African American or whatever you wish to call it,

has anything to do with the price of tomatoes.  Her allegation

is, "I wasn't a Filipina and as a result, they didn't let me

train and they didn't let me be considered for certain

positions and they didn't let me be considered for the good

shifts," all of which are adverse employment actions, all of

which she is going to go to the jury on, "and then I complained

about it and they turned around and then they fired me."  And

that's the plaintiff's case.  You know, the whole

Honduran/Filipino, this is what drives me crazy about these

kinds of cases.  Because of the history of the colonization of

the Philippines and the history of the colonization of Central

America, both people who live in the Philippines and the people

who live in Central America are of Hispanic origin, or at least

a lot of them are, and you can tell from the names.  Martinez.

We have a whole bunch of Hispanic names among the Filipino

nurses.  And that's not because people who colonized the

Philippines were named Smith, it's because the people who

colonized the Philippines were named things like Martinez, and

that's why these cases make me nuts.

It seems to me that this is a case about a lady -- and

she's made out her prima facie case -- that she was not a

Filipina, in an atmosphere in which there were quite a large

number of Filipina nurses, and that she wasn't given some

opportunities as a result of that even though, as everyone has

1    testified, she's a very fine nurse.  And then she complained

2    about it.  To quote her sister, she's the fighter, and she

3    complained about it, and lo and behold, they fired her for

4    complaining.  And that case is going to the jury.

5         MR. GARLAND:  Let me just state for the record then

6    why I thought, or think, that the retaliation case as well

7    shouldn't go to the jury.  And that is that there's no evidence

8    in this record that Catherine Graham, the decision maker, had

9    any bias against the plaintiff because she had made any

10   comments about her work environment.  And what's uncontroverted

11   in the record as it now exists is testimony from Catherine

12   Graham to Lisa Greene, totally uncontroverted, totally

13   unrebutted, that Graham said to Greene to get her in, and when

14   Martinez, Ms. Martinez did not come in, the unrebutted

15   testimony is that that's when Graham said to Greene, "I have to

16   terminate her.  I'm terminating her."  And that's been part of

17   the legitimate business reason that's been articulated for the

18   discharge from the beginning of the case.  There's been no

19   evidence, I would submit, at this point to get -- to get beyond

20   that.

21        THE COURT:  I hear what you're saying.  I think that

22   the plaintiff's case is thin.  I think, god forbid we get to

23   posttrial motions, I'll have to figure out exactly how thin,

24   but I'm not taking this case away from the jury on that theory.

25   I'm just not doing it.

Cab1mar3

1     MR. GARLAND:  Thank you, your Honor.

2     THE COURT:  And you made your record.

3     Okay.  Now but Mr. Nuwesra, let me talk to you.  I

4  mean, what is the evidence in the record that there was any

5  basis for the various adverse things, or that your client ever

6  thought there was a basis other than the fact that she was not

7  a Filipina, that the Filipina nurses were the ones that were

8  always getting the good assignments, they got the good shifts,

9  they got to go to the training, they got to, you know, do

10  cardiac cath, they got to do all the best assignments?  What is

11  the evidence that this case is anything about -- I mean, you

12  have to understand, I throw out cases all the time where all

13  the plaintiff says is, "I am --" fill in the blank with some

14  protected characteristic.  "Something bad happened to me at

15  work, so I guess it must have happened because I was --" fill

16  in the blank.  The case you've tried has focused about the

17  Filipino/nonFilipino aspect.

18     MR. NUWESRA:  Right.  But there's also the issue, as

19  the record will indicate, whereby, as a Spanish-speaking South

20  American, they wouldn't allow her to speak in Spanish and they

21  allowed the Filipino --

22     THE COURT:  Filipino/nonFilipino.  They spoke Tagalog

23  and she couldn't speak her native language.  You know, we're

24  still talking Philippines, not Philippines.  That's what this

25  case is about.

Cab1mar3

1          MR. NUWESRA:  Ethnicity and national origin.

2          THE COURT:  This is an ethnicity, national origin

3   case.  That's what this is.

4          MR. NUWESRA:  I have no problem with that, your Honor.

5          THE COURT:  I think that's what we should send it to

6   the jury as, ethnicity and national origin case, and because

7   all of the evidence, all of the evidence that you have elicited

8   points to ethnicity, national origin as being the friction

9   point, the friction point for Ms. Martinez.

10          MR. NUWESRA:  Right.  I understand.  The only thing --

11   and I have no problem with that, your Honor.

12          THE COURT:  Okay.  I think that's what we should do.

13          MR. NUWESRA:  The only thing, just for the record, is,

14   under the New York City Code, which is more liberal and so on,

15   but I have no problem with just limiting it to ethnicity and

16   national origin, your Honor.

17          THE COURT:  That's what we're going to charge.  Okay.

18   Speaking of the New York City Code -- have a seat --

19          MR. NUWESRA:  Okay.

20          THE COURT:  -- there was an issue which I indicated

21   earlier I was inclined to rule in the defendant's favor about

22   who's going to decide front pay and back pay, and that was when

23   I was thinking about it.  I now have Ben thinking about it,

24   which is a much more important person to have think about it.

25   And I was right.  And I will be the person who's deciding front

1    pay and back pay, and let me just put this in the record.

2            My former colleague, now my superior officer, Judge

3    Lynch, Professor Lynch at Columbia Law School, was asked to

4    opine in a case called *Browne Sanders v. Madison Square*

5    *Garden* -- very famous, very well-known case, it's the Knicks

6    case -- on the issue of whether front and back pay claims had

7    to go to the jury under the New York City Human Rights Law,

8    generally on the ground that, you know, it's a more liberal

9    law -- and Mr. Nuwesra sent me a letter -- it's a more liberal

10   law and you want to interpret it liberally to provide for the

11   right to a jury trial.  And Judge Lynch made the following

12   ruling:

13           "Plaintiff argues that she has a constitutional right

14   to submit her claim for front and back pay to a jury.  She

15   concedes, however, that the Second Circuit have stated that a

16   party is not entitled to a jury determination of back pay or

17   front pay under Title VII, deeming them equitable remedies."

18   And that's in *Broadnax v. City of New Haven*, 415 F.3d 265, 271

19   (2d Cir. 2005).

20           "Plaintiff also concedes that whether her similar

21   claims under state and city law are to be submitted to a jury

22   is a matter of federal, not state law."  Citing *Byrd v. Blue*

23   *Ridge Rural Electric Cooperative*, 356 U.S. 525.

24           "These two concessions essentially determine the

25   issue.  The state and city substantive remedial schemes at

1    issue here are virtually identical to the Title VII scheme at

2    issue in *Broadnax*.  No doubt it is possible the plaintiff may

3    some day, if the matter progresses so far, persuade the Supreme

4    Court, which has never ruled on the matter, that the Second

5    Circuit's decision in *Broadnax* was incorrect, or the plaintiff

6    might persuade the Second Circuit *en banc* to overrule *Broadnax*

7    or that the rule of *Broadnax* should not be applied to state and

8    city claims, though such a conclusion would have to be based on

9    discontent with the *Broadnax* rule and not on any comprehensible

10   difference between the virtually identical federal and state

11   statutes.  But it is not for this court to disregard binding

12   and indistinguishable precedents from the Second Circuit."

13          Now I know that at least a front pay claim would be --

14   one of my colleagues decided that it was a legal remedy for a

15   jury to decide under New York State Human Rights Law.  That

16   seems to me to be contradicted by *Broadnax*.  But more to the

17   point, none of these cases needs to be brought in federal

18   court, and I feel this way very strongly about the New York

19   City Human Rights Law.  I think if people want to sue under the

20   New York City Human Rights Law, they should go sue in the New

21   York State Supreme Court.  They shouldn't bring any federal

22   claims, which are narrower claims and are not necessary to

23   proceed with their case, and they can let state courts develop

24   state law.  But when it comes to federal court, they're bound

25   by federal procedural rules.

Cab1mar3

1      And so it looks to me like front pay and back pay

2  under *Broadnax*, which is absolutely binding on me, absolutely

3  binding on me, are determined by me.  And if we get that far,

4  I'll decide them.

5      Now I will say this:  I can certainly understand what

6  basis I would have to make a decision on front pay or back pay

7  if the plaintiff prevails on her termination claim, the

8  termination aspect of the claim.  I might have to go back

9  through the record, but I don't recall hearing any evidence

10  that would give me any basis for computing economic damages as

11  a result of, say, not being allowed to have certain training

12  which would qualify you for a particular promotion or

13  assignment to a particular unit, particular kind of work.  I

14  don't recall hearing that those nurses got more money, for

15  example.  Maybe I missed it.

16      MR. NUWESRA:  The charge nurses did, your Honor, and I

17  think by Ms. Libiran, she said $23 a shift.

18      THE COURT:  I remember $23 a shift.  That's right.

19      MR. NUWESRA:  So with regard to that.  So I hope that

20  answers the court's question.

21      THE COURT:  All right.  Great.

22      Okay.  Who are we calling at the back table?

23      MR. GARLAND:  I'm sorry?

24      THE COURT:  Who's your first witness?

25      MR. GARLAND:  Ms. Ondoy will be the first witness.  I

Cab1mar3

1  just wanted to check something on the pretrial order.  But we

2  can proceed.

3           THE COURT:  Don't be too hung up on the pretrial

4  order.  Once I read it, I never read it again.  It's kind of

5  like the answer.

6           All right.  Let's bring in the jury.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Okay.  Have a seat.

3          MR. GARLAND:  Defendants, your Honor, are calling

4    Norma Ondoy as their first witness -- as its first witness.

5          THE COURT:  Ms. Ondoy, would you please come up.

6          THE CLERK:  Please raise your right hand.

7          (Witness sworn)

8          THE CLERK:  Please state and spell your name for the

9    record.

10         THE WITNESS:  Norma Ondoy.  N-O-R-M-A, last name

11   O-N-D-O-Y.

12         THE COURT:  Ma'am, you may have a seat.  You're

13   talking to the jurors, and please speak into the microphone.

14         THE WITNESS:  Good morning.

15         THE COURT:  Yes.  You may inquire.

16         MR. GARLAND:  Thank you, your Honor.

17    NORMA ONDOY,

18      called as a witness by the Defendant,

19      having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. GARLAND:

22   Q.  Where are you currently employed?

23   A.  St. Barnabas Hospital.

24   Q.  And what's your current position at the hospital?

25   A.  Administrative nursing supervisor.

Cab1mar3                  Ondoy - direct

1    Q.  How long have you worked at the hospital?

2    A.  Five years.

3    Q.  When did you begin?

4    A.  October 2007.

5    Q.  When you joined the hospital, what was your position?

6    A.  The same.

7    Q.  Have your responsibilities, your job duties changed over

8    that five-year period?

9    A.  No.

10   Q.  So would you please describe for the jury what your duties

11   and responsibilities are in the position that you've described.

12   A.  Good morning.  I'm a nursing supervisor, and I work from

13   3:00 in the afternoon until 11:30.  I'm responsible for running

14   the hospital.  During that time -- I report to the director of

15   nursing and the vice president of nursing.  During that time,

16   which is the shift, the evening shift, I check the staffing,

17   meaning how many nurses, nursing attendants, transporters are

18   working, make sure that we have enough.

19         I also visit all the different units that I am

20   assigned.  The hospital has different units, medical surgical,

21   ICU, emergency room --

22         THE COURT:  Ma'am, let me ask you to just get back a

23   little bit away from the microphone because it's reverberating.

24   Just a little farther back.  Thank you.

25   A.  And when I visit the units, I make sure that everything is

1    going okay, or if there's any issues, problems, that I can

2    address it; questions about patients or anything that's going

3    on, that kind of thing.

4    Q.  Do you remember back in September 2009 that you became

5    aware that there was supposedly some morphine missing in the

6    ICU?

7    A.  Yes.

8    Q.  And how did that come to your attention?

9    A.  I received a phone call from the ICU.

10   Q.  And do you recall who made that phone call to you?

11   A.  I can't remember who did.

12   Q.  Do you recall what you did after you received that phone

13   call?

14   A.  Yeah.  I went down to the ICU.

15   Q.  And when you got to the ICU, what did you do?

16   A.  I spoke to the nurses and I looked at the narcotics sheet

17   so I would know what the problem was.

18   Q.  What did you do next?

19   A.  I looked at the sheet, I talked to the nurses, we tried to

20   figure out why the number is wrong.

21   Q.  What did you do to try to figure out why the number was

22   wrong?

23   A.  I looked at the narcotics sheet, I asked the nurses if

24   anybody gave the morphine and did not chart on the narcotics

25   sheet.

Cab1mar3                    Ondoy - direct

1    Q.  You have in front of you a black binder.  To my right, your

2    left.  That if you turn to Defendant's Exhibit 13 -- please let

3    me know when you get there.

4    A.  Yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cab1mar3                    Ondoy - direct

1    Q.   Please take a look at that exhibit and tell me if that's

2    the narcotics control sheet that you reviewed on September

3    14th, as you just referred to in your testimony.

4    A.   Yes.

5    Q.   Then, after you reviewed the narcotics control sheet, what

6    else did you do on that evening?

7    A.   After I reviewed and we couldn't explain why there's

8    Morphine missing, then I called my vice president of nursing.

9    Q.   Who is that?

10   A.   Cathy.

11   Q.   Cathy who?

12   A.   Graham.

13   Q.   What happened next?

14   A.   So, I reported to her that we couldn't account for the

15   missing Morphine.

16   Q.   And what else, if anything, did you do that evening?

17   A.   She reminded me to get statements from the nurses in that

18   unit and call pharmacy, call security.

19   Q.   Did you ever prepare a report or a document summarizing

20   what you did that evening?

21   A.   Yes.

22   Q.   I'd like to ask you to turn to Defense Exhibit 8 in that

23   notebook that you have in front of you.

24        Looking at that first page of Defense Exhibit 8, is

25   that the document you prepared that evening about what you were

Cab1mar3                    Ondoy - direct

1  doing?

2  A.  Yes, sir.

3  Q.  Let's just go through it from the beginning.  It's

4  addressed to Cathy Graham?

5  A.  Yes.

6  Q.  And you've got a couple of cc's on that.  Please tell the

7  jury who those individuals were, Alfredo Alvarado and Pauline

8  Frances-Lattery.

9  A.  Mr. Alvarado is assistant vice president and

10  Frances-Lattery is the manager.

11  Q.  By the way, why did you prepare this document?

12  A.  It's a procedure that after you do such investigation that

13  you make a report.

14  Q.  All right.  Then let's take a look at what you wrote.  The

15  subject is "Morphine sulfate 2 milligrams Tubex."  What did

16  that refer to?

17  A.  The missing medication.

18  Q.  Let's start going through the text of this memo.  It's your

19  memo, so why don't you read the very first paragraph and then

20  I'll ask you some questions about it.

21  A.  "R. Libiran called at 7 p.m. to inform me that she needed

22  to give Morphine sulfate 2 milligrams for her patient.  She

23  went to get the medication and found three Tubex missing."

24  Q.  R. Libiran, who is that?

25  A.  She's one of the nurses in I.C.U.

1    Q.  What's her name?

2    A.  Ricca.

3    Q.  Then let's go to the next paragraph.  Why don't you read

4    that.

5    A.  "Elizabeth Doctor was in charge and asked all the nurses in

6    D1, D2 and D3 if anyone gave Morphine 2 milligrams and forgot

7    to sign.  Everyone said no."

8    Q.  Then let's go to the next paragraph starting with "Security

9    Sergeant White."

10   A.  "Security Sergeant White was informed of the situation.  He

11   came up and did a search of the nurses' bags before they could

12   leave work.  The following nurses also wrote a statement

13   regarding their knowledge/no knowledge of the missing

14   medications."

15   Q.  And you collected those written statements?

16   A.  Yes, sir.

17   Q.  The first statement was from Cora Fischer according to your

18   memo.  The next paragraph.

19   A.  Oh.

20   Q.  Let's stay with Defense Exhibit 8.  Then you've got six

21   nurses or six people listed, 1 through 6.  Do you see that?

22   A.  Yes.

23   Q.  Let's just start with, who was Cora Fischer?

24   A.  Cora Fischer is a nurse in I.C.U. and all of them--

25   Jonathan Panes, Marlen Martinez, AnaRicca Libiran, Cleopatra

1    DeJesus and Arlene Gonzalez.  They were the nurses.

2    Q.  Did you collect statements from those six individuals?

3    A.  Yes, sir.

4    Q.  Let me ask you then just to turn for a moment to Defense

5    Exhibit 9 in your notebook.

6              Was that the statement that you received from Marlen

7    Martinez?

8    A.  Yes, sir.

9    Q.  You received that on the evening of September 14th?

10   A.  Yes, sir.

11   Q.  Then let me ask you to then turn to Defendant's Exhibit 10

12   in the notebook.

13             Is that the written statement that you received from

14   Ricca Libiran on the evening of September 14th?

15   A.  Yes, sir.

16   Q.  We're going to jump a few exhibits to Defense Exhibit 26,

17   if you would turn to that in your notebook.  Are you there?

18   A.  Yes, sir.

19   Q.  And what is that exhibit?

20   A.  This is written by the nurse who came and started working

21   at 7 p.m.

22   Q.  What was the name of that nurse?

23   A.  His name is Jonathan Panes.

24   Q.  And when you received that written statement from him on

25   September 14th, did you read it?

Cab1mar3                    Ondoy - direct

1   A.  Yes, sir.

2   Q.  And would you please read it now for the jury?

3   A.  "On September 14th, 2009, I counted with Ms. Cleo DeJesus

4   and the count of Morphine 2 milligram was 18.  We counted at

5   7:30 p.m."

6   Q.  That was 7:30 p.m. on the 14th?

7   A.  On the 14th.

8   Q.  I'm going to ask you to turn to Defense Exhibit 27.

9           Is that another written statement that you received on

10  the evening of September 14th?

11  A.  Yes, sir.

12  Q.  And who was that written statement from?

13  A.  This is from Othilyn Gonzalez.

14  Q.  And where was she working on September 14th?

15  A.  She was also working in I.C.U.

16  Q.  On which shift?

17  A.  The 7 a.m. through 7:30 p.m.

18  Q.  And did you have occasion to read her statement on the

19  evening of the 14th?

20  A.  Yes, sir.

21  Q.  Would you please read it now for the jury?

22  A.  "Dear Ms. Ondoy, We are working 7A to 7P in D3 on this

23  date.  The following nurses working are Ms. Ricca Libiran, Cleo

24  DeJesus, Marlen Martinez and myself.

25          "At the end of our shift (7:30 p.m.) we were notified

1   or informed by Ricca that Morphine count was missing.

2             "At that time everyone was still busy trying to finish

3   and give report to the next shift.

4             "After all reports were given to the next shift, we

5   all look, investigate and recount the narcotics, but it is

6   still missing and short of three Tubexes.

7             "We also reviewed (mostly done by Ricca and Lulut) the

8   previous record but still unable to find the missing Morphine.

9             "I did not use Morphine this day.  I only gave

10  Percocets to my patient in 534B.  We have no idea where the

11  missing Morphine went."

12  Q.  While you were reading, you mentioned the name "Lulut."

13  Who was that?

14  A.  She must have been the nurse in charge in the morning that

15  day.

16  Q.  Then let me ask you to turn in the notebook to Defense

17  Exhibit 28.

18            Is that another of the statements that you received on

19  the evening of September 14th?

20  A.  Yes, sir.

21  Q.  Did you read it when you received it?

22  A.  Yes, sir.

23  Q.  Who's it from?

24  A.  This one is from Cleo DeJesus.  Cleopatra DeJesus.

25  Q.  Where was she working on September 14th?

1    A.  She was also working in I.C.U.

2    Q.  Which shift?

3    A.  Seven a.m. to 7:30 p.m.

4    Q.  Particular district?  Was she in a particular district?

5    A.  I'm sorry, I didn't understand.

6    Q.  Were there different districts in the I.C.U.?

7    A.  D3.

8    Q.  You said there were --

9    A.  The telemetry unit.

10   Q.  So where was she working?

11   A.  In the telemetry unit.

12   Q.  Can you please read her statement, written statement, for

13   the jury?

14   A.  "To whom it may concern:  On September 14, '09, at the end

15   of the shift 7A to 7 p.m., on counting narcotic medication it

16   was found that three Morphine sulfate 2 milligram Tubex is

17   missing.  Other staff were informed.

18         "I have no patients that is on Morphine 2 milligram

19   medication."

20   Q.  I'm going to ask you to turn to Defense Exhibit 29 in the

21   notebook.

22         Is that another one of the written statements that you

23   received on the evening of September 14th?

24   A.  Yes, sir.

25   Q.  Who was that statement from?

1    A.   Cora Fischer.

2    Q.   Now let's turn back in the notebook to Defense Exhibit 8.

3    Are you there?

4    A.   Yes, sir.

5    Q.   So let's pick up, in going through your memo, with the

6    paragraph that starts after the number 6, Othilyn Gonzalez.  So

7    the paragraph I would like you to next read to the jury, that

8    is the one that starts with the words "Libiran informed me..."

9    A.   "Libiran informed me that the count at 7 a.m. was 12 of

10   Morphine 2 milligrams.  At 2 p.m. pharmacy gave Libiran ten

11   more Tubex of Morphine 2 milligrams.  At that point I.C.U. D3

12   had 22 Tubex of Morphine 2 milligrams.  At 7 p.m. Libiran had a

13   stat order of Morphine 2 milligrams for patient in Room 516.

14   That was the time she discovered three Tubex were missing.

15        "I called Agnes Lucero at home to also ask her if she

16   gave any Morphine 2 milligrams.  She said she did not give

17   any."

18   Q.   Let me stop you there for a moment.

19        Who was Agnes Lucero back in September-- let me ask it

20   this way:  What position did Agnes Lucero hold back in

21   September 2009?

22   A.   She was a manager/instructor for I.C.U.

23   Q.   Now, let's pick up with your memo then starting with the

24   next words "While Pauline Frances was calling the unit..."

25   A.   "While Pauline Frances was calling the unit, I also

Cab1mar3                    Ondoy - direct

1   informed her of the missing narcotics."

2   Q.  Let me stop you there.

3        Who was Pauline Frances?

4   A.  Pauline Frances is the manager of I.C.U.

5   Q.  And does she also go by the name of Pauline

6   Frances-Lattery?

7   A.  Yes, sir.

8   Q.  Now, let's go to the next paragraph and please read that

9   starting with the word "Tonight..."

10  A.  "Tonight, the nurse is charge is Young Yang.  She and I

11  went through the garbage in the medication room of D3 and the

12  plastic garbage bags of the medication carts.  We found the

13  following empty Tubex and I placed them in the paper envelopes:

14  Morphine sulfate 2 milligram Tubex, empty three."

15  Q.  Let me stop you right there.

16       When you say "Morphine sulfate 2 milligrams Tubex,

17  empty three," what does the three refer to?

18  A.  That we found three Morphine sulfate 2 milligram Tubexes.

19  Q.  And you have the word "empty" there.  So what does that

20  mean?

21  A.  Empty meaning there's no medication inside.

22  Q.  All right.  Then if you could continue with the number 2.

23  A.  "We also found Morphine sulfate 4 milligrams Tubex, empty

24  one."

25  Q.  So what does that mean?

Cab1mar3                    Ondoy - direct

1    A.  We also found another Morphine, different milligram.  It's

2    4 milligrams.  It was empty, just one.

3    Q.  Then go to number 3, please.

4    A.  "Heparin Tubex, empty" we found two.

5    Q.  And what did that mean?

6    A.  That we also found another medication in a Tubex form which

7    was empty and there were two of them.

8    Q.  And where did you find that?

9    A.  In the medication cart, plastic bag.

10   Q.  Is that true of-- well, let me go on.

11          So then, why don't you continue reading where you

12   started with the words "I picked up..."

13   A.  "I picked up all Tubex with gloved hands.

14          "James Cohen, pharmacist, was also informed of the

15   missing narcotics.  I faxed the copy to him of the controlled

16   drug shortage investigation form."

17   Q.  Let me stop you there.

18          Where did James Cohen work?

19   A.  He was working in pharmacy.  He's a pharmacist.

20   Q.  When you say "in pharmacy," in the hospital or somewhere

21   else?

22   A.  In the hospital.

23   Q.  And you said that you faxed him a copy of a document.  Why

24   did you fax that document to him?

25   A.  It's part of the procedure.

Cab1mar3                    Ondoy - direct

1    Q.  When you say "part of the procedure," what do you mean?

2    A.  That if there's any discrepancy for drugs, that they get a

3    report.

4    Q.  Let me ask you to turn to the second page of Defense

5    Exhibit 8.

6         Is that the form that you just referred to when you

7    said you faxed Mr. Cohen a copy of the controlled drug shortage

8    investigation form?

9    A.  Yes, sir.

10   Q.  All right.  Then let's go back to the first page of Defense

11   Exhibit 8.  Read next, please, starting with the words "In

12   checking transferred-out patients..."

13   A.  "In checking transferred-out patients today, I found the

14   following:  Patient was transferred today at 3:25 to Room 223.

15   Patient had a stat order of Morphine 2 milligrams on September

16   6 at 10:45 a.m.

17        "Another patient went to Room 321A, but had no order

18   for Morphine.

19        "Another patient was transferred to Room 722B, but had

20   no order for Morphine.

21        "Another patient went to Room 325A, also had no

22   Morphine order.

23        "Patient was transferred to Room 224B, received

24   Morphine 2 milligrams IV push at 12:10 a.m. at 9/14/09.

25        "Another patient went to Room 214B, had no Morphine

1    order.

2           "I left all those"--

3    Q.  Let's just stop there for a moment.

4           Why was it that you were checking transferred-out

5    patients?

6    A.  Cathy asked me to check if anybody was transferred out that

7    day and received Morphine 2 milligrams but was not charted on

8    the narcotics sheet.

9    Q.  When you use the word "transferred-out patients," what does

10   transferred-out patients mean?

11   A.  Meaning they were in I.C.U. and they were transferred to a

12   regular med-surg unit now.

13   Q.  When you said Cathy asked you to do that, which Cathy are

14   you referring to?

15   A.  Cathy Graham.

16   Q.  All right.  Then let's continue with going through your

17   memo, starting with the words "I left..."

18   A.  "I left all the statements, copy of narcotics sheets,

19   envelopes with the Tubex and the controlled drug shortage

20   investigation form on your round table.  I left copies to

21   Pauline Frances and Alfredo Alvarado.

22           "Thank you.  Good night.

23           "Norma."

24   Q.  Now, does this mean that you left-- let me ask this way:

25   Which statements were you referring to when you said you left

1    statements for Ms. Graham?

2    A.  My report and the statements from the nurses and the

3    investigation form sent to pharmacy.

4    Q.  So you left on Ms. Graham's desk or her round table-- let

5    me start with the round table.  What round table were you

6    referring to?

7    A.  She has a round table in her office where we would

8    generally sit when we were talking to her.

9    Q.  So you left the written statements of the nurses on her

10   table--

11   A.  Yes, sir.

12   Q.  -- that evening on the 14th?

13   A.  Yes, sir.

14   Q.  Do you recall, by the way, what time you left the hospital

15   that night?  Was it before midnight? after midnight?  Do you

16   remember?

17   A.  I don't remember, but it's anywhere from 11:30 to the

18   latest I've gotten home is 2 a.m.

19   Q.  So you left on her table before you went home the written

20   statements of the nurses, the memo that you just read to the

21   jury, envelopes with the empty Tubexes that you found in the

22   trash?

23   A.  Yes, sir.

24   Q.  And you also left for her a copy of the controlled drug

25   shortage investigation form, which is the second page of

Cab1mar3                    Ondoy - direct

1    Defense Exhibit 8?

2    A.   Yes, sir.

3    Q.   After you left all of those items on Ms. Graham's table in

4    her office, did you have any further involvement yourself in

5    looking or trying to find out what happened to the missing

6    Morphine?

7    A.   No more, sir.

8              MR. GARLAND:  No further questions, your Honor.

9              THE COURT:  Let's take our lunch break now.  Okay?

10   Can we do that?  Unless we have like two minutes of cross.

11             MR. NUWESRA:  No, no, your Honor.  We can take our

12   lunch break.

13             THE COURT:  All right.  Let's take our lunch break,

14   folks.  I'll see you at about five after two.  Fair warning.  I

15   have a sentencing at the end of the afternoon in a case that's

16   going to cause the press people to show up.  It's a case about

17   a rabbi who has pleaded guilty to using money that he said was

18   for Torahs that were from the Holocaust, but they weren't from

19   the Holocaust.  There was some newspaper coverage about it when

20   they took his plea.

21             He's being sentenced today.  I expect a lot of people

22   to show up for this sentencing and it will be distracting as

23   they come in.  I ask you to keep focused on what we're doing up

24   here, and we'll try to keep things quiet back there.

25             All right.  I'll see you after lunch.

1        MR. GARLAND:  Your Honor, what time would you like us

2   back?

3        THE COURT:  Five after two.

4        MR. GARLAND:  Thank you.

5        (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present)

2          MR. NUWESRA:  Your Honor, my question, before I

3   forget, because we don't have a trial date tomorrow, is I'll be

4   working this weekend on supplemental jury instructions --

5          THE COURT:  I'll give you a charge tomorrow.  You'll

6   have my proposed charge.  You can make any objections that you

7   want.

8          MR. NUWESRA:  Tomorrow?

9          THE COURT:  Tomorrow.  Oh, you'll have my charge.

10  I've been sitting up here working on my charge.  Ben and I are

11  working on my charge.  You'll have a draft from which to work.

12  You'll have something to shoot at.

13          MR. NUWESRA:  And we can supplement the --

14          THE COURT:  You can ask.  I'll probably say no, but

15  you can certainly ask.  I've charged a lot of these cases.

16          MR. NUWESRA:  And it will be by means of fax or e-mail

17  or something?

18          THE COURT:  We will e-mail you the charge.

19          MR. NUWESRA:  All right.

20          THE COURT:  Then we'll talk about it undoubtedly on

21  Monday.

22          MR. NUWESRA:  Okay.  I'm glad I asked.  Thank you.

23          THE COURT:  All right.

24          (Luncheon recess)

25          (In open court; jury not present)

Ondoy - direct

1            THE COURT:  Okay.  We will go for about two hours, and

2    by that time I will be 15 minutes late for a sentencing and

3    have a courtroom full of people.

4            MR. NUWESRA:  Your Honor, may I respectfully make a

5    request that the jury somehow be told that the comment

6    Ms. Santiago is an attorney --

7            THE COURT:  Oh, please, Mr. Nuwesra, enough already.

8    Enough already.

9            (Continued on next page)

Cab1mar3                    Ondoy - direct

1              (In open court; jury present)

2              THE COURT:  Okay, everybody.  Let's get settled.

3    We'll get Ms. Ondoy back on the stand.

4              Ma'am, come on up.  You're still under oath.  Have a

5    seat.  Make yourself comfortable.

6              THE WITNESS:  Thanks.

7              THE COURT:  Okay.

8              MR. NUWESRA:  Good afternoon, your Honor.  May it

9    please the Court.

10             THE COURT:  Your turn.

11   CROSS-EXAMINATION

12   BY MR. NUWESRA:

13   Q.  Good afternoon, Ms. Ondoy.  How are you?

14   A.  Good, thank you.

15   Q.  As you know, my name is Lee Nuwesra and I represent the

16   plaintiff in this case.

17             Ms. Ondoy, can you tell the jurors, what's your race?

18   A.  I'm Filipino.

19   Q.  Can you-- you mentioned the name and you identified him as

20   an assistant vice president, Mr. Alvarado.

21   A.  Yes, sir.

22   Q.  Can you tell the jurors, what's his race?

23   A.  Filipino.

24   Q.  And Elizabeth-- Elizabeth-- Ms. Elizabeth Doctor, that was

25   the charge nurse that day, what's her race?

1   A.  Filipino.

2   Q.  Mr. Jonathan Panes?

3   A.  Filipino.

4   Q.  Ms. Othilyn Gonzalez?

5   A.  Filipino.

6   Q.  Ms. Ricca Libiran?

7   A.  Filipino.

8   Q.  Ms. Fischer?

9   A.  Filipino.

10  Q.  Ms. Cleo DeJesus?

11  A.  Filipino.

12  Q.  And Ms. Agnes Lucero?

13  A.  Filipino.

14  Q.  Ma'am, isn't it a fact that you did not require the

15  statement from Ms. Lucero like you did the other nurses?

16  A.  Yes, sir.

17  Q.  When was it exactly that you found the empty Tubexes in the

18  medical cart garbage, trash?

19  A.  The same time.

20  Q.  What time is that?

21  A.  Around the time when I was in I.C.U. for the report.

22  Q.  When?

23  A.  The same time when I went down to I.C.U.

24  Q.  So what time was that?

25  A.  The change of shift.

1    Q.  So that --

2    A.  Seven o'clock, 7:30.

3    Q.  Seven o'clock, 7:30?  Okay.

4           Can you take a look at DX 13?  Do you see it?

5    A.  Yes, sir.

6    Q.  This is the St. Barnabas Hospital drug disposition record.

7    Right?

8    A.  Right.

9    Q.  Can you tell me how many-- by that time how many Morphine

10   sulfate 2 milligrams were used by the end of that shift?

11   A.  It says here there were remaining 17.

12   Q.  No.  At what time is that, the remaining 17?

13   A.  This is 4 a.m.

14   Q.  Is that the end of the shift you're talking about?

15   A.  No.  This one is way after the beginning of the shift, of 7

16   p.m.

17   Q.  All right.  You said that you went and you found the empty

18   Tubexes at the end of the day shift.  Correct?

19   A.  Correct.

20   Q.  And that's around 7, 7:30.  Right?

21   A.  Yes, sir.

22   Q.  Actually, it was a little bit after 7:30 because Mr. Panes

23   and Ms. DeJesus, they're the ones who counted and found the

24   missing three Tubexes.  Correct?

25   A.  You're correct.

1    Q.  So up to that point, can you tell us how many Morphine

2    sulfate 2 milligrams were used?

3    A.  If I have to count, it says one, two, three, four.

4    Q.  Okay.

5    A.  Five total.

6    Q.  Five total?

7    A.  All the way down at 4 a.m.

8    Q.  I just want you -- between 7 a.m. and 7:30 p.m., how many

9    were used?

10   A.  Okay.  Four, sir.

11   Q.  Okay.  And with regard to the Morphine sulfate 4

12   milligrams, do you see that?

13   A.  Yes.

14   Q.  And you said that you found one empty Tubex as of 7:30 in

15   the disposal, the regular disposal, trash, in the medication

16   cart?

17   A.  Yes, sir.

18   Q.  How many were used that day between 7 a.m. and 7:30 p.m.?

19   A.  Three.

20   Q.  What's the policy regarding discarding the empty Tubexes of

21   controlled substances such as Morphine?

22   A.  Tubex should be emptied in the sharps disposal.

23   Q.  And do you know who disposed of them and put them in the

24   regular disposal, in the regular medication disposal?

25   A.  No.

1   Q.  Do you know who did it?

2   A.  No.

3   Q.  People who do that, are they supposed to get disciplined

4   for that?  Is that a violation of hospital policy?

5   A.  Yes.

6   Q.  And, incidentally, who was the person, which nurse was it,

7   that entered the usage of the 2 milligram Morphines for that

8   day between 7 a.m. and 7:30 p.m.?

9   A.  The last one that I know used it between 7A and 7P was

10  Ricca Libiran.

11  Q.  Okay.  And who was the one that used the four-- withdrawn.

12          What district was Ms. Libiran working in that day?

13  A.  7 a.m. to 7:30 p.m.

14  Q.  What district?

15  A.  Telemetry, D3.

16  Q.  D3?

17  A.  Yes, sir.

18  Q.  That's the same district where you found the disposed empty

19  Tubexes in.  Right?

20  A.  Correct.

21  Q.  And who was it that utilized-- used or administered the 4

22  milligrams sulfates?

23  A.  The last one that I see, it says here, is A.L.L.

24  Q.  And where are you referring to?

25  A.  The one who last used the 4 milligrams.

1    Q.  And was that the only person?

2    A.  Another A.L.L., and the other one is also A.L.L.

3    Q.  Okay.  And do you know whose initials are A.L.L.?

4    A.  No.

5    Q.  You do not know.

6            Can you look at the bottom of the sheet and see if

7    that will tell you?

8    A.  There's an A.L.L., but there's no signature.

9    Q.  Are you looking at SB --

10   A.  Okay.  There's a stamp underneath the A.L.L.  It says "A.

11   Libiran."

12   Q.  Okay.  And are those the same initials that are next to the

13   4 milligrams Tubexes, Morphine Tubexes?

14   A.  Yes.

15   Q.  They're the same initials?

16   A.  Yes, sir.

17   Q.  So would that have also been Ms. Libiran?

18   A.  Yes, sir.

19   Q.  And this is the same day that she worked in District 3,

20   which is telemetry.  Right?

21   A.  Yes, sir.

22   Q.  And that's where you found that one empty 4 milligrams of

23   sulfate Tubex, the wrapper.  Right?

24   A.  Correct.

25   Q.  Okay.  Incidentally, isn't it a fact that when my client

1   was suspended on the evening of 9/15/2009, that you were in

2   attendance along with Ms. Libiran-Danao?

3   A.   Correct.

4   Q.   Thank you.

5            MR. NUWESRA:  I have no other questions.

6            THE COURT:  Sir?

7            MR. GARLAND:  Nothing further for this witness.

8            THE COURT:  Ma'am, you may step down.

9            THE WITNESS:  Thank you.

10           THE COURT:  You're done.  Thank you.

11           (Witness excused)

12           THE COURT:  Counselor, call your next witness.

13           MR. GARLAND:  Your Honor, it will be Dr. Adler or

14   Patricia Byrne, depending on who's there.

15           THE COURT:  Call your next witness, please.

16           MR. GARLAND:  Patricia Byrne.

17           THE COURT:  Ms. Byrne, please come up.

18           (Witness sworn)

19           THE DEPUTY CLERK:  Please state and spell your name

20   for the record.

21           THE WITNESS:  My name is Patricia Byrne,

22   P-a-t-r-i-c-i-a  B-y-r-n-e.

23           MR. GARLAND:  Thank you, your Honor.

24           THE COURT:  You may inquire.

25           MR. GARLAND:  Thank you.

cab1mar1                    Byrne - direct

1      PATRICIA BYRNE,

2           called as a witness by the Defendant,

3           having been duly sworn, testified as follows:

4      DIRECT EXAMINATION

5      BY MR. GARLAND:

6      Q.  Ms. Byrne, where are you currently employed?

7      A.  I'm employed at White Plains Hospital.

8      Q.  And what's your position at White Plains Hospital?

9      A.  I'm director of pharmacy.

10     Q.  And how long have you been at White Plains Hospital?

11     A.  About a year and a half.  A little bit more than a year and

12     a half.

13     Q.  Did you work at St. Barnabas Hospital at some point prior

14     to White Plains Hospital?

15     A.  Yes, for 18 years prior.

16     Q.  So when did you begin-- if you could maybe speak into the

17     microphone a little bit.

18     A.  Sorry.  Can you hear me now?

19     Q.  I think that's a little bit better.

20           So when did you begin your employment at St. Barnabas

21     Hospital?

22     A.  It was in January of '93.  '91?

23     Q.  Approximately when did you start at St. Barnabas?  That was

24     the question.

25     A.  In 1993.

1   Q.   And what was your position at that point?

2   A.   When I started there, I was a staff pharmacist.

3   Q.   And prior to starting as a staff pharmacist at

4   St. Barnabas, did you attain any degrees?

5   A.   Yes.

6   Q.   What degrees?

7   A.   Bachelor's of science in pharmacy and I became a registered

8   pharmacist.  I also have a master's degree.

9   Q.   Approximately when did you get your bachelor's?

10  A.   In 1991.

11  Q.   From what institution?

12  A.   St. John's University.

13  Q.   You also mentioned a master's.  Approximately when did you

14  get your master's?

15  A.   That was while I was employed actually at St. Barnabas.

16  I'm trying to remember what year it was.  '94 approximately.

17  Q.   And did you also mention-- did you hold any licenses within

18  the State of New York?

19  A.   I'm a registered pharmacist.

20  Q.   What does that mean?

21  A.   That means I have a license from the state to practice as

22  pharmacist and also as an immunizer.

23  Q.   When, approximately, did you get registered by the state?

24  A.   1991.

25  Q.   So when you began your employment at St. Barnabas as a

1  staff pharmacist, was there a particular pharmacy in the

2  hospital where you were working?

3  A.   When I first started, I was in the main pharmacy, including

4  jobs of all the areas.  So I was a regular inpatient pharmacist

5  with duties in the IV room and chemotherapy sections.

6  Q.   Did your position change at any time?

7  A.   Yes.

8  Q.   How did it change?

9  A.   After staff pharmacist, I became manager of the IV room

10  and, also, oncology.

11  Q.   Just briefly describe what your responsibilities were in

12  that role.

13  A.   I was responsible to organize the IV room, which is the

14  place where you make IV bags.  When a patient can't take

15  something orally, you need to make it in an IV bag that would

16  go into their vein or be injected.  So I was the manager of the

17  area that has to be a clean room to prepare those things and

18  also for oncology patients that get chemotherapy.  That's a

19  different type of preparation than a regular IV bag.  So I was

20  manager of that area, also.

21           (Continued on next page)

22

23

24

25

Cab1mar5                    Byrne - direct

BY MR. GARLAND:

1  Q.  As your employment moved forward with St. Barnabas, did

2  your role change again?

3  A.  Yes.  Then I became assistant director.

4  Q.  Assistant director of what?

5  A.  Assistant director of inpatient pharmacy, of operations,

6  mm-hmm.

7  Q.  Approximately when was that?

8  A.  Approximately two years later.

9  Q.  In that role what were your responsibilities?

10  A.  I had a more general overseeing responsibility of the whole

11  pharmacy and all of the various areas.

12  Q.  Did your role change again while you were employed at St.

13  Barnabas?

14  A.  Yes, one more time.  Then I became assistant director of

15  pharmacy -- associate director of the pharmacy.

16  Q.  And was there a particular pharmacy?

17  A.  It's of the main inpatient pharmacy.  So all areas of the

18  pharmacy at St. Barnabas.

19  Q.  Do you remember approximately when you took on that

20  position as associate director?

21  A.  Let me think how many years it was.  Maybe '98, maybe.

22  Yeah.

23  Q.  What were your responsibilities in that role?

24  A.  At that point as associate director, I had similar

1    responsibilities as director.  So I had general oversight of

2    the whole pharmacy department, including any satellites, such

3    as the oncology program, the IV room, the main pharmacy, all of

4    the dispensing within the pharmacy, the control of narcotics,

5    answering to regulatory agencies, such as if the Joint

6    Commission, which would be an accrediting agency, would come

7    into the hospital, I'd be responsible to answer to that and

8    show policies and procedures, as well as accounting to the

9    Bureau of Narcotic Enforcement.  Any regulatory agency that

10   would come in, I would have the responsibility to report to

11   those people.

12   Q.  Were you in that position then in September 2009?

13   A.  Yes.

14   Q.  Now you mentioned something about the responsibility with

15   regard to control of narcotics.

16   A.  Mm-hmm.

17   Q.  What does that mean?

18   A.  We're required in the pharmacy department to be the people

19   that guard the drugs, the security of the drugs, from the time

20   it is ordered to the time it is either given to a patient or

21   wasted or discarded.  So we have to track it what's called

22   cradle to grave.  So we have to make sure that when we order

23   something, it arrives, that the right amount is there, that it

24   is signed into stock in the pharmacy properly and it's checked

25   on multiple checks of counting.  When it's dispensed to the

Cab1mar5                    Byrne - direct

1    floor, there needs double signatures to assure that it arrived.

2    We have to make sure the sheets agree and anything that was

3    given out is accounted for, and that everything is reconciled

4    when all of the records come back to the pharmacy department,

5    and if we find a discrepancy, then we have to report it.

6    Q.  If you find a discrepancy in what?

7    A.  If we find a discrepancy in the counts of narcotics or if

8    the sheets don't add up and we can't find the answer to how

9    many and where it went, or even if it was something inside the

10   pharmacy, if there's a discrepancy to what I have in my stock.

11   Whatever discrepancy is found anywhere in the hospital, if we

12   can't solve the discrepancy, it must be reported out to either

13   the Bureau of Narcotic Enforcement or the Drug Enforcement

14   Agency.

15   Q.  The Bureau of Narcotic Enforcement, what is that?

16   A.  The Bureau of Narcotic Enforcement is the New York State

17   division of regulation that is monitoring controlled substances

18   that pharmacies must answer to.

19   Q.  And are narcotics controlled substances then --

20   A.  Yes.

21   Q.  -- that fall within their jurisdiction?

22   A.  Absolutely, yes.

23   Q.  You also mentioned the Drug Enforcement Agency.

24   A.  Mm-hmm.

25   Q.  What's that agency?

Cab1mar5                    Byrne - direct

1   A.   That's a federal agency that also would get involved in

2   drug diversion or if there is a large scale, so generally you

3   report a discrepancy and they would decide whether they will

4   investigate, depending on how large a scale.  So if there are

5   smaller discrepancies, they're reported to both until they

6   decide, but the Bureau of Narcotic Enforcement would usually be

7   the people that may come in to investigate whether the solution

8   is appropriate and if it was reported correctly and they'll

9   check the other records to go along with it.

10  Q.   In September 2009 to whom did you report?

11  A.   To Richard LaFontaine.  He's the director of the pharmacy.

12  Q.   In September 2009 were there any individuals in the

13  pharmacy who reported to you?

14  A.   Yes, many.

15  Q.   Would that be -- initially can you give us a general

16  description of who had reporting relationships to you.

17  A.   So the staff pharmacists, the pharmacy technicians, all of

18  the day shift managers, the assistant directors, which were

19  both of general organization and also of clinical pharmacy

20  department.

21  Q.   Now when -- when is it you left St. Barnabas?

22  A.   February 2011.

23  Q.   And why did you leave St. Barnabas?

24  A.   I got a higher level job.  I became director of pharmacy at

25  White Plains Hospital.

Cab1mar5                    Byrne - direct

1   Q.  Do you recall learning on or around September 15th, 2009

2   that there was morphine apparently missing from one of your

3   pharmacies?

4   A.  Yes.

5   Q.  Do you recall what it was that you learned?

6   A.  Yes.

7   Q.  What did you learn?

8   A.  The morning when I came in on the 15th was when I was

9   notified that there was a discrepancy in the counts for the

10  morphine.

11  Q.  The discrepancy in the count where?

12  A.  On the unit.

13  Q.  For which unit?

14  A.  5 North -- D3, in the ICU, the fifth floor.

15  Q.  When you learned that when you came in in the morning on

16  the 15th, what, if anything, did you do?

17  A.  I went to the area to make sure that the proper procedures

18  were fulfilled so that a discrepancy report was filled out, so

19  I was able to view that, make sure that the nurse manager was

20  notified, make sure security was notified.  Those are the

21  preliminary steps.  And then I personally started looking into

22  the issue as well.

23  Q.  When you say you went to the area, what area?  What did you

24  mean by that?

25  A.  Where the medication was missing, so that -- 5 North in the

1   D3 area.

2   Q.  And again, D3 is in what unit of the hospital?

3   A.  ICU.

4   Q.  Where, by the way, was your office in relation to the ICU?

5   A.  Oh, it's around the corner, on the same floor.

6   Q.  Which floor was that?

7   A.  Fifth floor.

8   Q.  So you also mentioned you started looking at a particular

9   report.  Which report was that?

10  A.  I believe the real title is controlled drug discrepancy

11  report.

12  Q.  You should have a binder right in front of you, the black

13  one.

14  A.  Okay.  The black one.

15  Q.  And if you would turn to Exhibit 8, the second page.

16  A.  Yes.

17  Q.  Is that the report that you just referred to?

18  A.  Yes.  Controlled Drug Shortage Investigation Form, yes.

19  Q.  And what's the purpose of that report?

20  A.  This is to give a way for the person that finds the

21  discrepancy to report it to the pharmacy, since it's our

22  responsibility ultimately to find out what happened to that

23  medication, so they -- it's used as a tool to communicate so

24  that I would get this tool and know that I need to intervene.

25  Q.  So after seeing that tool on September 15th, what did you

1    do?

2    A.  I began looking into various things that I look into.  So

3    what I would normally do would go and speak to people on the

4    unit, find out what they knew, like I said, make sure all the

5    people were notified.  I would check the controlled drug

6    disposition sheets.  There's a C-II and a C-III, IV, V.  Those

7    sheets, I would look at those, see if the numbers added up.  I

8    would count the narcotics that were currently there to make

9    sure that there wasn't a discrepancy anywhere else, because

10   sometimes when something is missing, there may be more of

11   something else or -- so I go through the system of checking

12   what's in the cabinet, checking what's on the sheets, making

13   sure people looked underneath things in there, in the garbage,

14   just finding out whatever information I can, because I keep

15   looking until all avenues are exhausted to make sure that I can

16   surely say that the drug is missing.

17   Q.  Again, why do you keep looking until you find out what

18   happened to the missing drug?

19   A.  Because I'm responsible for it.  I have to report it to the

20   Bureau of Narcotic Enforcement if I don't find it, and I have

21   to be able to tell them why.

22   Q.  You mentioned the narcotics control sheets.  I'd like to

23   ask you to turn in the binder to Exhibit 13.  Are those copies

24   of the narcotics control sheets that you reviewed on

25   September 15th?

1    A.  Yes.

2    Q.  I think when you described them, I think you called one a

3    C-II and some -- the other one by another name?

4    A.  Yeah.  So --

5    Q.  Let me just -- is one referred to as a C-II?

6    A.  I'm sorry?

7    Q.  Is one of them referred to as a C-II?

8    A.  Yes.  At the top of the page there's a C and two Is.

9    That's a C-II.

10   Q.  So just so we're clear, you're looking at the first page

11   then of Defendant's Exhibit 13?

12   A.  Yes.

13   Q.  And at the very top, to the right of the words "St.

14   Barnabas Hospital," there's a II and it has the letter C around

15   it?

16   A.  Yes, that's correct.

17   Q.  And what does C-II mean?

18   A.  C-II is a classification of a type of controlled substance,

19   and that is what's considered a narcotic, so the narcotics are

20   in the category of controlled drugs II, C-II.

21   Q.  And looking at the next page at the top, what is the name

22   of this second page of Defendant's Exhibit 13?

23   A.  This one is -- I call this C-III, IV, V because it's C-III,

24   C-IV, and C-V.  So the rest of the controlled drugs are split

25   out into those categories that are on these sheets.  So they're

Cab1mar5                Byrne - direct

1    controlled drugs but not necessarily narcotics.

2    Q.  Was there a medication cabinet or medication room then in

3    the District 3 area?

4    A.  Yes.

5    Q.  Where were these control sheets in relation to that?

6    A.  They're kept in the medication room on a clipboard,

7    generally underneath the narcotic cabinet, the cabinet that's

8    double-locked to hold the controlled drugs.

9    Q.  Can you actually describe for the jury that particular

10   medication room cabinet area, starting with walking into the

11   area.  How does one gain access to it?  Let's start there.  How

12   does one gain access to that?

13   A.  There's a code on the door so that it's locked and only

14   certain people can access that area so that it's secured,

15   because this type of medication requires -- well, the

16   medication in that room just requires a double-lock, and

17   then --

18   Q.  Can I just ask, back in September 2009, would you need a

19   key to get in the door or did you punch a code back in 2009?

20   A.  A code.

21   Q.  So it was a code in 2009?

22   A.  I believe.

23   Q.  And then when you get in the room, where were the narcotics

24   actually stored and how would they be accessed?

25   A.  The narcotics were in a metal cabinet up above the counter,

1    and it requires two keys, so one key goes in the left side and

2    opens this way (indicating), and the other key goes in the

3    right side and opens this way (indicating), so that you -- you

4    can't open both at the same time.  You need to have two

5    separate keys to make sure it's secure.  So the keys were only

6    for the narcotics.  They're secured at all times.

7    Q.  Back -- and again, my questions are all directed to

8    September 2009.

9    A.  Mm-hmm.

10   Q.  Who would have the keys to get into the cabinet?

11   A.  The person that would have the keys was usually the charge

12   nurse, but if another needed to give controlled drugs, they had

13   to get the keys from her, and on occasion when someone from the

14   pharmacy would deliver, they would have to get the keys from

15   the nurse who had the keys last or the charge nurse.  But it

16   was always in the possession of the nurse.

17   Q.  So going back then to the narcotics control sheets, which

18   are Defendant's Exhibit 13, on the -- on September 15th, when

19   you looked at them, what did you look at and what did you see?

20   A.  So I'd look first at the column where there was something

21   missing, and on this sheet where the --

22   Q.  Just to be specific --

23   A.  I'm sorry.  C-II.

24   Q.  -- what sheet are you looking at?

25   A.  On the narcotic sheet, the C-II sheet, the first one in

1    that -- do they have this?

2    Q.  Yes.  They have it.

3    A.  Okay.  So on this first sheet that you see there, I would

4    look down the column of the missing medication, which would

5    have been this morphine sulfate 2 milligrams Tubex.  It's about

6    halfway across the page.  And I would count.  So I would see

7    the count brought forward was from the day before, which was

8    the 12, and then the red one -- do they have color?

9    Q.  Yes, they do.

10   A.  Okay.  So in the red, that means the pharmacy delivered

11   something, because we write in a different color to be clear

12   about what was received versus what was dispensed.  So we

13   delivered 10, so that left a total of 22.

14   Q.  When you say "we delivered 10 --"

15   A.  The pharmacy department.

16   Q.  Your department.

17   A.  My department, mm-hmm, would have delivered.

18   Q.  All right.  Then going back, describing what you saw on

19   that morning when you look at this first page of Defendant's

20   Exhibit 13, what did you see?

21   A.  I saw that there were some missing names that were

22   associated with empty spaces that weren't filled in for a

23   particular patient.  So that's not allowed.  We need to account

24   for each dose that's given.

25   Q.  What else did you see?

Cab1mar5                    Byrne - direct

1    A.  Let's see.  Well, I saw that it hadn't been corrected, so

2    they hadn't found the answer at that point as to where it was.

3    I -- let's see.  Can I turn to the next page?

4    Q.  Please.

5    A.  Or -- okay.  So then on the next page, things that I would

6    notice here by looking through here are things that are written

7    over, because that's not allowed.  You're not allowed to write

8    over things on a narcotics sheet.  Just like you wouldn't be

9    able to use whiteout or anything like that because it's an

10   official document.  So that type of thing is something I'd look

11   at.

12   Q.  What did you see in the way of something being written

13   over?

14   A.  If you -- if you're on the second page, you can see that

15   the times going down the left-hand column, that 12 is written

16   over and the 5 p.m. is written over the 6, and there's a 1

17   rewritten also.  And there's -- in the column under lorazepam

18   tablets, there's something crossed out and it's moved over.

19        So those are just the type of things that I look for,

20   things that aren't normal.  So that's what I look for.  And

21   then --

22   Q.  So -- I'm sorry.  I didn't mean to cut you off.  Go ahead.

23   A.  I'm sorry.  So another thing I would look at is if I'm

24   missing -- if I'm missing three of those, three of the morphine

25   from the first page, did three of anything else go anywhere,

1   just -- because I try to get ideas to see if something balances

2   out somewhere else.  So there is -- on the page 2, the C-III,

3   IV, V, there's lorazepam Tubex, three of those were given out.

4   They're the same kind of device or syringe.  It's called Tubex

5   here, but that's like a glass syringe.  And then I just look to

6   see if signatures are in place and I look to see if the numbers

7   are correct on the bottom and if it was brought forward

8   correctly on the page and if the numbers work.

9   Q.  So after you finished doing that on the 15th, what else

10  did you do that day to try to find the missing morphine?

11  A.  Well, then after I looked for myself to see that yes, I

12  really do believe it to be missing, then I would ask to speak

13  to the people who were on the shift at that time that had

14  access to the medication room and to the narcotics.

15  Q.  How did you make arrangements to do that?

16  A.  With the nurse manager.

17  Q.  So did you meet with any of the nurses on that shift where

18  the missing morphine became apparent?

19  A.  I did.

20  Q.  Was there anybody who sat in on those meetings with you?

21  A.  Mm-hmm.  Fran Gatto.  She was a narcotic manager in the

22  pharmacy department.

23  Q.  Let me just stop you there for a second.  What were her

24  responsibilities as a -- the narcotic manager?

25  A.  So the narcotic manager is the person that collects the

sheets each day and she makes sure all the numbers are correct.

She also checks our own stock in the pharmacy to make sure

everything is dispensed correctly to the floor.  So she

prepares the narcotics and the controlled drugs for someone to

deliver them.  We check our own stock within the pharmacy.  At

that time we were counting it three times a day to make sure

all of our numbers matched up.  She has to have the paperwork.

Her responsibilities are more than that.  For instance,

anesthesiologists use a lot of controlled drugs, that she has

to take their anesthesia records and match that up to what was

used to make sure the numbers match.  She has to keep all of

the records that are investigated.  She keeps track of the

order sheets that we use that are official blanks to order the

medication and reconciled when things come in.  There may be

other things.  She's responsible for all the controlled drugs.

Q.  Back at that time in September 2009 to whom did she report?

A.  To me.

Q.  Now was anybody else meeting with you -- with you when you

interviewed the nurses?

A.  Yes.

Q.  Who else?

A.  Pauline.

Q.  Pauline?

A.  Frances-Lattery.

Q.  What was her position?

1   A.  The manager of the ICU, nurse manager.

2   Q.  Was there anybody else?

3   A.  I think Agnes Lucero.

4   Q.  Who was she?

5   A.  She was a nurse manager, but I don't remember exactly what

6   unit.

7   Q.  So did you then start interviewing the nurses?

8   A.  Yes.

9   Q.  Did you prepare any notes or -- of your interview?

10  A.  Yes.

11  Q.  I'd like to ask you to turn to Defendant's Exhibit 11.  Are

12  those your notes of the investigation, or the interviews that

13  you did?

14  A.  Yes, mm-hmm.

15  Q.  The jury has this as well, so really let's go through this

16  paragraph by paragraph.

17  A.  Okay.

18  Q.  Why don't you just read the very top two lines.

19  A.  Okay.  "ICU D3 narcotic discrepancy investigation on

20  9/15/09 as recorded by Patricia Byrne, Associate Director of

21  Pharmacy."

22  Q.  So what does that refer to then?

23  A.  That -- that is my report and as I recorded it from that

24  day.

25  Q.  Let's go to the next paragraph, and please read that for

Cab1mar5                    Byrne - direct

1    the jury.

2    A.  Okay.  "Background.  Narcotic count was missing three

3    morphine 2-milligram Carpujects from the C-II narcotic sheet

4    count dated 9/14/09.  All other counts were recorded as

5    accurate."

6    Q.  So let's stop there for the moment.  The word "Carpuject"

7    appears in that paragraph.  What does that mean?

8    A.  A Carpuject is the same thing as a Tubex, only it's a

9    different brand name, so it refers to a glass syringe.  So

10   on -- I believe on the controlled drugs disposition record it

11   says Tubex.  It's the same thing as Carpuject.

12   Q.  There's a reference to the C-II narcotic sheet.  Was that

13   the first page of Exhibit 13 that we looked at a moment ago?

14   A.  Yes.

15   Q.  Then let's go to the next paragraph, starting with the

16   words, "On 9/15/09."  Could you read that to the jury, please.

17   A.  Okay.  "On 9/15/09 spoke to Cleopatra DeJesus, AnaRicca

18   Libiran, Othilyn Gonzales, Cora Fischer, and Marlen Martinez."

19   Q.  What does that paragraph refer to?

20   A.  The people that I spoke to.

21   Q.  All right.  Now let's go to the next paragraph.  Please

22   read that to the jury.

23   A.  Okay.  The count was known to be correct at 12 noon on

24   9/14/09 when 10 Carpujects were received from the pharmacy and

25   the count was verified as 22 at that time.  Two sealed boxes of

1   10 and two loose Carpujects.  This was confirmed by Nurse

2   Libiran, who received and verified the count."

3   Q.  Do you recall how you became aware of that information in

4   that paragraph?

5   A.  Well, the first part, that it was last known to be correct,

6   I can see on the controlled drug sheet that it was signed by

7   two people, one from the pharmacy and the nurse, so at that

8   point they both count together and make sure that that count is

9   correct.  The two sealed boxes and two loose Carpujects was --

10  I knew that was confirmed by Ms. Libiran.

11  Q.  The two sealed boxes of 10, what does that mean?

12  A.  When we get the narcotics delivered of the morphine, they

13  come in rectangular boxes with 10 Tubex or Carpujects in each

14  box.  So when you receive the medication, you make sure it's

15  sealed so that you don't have to check each individual syringe

16  to make sure that it hasn't been tampered with, so it has two

17  boxes in there.

18  Q.  All right.  Let's go to the next paragraph then.  Starting

19  with the words, "Ms. Libiran."  If you could please read that

20  for the jury.

21  A.  "Ms. Libiran reported the missing Carpujects after going to

22  get a 7 p.m. dose of morphine 2 milligrams for her patient and

23  found that there were three missing.  During our interview

24  Ms. Libiran noted that she immediately noticed the Carpujects

25  were missing because the sealed box was now open.  She left

1    spaces on the narcotics sheet to follow up as to who had used

2    the morphine 2-milligram Carpujects.  She immediately asked the

3    staff present and no one responded.  She also notified the

4    pharmacy.  After no solution, Ms. Libiran notified nursing

5    supervisor and security."

6    Q.  Now in that paragraph you reference "our interview."  What

7    did that mean?

8    A.  Where I was seated with Fran and Pauline and Agnes.

9    Q.  Was Ms. Libiran present then?

10   A.  Yes.  She was the person that was in the room at that time

11   that we were interviewing, yeah.

12   Q.  Did you interview the nurses separately or together?

13   A.  Separately.

14   Q.  So then would you go to the next paragraph that you read,

15   starting with the word "Statement."

16   A.  "Statement noted order for stat morphine 2 milligrams for

17   patient in 516A.  This is when missing medication was

18   discovered."

19   Q.  The reference to statement, do you remember what that

20   means?

21   A.  Yes.  The nurses were asked to write statements of what

22   happened that night so we could try to figure out where the

23   missing medication was.

24   Q.  Did you look at those statements on September 15th?

25   A.  I did.

1   Q.  Let me direct your attention to Defendant's Exhibit 10 in

2   that same notebook.  Was that -- or is that a copy of

3   Ms. Libiran's statement that you looked at on September 15th?

4   A.  Yes.

5   Q.  All right.  Let's go back then to Defendant's Exhibit 11

6   and continue reading through your report.  So if you would read

7   for the jury the next paragraph that starts with the words,

8   "Ms. Libiran noted."

9   A.  "Ms. Libiran noted that Ms. Martinez announced the

10  returning of Ativan that had not been used by the doctor for

11  MRI," and then I have in parentheses a note:  "This Ativan dose

12  is not signed out on the narcotic sheet."

13  Q.  What does your note in parentheses refer to?

14  A.  It's the practice that all narcotics should be signed out

15  on the sheet so that at any time when I'm going to check a

16  sheet, they should agree.  So if something is missing from the

17  cabinet, it should be on the sheet.  So to me, this is odd.

18  Q.  Why was it odd?

19  A.  Because I expect the sheet to be right all the time.

20  Q.  And let's go to the -- well, before we go on to the next

21  paragraph, so with regard to the Ativan --

22  A.  Mm-hmm.

23  Q.  -- referenced in your parenthetical, what would you have

24  expected to see on the narcotic control sheet there?

25  A.  I'd expect to see a return of a narcotic.  If one had gone

1    out, I expect to see is it signed out, and then if it was

2    returned, I'd expect to see a return on the sheet, and that was

3    not on the sheet.

4    Q.  Let's go to the next paragraph then that starts with the

5    words "Ms. DeJesus."

6    A.  Ms. DeJesus performed the count, did not have any patients

7    on morphine 2 milligrams Carpujects.

8    Q.  Now where did this information come from?

9    A.  I need to find out who has any possibility of touching the

10   morphine to find out if -- where the mistake may have been

11   from.  So if someone had an opportunity to go in for morphine,

12   then that means there's a possibility they made a mistake.

13   Q.  Did you speak with Ms. DeJesus?

14   A.  Yes.

15   Q.  Was she one of the nurses who you interviewed on the

16   15th?

17   A.  Yes.

18   Q.  Now let's go to the next paragraph in your report that

19   starts with the word "Noted."

20   A.  Okay.  Noted.

21   Q.  Please read that to the jury.

22   A.  Okay.  "Prior to the time of finding the missing

23   medication, Ms. Martinez returned the keys to Ms. DeJesus after

24   getting the medication for her patient in 527A at 5 p.m.

25   Ms. DeJesus stepped out for a few minutes and Ms. Martinez was

1    paging her to get the keys back very soon.  When Ms. DeJesus

2    returned, Ms. Martinez returned the narcotic -- returned to the

3    narcotic cabinet.  Ms. DeJesus noted that she was in a rush to

4    get the keys back after already removing the medication."

5    Q.  So this information in this paragraph came from whom?

6    A.  Ms. DeJesus.

7    Q.  Did you have any reaction to what she was telling you

8    there?

9    A.  I did, because --

10   Q.  What was it?

11   A.  That you shouldn't be going back into the narcotic cabinet

12   if you don't have reason to get something out of it, and if

13   you've already removed medication from it, I would want to know

14   why you were going back there.

15   Q.  Who was it that was going back and forth?

16   A.  Ms. Martinez.

17   Q.  Let's go to the next paragraph then that starts with the

18   words "Ms. Gonzalez."  Please read that.

19   A.  Okay.  "Ms. Gonzalez did not have a patient on morphine or

20   other Carpuject formulation.  After finishing signout, searched

21   for medication and discussed the process."

22   Q.  Did that information come from an interview with

23   Ms. Gonzalez?

24   A.  Yes.

25   Q.  Then next you have the words "Ms. Fischer."  Please read to

1  the jury that paragraph.

2  A.   Okay.  "Ms. Fischer admitted to changing the time of

3  signing out medication.  In the morning removed dose for

4  10 a.m. and 12 noon at the same time since she was in D1 and it

5  was difficult to be able to come back to D3 later.  Signed out

6  her 6 p.m. medication early but then the time was changed to

7  5 p.m.  Ms. Fischer stated at the time that she changed the

8  time to 5 p.m. so it reflected the real time that the

9  medication was signed out."

10  Q.   Where did that information come from?

11  A.   From Ms. Fischer.

12  Q.   You interviewed Ms. Fischer?

13  A.   Yes.

14  Q.   And let's go to the next paragraph.  Please read that to

15  the jury.

16  A.   "Ms. Fischer appeared very nervous, changed some parts of

17  the story during the interview, noted that she passed

18  Ms. Martinez on leaving the narcotic room, and gave her the

19  keys."

20  Q.   What is the source of that note?

21  A.   My own perception of what was going on during the

22  interview.

23  Q.   At some point during the interview did you develop any sort

24  of working theory as to what had happened to the morphine?

25  A.   Yes.

1    Q.   What was it?

2    A.   Well, I started to believe that there was a reason that the

3    narcotics had been accessed, that maybe there was a mistake

4    that occurred and someone went back into the cabinet to make a

5    change.

6    Q.   What change?

7    A.   Well, in my mind what I was formulating at that point is

8    that if someone had taken out their medication and then rushed

9    back to do something different and then all the other numbers

10   matched, that I was wondering if possibly the Ativan, which was

11   three of them, had not actually been taken out initially.

12   Initially maybe three morphine were taken out, and then, once

13   it was discovered that there was an error, gone back to remove

14   lorazepam so it wouldn't still be there.  Because otherwise --

15   I mean, these are just things I try to decide what is going on

16   as I'm talking to people -- there was no reason to go back into

17   a cabinet once you take a medication out.  So if you're running

18   to go back somewhere to make a change, you shouldn't have had

19   your hands back on the narcotic keys if you have nothing else

20   to take out of there.

21   Q.   Now did you also interview Ms. Martinez?

22   A.   Yes.

23   Q.   And is that reflected in your next paragraph?

24   A.   Yes, that's the next paragraph.

25   Q.   All right.  So please read that next paragraph for the

1    jury.

2    A.   "Ms. Martinez.  Did not recall anyone -- did not recall

3    anyone that she got the keys from at any time.  When shown the

4    time change above her signout, Ms. Martinez said she changed

5    the time because Cora was leaving as she was coming in.  Then

6    she said that she got the keys from Cora.  I asked her to

7    describe the process of removing the narcotics and all of the

8    time she had gone in to get medication.  She did not mention

9    the on-call lorazepam until I asked about it.  Ms. Martinez

10   noted that she left the unit to get a Keppra from the pharmacy

11   to be hung before the patient returned from MRI.  I asked

12   Ms. Martinez about the MRI, and she described the process

13   before MRI and the need for Ativan to go with the patient.

14   When I asked about the return, she said that the MRI could not

15   be done because the patient's blood pressure was low and the

16   patient was agitated."

17   Q.  So let's just stop there and go through some of what you

18   just read, starting with the very first sentence, where you

19   wrote the following, "Did not recall anyone that she got the

20   keys from at any time."  Had you asked her something --

21   A.  Yes.

22   Q.  -- before she gave that response?

23   A.  Yes.

24   Q.  What did you ask her?

25   A.  I asked her at what point in the day had she gotten the

1    keys from someone.

2    Q.  Did you have any reaction to her answer?

3    A.  I was surprised, because there were multiple times that she

4    would have gone in to get narcotics, and like I was saying, as

5    each person takes out narcotics, the keys go from the person --

6    from person to person, so of course you'd have to get the keys

7    from someone.  And also there had been the description of how

8    she was running to find the person to give the keys back, so

9    you would remember that.  So I thought it was strange that she

10   would not say anything about where she got the keys from.  It's

11   just a question.

12   Q.  Then looking at this next sentence in that paragraph, you

13   wrote as follows:  "When shown the time change above her

14   signout, Ms. Martinez said she changed the time because Cora

15   was leaving as she was coming in."

16   A.  Yes.

17   Q.  What were you referring to when you wrote "the time change

18   above her signout"?

19   A.  Can we go back to the narcotics sheet?

20   Q.  If it helps you --

21   A.  Okay.

22   Q.  Well, I don't know if the judge can rule on that objection

23   or I should go on.

24   A.  I can --

25   Q.  Wait for the judge.

1      THE COURT:  I didn't hear objection.

2      THE REPORTER:  I didn't hear the objection.

3      THE COURT:  Nobody heard the objection, so there's

4   nothing to rule on.  If she didn't hear it and I didn't hear

5   it, then it didn't happen.

6      MR. GARLAND:  I'll go on then.

7      THE COURT:  Good.  I'm not losing my mind.

8   Q.  In order to explain to the jury what you're referring to in

9   that sentence, do you need to look at the narcotic control

10  sheet?

11  A.  I think it would be clearer for the jury.

12  Q.  All right.  So let's go to DX13, and explain to the jury

13  what you were referring to by looking at the narcotic control

14  sheet.

15  A.  If you turn to the second page, C-III, IV, V, you would see

16  in the left-hand column under the time where there's --

17  underneath the red there's a 5 p.m. and a 5 p.m.  That was what

18  I was referring to, because the 5 p.m. on the bottom part was

19  Ms. Martinez and the one above it, you can see, is the -- it

20  appears to be the same pen written over the one right above

21  that.  Over the 6 there's a 5.

22  Q.  What does that tell you?

23  A.  It says to me there was a change, and it also said to me

24  that Cora had said she changed it, but it looks to me like the

25  pen below.  So it was just a note that -- it was just -- it

1   didn't go along with the same story.

2   Q.  So then let's look back at the paragraph under the words

3   "Ms. Martinez" on Defendant's Exhibit 11, and I want to ask you

4   about something else that you wrote, which is the following:

5   "She did not mention the on-call lorazepam until I asked about

6   it."  What did that refer to?

7   A.  In a previous note it says that the lorazepam had been

8   taken out and returned, so I -- that was the on-call lorazepam,

9   on call to go to a procedure, and I didn't see that noted on

10  the sheet.

11  Q.  When you use lorazepam, can that be used interchangeably

12  with Ativan?

13  A.  Yes.

14  Q.  Now on the very next line in that paragraph there's a

15  reference to -- or there's the word "Keppra."  What does

16  "Keppra" mean?

17  A.  That's a type of medication.  That was for I believe a

18  different patient.  It's just the name of a medication that she

19  says that she had to go get from the pharmacy.

20  Q.  All right.  Then let's look at the next line that you

21  haven't read yet, which starts out with the words, "Noted on

22  statement."  Please read that for the jury.

23  A.  Okay.  "Noted on statement:  Patient 525B, no controlled

24  drugs.  526A, Percocet.  526B, medazepam 2-milligram IM.  2 --

25  527A, Percocet.  527A, Ativan 6 milligrams IV push -- IVP."

1    Q.   Where did that information come from?

2    A.   The statement.

3    Q.   The statement of?

4    A.   Each nurse wrote a statement.

5    Q.   So this comes from --

6    A.   I believe this was on Ms. Martinez' statement.

7    Q.   So let me ask you then to turn to Defendant's Exhibit 9.

8    Is that the statement that you were just referring to in your

9    report?

10   A.   Oh, yes.  Mm-hmm, yes.

11   Q.   All right.  Then let's go back to Defendant's Exhibit 11,

12   picking up where we left off.  I want to ask you so it's clear,

13   the numbers 525B, 526A and so forth, what do those numbers

14   mean?

15   A.   Those are room and bed numbers of patients.

16   Q.   Now let's continue going through the rest of your report.

17   Starting with the words, "Other notes," please read that next

18   paragraph for the jury.

19   A.   Okay.  "Other notes.  3 x 2-milligram empty Carpuject of

20   morphine 2-milligram and 1 x 4-milligram empty Carpuject of

21   morphine found in the garbage.  All nurses stated that they

22   discard the Carpujects in the sharps container."

23   Q.   So where did that information come from?

24   A.   Asking around, what have they checked, did they look in the

25   garbage, did they look on the counters, did they look on the

Cab1mar5                    Byrne – direct

1    floor.  That's information from their -- what they had found.

2    Q.  Then let's look at the next paragraph.  Please read that.

3    A.  "Some Carpujects, unsure of type, found empty on the

4    counter of the nursing station and were later cleaned up."

5    Q.  Where did that information come from?  Where did that

6    information come from?

7    A.  Also part of the discussion about where did people look,

8    what did they find, what happened to try to find the drug.

9    Q.  Then let's look at the next paragraph.  Please read that.

10   A.  "The only other controlled drug that was removed three at a

11   time," and in parentheses, "(that's possibly a lookalike

12   medication error) was lorazepam."

13   Q.  What did you mean when you wrote the words "possible

14   lookalike medication error"?

15   A.  Well, the pharmacy department is also responsible for

16   evaluating types of medication errors so you can look to see

17   what the root cause is, so sometimes what happens when there's

18   an error is that the medication looks very similar, so we call

19   that a lookalike medication.  So since they're both in the same

20   type of syringe, glass syringe, there's a possibility of

21   confusing those.

22   Q.  How, if at all, did that factor into your working theory of

23   where the missing morphine had gone?

24   A.  Because that's the only other thing that was taken out in

25   threes that was the same type of syringe, not a tablet, not a

Cab1mar5                 Byrne - direct

1   vial, so to me those -- that's a possibility of a mix-up.

2   Q.  By the way, as you were interviewing the nurses, did you

3   talk with Pauline Frances-Lattery and Fran Gatto among

4   yourselves about what you were learning?

5   A.  Yes, but not when the people that we were interviewing were

6   in the room.

7   Q.  So when the people you were interviewing were outside the

8   room, you were talking among each other.

9   A.  Yes.

10  Q.  And what was it that you said, if anything, about your

11  working theory?

12  A.  That it could have been lorazepam mixed up with the

13  morphine, so the morphine may have been taken out instead of

14  the lorazepam, so then I was wondering where's the lorazepam.

15  Q.  In any part of your working theory did you associate the

16  missing morphine with any of the nurses you were interviewing,

17  or attribute it to any of the particular nurses?

18  A.  I was thinking that Ms. Martinez may have mistakenly taken

19  the morphine instead of the Lorazepam.

20  Q.  Why did you think that?

21  A.  Because there were the same three missing, and there was a

22  point at which she was urgently trying to get back into the

23  room, possibly to make a change, so if -- if it's three and

24  they look alike and she was the person that had access to the

25  cabinet more than what was written down on the piece of paper

1    on the controlled drug sheet, that it's quite possibly that she

2    would have been the one that would have been in there.

3    Q.  Then let's look at the next paragraph in your report,

4    starting with the word "Unusual."  Please read that to the

5    jury.

6    A.  "Unusual that a patient in 527A would be agitated and have

7    blood pressure too low after getting lorazepam."

8    Q.  What prompted you to make that note?

9    A.  Because during the interview with Ms. Martinez she said

10   that the patient was too agitated to get the MRI.  So that

11   seemed strange, because I know the effect of medications

12   because I'm a pharmacist, so that's another reason why I was

13   wondering if there was a mix-up.

14   Q.  What about the effect of medications led you to say or to

15   wonder whether there was a mix-up that was attributed to

16   Ms. Martinez?

17   A.  Well, in most cases lorazepam calms people for a procedure.

18   It generally doesn't have a large effect on the blood pressure

19   going too low for a procedure, but it would calm you down

20   before you go into the MRI, because you have to be very still

21   for an MRI.  So that was just unusual the way it was described

22   to me.  But it wouldn't be unusual that you may be agitated

23   after getting morphine and your blood pressure would drop.  So

24   I was just thinking through in my head what could have happened

25   and what is an explanation of what's going on here.  And that

Cab1mar5                    Byrne - direct

1    just seemed to be another point that was in my mind, okay,

2    there was probably a mix-up.

3    Q.   Then let's look at the last paragraph in your report.

4    Please read that for the jury.

5    A.   "Patient in 527A was tested for morphine level.   No

6    morphine-like medication was ordered for this patient.

7    Patient's result was positive."

8    Q.   So what was the source of that information?

9    A.   I was told that later in the day.

10   Q.   Told what?

11   A.   That the patient had been tested and the result came back

12   positive for morphine.

13   Q.   Then the very last line, the question, "Where is the

14   lorazepam?"  What does that mean?

15   A.   That means, if the patient had been given morphine, I

16   should still have three lorazepam in my safe, in the cabinet,

17   because if you take the wrong thing, then the thing you were

18   supposed to take should still be in the cabinet.  But it wasn't

19   in the cabinet.  So now I have to change over to see, am I

20   reporting that I'm missing morphine or am I reporting that I'm

21   missing lorazepam?  Because I have to be accurate in what I

22   believe to be the true story when I report to the Bureau of

23   Narcotic Enforcement.  So at that point, once the patient had

24   tested positive for morphine, then I had to find out, where is

25   the lorazepam.

Cab1mar5                    Byrne - direct

1    Q.  Are you saying that you believe that you had accounted for

2    what happened to the morphine?

3    A.  I'm -- I believe so, yes.

4    Q.  And how do you believe you accounted for what happened to

5    the morphine?

6    A.  That the morphine had been given to the patient.

7    Q.  By whom?

8    A.  By Ms. Martinez.

9    Q.  Now when you finished up with your report, what did you do

10   with it?

11   A.  This report would go to my director, so to Richard

12   LaFontaine, and a copy would be given to Cathy Graham, director

13   of nursing at that time.  And one for the file.

14   Q.  Did you have any further involvement in the investigation

15   looking for what started out as missing morphine and

16   subsequently ended up as missing Ativan?

17   A.  Well, I spoke to my director, because he had to report it

18   to the Bureau of Narcotic Enforcement and had to report it with

19   a description of what occurred.

20   Q.  And after that did you have any further involvement?

21   A.  No.

22            MR. GARLAND:  No further questions.

23            THE COURT:  You may inquire.

24   CROSS-EXAMINATION

25   BY MR. NUWESRA:

Cab1mar5                    Byrne - cross

1    Q.   Good afternoon, Ms. Byrne.

2    A.   Good afternoon.

3    Q.   My name is Lee Nuwesra.  I'm representing Ms. Martinez.

4         How long did you work with Dr. Richardson?

5    A.   I believe more than 18 years, yeah.

6    Q.   Did you have confidence in Dr. Richardson when you

7    supervised him?

8    A.   Yes.

9    Q.   Do you think he was -- he is competent as far as relating

10   what some of the side effects of the different and various

11   medications are?

12   A.   Yes.

13   Q.   And is it in fact that he has a doctor of pharmacy --

14   pharmacology?

15   A.   Yes.

16   Q.   Did you ever report the missing morphine to the Bureau of

17   Narcotic Enforcement?

18   A.   No.

19   Q.   You did not.

20   A.   I did not report either --

21   Q.   Why not?

22   A.   I did not file the report.  Richard LaFontaine filed the

23   report.

24   Q.   So the hospital filed report eventually with the Bureau of

25   Narcotic Enforcement?

Cab1mar5                    Byrne - cross

1    A.   Yes.

2    Q.   How about the DEA?

3    A.   No.  It was not -- it was refused by them because the

4    dollar amount was too low.

5    Q.   Okay.  Did anything ever come of that report with the

6    narcotic enforcement bureau?

7    A.   Not that I'm aware of.

8    Q.   When you reported this to the bureau --

9    A.   But I don't think --

10   Q.   Let me --

11   A.   Sorry.

12   Q.   St. Barnabas reported to the bureau?

13   A.   Yes.

14   Q.   Did they advise the bureau that the patient in 527A was

15   tested for morphine level?

16   A.   I'd have to see the report.  I did not write it.

17   Q.   Okay.  Have you ever -- has the hospital prior to this

18   incident ever reported similar incidences to the bureau?

19            MR. GARLAND:  Objection as to form.

20            THE COURT:  I don't even understand what the question

21   is.

22   Q.   Have you ever been involved in reporting such incidences to

23   the Bureau of Narcotic Enforcement?

24   A.   I'm unclear as to how you're defining such incidents.

25            THE COURT:  Have you ever made a report to the Bureau

Cab1mar5                 Byrne - cross

1   of Narcotics Enforcement about missing drugs?

2                THE WITNESS:  Yes, I have.

3                THE COURT:  Thank you.

4   Q.  And what goes in these reports?

5   A.  Things that are missing that we can't account for.

6   Q.  And are you very specific and succinct as to how to account

7   for them?  For example, in this case, you have --

8                THE COURT:  Counsel, you're asking her about other

9   reports.

10  Q.  What happened to the drugs or the narcotics that were being

11  reported --

12               THE COURT:  I think the question is, do you follow the

13  same procedures in the other cases where you've filed reports

14  as you followed in this case?

15               THE WITNESS:  Yes.

16  Q.  And would it have been the proper practice to let the

17  bureau know that Patient N, the patient in that room, had

18  tested positive for morphine level?

19  A.  Can you ask me that question again, please?

20  Q.  Sure.  In your notes -- take a look at DX11.

21  A.  Yes, mm-hmm.

22  Q.  The second page.

23  A.  Yes.

24  Q.  And where you wrote patient in 527A was tested for morphine

25  level.  Do you see that?

1   A.   Yes.

2   Q.   That is not true, is it?

3   A.   It's true to the best of my knowledge.

4   Q.   Well, did you do anything to investigate the truthfulness

5   of that statement that was made to you?

6   A.   Are you talking about reporting to the Bureau of Narcotic

7   Enforcement?

8           THE COURT:  His question is, did you undertake any

9   investigation to ascertain whether the report that was made to

10  you about testing positive for morphine was true?  Did you make

11  further inquiry to see if in fact the person tested positive

12  for morphine?  Did you go look at the lab results?  Did you do

13  anything else?

14          THE WITNESS:  I don't recall.

15          THE COURT:  You don't recall.  Okay.

16  Q.   Do you under usual circumstances do that, make sure that

17  whatever statement is given to you by somebody else is correct

18  and accurate about lab reports, lab results?

19          THE COURT:  I think the question is, is it ordinarily

20  your practice to check on the lab results that undergird the

21  statement that some other medical professional makes to you or

22  do you rely on the statement that the medical professional

23  makes?

24          THE WITNESS:  I rely on the statement that was made to

25  me.

1    Q.  Who was it that made it to you?

2    A.  I don't recall.

3    Q.  Was it a manager?

4    A.  I said I don't recall.

5    Q.  Could you have checked the patient's chart or such lab

6    reports to make sure that that statement was accurate?  Were

7    you privy to the medical chart of the patient?

8    A.  I have a code -- a HIPAA agreement that I would only look

9    into patients' charts where I had a need.

10   Q.  Okay.

11   A.  So my need was met in the report that I handed in.  This is

12   not the Bureau of Narcotic Enforcement report, just so you're

13   clear on that.

14   Q.  So you didn't think that you should have gone and made sure

15   that the statement that was made to you was accurate that this

16   patient was tested positive for morphine?

17   A.  I assure you that I always act in my best responsible

18   manner and I did everything that I felt I should do on that

19   day.

20   Q.  Okay.  When you did the investigation, did you make the

21   interviews in the same order that you wrote here?

22   A.  I believe so.

23   Q.  Okay.  Now isn't it true that you interviewed Ms. Fischer

24   before Ms. Martinez?

25   A.  I believe so.

Cab1mar5                    Byrne - cross

1    Q.  You can take a look at the report.

2    A.  That's what -- yes.

3    Q.  That's what it says; right?

4    A.  Mm-hmm, yes.

5    Q.  Is there any reason why you didn't believe Ms. Fischer when

6    she told you she was the one who changed 6 p.m. to 5 p.m.?

7    A.  I didn't not believe her.  I was wondering why the pen

8    color was different.

9    Q.  Was that the only pen color that was different on that

10   sheet?

11   A.  No.

12   Q.  There was two others at least; right?

13   A.  That's quite possible, so I'm --

14   Q.  Okay.  Let's take a look at it, DX13.

15   A.  Okay.

16   Q.  The second page; right?

17   A.  Yes.

18   Q.  Okay.  C-III, C-IV, and C-V for the record; right?

19   A.  Yes.

20   Q.  Okay.  Do you see the third column from the top?

21   A.  Yes.

22   Q.  What does that say?

23   A.  12A.

24   Q.  Does that appear to you like it was written over?

25   A.  Yes.

1    Q.  Did you inquire about that?

2    A.  I believe so.

3    Q.  From whom?  By whom?

4    A.  Well, Ms. Fischer had told me that she had changed times

5    and Ms. Martinez had told me that she changed times, so they

6    both told me that they changed times, so to me that was

7    inconsistent.

8    Q.  I'm talking about the 12 p.m. -- the 12 noon or 12 p.m.,

9    not the 5 -- not the 6 to 5 or vice versa.

10          THE COURT:  I have no idea what you just said.

11          MR. NUWESRA:  Your Honor, I'm asking her about the 12

12   noon writing in DX13, not the 6 to 5 p.m.

13          THE COURT:  Oh.  You're talking about something that

14   has nothing to do with this lawsuit?  Please deal with this

15   lawsuit, all right?  This lawsuit is about the 6 to 5.  It's

16   not about the 12 p.m.

17   Q.  Well, ma'am, isn't it also a fact that there is another

18   writing, writing over after the 5 p.m. one?

19   A.  It appears that way.

20   Q.  What's the time of that?

21   A.  Looks like 1 a.m.

22   Q.  Did you inquire about that one?

23   A.  No.

24   Q.  Now can you tell the jurors what is the -- what are some of

25   the side effects of Ativan?

1    A.   Some of the side effects would be drowsiness and calming.

2    There are many side effects to many different types of

3    medications and they can affect people differently.  So there

4    are some populations where you would see possibly different

5    side effects that can occur.  Most patient populations will be

6    in a sedated manner so that they can have the procedures to be

7    done and would feel in a relaxed mode and they wouldn't be

8    moving around very much.  But it wouldn't have the decreased

9    blood pressure that might be dangerous to a patient.

10   Q.   Isn't it a fact that one of the side effects of Ativan is

11   restlessness?

12   A.   That's much less common and isn't seen in many patients.

13   Q.   But is it a side effect?

14   A.   It may be, but in a small population.

15   Q.   And isn't it also a fact that one of the side effects of

16   Ativan is hypotension?

17   A.   I would have to check that.

18   Q.   Okay.  And hypotension means low blood pressure; right?

19   A.   Did you say hypotension?

20   Q.   Hypo, yes.

21   A.   Yes.

22         THE COURT:  So just so I'm clear, you said you'd have

23   to check before you could say whether that was a side effect?

24         THE WITNESS:  It's not a usual side effect.  It would

25   be a less common side effect.

1    Q.  And isn't it a fact that those two same -- that those two

2    side effects, restlessness and hypotension, also apply to

3    morphine?

4    A.  Yes.

5    Q.  Now can I take you back to DX11 and with regard to your

6    note of Ms. Libiran.

7    A.  Okay.

8    Q.  Can you tell me again what you meant when you wrote that

9    note, "This Ativan dose was not signed out on the narcotics

10   sheet."

11   A.  I was referring -- the previous sentence says, "Ms. Libiran

12   noted that Ms. Martinez announced the returning of Ativan that

13   had not been used by the doctor for the MRI."  And when I said

14   this dose was not signed out on the narcotic sheet, that means

15   it wasn't indicated on the controlled drug sheets.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Q.  Okay.  And isn't it a fact that when you questioned
Ms. Martinez about why she had to go back to the medication
closet, that she told you she needed to get a 2-milligram
Ativan on the go for the same patient that was going for the
MRI?

A.  I don't believe that was how it was explained, no.

Q.  Now, can you tell us, why did you decide that whoever took
the Morphine, the missing Morphine, had to have taken all three
at one time?

A.  I was looking for similarities.  Many times when you're
looking for medication errors, you're looking for how something
would be similar, the same.  The three were missing in between
the time someone had written down for a patient and then the
next time someone went in to take out Morphine.  So it is
unusual that three separate people would forget to write
something down in a row, because it is required that you record
everything that you remove.

Q.  Can you take a look at DX 13 again, please?

A.  Sure.

Q.  Did you notice that between 6 p.m. and 7 p.m., Nurse
Libiran had noted that there were two missing Morphine Tubexes
between 6 and 7 p.m.?

A.  I see that.

Q.  And do you see where she also indicated -- the same nurse,
Ms. Libiran -- that another one was missing after 7 p.m.?

1   A.  I see that.

2   Q.  And isn't it a fact that the three missing Morphine Tubexes

3   were discovered at 7:30 by Ms. DeJesus and Mr. Panes?

4   A.  Say that--

5   Q.  Mr. Panes and Ms. DeJesus.

6   A.  Ms. DeJesus said that she found the missing doses at that

7   time.

8   Q.  She counted at the end of the shift?

9   A.  Yes, she counted.

10  Q.  Which was at the end of the shift, 7:30 p.m.?

11  A.  Yes.

12  Q.  So between those two, the one between 6 and 7 and the one

13  between 7 and 7:30, account for three missing doses?

14  A.  Ask me again, please.

15  Q.  Wouldn't those-- wouldn't the two missing Tubexes between 6

16  and 7 and the one that was written as missing by Ms. Libiran

17  between 7 and 7:30 account for three?

18  A.  They would account for three, yes.  Missing three.

19  Q.  Thank you.

20          Can you tell me, how is Ativan stored?

21  A.  It can be stored two ways.

22  Q.  Yes.

23  A.  It can be stored at room temperature if you give it an

24  expiration date other than what's labeled on the box.  So you'd

25  have to have an extra auxiliary sticker that would date how

1   long it's good for at room temperature.  If you're not going to

2   date it that way, then it would be stored in the refrigerator

3   and then can be kept for the whole time until it's labeled on

4   the box.

5   Q.   And how is Morphine stored?

6   A.   Morphine is stored at room temperature.

7   Q.   Isn't it a fact that the three Ativan Tubexes that my

8   client signed out for from D3 that day were refrigerated?

9   A.   In D3, at that time, I believe they were stored at room

10  temperature and only in D1 were they stored in a lockbox in the

11  refrigerator.

12  Q.   Why didn't they have a lockbox in the refrigerator in D3?

13  A.   They hadn't requested it.

14  Q.   Sorry?

15  A.   They had not requested it at that time.  So generally

16  there's not a lot of storage in a small under-the-counter

17  refrigerator.  So if someone is on a lot of IV medications,

18  like big bags of nutrition, they need the refrigerator space.

19  And if they had not requested at that time to get a lockbox in

20  the refrigerator, it would be stored at room temperature with

21  the suggested expiration date.

22  Q.   Would you please take a look at DX 12?  Let me know when

23  you have located it.  Do you have it?

24  A.   I do have it, yes.

25  Q.   When was it that you found out or that somebody told you

1    that the patient in question -- whom we will refer to as

2    Patient N -- that Patient N tested positive for Morphine during

3    your investigation?

4    A.   I believe it was on the 15th, later in the day.

5    Q.   How late?

6    A.   I don't recall exactly.

7    Q.   How long did it take you-- was it before you interviewed

8    the nurses that were involved?

9    A.   No.

10   Q.   It was after?

11   A.   It was after.

12   Q.   And when was it that you interviewed them?

13   A.   During the day, after I had finished looking through the

14   narcotic records and the safe and found out if there were

15   anything missing around midday.

16   Q.   Did you have anything to do with the ordering of that lab

17   test?  Did you ask anybody to do a lab test for-- a urine

18   toxicology of Patient N?

19   A.   No.  I cannot order lab tests.

20   Q.   Did you ask a doctor to do the order?

21   A.   I did not, no.

22   Q.   Okay.  Thank you.

23            Take a look at DX 12.  Take a look at the second page

24   of that.

25            Do you recognize this document?  Have you ever seen

1   anything similar to this while you were working at

2   St. Barnabas?

3   A.   I've seen lab result forms, yes.

4   Q.   Okay.  Do you recognize this as a urine lab result report?

5   A.   It does say "Urine Drug Screen."

6   Q.   Okay.  And can you tell me what-- isn't it a fact that this

7   is dated on 9/14/09?

8   A.   Yes.

9   Q.   And that the lab results showed that this patient was

10  positive for benzodiazepine?

11  A.   Yes.

12  Q.   And that this patient was negative for the other tests that

13  they-- that's indicated there, such as cocaine, opiates,

14  barbiturate and THC?

15  A.   Yes.

16  Q.   And take a look at the second page.

17  A.   This is the second page?

18  Q.   The following page, yes, ma'am.

19  A.   Okay.

20  Q.   So that would be the third page.

21          Do you recognize this as a lab result for the urine

22  toxicology report, as well?

23  A.   Yes.

24  Q.   And can you tell us the date of that?

25  A.   9/15/09.

1    Q.  And can you tell us whether there is any indication in this

2    lab report that shows that this patient was positive for

3    Morphine?

4    A.  If you were positive for Morphine, that would show up as

5    positive for opiates.

6    Q.  But isn't it a fact that opiates include other controlled

7    substances besides Morphine?

8    A.  But not lorazepam.  Yes, it does have others, but they're

9    all in certain classes of their own.  Not all controlled drugs

10   would show up as an opiate.

11   Q.  Well, is Morphine a member of the class of opiates?

12   A.  Yes, Morphine is an opiate.

13   Q.  Right.

14   A.  Yes.

15   Q.  And this shows that this patient tested positive for

16   opiates.  Correct?

17   A.  Yes.

18   Q.  It does not show that this patient was positive for

19   Morphine specifically, does it?

20   A.  No, it shows opiates.

21   Q.  And it also shows that this patient was positive for

22   benzodiazepine.  Right?

23   A.  Yes.

24   Q.  And would Ativan be part of that?

25   A.  Yes.

1   Q.  And can you tell us, what time was this collection of urine

2   done based on this report?

3   A.  It looks like the collection --

4           MR. GARLAND:  Objection.  Well, based on the report.

5   Okay.  I think she's just reading the report, but --

6           THE COURT:  She is just reading the report.  What does

7   the report say?

8           THE WITNESS:  The report says 1251.

9   Q.  That's just before one o'clock.  Right?

10  A.  Yes.

11          THE COURT:  1251 is 1251, Mr. Nuwesra.

12  Q.  And you had nothing whatsoever to do with requesting such a

13  report be done on this patient, right, Patient N?

14          THE COURT:  Did you ask for this tox report to be

15  prepared?

16          THE WITNESS:  No.

17          THE COURT:  Thank you.

18          MR. NUWESRA:  Thank you.  I have no other questions,

19  your Honor.

20          THE COURT:  Redirect?

21          MR. GARLAND:  None.

22          THE COURT:  None?

23          MR. GARLAND:  None.

24          THE COURT:  Thank you.  You may step down and call

25  your next witness.

1          THE WITNESS:  Thank you.

2          (Witness excused)

3          MR. GARLAND:  Your Honor, while we're getting

4    Dr. Adler, can we briefly be heard at sidebar about an issue

5    that may come up with him?

6          THE COURT:  You're asking me now?  Come on over.

7          (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

center header

1          (At the side bar)

2          MR. GARLAND:  I just wanted to make sure I'm operating

3     consistent with your orders on the medical records because

4     there is an entry that I would like Dr. Adler to be able to

5     read.  The medical record's not his.  It's his entry of

6     September 16th which --

7          THE COURT:  Concerning Patient N?

8          MR. GARLAND:  Concerning his order for the urine

9     toxicology --

10          THE COURT:  It has to come in.  It has to come in.

11          MR. GARLAND:  So I can ask him to read that and we

12     can --

13          THE COURT:  Yes.

14          MR. NUWESRA:  And, of course, I will be allowed to

15     question him with other relevant documents if --

16          THE COURT:  If you are asking a question whether he

17     wrote that or didn't write that, if he wrote it, that's the end

18     of it.

19          MR. GARLAND:  Thank you, your Honor.

20          (Continued on next page)

21

22

23

24

25

1          (In open court)

2          THE DEPUTY CLERK:  Please state and spell your name

3    for the record.

4          THE WITNESS:  Darryl, D-a-r-r-y-l, Adler A-d-l-e-r.

5          THE COURT:  Have a seat, Doctor.

6          THE WITNESS:  Thank you.  You can call me Darryl.

7          THE COURT:  I'll call you Doctor; you call me Judge.

8    That will work.  That's your audience, those people in the box.

9          MR. GARLAND:  Thank you, your Honor.

10    DARRYL ADLER M.D.,

11        called as a witness by the Defendant,

12        having been duly sworn, testified as follows:

13   DIRECT EXAMINATION

14   BY MR. GARLAND:

15   Q.  Where do you currently work?

16   A.  St. Barnabas Hospital in the I.C.U., intensive care unit.

17   Q.  And what is your position there?

18   A.  I'm the director of the intensive care unit.

19   Q.  Are you actually an employee of St. Barnabas?

20   A.  No, we're a PC-- a PC.

21   Q.  And so can you briefly explain to the jury what that

22   means?

23   A.  We're hired by St. Barnabas Hospital.  St. Barnabas

24   Hospital pays our private corporation and we provide the

25   service of intensive care physicians to the intensive care

1   unit.

2   Q.   What was your position at St. Barnabas in September of

3   2009?

4   A.   Acting director of the intensive care unit.

5   Q.   In that position, what were your responsibilities in

6   September 2009?

7   A.   In general, making the schedule for the other intensive

8   care physicians, teaching medical residents on rounds, was

9   involved with quality assurance issues in the intensive care

10  unit.  Any meetings that required my presence, I would go to.

11  Q.   How long have you been working at St. Barnabas?

12  A.   This past June has been ten years.

13  Q.   And when you joined ten years ago, what was your position?

14  A.   A staff intensive care physician.  And I'm still -- besides

15  the director, I still work as an intensive care physician.

16  Q.   And where are you licensed to practice medicine?

17  A.   In New York State.

18  Q.   Do you have any particular certifications or specialties?

19  A.   Yes.  I did a specialty in critical care medicine.

20  Q.   Do you recall learning on September 15, 2009, about a

21  patient where there was a question as to whether or not the

22  patient had received Morphine or Ativan?

23  A.   Yes.

24  Q.   Do you recall how you learned about that?

25  A.   There was a-- the nurse manager brought it to my attention.

1    There was a discrepancy in the narcotic count.  At the end of

2    the shift, the nurses count how many narcotics were-- what

3    narcotics were used during the day, and there was a discrepancy

4    with Morphine missing.

5    Q.   When you say the "nurse manager," who was that?

6    A.   Pauline Lattery.

7    Q.   Did you do anything with regard to Patient N after she told

8    you that?

9    A.   The first-- it was-- the first day it was brought to my

10   attention that there was a discrepancy with the count, the

11   narcotic count.  And then the next day with Pauline Lattery and

12   Agnes Lucero, we were just trying to determine if a patient

13   received the narcotic.  And what we came up with is that we

14   would check the urine for presence of narcotics, of

15   specifically Morphine, opiates.

16   Q.   So what, if anything, did you do?

17   A.   I told the nurse, "Please send the urine for a tox screen."

18   A urine tox screen, that is.

19   Q.   When you say you told the nurse, do you remember which

20   nurse you told?

21   A.   Yes.  Cora Fischer.

22   Q.   Now, when you told her that, did you also write an order?

23   A.   No.  It was just-- I had just gotten finished discussing

24   the incident with the nurse man -- Agnes Lucero and Pauline

25   Lattery.  And on passing the room where Cora was taking care of

1   the patient, she actually had a urine specimen.  I said, "Don't

2   throw that away.  Send it for a urine toxicology."

3           Then, the following day, they told me-- or Cora told

4   me, "You ordered that, but you never wrote the order."  So I

5   wrote the order the following day.

6           MR. GARLAND:  Your Honor, may I approach the witness

7   with a page from the medical record?

8           THE COURT:  You may.

9           Okay.  This is just going to be-- you don't have this

10  because this is part of Patient N's medical.

11          When I'm talking to them, please bring it up so we

12  don't waste time.

13          This is not something that's in your book because it's

14  part of Patient N's medical records and you know we're keeping

15  those records private.  We're going to talk about one entry on

16  that medical record.

17          MR. GARLAND:  Just so the record is clear, I believe

18  this was identified as Plaintiff's Exhibit 16.  The page is

19  SB0616.

20          THE COURT:  Okay.

21  BY MR. GARLAND:

22  Q.  Yes or no:  Is there an entry that you made on that page?

23  A.  Yes.

24  Q.  Does that entry mention Patient N's name?

25  A.  The entry doesn't, but on the order sheet there's a sticker

1  with the patient's name.

2  Q.  Well, we don't want to mention the patient's name.  So can

3  you please just read for the jury what the order was that you

4  wrote?

5  A.  "Please send urine to tox."  Then in parentheses I wrote

6  "Late entry done on 9/15."  So the order was for 9/15, but I

7  wrote the order on 9/16.

8  Q.  Now, at some point in time, did you find out what the

9  results were of the order that you had given on the 16th?

10  A.  Yes.  The urine tox was positive for opiates.

11  Q.  How did you find that out?

12  A.  I went to the computer and I looked up under the patient's

13  name and the lab result.

14  Q.  Did you look at any other lab results for that patient

15  then?

16  A.  I honestly don't remember.

17  Q.  Let me direct your attention to Defendant's Exhibit 12,

18  which is in the binder right in front of you.  Go to Tab 12.

19  And I'd like you to go to the third page, the third page of

20  that exhibit.

21  A.  Okay.

22  Q.  And that has the 9/15/2009 date on it.

23       Were those the lab results that you looked at on the

24  15th?

25  A.  Yes.  Yes.

1    Q.  Again, how did you look at them?

2    A.  On the computer.

3    Q.  Let's just go through what these lab results then say.

4    First of all, we have the "in" line with a date and a time.

5    What does that mean?

6    A.  The in time is when the lab gets a specimen and clocks it

7    in.

8    Q.  And then the "out" time, what does that mean?

9    A.  When the result comes out.

10   Q.  Now, the next line is "COLL time."  What is that?

11   A.  Collection time.

12   Q.  Now, on this form, it looks like the collection time is the

13   same as the in time.  Do you know why that is?

14   A.  No, I don't.

15   Q.  Then, when you look at the results, what did you see?

16   A.  Opiates positive and benzodiazepine positive.

17   Q.  Did you do anything to determine whether or not-- well,

18   first of all, before we get there, is Morphine an opiate?

19   A.  Yes.  Yes, it is.

20   Q.  Did you conclude anything from this test result?

21   A.  Well, if the patient was given Morphine, then the urine tox

22   results would be positive for Morphine.

23   Q.  Did you do anything to determine whether or not the patient

24   had been prescribed Morphine?

25   A.  Yes.  I ran by-- I went back and I just looked through the

1    order sheets to see if, during the ER visit and the

2    hospitalization, the patient received Morphine.  And I also

3    looked back at the prior tox screens and they weren't positive

4    for opiates.

5    Q.  So where did you look at the prior tox screens?

6    A.  On the computer.

7              THE COURT:  I'm sorry, I may have missed something.

8    Was there a prior prescription for Morphine?

9              THE WITNESS:  No.  That's what I'm saying.  I could

10   look through the order sheets from when the patient first came

11   through the emergency room and during the hospitalizations.

12   And I looked to see if the patient was given Morphine prior to

13   this incident, and the patient was not prescribed Morphine.

14             THE COURT:  Okay.  How about other opiates?  Did you

15   look for that?

16             THE WITNESS:  I didn't-- yes, I looked for any

17   narcotics.  The prior-- the two prior drug screens -- I don't

18   remember how many exactly -- were negative for opiates.

19             THE COURT:  Okay.

20   Q.  Well, let's look at the other pages, then, of Defendant's

21   Exhibit 12.  Look at the first page.  You said you looked at

22   two other drug screens, toxicology screens.  So, again, we're

23   back in Exhibit 12, first page.

24   A.  Yes.

25   Q.  And that's for September 11th, 2009.  What does that show

1   for opiates and benzodiazepine?

2   A.  The drug screen there is negative for any opiates.

3   Q.  What about benzodiazepine?

4   A.  Benzo negative, also.

5   Q.  Then let's look at the next page of Defendant's Exhibit 8.

6   That's September 14, 2009, with an out time of 1748 military

7   time.  What does that show?

8   A.  It's positive for benzodiazepine.

9   Q.  What about opiates?

10  A.  No, negative.

11          MR. GARLAND:  No further questions, your Honor.

12  CROSS-EXAMINATION

13  BY MR. NUWESRA:

14  Q.  Good afternoon, sir.

15  A.  Good afternoon.

16  Q.  My name is Lee Nuwesra.  I represent the plaintiff.

17          THE COURT:  Could you speak up, Mr. Nuwesra, please?

18          MR. NUWESRA:  Sure.

19  Q.  My name is Lee Nuwesra and I represent the plaintiff.

20          Would you please tell the jurors what other controlled

21  substances would constitute opiates besides Morphine, would

22  fall under opiates?

23  A.  Morphine, heroin, methadone.

24  Q.  Anything else?

25  A.  Codeine.

1   Q.  Anything else?

2   A.  That's all I could think of right now.

3   Q.  Would Percocet also qualify as an opiate?

4   A.  It contains codone in it, yes.

5         THE COURT:  Wait a minute.  You mean that Percocet's

6   an opiate because it has Codeine in it?

7         THE WITNESS:  Yes.

8         THE COURT:  Okay.

9   Q.  Are you familiar with Oxycodone?

10  A.  Yes.

11  Q.  Is that an opiate, also?

12  A.  Yes.

13  Q.  Are you familiar with hydromorphine?

14  A.  Yes.

15  Q.  Is that also an opiate?

16  A.  Yes.

17  Q.  Sir, isn't it a fact-- take a look at DX-- I'm sorry, DX 12

18  again.

19        When you gave the verbal order for this toxicology

20  test, did you consider it to be an emergency?

21  A.  No, it wasn't an emergency.

22  Q.  Did you round that day?

23  A.  I was not assigned to that patient.

24  Q.  Isn't it a fact it was Dr. Stumacher who was assigned to

25  that patient?

1    A.  To be honest, I didn't look on the schedule back at that

2    time, so I don't know.  I cannot answer that.

3    Q.  Is there any reason why you did not discuss the patient

4    with his assigned doctor-- her assigned doctor?  I'm sorry.

5    A.  As the director of the I.C.U., I was discussing it with the

6    nurse manager and her assistant.

7    Q.  And the nurse manager was whom again?

8    A.  Pauline Lattery.

9    Q.  And who was her assistant?

10   A.  Agnes Lucero.

11   Q.  And what's the race of Ms. Agnes Lucero?

12   A.  She's Filipino.

13   Q.  Were you aware at the time that Ms. Lucero was questioned

14   by the night manager, Ms. Ondoy, about the same missing

15   Morphine?

16   A.  No, I'm not aware of that.

17   Q.  Is there any reason why you did not order a test to be

18   specific for Morphine rather than generally opiates?

19   A.  This is the only tox screen that the hospital has.  I'm not

20   aware of if you could specifically as an order out do it, but

21   this is the standard tox screen that we have in the hospital.

22   Q.  Okay.  Take a look at, again, DX 12, the second page.  Do

23   you see the notations on the bottom where it says "Note"

24   between those stars?  Can you read it for the jury where it

25   says "Note"?

1    A.  I'm not sure what you're directing me to look at.

2    Q.  All right.  You see this area of the stars, the stars

3    there?  Do you see on the bottom where it says "Note:  The

4    positive findings are not confirmed"?  Do you see it?

5    A.  Yes.

6    Q.  Can you tell us what that means?

7    A.  No.  You would have to ask the lab.  I'm not-- I'm not sure

8    what that means.

9    Q.  Are you familiar with the term "false positive" or "false

10   negative"?

11   A.  Sure.

12   Q.  Can you tell the jury what that is?

13   A.  A false positive, for instance, is that you may ingest a

14   substance and it's not the actual substance that you tested for

15   or that came back positive.

16   Q.  And isn't it a fact, sir-- take a look at the following

17   page, which is the test results of 9/15/2009.  Can you tell the

18   jury what that note says?

19   A.  Are you referring to the same thing that says "The positive

20   findings are not confirmed"?

21   Q.  Right.  But it's different documents.  The second document,

22   a different date.  Right?

23   A.  Yes.

24   Q.  Okay.  Please read it to the jury.

25   A.  "The positive findings are not confirmed."

1  Q.  Now, how long was Patient N in the hospital?

2  A.  I didn't look specifically at the time frame the patient

3  was in the hospital.

4  Q.  And this report, they were able to develop it in one hour.

5  Right?  It went in at 1251 and the results were there at 1351,

6  which is almost 2 o'clock.  Right?

7  A.  Sure.  That's about what it takes, an hour, two hours.

8  Q.  Is there any reason -- if you were so concerned whether

9  Morphine was in this patient's system, is there any reason why

10  you did not try to get a more specific test with regard to the

11  analysis of Morphine?

12  A.  I'm working with what we have in the hospital.  This is our

13  standard tox screen.

14  Q.  Do you usually send them out for the specific analysis of

15  the --

16  A.  Rarely.

17  Q.  Okay.  Thank you.

18          MR. NUWESRA:  I have no other questions.

19          THE COURT:  Anything else?

20          MR. GARLAND:  No, your Honor.

21          THE COURT:  Okay.  Then, Doctor, you may stand down.

22          THE WITNESS:  Thank you.

23          (Witness excused)

24          THE COURT:  I think, folks, because we've got this

25  other matter on and we've reached the end of the doctor's

1    testimony today about 15 minutes earlier than I thought, I'll

2    let you go 15 minutes early.  And that means you're off for the

3    weekend.

4           Now, my guess is that we're pretty close to the end of

5    the trial.  I'm going to have draft jury instructions to the

6    lawyers tomorrow.  Maybe I can get them to come in tomorrow

7    afternoon and we can have a chat about it.  So I'm guessing

8    that sometime early next week, on Monday perhaps, you'll be

9    listening to the summations.  Possibly the charge, but

10   certainly by Tuesday.  So, as promised, a day or two next

11   week.

12          Don't discuss the case over the weekend, "discuss"

13   using the broadest sense of the term.  Keep an open mind.  You

14   haven't heard everything yet.  You haven't heard all of the

15   witnesses; you haven't seen all of the exhibits.  We certainly

16   haven't heard the arguments of the lawyers and you haven't

17   heard my charge on the law.

18          Have a very pleasant, very restful weekend, and I'll

19   see you all on Monday morning.

20          THE DEPUTY CLERK:  Judge, should they bring their

21   binders back?

22          THE COURT:  Yes.  The binders should go back in the

23   jury room, also your notebooks, and we will lock everything up.

24          (Jury excused)

25          (Continued on next page)

```
 1              (In open court; jury not present)

 2              THE COURT:  Okay.  I need you folks to clear out.  But

 3    before that, have a seat.  What are you guys doing tomorrow

 4    afternoon?

 5              MR. NUWESRA:  I'm sorry, your Honor?

 6              THE COURT:  Does it make sense for us to have a

 7    charging conference tomorrow afternoon?

 8              MR. GARLAND:  If I can tell you my problem, your

 9    Honor--

10              THE COURT:  You've got a problem, he's got a problem.

11    Everybody has a problem.

12              MR. GARLAND:  Tomorrow evening I'm leaving on a plane

13    to go visit my son at college over the weekend.

14              THE COURT:  Oh, how much fun.  It is actually.  I used

15    to do it all the time.  I don't have any more sons in college.

16              MR. GARLAND:  Right.  So the flight, I really need to

17    get --

18              THE COURT:  Okay.  All right.  Well, what that means--

19    how many more witnesses do you have?

20              MR. GARLAND:  Two.

21              THE COURT:  Two.  Right.  They're going to be about

22    the same length as these guys?

23              MR. GARLAND:  A little bit longer.  You're talking

24    about Dr. Adler and you're talking about Graham.

25              THE COURT:  Okay.  So they're going to take some more
```

1    time maybe.  All right.  So we're just going to have to cram in

2    a charge conference as soon as you get done.  We're going to

3    have to cram in a charge conference.  You have to be ready to

4    close Monday afternoon.  I think you could close now.  At least

5    I know what you're going to say.  So let's be ready to do that,

6    and then I'll charge Tuesday morning.  I've already told Jim

7    that we'll pick the jury in another matter Wednesday morning.

8    If this jury is deliberating, it will give me something to do

9    while we're waiting for them.

10             All right.  So we'll see you then.

11             MR. GARLAND:  Thank you, your Honor.

12             THE COURT:  I have this really extensive verdict sheet

13   from Ben, who obviously got it from somebody because he's never

14   seen a verdict sheet before because he's brand new.  So good,

15   but brand new.  Nice, but I like general verdicts.  I'm a big

16   fan of general verdicts.  So the odds that I'm going to submit

17   a lot of questions to the jury is somewhere between slim and

18   none.  Okay?

19             MR. GARLAND:  So we'll see that with the proposed jury

20   charge?

21             THE COURT:  I'll get that to you.

22             MR. GARLAND:  All right.

23             THE COURT:  I need to take another pass at the notes

24   that I've been passing him all morning.

25             MR. NUWESRA:  So, your Honor, we're going to have the

1   charging conference and closing arguments on Monday?

2             THE COURT:  Yes, correct.  We'll go right from one to

3   the other.

4             MR. NUWESRA:  Okay.

5             THE COURT:  Yes, we move.  We really move.  And you

6   guys have been very helpful to me.  Thank you.

7             MR. NUWESRA:  Thank you.

8             THE COURT:  Okay.

9             (Adjourned to October 15, 2012, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          INDEX OF EXAMINATION

2   Examination of:                        Page

3   LORETA VERZONILLA

4   Direct By Mr. Nuwesra . . . . . . . . . . 277

5   MERVYN RICHARDSON

6   Direct By Mr. Nuwesra . . . . . . . . . . 283

7   Cross By Mr. Garland . . . . . . . . . . 301

8   Redirect By Mr. Nuwesra . . . . . . . . . 302

9   LISA D. GREENE

10  Direct By Mr. Nuwesra . . . . . . . . . . 304

11  Cross By Mr. Garland . . . . . . . . . . 312

12  MIRNA SANTIAGO

13  Direct By Mr. Nuwesra . . . . . . . . . . 315

14  Cross By Mr. Garland . . . . . . . . . . 323

15  RICHARD STUMACHER MD

16  Direct By Mr. Nuwesra . . . . . . . . . . 328

17  Cross By Mr. Garland . . . . . . . . . . 344

18  NORMA ONDOY

19  Direct By Mr. Garland . . . . . . . . . . 356

20  Cross By Mr. Nuwesra . . . . . . . . . . 377

21  PATRICIA BYRNE

22  Direct By Mr. Garland . . . . . . . . . . 384

23  Cross By Mr. Nuwesra . . . . . . . . . . 419

24  DARRYL ADLER M.D.

25  Direct By Mr. Garland . . . . . . . . . . 438

Cross By Mr. Nuwesra . . . . . . . . . . . . . 445