CAFBMAR1                    Trial

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARLEN MARTINEZ,

                  Plaintiff,

          v.                        10-CV-5163 (CM)

ST. BARNABAS HOSPITAL,

                  Defendant.        Jury Trial

------------------------------x
                                    New York, N.Y.
                                    October 15, 2012
                                    9:42 a.m.

Before:

                    HON. COLLEEN McMAHON,

                                    District Judge

                         APPEARANCES

LAW OFFICES OF LEE NUWESRA
     Attorneys for Plaintiff
BY:  LEE S. NUWESRA, ESQ.

EPSTEIN BECKER & GREEN, P.C.
     Attorneys for Defendant
BY:  DAVID W. GARLAND, ESQ.
     JOHN F. FULLERTON, III, ESQ.

1        (Trial resumed)

2        (In open court; jury not present)

3        THE DEPUTY CLERK:  Case on trial is Martinez v.

4   St. Barnabas, 10 Civ. 5163.  Plaintiff is here; defendant is

5   here; jurors are in the jury room.

6        THE COURT:  Well, somehow miraculously our jurors got

7   in the building.  The marshals must have done a great job

8   because there are a million people picking today and we have a

9   million jurors standing in lines outside the building.

10        So who is our next witness?

11        MR. GARLAND:  Pauline Frances-Lattery.

12        THE COURT:  Ms. Lattery, come on up.

13        Let's get the jurors in the box.

14        MR. NUWESRA:  Your Honor, I have plaintiff's exhibits

15   for the jurors just like the defendants did.

16        THE COURT:  That's fine.  Pass them out.  Put them on

17   the chairs.

18        MR. NUWESRA:  Thank you, your Honor.

19        (Jury present)

20        THE COURT:  Good morning, everyone.  Aside from this

21   being a miserable day, all weekend it was a lovely one and I

22   hope everyone got a lot of rest and had a great weekend.  We

23   are ready to resume.

24        You have two exhibit binders now.  There's a

25   plaintiff's exhibit binder, as well.  Mr. Nuwesra will call

1   your attention to exhibits at various times when he wants to do

2   so.  So you know the rules.  Keep them close until it's time to

3   look at them and then look at only the exhibit that you've been

4   called to look at.

5           Call your next witness, please.

6           MR. GARLAND:  Calling Pauline Frances-Lattery.

7    PAULINE FRANCES-LATTERY,

8       called as a witness by the Defendant,

9       having been duly sworn, testified as follows:

10  DIRECT EXAMINATION

11          THE DEPUTY CLERK:  Please state and spell your name

12  for the record.

13          THE WITNESS:  My name is Pauline Frances-Lattery,

14  L-a-t-t-e-r-y.

15          THE COURT:  Have a seat, ma'am.

16          THE WITNESS:  Thank you.

17          THE COURT:  You're talking to those folks over there

18  in the box.  If you'd use the microphone, I'd be grateful.  So

19  would the court reporter.

20          You may inquire.

21          MR. GARLAND:  Thank you, your Honor.

22  DIRECT EXAMINATION

23  BY MR. GARLAND:

24  Q.  Where are you currently employed?

25  A.  I'm currently employed at St. Barnabas Hospital in the

1   Bronx.

2   Q.  How long have you been working there?

3   A.  I've been working there for over 25 years.

4   Q.  So you started approximately when?

5   A.  In 1997, the 5th of May, I started at St. Barnabas

6   Hospital.

7   Q.  When you started at the hospital, what was your job?

8   A.  I started as a med-surg nurse on the medical-surgical unit.

9   And that was my first position there.

10  Q.  Just briefly, what did you do in that job?

11  A.  In that job I used to-- I was a staff nurse on that floor,

12  reporting to a charge nurse.  I had in my care about eight to

13  nine patients.  I used to work the day shift.

14  Q.  Did you have a next job at St. Barnabas?

15  A.  Yes.  After that I went to the intensive care unit as a

16  staff nurse.  I had been on that unit for about a year and six

17  months.

18  Q.  What did you do in that position?

19  A.  In that position, I was caring for critical care patients

20  of different type of illnesses.  And it depends on what part of

21  the unit I was working.  You could have two patients or, if it

22  was a telemetry unit, I would have five patients.

23  Q.  By the way, what is telemetry?

24  A.  Telemetry is a monitoring unit.  Monitoring means we have

25  leads on the patient's chest where you're monitoring the heart,

1    the pulse, the respiration and blood pressure.  And that level

2    of care is where the nurse and the physicians and other

3    consultants will be caring for that patient, and they require

4    every-four-hour monitoring.

5    Q.  Now, did you have a next job at St. Barnabas?

6    A.  After that I got promoted to the nursing supervisor for a

7    neuro floor, which was the seventh floor.  That was my first

8    management role.

9    Q.  When you refer to the "neuro floor," what does that mean?

10   A.  Patients that were neurological and nurses.  Could be a

11   stroke patient or a patient that had a stroke.  We had the

12   second level of where they had traumatic brain injury, so

13   they're not as acute as they are in I.C.U.  It was really a

14   medical-surgical care.

15   Q.  You said that was your first management job.  So what did

16   you do in that role?

17   A.  In that role, I was a supervisor for about 30 staff

18   members, which consisted of registered nurses, L.P.N.s, nursing

19   attendants and unit clerks on the day shift for eight hours.

20   Q.  For about how long did you stay in that role?

21   A.  I stayed in that role for about a year and six months.

22   Q.  Did you have a next job at St. Barnabas?

23   A.  Then I went to the night shift, after having my second

24   child, as an administrative night supervisor, where my role was

25   to cover the hospital was a second supervisor.

1    Q.  And in that role, covering the hospital as a second

2    supervisor, what does that mean?

3    A.  That role was a larger role.  My responsibility was to

4    oversee the hospital when my director was off.  It was really

5    on the night shift, 11 to 7 shift.  I was the second

6    supervisor, really overseeing the function of the hospital from

7    the nursing aspect along with the physicians.  Really, making

8    sure that the patients' level of care was met.

9    Q.  For about how long did you hold that position?

10   A.  I had that position for about six years.

11   Q.  Did you have a next job then at St. Barnabas?

12   A.  Then I moved back to the intensive care unit, but in a

13   different role.  I became the nurse manager for the intensive

14   care unit.

15   Q.  About when was that?

16   A.  That was in December of 1999.

17   Q.  What did you do in that job?

18   A.  This role -- which I'm presently still in that role -- I

19   was a manager, and I am the manager, of the over-90 staff.  The

20   intensive care unit consists of 36 beds, where we would see

21   acute patients, very acute, traumatic, cardiac, stroke

22   patients.  And then we have another level of care where the

23   patients could be, like, post-op surgeries.  That would be in

24   the telemetry unit.

25   Q.  Briefly describe your educational background.  What degrees

1   do you hold?

2   A.  I have a bachelor's degree in nursing, which I obtained

3   in-- I was trained in Jamaica, where I obtained my nursing and

4   my bachelor's degree in nursing in Jamaica.  And then I

5   acquired my master's in nursing in 2008 in College of New

6   Rochelle.

7   Q.  Focusing on the period of around September 2009, what role

8   were you in then?

9   A.  In 2009 I was a nurse manager for the intensive care unit.

10  Q.  So at that time, who reported to you?  Briefly describe who

11  would report to you.

12  A.  The registered nurses.  I had 92 staff, which consists of

13  about 60 or 62 nurses, of regular nurses.  I had nursing

14  attendants, unit clerks, patient care technicians, monitor

15  watchers.  That's about it really.

16  Q.  Again, same time period, about round September of 2009, who

17  did you report to?

18  A.  I reported then to Cathy Graham, who was the director of

19  nursing.

20  Q.  Now, on or about September 14, 2009, did you become aware

21  that there may have been some Morphine missing in the I.C.U.?

22  A.  Yes.  I made my usual call -- I have 24-hour responsibility

23  for my unit, sir, in the afternoon.  In the evening, I had

24  called my unit just to see how things were going.

25  Q.  Who did you speak with?

1    A.  I spoke with the charge nurse, who then led me to speak to

2    the supervisor who was working that evening.

3    Q.  Who was the supervisor?

4    A.  It was Ms. Norma Ondoy.

5    Q.  What did you learn that evening about apparently missing

6    Morphine?

7    A.  Well, what she had to relate to me were that they were

8    investigating that there was some missing Morphine.  And they

9    were in the process of investigating where it could be, what

10   happened, and reviewing the charts of patients at that time.

11   Q.  What, if anything, did you say to her when you learned

12   that?

13   A.  I said to her definitely get statements from all the

14   persons-- the nurses who were involved and make sure Cathy

15   Graham is aware of that.

16   Q.  Did you have any further involvement that evening in

17   looking into the missing Morphine?

18   A.  No, I did not.

19   Q.  When was your next involvement?

20   A.  The next day.

21   Q.  What happened the next day?

22   A.  Ms. Norma Ondoy had provided all the statements that she

23   had obtained that evening, and it was left in my mailbox for me

24   to follow through to speak to Cathy Graham following that.

25   Q.  You have a black binder in front of you.  I want to ask you

1    to turn to Defendant's Exhibit A, to Tab 8.

2    A.  Could you repeat that again, please?

3    Q.  I'd like you to turn to Defendant's Exhibit 8.  There

4    should be a Tab 8.  It may say DX 8; it may say 8.

5    A.  Yes, I'm there.

6    Q.  You mentioned that the next day when you came in, you

7    received something in your mailbox.

8    A.  Yes.

9    Q.  Looking at the first page of Defendant's Exhibit 8, was

10   that what you were referring to?

11   A.  Yes.  This is what I had received, a copy of what I had

12   received.

13   Q.  Then, if you turn to the next page of Defendant's Exhibit

14   8, was that in your mailbox, as well?

15   A.  Yes, it was.

16   Q.  You also mentioned nurses' statements.  I want to ask you

17   to turn to Defendant's Exhibit 9 in that same notebook.

18   A.  Okay.

19   Q.  Was that statement in your mailbox?

20   A.  Yes, it was.

21   Q.  I want you to turn to Defendant's Exhibit 10, and when you

22   get there, ask you, was that exhibit in your mailbox?

23   A.  Yes, it was.

24   Q.  Now I'm going to ask you to jump all the way to Defendant's

25   Exhibit 26.  Was a copy of that statement in your mailbox?

1   A.  Yes, it was.

2   Q.  Now if you would turn to Defendant's Exhibit 27.  Was a

3   copy of that statement in your mailbox?

4   A.  Yes, it was.

5   Q.  Now I'd like you to turn to Defendant's Exhibit 28.  Was a

6   copy of that statement in your mailbox?

7   A.  Yes, this was in my box.

8   Q.  And then I'd like to ask you to turn to Defendant's Exhibit

9   29.  Was a copy of that statement in your mailbox?

10  A.  Yes, this was in my box.  Yes.

11  Q.  So after you received these documents in your mailbox on

12  the 15th, what did you do next?

13  A.  I had consulted with Cathy Graham and told her that I had

14  obtained all the statements, which she knew what they were.

15  And then we spoke to pharmacy, which consisted of two persons

16  from the pharmacy department -- and my educator then was Agnes

17  Lucero -- and myself, Jose.  At that time we decided to

18  interview the nurses.

19  Q.  Decided to interview which nurses?

20  A.  The nurses from the statements that we had obtained.

21  Q.  Who was it in the pharmacy that you spoke with?

22  A.  Patricia Byrne and Fran Gatto.

23  Q.  What was Patricia Byrne's position?

24  A.  She was a director of the pharmacy department.

25  Q.  And how about Fran Gatto?  What was her position?

1    A.  Fran Gatto was one of the pharmacy consultants.  As far as

2    narcotics were concerned, that's who we used to-- when we have

3    a missing medication, this is the person we would speak to.

4    Q.  You also mentioned Agnes Lucero.  What was Ms. Lucero's

5    role, generally speaking, in September of 2009?  What function

6    did she perform?

7    A.  Agnes Lucero was the intensive care unit educator.  She was

8    the person who did all the critical care training for the

9    I.C.U. nurses which consist of over a six-month period.  She

10   would follow them through on the units.  So she basically was

11   the educator for the I.C.U.

12   Q.  Now, did you and Ms. Byrne, Ms. Gatto and Ms. Lucero then

13   meet with anyone?

14   A.  Yes, we did.  We met with all the nurses individually in

15   the conference room.

16   Q.  What was the purpose of meeting with the individuals--

17   meeting with the nurses individually in the conference room?

18   A.  We had a copy of their statements.  And we went through

19   their statements and we wanted to finalize exactly what

20   happened that evening.  We were trying to further-- continue

21   the investigation of the missing Morphine.

22   Q.  By the way, about what time were these meetings?  Let me

23   ask this:  About what time did those meetings take place?

24   A.  It was, I would say, before-- between 10 and 11:30.  And I

25   don't recall exactly the time, but I remember that particular

1    day, it was Nursing Appreciation Day, and we had to investigate

2    that.  It indefinitely had to be done.  I know it was before

3    lunchtime, though.

4    Q.  Now, following those interviews, what happened next?

5    A.  Following those interviews, Patricia Byrne, the director of

6    pharmacy, had typed up all the-- what was sent to us from each

7    nurse, and it was forwarded to Cathy Graham at that time, if I

8    remember.

9    Q.  What, if anything, did you do next about looking into the

10   missing Morphine?

11   A.  After that I spoke to-- I spoke to Cathy Graham.  I was

12   waiting for the response, what was to be done next, based on

13   the findings from the statements that was obtained.

14   Q.  What were the findings based upon the statements obtained?

15   A.  There was a discrepancy between two nurses.  There was a

16   notation on the narcotics sheet where one nurse before had

17   stated that she had changed the time on it, and then the second

18   nurse that we spoke to regarding that said the same-- the

19   similar story.

20   Q.  Who were those two nurses?

21   A.  That was Cora Fischer I had spoken to first, who had an

22   entry on the narcotic sheet for her patient.  And the time was

23   written over and I asked her who changed the time, and she said

24   she did.

25          The second nurse I spoke to was Marlen Martinez, and

1    Marlen Martinez stated that she had changed the time on the

2    same entry that Ms. Fischer had mentioned.

3    Q.   Were there any other findings that you can recall at the

4    moment from your interviews?

5    A.   There were entries on the narcotics sheets that were blank,

6    and that we had addressed with one of the nurses that we

7    interviewed, Ms. Anna Ricca Libiran.

8    Q.   Did you speak with anyone else in I.C.U. including any

9    doctors in connection with your interviews?

10   A.   At that point in time, Dr. Adler, the director of the

11   intensive care unit, after Patricia Byrne had met with us in

12   the conference room.  And we had looked at what was missing.

13   The determination at that time was to have further testing done

14   on one of the patients.

15   Q.   Explain what you mean by that.

16   A.   Okay.  There was a patient that went for an MRI study

17   coming from the telemetry area, and that particular patient was

18   supposed to have received Ativan to be able to have the MRI

19   done.  Based on how the patient behaved when the patient went

20   down for the test, the patient was agitated and the condition

21   had changed and the test could not have been done.  So the

22   determination was to do further testing on that patient.

23   Q.   Did you speak-- well, when you say the determination was

24   made to have further testing done, what do you mean by that?

25   A.   Dr. Adler had assessed the patient along with the resident

1   and deemed that the patient was-- something-- there was some

2   things done with that patient.  The patient's condition had

3   changed.  So he had ordered a urine specimen for that patient.

4   Q.  After the interviews, did you do anything else besides

5   speaking with Dr. Adler and speaking with Cathy Graham as part

6   of trying to find out what happened to the missing Morphine?

7   A.  No.  I was waiting for instructions from Cathy Graham based

8   on the findings that we had, that we found.

9   Q.  Did you learn during the course of that day the results of

10  the testing that Dr. Adler had ordered?

11  A.  Yes.  We learned from-- Dr. Adler informed us that that

12  patient that came in, this particular patient we were concerned

13  about came in negative to opiates, was positive for opiates in

14  the urine.  And at no time was opiates ever ordered for this

15  patient during the care-- during the time that the patient was

16  admitted to the hospital from emergency room to our care.

17  Q.  Did you share that information with Ms. Graham?

18  A.  Yes, I did, along with-- yes, I did, along with Patricia

19  Byrne.  We both shared it with her.

20  Q.  So what happened next?  You said you were waiting for

21  instructions from Ms. Graham.  What happened next?

22  A.  What happened next is it was deemed that because of the

23  discrepancy in the stories by both nurses, Cora Fischer and

24  Marlen Martinez, that both nurses would be suspended pending

25  investigation because we needed to investigate further as to

1   why was both nurses saying that they made changes and, of

2   course, with the patient being positive for opiates in the

3   urine.  That was part of the further investigation that needed

4   to be done.

5   Q.  Once that determination was made, what did you do next?

6   A.  I was instructed to suspend both nurses.  And we -- at the

7   end of the shift, when both nurses were completed with their

8   shift, that's after 7:00, they were instructed to come to the

9   classroom with a union delegate.  Myself and Norma Ondoy and

10  both nurses along with the union delegate were in the

11  conference room where the suspension was presented to both

12  nurses and their documentation.

13  Q.  Who instructed you to suspend both nurses?

14  A.  Cathy Graham.

15  Q.  So how did-- well, did you do anything to get the two

16  nurses to the conference room?

17  A.  Well, I waited for them to complete their shift.  When I

18  spoke to the nurses while on the unit, I said, "When you're

19  finished with your shift, I need to meet with you in the

20  conference room upstairs.  But please bring a union delegate,

21  and myself and someone from administration will be meeting with

22  you."

23  Q.  You had that conversation with Ms. Fischer?

24  A.  With Ms. Fischer and with Marlen Martinez.

25  Q.  And did Ms. Martinez say anything to you when you told her

1   that?

2   A.  I don't recall.

3   Q.  Now, what happened next in terms of moving the time line

4   forward?  Was there a meeting in the conference room?

5   A.  Yeah.  Both nurses came to the conference room, met with

6   me, Ms. Ondoy and Lisa Greene, the union delegate.  I relayed

7   to both nurses what the suspension was going to be about.

8   "We're suspending both of you because there was a discrepancy

9   in your stories until further investigation."  And Lisa Greene,

10  the union delegate, was present.

11         The union delegate, Lisa, asked us to step out.  On

12  stepping out of the room, myself and Ms. Ondoy, there was words

13  exchanged between both nurses:  "You didn't tell me."  I don't

14  recall who was saying what, but that's what I overheard on

15  exiting the room.

16  Q.  Now, did you say you had actually prepared written

17  suspension notices?

18  A.  I beg your pardon?

19  Q.  Did you actually prepare written suspension notices?

20  A.  Yes, I did.

21  Q.  I'm going to ask you, in the black notebook in front of

22  you, to turn to, first, Defendant's Exhibit 17.

23         Is that the suspension notice that you prepared for

24  Ms. Fischer?

25  A.  Yes, it is.

1  Q.  Now, I want to ask you specifically with regard to what is

2  written in the "details" section.  Whose handwriting is that?

3  A.  That's my handwriting.

4  Q.  Since it's your handwriting, would you please read verbatim

5  what you wrote in that detailed section?

6  A.  "Conflicting story"-- "Number 1, Conflicting story.

7          "Two, not telling the truth.  Stated that she was the

8  one who changed the time on the drug disposition record and

9  24-hour nursing audit form."  And see attachment. There was an

10  attachment to this.

11  Q.  Do you recall what that attachment was?

12  A.  That was a copy of the narcotic sheet, the drug disposition

13  record.  That was a copy of it.

14  Q.  Then is your signature on this form?

15  A.  My signature's on top, R.N. nurse manager; Pauline Lattery,

16  R.N. nurse manager; and below is Catherine Graham.

17  Q.  Then let me ask you next to turn in that same notebook to

18  Defendant's Exhibit 15.

19          Is that another suspension notice that you prepared on

20  September 15?

21  A.  Yes, I did.

22  Q.  Who was that suspension notice directed to?

23  A.  Marlen Martinez.

24  Q.  Again in the "Details" section, do you know whose

25  handwriting appears there?

1   A.  That was my handwriting.

2   Q.  Again, since it's your handwriting, would you please read

3   for the jury what it is that you wrote in the "Details"

4   section?

5   A.  Okay.  "Conflicting story.  Stated she changed the time on

6   the narcotic sheet.  There is evidence of positive opiates on

7   patient in 527A who was under her care.  The scheduled

8   procedure for this patient was done.  The patient's blood

9   pressure had dropped 80/40.  Please see attachment."

10  Q.  Again, there doesn't appear to be an attachment here in

11  this exhibit.

12  A.  No.

13  Q.  Do you recall what the attachment was?

14  A.  I believe it was the-- a copy of the narcotic sheets and a

15  copy-- I don't recall if the second copy was a copy of the

16  opiate results of the patient.

17  Q.  Is your signature on this suspension notice?

18  A.  Yes, it is.

19  Q.  Now, after this meeting that you had with Ms. Fischer and

20  Ms. Martinez, and also Ms. Ondoy was present and Ms. Greene was

21  present, did you have any further involvement in trying to find

22  out what happened to the missing Morphine?

23  A.  We-- after that day there was an investigation continuously

24  going on.  What happened was --

25  Q.  Well, did you have any personal involvement in that?

1    A.  No, I did not, not alone.  It was myself and the pharmacy.

2    Q.  Then let's go back to the meeting.  You mentioned Ms. Ondoy

3    was there at the suspension meeting with you, Ms. Greene,

4    Ms. Fischer and Ms. Martinez.

5    A.  Right.

6    Q.  Why did you want Ms. Ondoy there?

7    A.  Cathy Graham had stated that I need a representative from

8    administration.  And she was the administrator supervisor

9    scheduled that evening, so I had asked her to be present while

10   I had to give the discipline.

11   Q.  Let's change subject matters now altogether.  And I want to

12   ask you, focusing now on the period between around 2002 and

13   2009, September of 2009.  Were there times that there would be

14   a charge nurse or nurses working in the I.C.U.?

15   A.  Yes there was.

16   Q.  Now, first, during that time frame, what is a charge nurse?

17   A.  The charge nurse's role in the I.C.U. was to oversee the

18   functionality of the unit, which involves ensuring that the

19   assignment for each nurse was done, nursing attendant, unit

20   clerk, PCT, patient care tech, was set and with their break

21   time.  To really run the unit to make sure we're getting

22   admissions and discharge and every patient was cared for and to

23   do rounds with the attending on each patient.  That's it in a

24   nutshell.

25   Q.  Now, again, focusing on that same period, but let's focus

1    now a little more precisely toward the beginning of that

2    period, so closer to 2002 than September 2009.

3            Did you know what the process was then of how a charge

4    nurse in the I.C.U. would be selected?

5    A.   The charge nurse in the I.C.U. was selected on rotation.

6    They had a rotation book that was kept; that if you were in

7    charge, you would log it in and it's your turn to be in charge.

8    So it was really on a rotation basis.

9    Q.   And when you say "rotation," who rotated?

10   A.   All the nurses are rotated to that role.

11   Q.   Including Ms. Martinez?

12   A.   Yes.

13   Q.   At some point during that period between 2002 and September

14   2009, did the selection process for who was going to be the

15   charge nurse change?

16   A.   Yes, it did.

17   Q.   How did it change?

18   A.   It changed-- the administration and the attendings and the

19   trauma attendings came to me.  And because the unit was getting

20   so extremely busy, they had said, "Pauline, we're going to have

21   to have the role of the charge nurse changed.  I want really

22   the more senior nurses, the experienced nurses, in that role to

23   run that unit."  That was a meeting they had with me as a

24   manager and Dr. Adler as a director of nursing.  And because we

25   were projected to look at other-- to admit other types of

1   patients, because we were going to become a chest pain unit,

2   there was going to be a lot more admissions and discharges, so

3   they wanted certain nurses to be in that role.

4   Q.  What was your role in selecting who would be the charge

5   nurse?

6   A.  My role was to suggest some of the nurses.  I was not the

7   final decision-maker.  It was decided on as a committee,

8   because the interaction of the nurse with our departments --

9   would be the ER, the OR and the trauma doctor -- was a big

10  thing.  When I spoke at that time at the meeting, those were

11  the other parties that were at the meeting.  And they wanted

12  charge nurses that they would be able to communicate very

13  easily with and be able to get things done in a fluent manner.

14  Q.  When you say you had some input --

15  A.  I had some input, but the greater input really came from

16  the administrative body as far as who should be in that role.

17  Q.  What was your input, though, in terms of-- were there any

18  criteria that you considered when you were providing your input

19  as to who should be selected as a charge nurse?

20  A.  Well, the charge nurse-- I looked at the nurses who had the

21  capability of doing it.  Not everyone likes to be in charge.  I

22  looked at the nurse who would be-- and who will be able to

23  interact with other departments and would not be a hindrance in

24  trying to get the patients admitted and discharged and whatever

25  care they needed.

1          So my role as a manager is to look at my nurses across

2     the board.  And most of these nurses were the more senior

3     nurses because they had the most experience in that role.

4     Q.  And when you say most senior, what does that mean?  What do

5     you mean specifically by that?

6     A.  Years of experience.  I have a lot of nurses in my I.C.U.

7     who have been there for over 20 years.  And 18 to 20 years is a

8     majority of my nurses.  I do have nurses who are younger than

9     that, you know, in that role.

10    Q.  Did Ms. Martinez ever speak with you about who was selected

11    as a charge nurse following what you're now describing?

12    A.  She had mentioned it once, why she wasn't selected in that

13    role.  And she had mentioned she felt like she should have been

14    in that role, because during the time when we did not see--

15    when we had a rotation, she was in charge for those occasions.

16    Q.  Did you respond at all to what she said about that?

17    A.  I had mentioned to her why the selection had been done, but

18    that they had changed the role of the charge nurse and they

19    wanted to select a core of certain type of-- certain nurses for

20    that role.

21    Q.  Now, was there a nurse by the name of Laurie Verzonilla who

22    worked in the I.C.U. back in 2009?

23    A.  Yes, there is.

24    Q.  Did there come a time when there was an issue or a problem

25    with one of the patients for whom she was caring who was

1   suffering from a traumatic brain injury?

2   A.  Yes, there was.

3   Q.  Did you have any role in following up with her following

4   that incident?

5   A.  Yes.  As a result of the incident, which went to a root

6   cause analysis, it was deemed that her skills needed to be

7   upgraded.  It was not sharp enough in addressing-- in

8   recognizing this traumatic brain injury patient.  And that was

9   obtained through the root cause analysis team.

10  Q.  So can you describe it in a little more detail then?  What

11  happened following the root cause analysis?  Specifically with

12  regard to Ms. Verzonilla, what, if anything, she had to do.

13  A.  After the root cause analysis, what was done, she had to

14  reeducate herself on traumatic brain injury patients, mainly

15  looking at why -- when the patient is getting ill or the

16  condition is changing, recognizing the signs and symptoms.

17  Like when the temperature is going up or if the patient's

18  responsiveness is different.

19          Those are a few and there's a lot more she had to

20  address.  She had to review the cases and, also, she had to

21  present -- do a PowerPoint presentation to the intensive care

22  unit.  She works mainly the night shift, so she'll come on the

23  day shift.  And she did -- at that time did in-service to all

24  of the nurses in the classroom with a PowerPoint presentation

25  with the support of the director of nursing as well as the

1    director of I.C.U., medical director, Dr. Adler.  And she

2    educated both the day nurses and the night nurses.

3              In conjunction to that, she had to do a QI for the

4    traumatic brain injury by monitoring all TBI patients.  And

5    that was monitored closely, filling out all those forms,

6    addressing each individual patient.

7    Q.  You just used the letters, I think, "QI."  What is that?

8    A.  Quality assurance.  It's really monitoring of, in this

9    instance -- it's like a performance improvement.  She was

10   looking at all traumatic brain injury patients to recognize the

11   same type of illness as a form of performance improvement.  It

12   could be QI or quality improvement or performance improvement,

13   PI.

14   Q.  Did you ever perform an annual performance appraisal for

15   Ms. Martinez?

16   A.  Yes, I did.

17   Q.  Did you perform one in 2009?

18   A.  No, I did not.

19   Q.  Why did the not?

20   A.  Because that year the evaluations were changed.  They were

21   due October of each year, and I had until October the 31st to

22   do it of 2009.

23   Q.  So did you ever then speak with Ms. Martinez about her

24   performance evaluation in 2009?

25   A.  I didn't have that conversation with her in 2009, no.

1  Q.  Did you have a conversation with her in 2009 where she was

2  talking about being treated unfairly in the workplace and that

3  you told her she should go see --

4           MR. NUWESRA:  Objection, your Honor.  Leading.

5           THE COURT:  The objection is sustained.

6  Q.  Did you have any conversation in 2009 with Ms. Martinez

7  where you --

8           THE COURT:  About the issue of how she was being

9  treated in the workplace.  Did you have any such conversation

10  in 2009?  Let's start with the general.

11           MR. GARLAND:  Thank you, your Honor.

12  A.   The only conversation Ms. Martinez had with me is in the

13  in-charge role, where she felt that she should have been in

14  charge in the I.C.U.  That's the only-- I didn't have any other

15  conversation with her.

16  Q.  And the one about the charge nurse that you described a

17  little while ago?

18  A.   The charge nurse role, because it was, as I said, for the

19  most senior nurses at that time.  Ms. Martinez was one of our

20  junior nurses and quite often she was floated to the emergency

21  room, to other units, mainly because our more senior nurses, 18

22  and above, are according to the 1999 contracts.  Those are

23  nurses that never floated.  So the chances of her consistently

24  being in charge when we selected and narrowed it down to those

25  nurses was not as frequent as-- you know, she wasn't in that

1   role.

2           MR. GARLAND:  Your Honor, I just want one quick

3   moment.  I may be done.

4   Q.  One last question or two.

5           Going back to the charge nurse selection, do you

6   recall approximately what year that took place?

7   A.  In 2008 we started-- 2008 we started having a selection of

8   core nurses to be in that role.

9   Q.  Do you recall approximately how many nurses were selected

10  for that role?

11  A.  Approximately four nurses were selected for that role.

12  Q.  And at that time approximately how many nurses worked in

13  the I.C.U.?

14  A.  About 64.  Sixty-four R.N.s.

15          MR. GARLAND:  No further questions, your Honor.

16          THE COURT:  Mr. Nuwesra.

17          MR. NUWESRA:  Thank you, your Honor.

18  CROSS-EXAMINATION

19  BY MR. NUWESRA:

20  Q.  Good morning, Ms. Frances-Lattery.

21  A.  Good morning.

22  Q.  Can you hear me?

23  A.  Yes, I can.

24  Q.  My name is Lee Nuwesra and I represent Ms. Martinez in this

25  case.

1   A.  Sure.

2   Q.  Did I hear you right when-- did you testify earlier that

3   you are from Jamaica?

4   A.  I grew up in Jamaica, yes.

5   Q.  Were you born in Jamaica?

6   A.  I was born in England.

7   Q.  In England?

8   A.  Yes.

9   Q.  So what would you consider your ethnicity or national

10  origin to be?

11  A.  West Indian.

12  Q.  Okay.  Now, I want to bring your attention to the-- to

13  September 15th of 2009.

14  A.  Sure.

15  Q.  Can you tell me, when was it that you found the statements

16  of the nurses in your box?  What time?

17  A.  I usually get to work by 6:30.  My shift starts at 7.  I

18  went to the nursing office, which my mailbox was in the nursing

19  office, around a few-- a quarter-- I would say about a few

20  minutes to 7.  That's the time I collected the envelope for my

21  mailbox.

22              (Continued on next page)

23

24

25

1  BY MR. NUWESRA:

2  Q.  You said that you recall that that day was nurses

3  appreciation day?

4  A.  Yes, I do remember it was.

5  Q.  What does nurses appreciation day entail?

6  A.  Actually it's employee appreciation day.  Employee

7  appreciation day was for all the employees of St. Barnabas

8  where they would have a picnic outside and all the employees

9  could go down and take part in it.  They would get lunch.  Some

10  would get a gift.  It depends on what's happening.

11  Q.  Who takes care of the patients?

12  A.  Who takes care of the patients, the nurses and the doctors.

13  Q.  Would you still have a full line of nurses taking care of

14  the patients; during this appreciation you still have the same

15  amount of nurses covering the units?

16  A.  They are going downstairs on their lunchtime to attend

17  this.

18  Q.  How long is a nurse's lunch break?

19  A.  It's an hour.

20  Q.  By what time on 15 September 2009 did you get with

21  Ms. Byrne, Ms. Gatto and Ms. Lucero?

22  A.  I remember it was before 12:00, I would say from the hour

23  of 10, 10, 10:30; I recall it was before 12:00.

24  Q.  Were all the nurses present on that date?  Were they all

25  scheduled to work that were involved in this investigation?

1   A.  No; one nurse had to come from home.

2   Q.  Which one is that?

3   A.  AnaRicca Libiran.

4   Q.  What time was her interview?

5   A.  I don't recall exactly what time.

6   Q.  Isn't it a fact you interviewed my client between 2 and

7   3:00 in the afternoon on that day?

8   A.  I don't recall what time I interviewed her.

9   Q.  Did you interview Ms. Fischer before you interviewed my

10  client?

11  A.  I believe I did interview Ms. Fischer before I interviewed

12  Ms. Martinez, yes.

13  Q.  At what time did you -- withdrawn.  Isn't it a fact that

14  you discussed with Dr. Adler the issue of patient N with

15  respect to the MRI after you concluded all the interviews with

16  all the different nurses that were involved?

17  A.  Dr. Adler was present with us in the conference room

18  because he was invited after we finished speaking to all the

19  nurses so all of us were there.  That's when we discovered

20  that.  I didn't speak to Dr. Adler before that time.

21  Q.  So I understand you, would it be fair to say that you

22  talked to Dr. Adler after you interviewed all the nurses

23  including my client?

24  A.  Yes.

25  Q.  Was that the very first time that you spoke to Dr. Adler

1    regarding patient N's situation the day before with respect to

2    the MRI?

3    A.   When we interviewed on the 15th was the first time I spoke

4    to Dr. Adler.

5    Q.   Did you ever tell Ms. Byrne that the toxicology result

6    showed patient N on 15 September showed positive for morphine?

7    A.   I was not the person who relayed that to her.  The result

8    was obtained and Dr. Adler was the one who relayed that to her.

9    Q.   But isn't it a fact Dr. Adler did not request those

10   toxicology tests for patient N until after you all the nurses

11   were interviewed?

12   A.   He was at the conference after the nurses were interviewed;

13   that's when it was ordered, yes.

14   Q.   How do you know Dr. Adler related to Ms. Byrne that patient

15   N showed positive for morphine on 15 September 2009?

16   A.   Could you repeat the question.

17   Q.   How do you know that it was Dr. Adler who related to

18   Ms. Byrne that the toxicology result, report of patient N on 15

19   September 2009 was the one that related that it was positive

20   for morphine to Ms. Byrne?

21   A.   We are all present when the result came back and he was the

22   one that related to us that it was positive.

23   Q.   What time was this?

24   A.   I don't recall exactly what time it was.

25   Q.   Dr. Adler told everybody at the meeting that patient N's

1   toxicology results showed that she was positive for morphine?

2   A.   Positive for opiates, yes.

3   Q.   Isn't it a fact being positive for opiates and being

4   positive for morphine is two different things?

5   A.   As far as I recall, this patient was never ordered morphine

6   or any form of opiates from admission to present.  The urine

7   specimen from what I recall for what was relayed to me was

8   always negative; the patient suddenly became positive.

9           THE COURT:  Got that.  The question is is it possible

10  to be positive for opiates other than morphine; can you get a

11  positive for opiates if you are given a drug other than

12  morphine?

13          THE WITNESS:  Yes.

14          THE COURT:  You have to be given some opiate in order

15  to test positive for morphine.

16          THE WITNESS:  Yes.

17          THE COURT:  Morphine is an opiate.

18          THE WITNESS:  Yes.

19  BY MR. NUWESRA:

20  Q.   Would you please look at DX Exhibit 17 which you looked at

21  earlier regarding Ms. Fischer's suspension.  Can you tell me

22  what date did you sign that suspension notice?

23  A.   On 15 September 2009.

24  Q.   Does Ms. Graham's signature appear there?

25  A.   Yes.

1   Q.  Did she sign it on September 15, 2009?

2   A.  She was not present with me that day, Ms. Norma Ondoy was

3   present.

4   Q.  When was it that Ms. Graham signed it?

5   A.  Ms. Graham signed it I believe the next day.

6   Q.  Look at exhibit DX 15.  This is regarding the suspension

7   notice as it relates to my client Ms. Martinez, right?

8   A.  Yes.

9   Q.  You signed that correct?

10  A.  Yes, I did.

11  Q.  What's the date you signed?

12  A.  9/15/2009.

13  Q.  Does Ms. Graham's signature appear there too?

14  A.  Yes, it does.

15  Q.  When did Ms. Graham sign that?

16  A.  She signed it the next day.

17  Q.  You stated that at the time you prepared this there were

18  two attachments to it, correct?

19  A.  Yes.

20  Q.  One was the medication, the medication, the log-in sheet

21  for the medication?

22  A.  The narcotics sheet, a copy of the administration, the

23  narcotics sheet, yes.

24  Q.  You also testified that also the results of patient N's

25  drug testing for 15 September were also attached, correct?

1  A.  Yes.

2  Q.  Can you tell who me sits on this committee that decides who

3  should be a charge nurse in ICU?

4  A.  Who sits on the committee who decided at that time to be

5  charge nurse was myself, Cathy Graham, the director of

6  intensive care unit Dr. Adler at the time.

7  Q.  Anybody else?

8  A.  Those are the three persons I recall were at the meeting.

9  Q.  Isn't it a fact that on September 17, 09 the same patient,

10  patient N couldn't have her MRI done because of agitation?

11  A.  I don't recall.

12  Q.  Would anything refresh your recollection?

13  A.  I really don't recall.

14  Q.  Look at what is in front of you which is patient N's

15  medical chart.  Look at SB 0448 and tell me if that refreshes

16  your recollection as to whether patient N could not do her MRI

17  on this date?

18  A.  Repeat the number.

19  Q.  SB, see the numbers on the bottom?

20  A.  Yes.

21  Q.  0448.

22  A.  I am there.

23  Q.  Does that now refresh your recollection that patient N

24  could not have her MRI done on that day?

25  A.  No, it does not.

1   Q.  Look at the following page SB 04449, do you see the note

2   from Dr. Stumacher?

3   A.  Yes.

4   Q.  Read it to yourself and let me know if that refreshes your

5   recollection that she could not have an MRI done?

6   A.  I am not able to make this out and I don't recall anything

7   from this.

8   Q.  Isn't it a fact that on 9/15/2009 patient N was under the

9   care of Ms. Fischer not Ms. Martinez?

10  A.  As far as I recall if --

11          THE COURT:  The question is does that jog your memory

12  that Ms. Fischer was the nurse in charge of this patient; does

13  it, yes or no?

14          THE WITNESS:  I don't recall, I don't.

15          THE COURT:  It doesn't jog her memory.  Next question.

16  Q.  Can you look at SB 0706.

17  A.  What's the number again.

18  Q.  SB 0706.  Does that now refresh your recollection that

19  Ms. Fischer was taking care of patient N on that day?

20  A.  According to the documentation there is a notation that

21  this patient was under her care on the 15th.

22          MR. GARLAND:  Objection; I don't know if it refreshes

23  her recollection or she is just reading the record.

24          THE COURT:  Do you have an independent recollection,

25  ma'am.  Give me those pieces of paper.

1        THE WITNESS:  No, I don't.

2        THE COURT:  Do you have a memory yourself?

3        THE WITNESS:  Of her care, no, I don't.

4        THE COURT:  OK.  Thank you.

5   Q.  Can you tell me in your experience as a nurse for the past

6   25-plus years, can you tell us what it means when a nurse

7   writes the number 2 and the degree on top of it?  Does the

8   number 2 with a degree sign on it mean secondary in nursing

9   jargon, secondary to?

10  A.  That's the terminology usually written by physicians.

11  Q.  Would physicians write 2 with a degree sign meaning

12  secondary to?

13  A.  Yes, I have seen it written that way, yes.

14  Q.  Can you tell us when a nurse or healthcare provider writes

15  the letters F/U what that stands for?

16  A.  F/U usually means follow up.

17  Q.  When you met at the conclusion of the meeting, the first

18  investigatory step on 15 September with Ms. Byrne and Dr.

19  Adler, was anybody else there?

20  A.  Agnes Lucero was with me, the educator, and Fran Gatto, the

21  narcotics pharmacist.

22  Q.  Dr. Adler was there?

23  A.  Dr. Adler was not for the whole time but he came in towards

24  the end.

25  Q.  Isn't it a fact Dr. Adler was never there when you

1    interviewed the nurses?

2    A.  No, not for the whole time, no.

3              MR. NUWESRA:  Your Honor, may I check with my client.

4              THE COURT:  Surely.

5              (Pause)

6              MR. NUWESRA:  Thank you, your Honor, I have no other

7    questions at this time.

8              MR. GARLAND:  Nothing further.

9              THE COURT:  You may step down.

10             Call your next witness.

11             MR. GARLAND:  Catherine Graham.

12    CATHERINE GRAHAM,

13        called as a witness by the Defendant,

14        having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. GARLAND:

17   Q.  Where do you currently work?

18   A.  St. Barnabas Hospital in the Bronx.

19   Q.  What's your current role at St. Barnabas?

20   A.  Senior vice president of operations.

21             THE COURT:  Move closer to that microphone so we can

22   all hear you more clearly.

23   A.  Senior vice president of operations.

24   Q.  How long have you been working at St. Barnabas?

25   A.  Since 1984.

Caf4mar2                    Graham - direct

1    Q.  When you began working at the hospital in 1984 what was

2    your first position?

3    A.  Registered nurse, staff nurse.

4    Q.  In a particular area of the hospital?

5    A.  Med-surg, medical-surgical unit.

6    Q.  What is the medical-surgical unit?

7    A.  It's not an area of specialty.  If somebody has a medical

8    condition or they have surgery, they would go to a unit like

9    that.

10   Q.  Prior to your beginning in that position what was your

11   educational and licensing background?

12   A.  Registered nurse licensed by the State of New York, diploma

13   graduate of the school of nursing.

14   Q.  How long did you work in that medical-surgical position?

15   A.  Six years.

16   Q.  Did you have another position, a next position then at the

17   hospital?

18   A.  I then became the nurse recruiter.

19   Q.  When you became nurse recruiter, what did you do in that

20   role?

21   A.  Tried to recruit nurses both locally and abroad and fill

22   vacancies, assist with transfers from to one position to

23   another, and work on retention of staff.

24   Q.  For about how long did you do that?

25   A.  I kept the title of nurse recruiter for about three years.

1  My title changed in 1993 to assistant director of nursing, but

2  I still was responsible for recruitment and retention.

3  Q.  When your title changed did you have additional

4  responsibilities?

5  A.  Yes, I was put in charge of staffing all the nursing units

6  for the hospital.

7  Q.  What does that involve?

8  A.  Involved knowing your staff, what their backgrounds were,

9  making sure you had adequate skilled competent nurses on the

10  right unit so that the complexity of the patient care matched

11  the background of the nurse that would take care of them.

12  Q.  Did you have other responsibilities as assistant director

13  of nursing?

14  A.  No, pretty much staffing the hospital and recruiting nurses

15  was a pretty full plate as far as I am concerned.

16  Q.  Did you have a next job after that at St. Barnabas?

17  A.  Yes.  Following that I became director of nursing.

18  Q.  Approximately when did you become director of nursing?

19  A.  I believe it was around 1997.

20  Q.  Did your responsibilities change at all when you became

21  director of nursing?

22  A.  Yes.

23  Q.  How did they change?

24  A.  I was responsible to do the budget for the entire nursing

25  department, work with the president and executive staff of the

1    hospital to make sure we were taking good care of our patients,

2    and I also had report to the board of trustees.

3    Q.   For about how long did you remain in the director of

4    nursing position?

5    A.   For approximately three years.

6    Q.   Did you have a next position at St. Barnabas?

7    A.   Yes.

8    Q.   What was that?

9    A.   I became senior vice president and director of nursing.

10   Q.   When you became senior vice president and director of

11   nursing did your responsibilities change?

12   A.   Yes, because I also was given other units to be responsible

13   for, other services.

14   Q.   What is other units and services?

15   A.   I have given environmental services which covers

16   housekeeping, laundry and gardens and grounds; in addition, I

17   was given cardiopulmonary which is respiratory therapy, and

18   cardiac therapy.

19   Q.   Generally what other responsibilities did you have then for

20   these other units or departments?

21   A.   Pretty much the same, to assist with retention of those

22   employees, to do their budgets; that's pretty much the same as

23   I did for the nursing department.

24   Q.   How long did you remain in the senior vice president and

25   director of nursing position?

Caf4mar2                    Graham - direct

1    A.  Up until about a year, year and a half, two years ago.

2    Q.  What did your position then become at that time?

3    A.  I then became senior vice president of operations.

4    Q.  What were your responsibilities in that role?

5    A.  I took over different departments and then no longer

6    oversaw nursing, so, about a year and a half to two years ago I

7    was given other departments such as the pharmacy, the

8    laboratory, nutrition services, physical therapy and

9    occupational therapy, and I still retained housekeeping

10   cardiopulmonary.

11   Q.  Is that your current role?

12   A.  Yes, that's my current role.

13   Q.  I want to go back in time to when you had recruiting

14   responsibilities and I think you had said then you had

15   recruiting responsibilities locally and abroad.  What do you

16   mean by that?

17   A.  When I took the position as nurse recruiter, I was given an

18   orientation by the previous recruiter who was retiring.  She

19   taught me how to do local recruitment, what credentials I would

20   have to look for in nurses, and then St. Barnabas at that time

21   in 1990 had contracted with two different agencies to recruit

22   nurses from overseas.

23   Q.  Did St. Barnabas at that time recruit nurses from

24   Philippines?

25   A.  Yes, they did.

1  Q.  Why was that?

2  A.  First of all, they were available; second of all, the

3  educational background qualified them to sit for the New York

4  State licensure exam.

5  Q.  You also mentioned you were recruiting locally; why were

6  you recruiting in the Philippines when you were recruiting

7  locally?

8  A.  Because we had many, many vacancies that we could not fill

9  through local recruitment.  We were not getting enough

10  applicants or we weren't getting appropriately qualified

11  applicants.

12  Q.  When you say recruiting locally geographically what do you

13  mean by that?

14  A.  Locally means in the metropolitan area, including New

15  Jersey, Connecticut, and locally I guess it's not local but

16  closer than the Philippines, I even went as far as Canada to

17  recruit nurses to fill our vacancies.

18  Q.  Did you recruit in New York?

19  A.  Surely, yes.

20  Q.  Where graphically within New York?

21  A.  All the boroughs of New York.  I went to Connecticut,

22  University of Connecticut, I would go to career days, job

23  fairs, mostly recruiting from schools and job fairs and

24  advertising.

25  Q.  Did you have in your various roles the opportunity to work

1    with Marlen Martinez?

2    A.  If you mean work with, she was one of my staff nurses when

3    I was director of nursing.

4    Q.  When you were director of nursing about how many staff

5    nurses did you have?

6    A.  About 240.

7    Q.  How would you describe your relationship with Ms. Martinez?

8    A.  Good, positive.

9    Q.  Why do you say that?

10   A.  Number 1, she was a very good nurse; number 2, I enjoyed

11   speaking with her, and she would tell me some things about

12   herself, related to her work or related to her family.  I liked

13   her.

14   Q.  When she talked to you about things -- where was it that

15   you would talk to her in the hospital?

16   A.  Various places.  I have what they call an open door policy.

17   My office was on the 6th floor.  Across the hall from my office

18   was the payroll department.  Quite often if nursing staff had

19   questions about their paychecks, they would come up to the

20   payroll office, and a lot of times they would stop by my office

21   to chat.  I was also very visible on the nursing units and so I

22   would make rounds quite often and whatever area Marlen was

23   working, I would see her and chat with her.

24   Q.  What sorts of things did you chat about with her when you

25   would see her?

Caf4mar2                     Graham - direct

1    A.  Sometimes she would be working in units that was not her

2    regular unit so we would talk about the fact that she got

3    floated.  Sometimes she would tell me about the health of her

4    father.  She was also completing her master's degree and we

5    would chat about that.

6    Q.  When you say you chatted with here about getting floated,

7    what did she say to you and what did you say to her?

8    A.  Well, her home unit was the intensive care unit.  Quite

9    often I would see her working in the emergency department which

10   she was qualified to do.  Actually I was thankful to see her

11   there because she always seemed to have a very positive

12   attitude even though she was floating.

13   Q.  Did you know why she was floating?

14   A.  The reason usual reason for floating nurses is that there

15   is a hole shall we say where we need an additional, there are

16   not enough nurses on a specific unit or because of operational

17   reasons or clinical reasons, you need an additional nurse, so

18   then you would float a nurse who was not regularly scheduled to

19   work there but was competent to work in that area.

20   Q.  Was Ms. Martinez a member of a union?

21   A.  Yes, she was a member of 1199.

22   Q.  What if anything did her membership in the union have to do

23   with where she would be assigned whether she was floating?

24   A.  Sometimes floating had to do with seniority.

25   Q.  Explain what you mean by that.

1  A.  If two nurses had like training and like competency and we

2  needed one nurse to float and neither wanted to volunteer, then

3  it would be the nurse with the least seniority who would float.

4  Q.  Why?

5  A.  That was written within their contract.

6  Q.  The union contract?

7  A.  The union contract, yes.

8  Q.  During the time that you were senior vice president with

9  responsibility for the nurses, did you have some familiarity

10  with the hospital's medication error policy?

11  A.  Yes.

12  Q.  You have a black notebook in front of you.  I would like to

13  ask you to turn to Defendant Exhibit 2, tab 2, DX 2.  That's a

14  copy of the hospital's medication error policy?

15  A.  Yes, it is.

16  Q.  Explain to the jury generally what the policy provided,

17  what the medication error policy provided?

18  A.  It provided guidelines that in the event that an error was

19  made, what steps should be taken.

20  Q.  In the event an error was made, what steps should be taken

21  and by whom?

22  A.  If an individual either made a medication error that they

23  were aware of or witnessed a medication error, then the first

24  thing they should do is assess the patient, the second thing

25  they should do is notify the physician, and the third thing

1   they should do is notify their superior.

2   Q.  Let's look at the policy itself, Defendant Exhibit 2.  Do

3   you see the very first paragraph says the policy is as follows;

4   all medication errors shall be identified, reported and

5   corrected immediately to prevent any adverse patient outcome?

6   A.  Correct.

7   Q.  Then section A there is a definition of medication error;

8   section A is definition of medication error?

9   A.  Yes.

10  Q.  There is this whole, 17 numbers that follow under the

11  medication error section?

12  A.  Correct.

13  Q.  Coming down to number 9, one of those errors would be the

14  wrong medication or solution?

15  A.  Correct.

16  Q.  The next number 10 would be an unordered medication or

17  solution?

18  A.  Correct.

19  Q.  Then next section, section B, has the heading reporting of

20  medication error?

21  A.  Yes.

22  Q.  In that section it describes what the nurse should do when

23  there is a medication error?

24  A.  Correct.

25  Q.  What was the underlying reason or policy for the hospital

1  wanting nurses to report medication errors?

2  A.  To protect the patient.

3  Q.  By reporting the error how could the patient be protected?

4  A.  By being clinically assessed by the physician.

5  Q.  I want to turn attention to September 14, 2009.  On that

6  day did you become aware that there was apparently some

7  morphine missing from the ICU?

8  A.  Yes.

9  Q.  How did you become aware of that?

10  A.  I was called by Norma Ondoy, my evening nurse and

11  supervisor, that the narcotics count was not correct.

12  Q.  Did you learn anything else that evening about the

13  apparently missing morphine?

14  A.  I don't know what you mean.

15  Q.  Aside from, did you learn anything else from speaking with

16  Ms. Ondoy that evening about the apparently missing morphine?

17  A.  Yes.

18  Q.  What did you learn that evening, still on the 14th?

19  A.  Apparently a nurse had a STAT order for morphine for her

20  patient, and when she went to the narcotics box and opened the

21  narcotics box, she immediately thought something was wrong,

22  because she could see that a previous number of morphine -- let

23  me back up.  She went to take the morphine out and noticed that

24  no morphine had been signed out on the narcotics sheet but the

25  count was different than before.

1    Q.  What if anything did you do that evening when you learned

2    that information?

3    A.  I asked Norma Ondoy to, first of all, they held all the

4    nurses in the ICU until they could figure out whether somebody

5    had given it and forgotten to sign it out.  They had already

6    done that.  Every nurse had said they had not taken out the

7    morphine, so we asked for statements from the nurses that were

8    working in that particular district where the narcotics were

9    missing.

10   Q.  Was there anything else you did that evening after learning

11   about what you described?

12   A.  Norma Ondoy also told me that in the medication room, when

13   you give an injection you have to dispose of a syringe, or in

14   this instance it's called a tubex, a glass tube with medication

15   in it with a needle on the end.  The normal way to discard of

16   that is to put in what they call a sharps container, a

17   container that's locked, so that if you put something in you

18   can't take it out.  When Norma and one of the nurses checked

19   the medication cart there was a paper bag there for disposal of

20   waste, and when they went through the paper bag, they found

21   three empty morphine tubexes, and also an empty saline tubex.

22   Q.  Turn to Defendant Exhibit 8, tab 8 in the binder.  Is that

23   a copy of a memo that you received from Ms. Ondoy describing

24   what she had done on the evening of the 14th?

25   A.  Yes.

1   Q.  When did you get that memo from her, do you remember?

2   A.  The next morning.

3   Q.  That would have been 15 September?

4   A.  Correct.

5   Q.  Turn to the second page of Defendant Exhibit 8, there is a

6   document called controlled drug shortage investigation form.

7   Was that something you saw on September 15?

8   A.  Yes.

9   Q.  How did you receive that?

10  A.  Norma Ondoy had left it on a table in my office.

11  Q.  Did she also leave in your office the written statements of

12  the nurses you referred to?

13  A.  Yes.

14  Q.  Let me ask you to turn to tab 9, Exhibit 9, Defendant

15  Exhibit 9, is that one of the statements that was left on your

16  table?

17  A.  Yes.

18  Q.  Turn to Defendant Exhibit 10; is that one of the statements

19  that was left on your table?

20  A.  Yes.

21  Q.  Jump all the way to Defendant Exhibit 26, was that one of

22  the statements left on your table?

23  A.  Yes.

24  Q.  Turn to Defendant Exhibit 27; was that one of the

25  statements left on your table?

1    A.  Yes.

2    Q.  Please turn to Defendant Exhibit 28; was that one of the

3    statements left on your table?

4    A.  Yes.

5    Q.  Turn to Defendant Exhibit 29; was that one of the

6    statements left on your table?

7    A.  Yes.

8    Q.  Focusing on after you came in on the 15th, you received the

9    memo, the statements and the controlled drug shortage

10   investigation form from Ms. Ondoy, what if anything did you do

11   that day regarding the apparently missing morphine?

12   A.  I did quite a few things actually.  I called in the nurse

13   manager for the unit, Pauline Lattery, the nurse patient care

14   coordinator assigned to ICU Agnes Lucero.  The previous evening

15   when the narcotics were found missing, the pharmacy had also

16   been notified.  The associate director of the pharmacy at the

17   time was Patricia Byrne.  We involved her also in helping us

18   complete an investigation.

19   Q.  As the day went forward on the 15th, what did you learn

20   about the investigation if anything?

21   A.  It seemed, I guess we have to go back.  It seemed that

22   there was a patient in the ICU who was under the care of Marlen

23   who had to go for a test and eventually the test ended up being

24   canceled because the patient's condition changed.  I found out

25   about that that morning.

Caf4mar2                    Graham - direct

1    Q.  What else did you find out during the course of the 15th

2    about the apparently missing morphine in the ICU district 3?

3    A.  That there was a concern that one of the patients under

4    Marlen's care, the condition had changed and it was determined

5    at that time, considering there were was missing morphine and

6    the patient's condition changed, that the physician decided to

7    ask for a urine specimen from the patient.

8    Q.  On the 15th did you learn about the results of that test?

9    A.  Yes.

10   Q.  What did you learn?

11   A.  The patient's urine was positive for morphine.

12   Q.  What else if anything did you do that day regarding

13   Ms. Martinez?

14   A.  Ms. Martinez and another nurse was suspended indefinitely,

15   pending completion of the investigation.

16         THE COURT:  I need you to speak up a little bit.

17   Q.  Who was other the nurse?

18         (Pause)

19   Q.  I think I was asking about the other nurse; who was the

20   other nurse?

21   A.  Cora Fischer.

22   Q.  What if anything did Cora Fischer have do with what you

23   were doing that day?

24   A.  Well, it appeared that Cora Fischer lied, and the previous,

25   when they were starting the investigation the evening before,

1    they noted on the narcotics sheet that there appeared to be a

2    change of an entry.  Cora Fischer admitted that she changed

3    that entry.

4    Q.  Why do you say that it appeared that Cora Fischer lied?

5    A.  Well, let's back up.  Cora Fischer was suspended because

6    she, OK, when you are going to medicate a patient, you should

7    only remove the medication at the time that you are going to

8    medicate a patient, particularly a narcotic.  Cora had taken

9    narcotics out of the narcotics box prior to the scheduled time

10   that she was going to give it, and that's not a practice that

11   should be performed.

12   Q.  So Ms. Fischer was suspended?

13   A.  Yes.

14   Q.  Go to Defendant Exhibit 17 in that black binder; is that a

15   copy of the suspension notice for Ms. Fischer?

16   A.  Yes.

17   Q.  Does your signature appear on that page?

18   A.  Yes, where it says signature of department head.

19   Q.  Above your signature whose signature is that?

20   A.  Pauline Lattery, nurse manager of ICU.

21   Q.  To the right of her signature, that is Ms. Lattery's

22   signature, there is a date; whose handwriting is that?

23   A.  Pauline Lattery's.

24   Q.  Beneath Pauline Lattery is your signature?

25   A.  Yes.

1    Q.  To the right of your signature, I don't see a date; do you

2    recall when you signed that?

3    A.  It was on the 15th, the morning of the 15th.

4    Q.  Do you recall when -- let me back up.  How did it come

5    about that Ms. Fischer was suspended; who made that decision?

6    A.  I did.

7    Q.  Why did you make that decision?

8    A.  Until you can complete an investigation and be assured, to

9    keep patients safe until we completed investigation, I didn't

10   want anybody who I thought was involved taking care of patients

11   until we figured out exactly what happened.

12   Q.  Do you recall when during the day on the 15th, you

13   described a number of things that were going on during the

14   course of that day, that you directed that Ms. Fischer be

15   suspended?

16   A.  Do I remember exactly when, no, I don't.

17   Q.  Beginning, end, middle of the day, end of the day, when

18   during the day?

19   A.  I don't recall.

20   Q.  Did you direct that anybody else be suspended that day?

21   A.  Yes, Marlen Martinez.

22   Q.  Why did you direct that Ms. Martinez be suspended that day?

23   A.  Because she was drawing narcotics from the narcotics box,

24   the same narcotics box.

25   Q.  Directing your attention to Defendant Exhibit 15, is that a

1    copy of the suspension notice you signed for Ms. Martinez?

2    A.  Yes.

3    Q.  Before you signed it did you read the detail section?

4    A.  Yes.

5    Q.  What did the detail section say?

6    A.  Suspended indefinitely pending investigation, conflicting

7    story, stated that she changed the time on a narcotics sheet;

8    second, there is evidence of positive opiates in patient in

9    527A, who was under her care; third, that the scheduled

10   procedure for the patient was not done, the patient's blood

11   pressure had dropped to 80 over 40, please see attached.

12   Q.  I want to go back and forth between Defendant Exhibit 15

13   and Defendant Exhibit 17.  Go back to 17 for the moment; did

14   you read the detail section of that suspension notice before

15   you signed it?

16   A.  Yes.

17   Q.  What did that detail section say?

18   A.  (1) conflicting story: (2) not telling the truth, stated

19   that she was the one who changed the time on the drug

20   disposition record and 24-hour nursing order form, please see

21   enclosed.

22   Q.  If you look at Defendant Exhibit 15 and Defendant Exhibit

23   17, they both start out with the words conflicting story.  As

24   you sit here now do you recall what that conflicting story was?

25   A.  Yes.

1    Q.  What was it?

2    A.  As I stated before, it was noted on a narcotics sheet that

3    an entry, specifically a time had been changed.  At one point

4    Cora Fischer admitted that she changed the time; then at the

5    same time Marlen Martinez admitted that she changed the time.

6    Q.  So following the issuance of the suspension notices,

7    suspensions pending investigation, what if anything did you do

8    further to investigate?

9    A.  Well, I asked for the nurses involved to come in and see

10   me; I wanted to speak to them.

11   Q.  Which nurses involved?

12   A.  Cora Fischer and Marlen Martinez.

13   Q.  Did either one of them come in?

14   A.  Cora Fischer came in.

15   Q.  When she came in did you speak with her?

16   A.  I did.

17   Q.  What did you say to her and what did she say to you?

18   A.  I asked her whether or not she had changed the entry on the

19   narcotics sheet.  She said no, she had not.  When I asked her

20   why did she lie and say that she had changed the entry, she

21   said she was afraid because she thought she would get in

22   trouble because she had removed the narcotics prior to the time

23   that she was going to use them.

24   Q.  What did you say in response to that?

25   A.  Well, I told her, yes, she did do something she shouldn't

1    have, but she also should not have lied and said that she

2    changed the entry time on the narcotics sheet.

3    Q.   What if anything did you do then regarding her suspension?

4    A.   She was, she had representation with her, which was a union

5    delegate.  I asked Cora to step outside.  I spoke with the

6    union delegate.  I told them that Cora still had to have some

7    sort of discipline related to the fact that she lied in the

8    middle of this investigation.  So, we reduced the suspension to

9    a, we made the suspension a 3-day suspension, and then

10   scheduled her to come back on duty.

11   Q.   Did Ms. Martinez respond to you following her suspension

12   and come in and speak with you?

13   A.   No.

14   Q.   What if anything did you or your office do to try to speak

15   with her while she was out on suspension?

16   A.   We placed phone calls to phone numbers we had listed for

17   her.  We did not get a response.  I sent a letter to her home

18   address, the address that we had.  I did not get response.  So

19   I did reached out to her union delegate Lisa Greene to see

20   whether Lisa could get her to respond and come in an see me.

21   Q.   Why did you want to see Ms. Martinez?

22   A.   I wanted to speak to her and have her tell me in her own

23   words what happened that night.  Quite often when people give a

24   written statement, they don't always include every detail.  The

25   other thing is when you meet with somebody, face-to-face, you

1    can ask them whether there was some extenuating circumstance,

2    was there something going on, and actually see their emotional

3    state.  So I wanted to speak to Marlen.

4    Q.  Did you hear from her?

5    A.  I did not.

6    Q.  Directing your attention Defendant Exhibit 19, you

7    mentioned that you sent a letter to Ms. Martinez while she was

8    out on suspension, is this a copy of that letter?

9    A.  Yes.

10   Q.  There aren't any c.c.s on this letter; is there any reason

11   did you not c.c. anybody from her union on that letter?

12   A.  Because I was already in communication with them verbally.

13   Q.  Who specifically at the union were you speaking with?

14   A.  Lisa Greene, who is a delegate and also had the title of

15   contract administrator, and then Nadine, the last name escapes

16   me, she was the organizer for 1199, RN organizer.

17   Q.  You put a phone number in your letter to Ms. Martinez;

18   whose phone number was that?

19   A.  My phone number, my office phone number.

20   Q.  After you sent this letter to Ms. Martinez, did she call

21   you?

22   A.  No.

23   Q.  Did you hear directly from her?

24   A.  No.

25   Q.  What if anything did you decide to do when you didn't hear

1   from her?

2   A.   I followed up with Lisa Greene again and asked her whether

3   she had gotten in touch with her.  She said that she was not

4   getting responses from Marlen.  Lisa then reached out to Nadine

5   at 1199, and I had spoken to both of them regarding how many

6   efforts they had made to speak to Marlen.  Lisa Greene came to

7   my office.  She verbalized not understanding why Marlen would

8   not want to respond and come in and speak to me.  So

9   eventually, I went ahead and terminated Marlen.

10  Q.   Directing your attention to Defendant Exhibit 20, is that a

11  copy of the letter terminating Ms. Martinez's employment?

12  A.   Yes.

13  Q.   Did you have to take any steps along the way, provide some

14  lesser discipline, or were you permitted to go straight to

15  termination; in other words, did you have authority to

16  terminate her employment under these circumstances?

17  A.   Yes.

18          MR. GARLAND:  If I might confer, your Honor, I might

19  be done.

20          (Pause)

21          MR. GARLAND:  No further questions, your Honor.

22          THE COURT:  Cross.

23  CROSS EXAMINATION

24  BY MR. NUWESRA:

25  Q.   You testified during direct a few minutes ago that you

Caf4mar2                    Graham - cross

1   sought the assistance of the union after, to make contact with

2   my client after you sent a letter; do you recall that

3   testimony, yes or no, do you recall that testimony?

4           THE COURT:  Read the question back.

5           (Record read)

6   A.  Yes.

7   Q.  Look at Exhibit 19 that's in front of you.  This is the

8   letter you were referring to?

9   A.  Yes.

10          THE COURT:  Plaintiff exhibit or defendant exhibit.

11          MR. NUWESRA:  This is a defendant exhibit.

12          THE COURT:  Thank you.

13          You need to clarify that for the record.

14          (Continued on next page

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Now, Ms. Graham, how did you learn that Patient N was

2  positive for Morphine?

3  A.  Pauline Frances-Lattery, the nurse manager, told me.

4  Q.  Before signing off on this, on the suspension letter, which

5  is Defendant's Exhibit 15-- you can take a look at it.  Before

6  signing off on that, did you do anything to personally

7  investigate the circumstances besides what you were told about

8  it?

9  A.  I don't understand the question.

10 Q.  Well, I believe you testified that you signed off on this

11 letter on the morning of the 15th of September, 2009.  Do you

12 recall that testimony?

13 A.  Yes.

14 Q.  My question to you:  Prior to signing off on that letter,

15 did you personally do anything to investigate what happened?

16 A.  Yes.

17 Q.  What did you do?

18 A.  Well, it started the evening before, when the nursing

19 supervisor called me and started telling me the details related

20 to missing narcotics.

21     I then, the next morning, reviewed the statements that

22 were on my table in my office and then met with the nurse

23 manager, the patient care coordinator, and Patty Byrne, the

24 associate director of the pharmacy, in seeking assistance in

25 getting all the facts together.

1    Q.  Okay.  So you basic-- would it be fair to state that you

2    basically talked to the investigating committee, instructed

3    them as to what they should do, and exchanged ideas?  Right?

4    A.  Yes.

5    Q.  Did you personally meet with any of the nurses that were

6    involved with the missing Morphine the night before?

7    A.  Not to my knowledge.

8    Q.  Did you talk to my client prior to signing off on that

9    suspension letter?

10   A.  Not to my knowledge.

11   Q.  Then would it be fair to state that at the time that you

12   signed off on the suspension letter, the only information you

13   had was what Ms. Ondoy and Ms. Lattery told you?

14   A.  Correct.

15   Q.  Now, how did you learn, ma'am, that there was a change in

16   Patient N's condition on the 14th of September?

17   A.  Pauline Frances-Lattery told me the morning of the 15th.

18   Q.  Okay.  Did you do anything to double-check those statements

19   of Ms. Lattery?

20   A.  No.

21   Q.  Were you privy to the chart of the patient at the time?

22   A.  I could have looked at the chart, yes.

23   Q.  But you didn't?

24   A.  I did not.

25   Q.  Now, you testified-- withdrawn.

1          Isn't it a fact, ma'am, that you never personally

2    reached to the phone to contact my client personally; it was

3    your staff members who told you that they did it?

4    A.  Correct.

5    Q.  Would you please take a look in the blue folder, the blue

6    one which is Plaintiff's Exhibits, and take a look at the tab

7    that says number 2, or marked as 2?  And let me know when you

8    have finished reviewing that document, please, and it's

9    double-sided.

10   A.  Okay.

11   Q.  Did there ever come a time during my client's suspension

12   where you learned that she had hired her own private attorney

13   to communicate with the hospital on her behalf?

14   A.  The only thing I was told was that she was speaking with an

15   attorney.

16   Q.  And who was it that told you that?

17   A.  I'm not quite sure.  I'm not quite sure.

18   Q.  Was it another manager at St. Barnabas?

19   A.  I don't want to guess.

20          THE COURT:  Excellent.

21   Q.  Was it Mr. Keith Wolf?

22   A.  To my knowledge, no, it wasn't Keith.

23   Q.  Was it Mr. Marc Wolf?

24   A.  I would be guessing, but I believe not, no.

25   Q.  And just for the record, who is Mr. Marc Wolf?

1  A.  Mr. Marc Wolf is the director of human resources.

2  Q.  And that is the gentleman that sent out the termination

3  letter on behalf of the hospital to my client?  I believe it's

4  DX No. 20 in the black one.

5        THE COURT:  Did Mr. Marc Wolf sign the termination

6  letter that was sent to plaintiff here?

7        THE WITNESS:  Yes.  Yes.

8        THE COURT:  Thank you.

9  Q.  Now, when Ms. Cora Fischer had told you that she had lied

10 about the change in the narcotics sheet, did you then have

11 reason to believe that my client, Ms. Martinez, was therefore

12 telling the truth?

13 A.  No.

14 Q.  Now, with regard to the medication error policy of

15 St. Barnabas, would it be fair to state that all of the nurses

16 that had been under your jurisdiction in your capacity as the

17 senior vice president of nursing were aware of it?

18 A.  Yes.

19 Q.  And would it then be fair to state that my client, who had

20 been under your jurisdiction, would have also been aware of

21 that?

22 A.  Yes.

23 Q.  And is it a fair characterization that your medication

24 error policy is designed to be nonpunitive?

25 A.  Correct.

CAFBMAR3                    Graham - cross

1   Q.  During direct examination, you mentioned that Ms. Norma

2   Ondoy relayed to you that in the nonhazardous waste bag, in the

3   regular trash bag or garbage bag, that there were three empty

4   Morphine Tubexes.

5           Do you recall that testimony?

6   A.  Yes.

7   Q.  Would you please tell me what else she told you there was

8   there?  Because I did not hear you.

9   A.  A saline Tubex.

10  Q.  Saline.

11          Were you aware at the time that the only person that

12  administered any Morphine in D3 was Ms. Libiran?

13  A.  I know that --

14          MR. GARLAND:  Objection.  Can I hear that again,

15  please?  Can I hear the question again, please?  I didn't hear

16  the question.

17          THE COURT:  Would you read back the question, please.

18          (Record read)

19          MR. GARLAND:  Thank you.

20          MR. NUWESRA:  There's an objection.

21          MR. GARLAND:  No, I just wanted to --

22          THE COURT:  No, he just wanted to hear the question.

23          MR. NUWESRA:  Thank you.

24          THE COURT:  Were you aware of that?

25  A.  I know that Ms. Libiran gave Morphine.

1    Q.  Okay.  And what-- why it is a no-no, for lack of a better

2    word, for nurses to leave the empty Morphine Tubexes in the

3    regular garbage bag rather than in the hazardous waste bag?

4    A.  Because somebody could accidentally get stuck by a needle.

5    Q.  So that I can understand, you mean to tell me that the

6    empty-- the Tubexes, the Morphine Tubexes, actually have

7    needles in them?

8    A.  Correct.

9    Q.  And would it also be against hospital policy or practice to

10   just leave those empty Morphine Tubexes on the medication cart

11   without disposing of them either in the hazardous waste or in

12   the regular garbage bag after administering them, after giving

13   the shot to the patient?

14   A.  The nurses are trained that the proper disposal of a needle

15   and syringe is in a sharps container, which is hazardous waste.

16   Q.  And if a certain nurse does not abide by that policy or

17   practice, is she or she subject to discipline?

18   A.  Possibly.

19   Q.  Under what circumstances would you think that those nurses

20   shouldn't be subject to discipline?

21   A.  Could you ask that again, please?

22   Q.  In those scenarios, where they would leave-- those nurses

23   that would leave the empty Tubex-- empty Morphine Tubexes on

24   either the medication cart or in the regular garbage bag, under

25   what circumstances would the hospital not discipline them for

1   doing that?

2   A.  I don't know.  I've never had that issue, so I'm not going

3   to make up an answer.

4   Q.  Okay.  Fair enough.

5          Did there ever come a time between 2008 and the time

6   that you terminated my client-- initially suspended her, which

7   is September of 2009, where you told Ms. Lattery or anybody

8   else in the I.C.U. that my client does not qualify to be a

9   charge nurse?

10  A.  Did I ever say that?

11  Q.  Yes.

12  A.  No.

13  Q.  During-- based on your observation and knowledge of my

14  client during her tenure at St. Barnabas, do you think-- or did

15  you think that she would make a good charge nurse?

16  A.  Yes.  She was a very good nurse.

17  Q.  Since joining St. Barnabas in the variety of positions that

18  you held, did there ever come a time where you learned of the

19  term "progressive discipline"?

20  A.  Yes.

21  Q.  What is progressive discipline?

22  A.  Progressive discipline is when you put an employee on

23  notice -- usually first verbally and then, second, written --

24  then with progressive suspensions and then possibly

25  termination.

CAFBMAR3                    Graham - cross

1   Q.  Ms. Graham, is it a fact that my client was never -- during

2   her tenure prior to the 14th of September, 2009, she was never

3   disciplined for misadministering-- misadministering any kind of

4   narcotics?

5   A.  That, I can't answer.  I don't have her folder.

6   Q.  Let me ask you this:  Had Ms. Martinez contacted you prior

7   to her termination, would you have taken her back?

8   A.  I can't answer that because it didn't happen.

9          MR. NUWESRA:  Okay.  Give me a minute, your Honor, to

10  check with my client.

11         THE COURT:  Certainly.

12         MR. NUWESRA:  Thank you.

13         (Pause)

14         MR. NUWESRA:  I have no other questions, your Honor.

15         THE COURT:  Any redirect?

16         MR. GARLAND:  Just very briefly, your Honor.  Very

17  brief.

18  REDIRECT EXAMINATION

19  BY MR. GARLAND:

20  Q.  On the subject of charge nurses, do you have a recollection

21  one way or another whether or not Ms. Martinez ever worked as a

22  charge nurse?

23  A.  I believe she did.  I can't say exactly yes, but I believe

24  she did.

25  Q.  Do you have a recollection one way or another --

1          MR. NUWESRA:  Objection, your Honor.  Asked and

2   answered.

3          THE COURT:  The objection is overruled.

4   Q.  Do you have a recollection one way or another whether or

5   not the process by which charge nurses were selected changed in

6   the period between 2002 and 2009?

7   A.  I don't believe so, no.

8          MR. GARLAND:  No further questions, your Honor.

9          MR. NUWESRA:  No recross, your Honor.

10         THE COURT:  Thank you, ma'am.  You're done.

11         THE WITNESS:  Thank you.

12         (Witness excused)

13         MR. GARLAND:  The defendant rests.

14         THE COURT:  The defendant rests.

15         Are there rebuttal witnesses for the plaintiff?

16         MR. NUWESRA:  Can I just confer with my client about

17  possible rebuttal?

18         THE COURT:  Yes.

19         (Pause)

20         MR. NUWESRA:  Your Honor, I respectfully ask that I

21  recall my client for rebuttal purposes.  It shouldn't take more

22  than five to ten minutes at the most.

23         THE COURT:  Okay.  Ms. Martinez, would you come back?

24  You're under oath.

25         Rebuttal testimony will be limited to specific areas

1   that were only covered on the defendant's case.  We will not

2   have any reiteration of previously given testimony.

3             THE COURT:  Have a seat.

4             THE WITNESS:  Thank you.

5    MARLEN MARTINEZ, recalled.

6   REDIRECT EXAMINATION

7   BY MR. NUWESRA:

8   Q.  Good morning, Ms. Martinez.

9   A.  Good morning, Mr. Nuwesra.

10  Q.  I just want to ask you a few questions with regard to

11  certain testimonies that were given this morning by Ms. Lattery

12  and Ms. Graham.  You heard Ms. Graham and Ms. Lattery

13  testifying under oath that between the 14th of September and

14  the 15th of September, Patient N's condition changed.

15            Do you recall their testimony?

16  A.  Yes.

17  Q.  With regard to your knowledge, did Patient N's condition

18  change between September 14 and September 15th, before you were

19  suspended?

20            MR. GARLAND:  Your Honor, I think that was covered in

21  plaintiff's direct testimony earlier.

22            THE COURT:  It was.  It's not proper rebuttal.  I

23  mean, she doesn't get to come up here and say it again.  If

24  there's a new point she did not cover on her direct testimony,

25  you are welcome to cover it.  This is not to reemphasize the

1    old.

2           MR. NUWESRA:  There is, your Honor, if I'm allowed.

3    A.  No, the patient's condition did not change.

4    Q.  Based on your caring for Patient N, did there ever come a

5    time prior to your suspension where her blood pressure was low

6    on the 15th of September?

7           MR. GARLAND:  Objection.

8           THE COURT:  The objection is-- this is not proper

9    rebuttal testimony.

10          I'll tell you what.  You go take-- I hate to do this,

11   because I'm going to make you take two breaks.  But go take a

12   five-minute break so I can talk to him about what it is he's

13   going to do.  Don't discuss the case.  Keep an open mind.

14          (Jury excused)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Okay.  I want a proffer.  So ask the

3     questions you want to ask.

4          MR. NUWESRA:  Okay.  No problem.

5          Ms. Martinez, when you had the opportunity to review

6     Patient N's chart in response to her mom's inquiry, was there

7     anything with regard to her condition that was different than

8     on the 14th of September?

9          THE WITNESS:  Patient N needed to go in isolation, so

10    therefore the doctor decided to move her into District 1

11    because that's the only district that provided isolation for

12    the patient.  They were ruling out meningitis, which is

13    contagious by droplets.

14         MR. NUWESRA:  Now, you heard testimony from

15    Ms. Lattery and Ms. Graham that Patient N's MRI wasn't-- didn't

16    go forward because her condition has changed vis-a-vis the

17    restlessness and the low blood pressure.

18         Do you recall that?

19         THE WITNESS:  Yes.

20         MR. NUWESRA:  Based on your review of Patient N

21    September 15, 2009, was she restless and/or did her low blood

22    pressure fall?

23         THE WITNESS:  Patient N continued to be restless.  And

24    I know that they had given her Ativan, 8 milligrams, like

25    around 10:00, and her pressure had subsequently dropped also

1    from baseline at that time.

2              MR. NUWESRA:  And was she under your care on the 15th?

3              THE WITNESS:  She was under Cora Fischer's care.  No,

4    she was not under my care.

5              MR. NUWESRA:  And when you took over the care of

6    Patient N on the 14th of September, 2009, around 1:30 or so

7    p.m., did you review her chart?

8              THE WITNESS:  Yes, I did.

9              MR. NUWESRA:  Was there anything significantly

10   different with regard to her condition prior to her arriving at

11   your unit?

12             THE WITNESS:  No.  She was restless and agitated on

13   the unit, and they wanted to keep a closer eye on her.  Because

14   on the unit, you're monitoring the patient's vitals every

15   shift, which is like every seven hours.  Because on the unit

16   it's not 12 hours like I.C.U.  So therefore they wanted closer

17   monitoring, so they transferred her to telemetry for every

18   four-hour monitoring as opposed to every eight-hour monitoring.

19             MR. NUWESRA:  And that's exactly why I wanted her

20   testimony, your Honor.  I did not want the jury to be left with

21   the impression that Patient N -- in fact, Patient N's condition

22   in fact did change.

23             MR. GARLAND:  Your Honor, I think a lot of this was

24   covered already in the direct case.  I don't understand how

25   this is proper rebuttal.  It's been covered.

1          THE COURT:  I disagree with you that all of it has

2     been covered.  So limit it to those questions, I'll allow it,

3     and then you're free to recross her.

4          MR. NUWESRA:  Thank you, your Honor.

5          THE COURT:  You can go back and get the jury.

6          My personal understanding, listening to the evidence,

7     of how the patient's condition changed is because the patient's

8     condition changed because the patient's blood pressure dropped,

9     but that's maybe not what these medical people were saying.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury present)

2          THE COURT:  Okay.  Have a seat.  So we're going to

3     allow some limited questioning.  I listened to questions and

4     decided that I'm going to allow some limited questioning on

5     rebuttal.

6          MR. NUWESRA:  May I, your Honor?

7          THE COURT:  Yes.

8     BY MR. NUWESRA:

9     Q.  Ms. Martinez, you heard testimony from Ms. Lattery and

10    Ms. Graham that the reason Patient N couldn't do the MRI is

11    because her condition had gotten worse.

12         Do you recall that testimony?  Yes or no.

13    A.  Yes.

14    Q.  Based on your review of Patient N's chart for the 15th of

15    September, 2009, what was her condition with regard to the

16    symptoms for the physical-- the physical symptoms that she

17    presented while under the care of Ms. Fischer?

18    A.  Patient N remained restless; she continued to be agitated.

19    And the reason she was moved into District 1 was because they

20    were ruling out meningitis.  And District 3 is a two-bedded

21    room, so she needed to go in isolation.  However, her condition

22    remained the same.  She was still restless.

23         Subsequently, because she was still restless, they

24    gave her Ativan, 8 milligrams, in District 1, after she got to

25    District 1 area under Ms. Cora Fischer's care, and her blood

1    pressure also dropped there.

2    Q.  Do you recall what it dropped to?

3    A.  It dropped to, like, 100/40-something or --

4              THE COURT:  Are you now just quoting from her chart,

5    from your review of her chart?

6              THE WITNESS:  No, it was like-- MAP.  I'm remembering

7    what it dropped to.

8    Q.  And this is based on your review of the questions --

9              MR. GARLAND:  Objection.

10             THE COURT:  The objection is sustained.

11             Were you her caring nurse at that time?

12             THE WITNESS:  I was trying to find information from

13   the mother, because the mother approached me before I took her

14   in there.

15             THE COURT:  How did you find that information?

16             THE WITNESS:  Through the record.

17             THE COURT:  Through her chart?

18             THE WITNESS:  I took the mother over to the-- yes.

19             MR. NUWESRA:  Okay.

20             THE COURT:  No.  Sorry.

21             MR. NUWESRA:  All right.

22   Q.  And when you received Patient N at approximately 1:30 on

23   the 14th of September, 2009, did you have the occasion to also

24   review that chart, her chart?

25   A.  Yes.

1  Q.  And can you tell the jurors, based on your review of that

2  chart, if Patient N's care-- I'm sorry, Patient N's condition

3  ever changed between the time that she arrived at the hospital

4  on September 11, 19-- 2009, until you received her on September

5  14, 2009?  Please tell the jury.

6          MR. GARLAND:  Objection.

7          THE COURT:  I'm sorry.  I don't understand the

8  question.

9          MR. NUWESRA:  All right.  Let me ask it differently.

10 Q.  When you received Patient N on the 14th of September, 2009,

11 was part of your responsibility to review her chart to see why

12 she was there?

13 A.  Yes.

14 Q.  When you received Patient N, was her condition any

15 different than when you cared for her on the 14th of September,

16 2009, prior to you receiving --

17         MR. GARLAND:  Objection.

18         THE COURT:  Are you asking whether her review of the

19 chart revealed that her condition prior to Ms. Martinez taking

20 care of her had been different than it was during --

21         MR. NUWESRA:  Exactly, your Honor.

22         THE COURT:  Okay.  That's the question.  You looked at

23 her chart as part of it.

24         Did you see anything on the chart that was

25 inconsistent with her condition while she was under your care?

1          THE WITNESS:  No.

2          THE COURT:  Thank you.

3          MR. NUWESRA:  Thank you.  I have no other questions,

4    your Honor.

5          MR. GARLAND:  No questions, your Honor.

6          THE COURT:  Thank you, ma'am.  You may step down.

7          (Witness excused)

8          THE COURT:  Plaintiff rests, I take it?

9          MR. NUWESRA:  Oh, yes, your Honor.  Plaintiff rests.

10         THE COURT:  Okay.  Folks, here's what we're going to

11   do.  The timing is great.  I need to let you go for a while

12   because I need to have a chat with the lawyers.  I need to have

13   a discussion both about some legal matters that I'm required to

14   discuss out of your hearing, and then I need to have a chat

15   with them about the charge, which I was working on last week

16   and which I sent to them on Friday and which we need to discuss

17   and iron out and nail down before they close.  The lawyers are

18   entitled before their closing arguments to know what it is that

19   I'm going to tell you about the law so they can tailor their

20   arguments to that.  So that's what I'm going to do.

21         I'm going to give you kind of an extra-long lunch and

22   I'm going to ask you to be back here, ready to go, at 1:45.  We

23   will start with the closing arguments.  The first closing

24   argument will be given by the defendant, by the hospital, and

25   the second closing argument will be given by Mr. Nuwesra on

1   behalf of the plaintiff.

2           The reason that we do things in that order is that the

3   plaintiff, you will recall, has the burden of proof.  So the

4   first voice that you heard was a voice on behalf of the

5   plaintiff; and the last voice you will hear discussing the

6   facts is the voice of the party with the burden of proof, the

7   lawyer representing the plaintiff.

8           At the end of those proceedings, we'll see if there's

9   time left for me to charge today or if I should wait until

10  first thing in the morning to charge you.  We'll look at the

11  clock and see what's going on.  But have a pleasant lunch.  Let

12  me talk with them for the next hour.  Don't discuss the case.

13  Keep an open mind.  Leave all that stuff in the back room.

14          (Jury excused)

15          THE COURT:  Gentlemen, we need to take a five-minute

16  break.  Okay.  Take five.

17          MR. GARLAND:  Thank you, your Honor.

18          (Recess)

19          (Continued on next page)

20

21

22

23

24

25

1          (In open court; jury not present)

2          THE COURT:  Okay.  Case on trial continues.  The

3   parties are present; the jurors are not present.

4          Any motions at this point?  Have a seat, folks.

5          MR. GARLAND:  I'd like to make a motion, your Honor,

6   if I may.

7          THE COURT:  Yes.

8          MR. GARLAND:  Again under Rule 50.  Now that the case

9   has been concluded, both plaintiff's case and the defense case,

10  I must say, your Honor, both that -- let's talk about the

11  termination claim, the discrimination claim that her discharge

12  was discriminatory or that her discharge was retaliatory.

13         Let's just start with the discharge of discrimination

14  based upon national origin.  Your Honor, I would submit that no

15  reasonable jury could possibly conclude on this record that the

16  fact that the plaintiff was from Honduras originally somehow

17  motivated the discharge.  There's absolutely, I would submit--

18  this is an overused term, perhaps, but there's not a scintilla

19  of evidence in this record, it seems to me, your Honor, to

20  support the notion that she was discharged because of her

21  national origin, whether it's under Title VII, New York State

22  Humans Right Law or the city law.  The record is totally

23  absent, except for the fact that there were some Filipino

24  nurses in the hospital.

25

1          THE COURT:  I would agree with you that this is a weak

2     case.  It's going to the jury.  I think you have very strong

3     arguments on the discharge.  It's not bulletproof, so I'm not

4     going to dismiss it.

5          MR. GARLAND:  Thank you, your Honor.

6          Just for the record, I don't think there's any

7     evidence in the record as well that any allegedly protected

8     activity brought about the discharge.  If I may --

9          THE COURT:  And that's the more interesting part of

10    the-- that's the more interesting part of the motion, is

11    whether there's evidence to support a retaliation as opposed to

12    a national origin discrimination claim in terms of discharge.

13    The decision was made by Ms. Graham, and I don't recall hearing

14    any evidence that Ms. Graham was privy to any of the

15    plaintiff's complaints that she had previously made about being

16    discriminated against.

17         MR. NUWESRA:  May I?  I'm sorry.

18         THE COURT:  In a minute you will, yes.

19         I may have missed it.

20         MR. GARLAND:  I don't think there's anything there.

21    And even if there was something there, just for the sake of

22    argument, there was nothing to show in this record that that

23    would have motivated her decision.  What it shows was she was a

24    senior-level executive in the hospital, information was

25    presented to her, two people were suspended.  One responded to

1    her.  She met with her, disciplined her, and brought her back.

2            The other one, the plaintiff herself conceded that,

3    you know, I got that letter, I did get that letter from her,

4    and I didn't call her back.  I didn't call her back.

5            I thought it was very telling, the question that

6    plaintiff's counsel asked Ms. Graham today, which is, had she

7    come back-- had she come to meet with you, would you have

8    brought her back?  And her answer was, well, I was never

9    presented with that opportunity, so I can't tell you what I

10   would have done.  That just reinforces the legitimate business

11   reason here that's been articulated.  Nothing is cast out on

12   this.

13           So, again, under all three statutes, I would submit

14   that that claim should be dismissed, your Honor.

15           THE COURT:  Okay.  I need to-- I want to hear on the

16   retaliation prong of it so I could decide whether to reserve or

17   not on that.  I'm not reserving on the discrimination prong.

18   On the retaliation prong, I need to hear what it is that-- what

19   evidence there is that the decision-maker in this instance was

20   aware of the complaints.

21           MR. NUWESRA:  I believe that their motion should be

22   denied for two reasons.

23           THE COURT:  I asked you a question.  Answer my

24   question.

25           MR. NUWESRA:  I will, your Honor.

1          THE COURT:  No, no.  Answer my question and then you

2     can say whatever you want.  But when a judge asks you a

3     question, you answer the question.

4          MR. NUWESRA:  Okay.

5          THE COURT:  What's the evidence that the

6     decision-maker, the person who decided to fire her, what's the

7     evidence that she was aware of the plaintiff's complaints about

8     discrimination?

9          MR. NUWESRA:  My client's testimony, your Honor, not

10    only once, but on both days, she repeated her name.  She said

11    that she had complained to her about the -- as the record will

12    indicate, that when Ms. Lattery met with her sometime in

13    September, Ms. Lattery told her that upper management knows and

14    I suggest you speak with Ms. Graham.

15         She spoke with Ms. Graham.  She specifically told her

16    that she feels that the Filipinos have been getting

17    preferential treatment.  And what is really telling, your

18    Honor, is that Ms. Graham did not deny that today.

19         THE COURT:  Okay.  I don't know how telling that is,

20    but, okay.  I'll deny the motion and I'll let the jury decide

21    it.

22         MR. NUWESRA:  Thank you.

23         MR. GARLAND:  If I may, too, with the other -- what

24    I'll call the other discrimination claim.  Not the discharge,

25    but --

1          THE COURT:  There being a charge nurse getting the

2     good shifts.

3          MR. GARLAND:  Right.  That was really never

4     articulated clearly other than in general, vague, conclusory

5     allegations.  There was never any testimony that there was this

6     particular position at this particular time, that that

7     particular nurse got this and I didn't, nor was there any

8     evidence of any damages presented by plaintiff as to any of

9     these other vague claims.  Both --

10         THE COURT:  Twenty-three dollars an hour for not being

11    a charge nurse.

12         MR. GARLAND:  For what?  Over what -- how could the

13    Court then determine, was it one hour?  Was it two hours?  How

14    many hours would it be?  There was no evidence in the record to

15    that.

16         THE COURT:  Since the jury is not going to determine

17    that and I am, we're not going to worry about that right now.

18    I'm trying to get a case to the jury.

19         MR. GARLAND:  Right.  But the other piece -- and it's

20    potentially going to the jury -- is, are there any noneconomic

21    or compensatory damages?

22         THE COURT:  Yes, she did testify about noneconomic and

23    compensatory damages and her sister reinforced her testimony.

24         MR. GARLAND:  As to the termination, but not as to the

25    other.  The testimony to the other was that she loved her job.

1    There was never any testimony about compensatory damage that

2    related to her not getting --

3              THE COURT:  Great.  Make that point to the jury when

4    you close.

5              MR. GARLAND:  Thank you.

6              THE COURT:  Okay.  Now, before we turn to the charge,

7    I want there to be a caution to Mr. Nuwesra.  I want to clear

8    this up in my own head, but then I want to caution you about

9    something.  You have repeatedly made a big deal about the fact

10   that the drug test on Patient N was positive for opiates and

11   not specifically for Morphine.

12             There is no evidence in this record that any other

13   form of narcotic was missing or unaccounted for, and there is

14   no testimony from any witness in this record about a difference

15   between testing positive for opiates and testing positive for

16   Morphine, or competent evidence from which a jury could

17   conclude that it was possible that Patient N was medicated

18   mistakenly or otherwise with an opiate other than Morphine.

19   The jury is not allowed to speculate about matters to which

20   there is no evidence.

21             So if you don't want me to tell the jury that they are

22   not free to speculate that there was something like that, you'd

23   better not argue it.

24             MR. NUWESRA:  If I may, your Honor.  I just want to be

25   able to incorporate this into my closing argument, and this

1    should be no surprise to the defendants.  The evidence clearly

2    shows that there was at least three or four conflicting

3    testimonies about that day with regard to the test of

4    Patient N.  Ms. Fischer said that she collected the specimen

5    around 9:15, 930 the latest.  The report itself says it was

6    collected at 12:51.

7             THE COURT:  These are all things that you're free to

8    put in.

9             MR. NUWESRA:  Okay.

10            THE COURT:  But you're not free to suggest to this

11   jury that there was some drug other than Morphine in the system

12   because there is no evidence that there was any opiate other

13   than Morphine in Patient N's system.  That's what I'm telling

14   you you may not suggest.  You didn't have any expert up here

15   who analyzed the test and said this test could be for something

16   other than Morphine, and there was no evidence adduced that

17   there was any opiate other than Morphine that was missing from

18   the drug cabinet.

19            So you're asking the jury to speculate wildly if you

20   want to suggest that the patient tested positive for an opiate

21   other than Morphine, and I'm not going to allow you to do

22   that.

23            MR. NUWESRA:  Well --

24            THE COURT:  Now, differences in the time, differences

25   in who asked for it, inconsistencies, but it's the

1   Morphine/opiate distinction for which you have offered no

2   evidence.  All the evidence is, is Morphine is an opiate.  If

3   you test positive for an-- if you have Morphine in your system,

4   you'll test positive for an opiate under the test that's used

5   at St. Barnabas Hospital.  That's the only evidence in the

6   record on that precise little point.

7        MR. NUWESRA:  The other thing, so as not to prejudice

8   my client, your Honor --

9        THE COURT:  I'm not prejudicing your client.  The

10  evidence is what it is.

11       MR. NUWESRA:  I understand.

12       THE COURT:  You had an opportunity to put it in.  You

13  could have hired an expert who could have come in here and said

14  that test doesn't tell you whether it was Morphine or something

15  else.  You did not.  You did not hire an expert.  You did not

16  ask any witness that question.

17       MR. NUWESRA:  The only point I would like to make on

18  the record is that the defendant insists that they let her go

19  because Patient N definitely was showing Morphine; not opiates,

20  but Morphine.  That's what Ms. Byrne testified to.  She even

21  said that she wrote -- not herself, but the hospital wrote to

22  some regulatory agency saying that there was absolutely

23  Morphine found rather than opiates.  The disciplinary --

24       THE COURT:  You're missing my point.  My point is that

25  if you wanted to argue to the jury that there could have been

 1   something other than the Morphine, Morphine was -- the

 2   hospital's position is that your client, an excellent nurse,

 3   made a mistake and accidentally grabbed the wrong thing and

 4   injected her patient -- not intending to -- with Morphine.  And

 5   that, in fact, is not even why the client says they fired her.

 6   They say they fired her because she didn't respond to the

 7   letters.  You can make some interesting arguments about that,

 8   I'll grant you.  Okay?  But that's their position, is that your

 9   client is an excellent nurse who is a human being, like all of

10   us, and who happened to make a mistake on that day.

11          Now, if you wanted to make an argument that the test

12   for opiates was not attributable to the Morphine, you needed to

13   call some witness to do that, and you didn't.  You chose not

14   to.

15          MR. NUWESRA:  But we had the assistant director of

16   pharmacy who testified, as well as Dr. Adler, about the

17   positive-- the false positive and false negative.  And their

18   own report says --

19          THE COURT:  You can talk about false positives and

20   false negatives.

21          MR. NUWESRA:  All right.

22          THE COURT:  You just can't suggest that it was

23   something other than Morphine.  That's what I'm saying, because

24   you have no evidence that any other opiate, any other

25   opium-based drug-- Codeine, Vicodin, Percocet-- was ever either

1    administered, mistakenly or otherwise, or was missing from the

2    medicine cabinet.

3             MR. NUWESRA:  No, I understand that point.

4             THE COURT:  And you certainly don't have any evidence

5    that some Gremlin sneaked in from the outside, like an angel of

6    death, and injected the patient with opium.  You have no

7    evidence of that and the jury isn't allowed to speculate about

8    things that aren't in evidence.

9             MR. NUWESRA:  With regard to the missing Morphine,

10   your Honor, there is testimony that Ms. Libiran had found out

11   and put in the chart that there were two Tubexes missing

12   between six and seven, one after seven.  She put-- so I --

13            THE COURT:  You're missing my point.  So I'll tell you

14   what.  If you say something that I just told you you can't say,

15   I'll stop you and I'll tell the jury there's no evidence to

16   support that point.

17            MR. NUWESRA:  Okay.

18            THE COURT:  And they're to disregard your argument on

19   that point.  There are a lot of arguments you can make.  There

20   are lot of inconsistencies in the record.  I have to tell you,

21   in the end, I don't think any of them has anything to do with

22   whether your client was fired or not, whether there were two

23   Tubexes or three Tubexes, whether there was-- the critical

24   points are there was Morphine that was missing.  There was an

25   opiate, a Morphine-- no evidence that there's anything else--

1    that ended up in your client's patient and your client changed

2    a record.  That's what's relevant here.  That's what relevant

3    here.

4              MR. NUWESRA:  Also, your Honor, they emphasized that

5    the test was done while she was under the care of my client,

6    which that is not the truth.

7              THE COURT:  They haven't said that.  They said that

8    the doctor ordered the test the next day.

9              MR. NUWESRA:  Okay.  And the patient was under the

10   care of Ms. Fischer and I want to be able to emphasize that.

11             THE COURT:  You should emphasize that.

12             MR. NUWESRA:  That's all.

13             THE COURT:  No question you should emphasize that.

14   Emphasize that.

15             MR. NUWESRA:  Okay.  Thank you, your Honor.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

Caf4mar4a

1           (Jury not present)

2           THE COURT:  Let's talk about the charge.  Objections

3     from the plaintiff.  You can tell I am a great believer in a

4     plain English, no repetition, short version charge.

5           MR. NUWESRA:  Are we going to be doing this page by

6     page.

7           THE COURT:  Start at the earliest page at which you

8     have an objection or suggestion and make your pitch.  I want

9     the record to be clear this is an interesting twist on the

10    national origin/ethnicity case.  It's really kind of a negative

11    the national origin/ethnicity case.  The real allegation here

12    is that the plaintiff was not Filipina, that it's a more

13    important point that she was Honduran.  I don't think anybody

14    cares if she was from Honduras, Nicaragua, Panama, Colombia, or

15    Mexico, or the Dominican Republic.  It's that she was not

16    Filipina.

17          MR. NUWESRA:  I agree, your Honor.

18          (Pause)

19          MR. NUWESRA:  Your Honor, page 5, under burden of

20    proof and preponderance of the evidence standard, second

21    paragraph, last sentence, I will read it:  The balance must tip

22    in favor of believing that the particular event did not occur

23    or a particular fact did exist in order for the plaintiff to

24    meet the burden of proof required by law.

25          THE COURT:  You put an extra not in there.

Caf4mar4a

1          MR. NUWESRA:  You added.

2          THE COURT:  You did.  The sentence reads:  The balance

3   pus must tip in favor of believing that a particular event did

4   occur on that a particular fact did exist in order for

5   plaintiff to meet the burden of proof by required by law.

6   Forget the first 12 pages, I am not going to change a word;

7   that's what I charge in every case.

8          MR. NUWESRA:  OK.

9          THE COURT:  I am not going to change my burden of

10  proof charge.

11         MR. NUWESRA:  I won't waste the court's time if it's

12  going to be futile.

13         THE COURT:  It would be futile to argue on my standard

14  charges.

15         MR. NUWESRA:  Thank you, your Honor.

16         (Pause)

17         MR. NUWESRA:  Based on the comments 5 minutes ago of

18  the court --

19         THE COURT:  What page.

20         MR. NUWESRA:  18, your Honor, that this is a negative,

21  and I am referring to the third paragraph again the last

22  sentence.

23         THE COURT:  I think the reason I made the comment

24  about this sort of being a negative case as she was not, I put

25  this all the way through here.

Caf4mar4a

1      MR. NUWESRA:  OK.

2      THE COURT:  I have not Filipina.

3      MR. NUWESRA:  But when you add Honduran.

4      THE COURT:  I can say something else if you want.  You

5  made a big deal about her being Honduran.

6      MR. NUWESRA:  Based on the race taken out national

7  origin/ethnicity that she is Hispanic or something else,

8  something else works for me.

9      THE COURT:  Hispanic.

10      MR. NUWESRA:  Yes, Hispanic descent, something else

11  works.

12      THE COURT:  Make sure you argue, the last time I

13  looked, the Philippines was colonized by Spain.  Spanish is the

14  other national language of the Philippines.  I think everybody

15  in this case has a Spanish last name.  I assume the defendant

16  will make that argument.

17      MR. NUWESRA:  I believe that there should also be a

18  mixed motive charge in addition to this because to have

19  plaintiff not have as well a mixed motive charge.

20      THE COURT:  There is a mixed motive charm.  Plaintiff

21  need not prove national origin/ethnicity was the only factor

22  motivating an adverse employment decision but she must prove it

23  was a substantial or motiving factor in the decision.  That's a

24  mixed motive charge.

25      MR. NUWESRA:  That's the conflict I have with that

1    sentence, plaintiff has to prove both.

2           THE COURT:  Now you are into *McDonnell Douglas*.  She

3    has to prove pretext that defendant lied about the reason and

4    she has to prove that the real reason was her ethnicity, and

5    that's right out of Supreme Court precedent, because the

6    hospital can lie but the real reason cannot have been other

7    than her ethnicity.  This is classic right out of Supreme Court

8    jurisprudence.  It's not enough to prove that the hospital is

9    pretextual.  You have to prove both pretext and that the real

10   reason was discrimination.  Ultimately plaintiff's burden is to

11   prove discrimination by a preponderance of the evidence.  I

12   know this charge is correct as a matter of law.

13          MR. NUWESRA:  For the record, your Honor, we believe

14   that her race was a reason rather than the reason, the only

15   reason.

16          THE COURT:  I hear you.  I think you are going to be

17   arguing that this is a mixed motive charge case.  That's my

18   understanding, at least the termination I think you are going

19   to go arguing that.  That wouldn't come at any great surprise.

20   That's why I say:  Note that the plaintiff need not prove that

21   national origin or ethnicity was the only factor.  It has to be

22   a factor.

23          MR. NUWESRA:  That's on the second paragraph.

24          THE COURT:  The second paragraph.  I will tell you

25   what I will do to make you happy on the third paragraph.  The

1  both and is correct, I will say:  Plaintiff has to prove both

2  that they were not the reasons for the hospital's actions and

3  that at least part of the real reason why this happened to her

4  is because of it.  OK.

5       MR. NUWESRA:  That's great, your Honor.

6       THE COURT:  OK.

7       MR. NUWESRA:  Thank you.  Next page there is Honduran,

8  first paragraph, the ending of that sentence.

9       THE COURT:  I am not prepared to change the last part

10  of that.

11       MR. NUWESRA:  That she was Honduran.

12       THE COURT:  Honduran rather than Filipina, yes.

13       MR. NUWESRA:  Note my objection, your Honor.

14       THE COURT:  OK.  Anything on retaliation.

15       MR. NUWESRA:  Yes, your Honor.

16       THE COURT:  There's a typo on page 21.

17       MR. NUWESRA:  19, I believe we should be able to argue

18  good faith basis with regard to their business reason, there is

19  case law on that, rather than that they cannot question, they

20  can consider good faith, credibility of witnesses, and so on.

21       THE COURT:  You can argue credibility of the

22  witnesses.  This charge which is a standard charge in every

23  discrimination case is exactly correct as a matter of law.  You

24  are free to argue they shouldn't believe defendant's witnesses.

25  There is a typo on page 21, 6th line from the bottom, Ms.

1    Martinez is she obviously not he.

2              MR. NUWESRA:  Yes.

3              THE COURT:  I am correcting that.

4              MR. NUWESRA:  Back to 20.

5              MR. GARLAND:  Your Honor, before --

6              THE COURT:  You have not said a word and don't say a

7    word until he is done.

8              MR. NUWESRA:  On page 20, your Honor, retaliation,

9    fine.  With regard to 21, third paragraph, I believe that under

10   case law of the Second Circuit at least as of 08, the

11   decision-maker, the protected activity, complaints of

12   discrimination do not have to be communicated directly to the

13   decision-maker.

14             THE COURT:  The decision-maker has to know about them.

15   That's all I said.  All it says, plaintiff has to prove that

16   the decision-makers were aware that she had engaged in

17   protected activity.  It does not say plaintiff has to prove she

18   complained directly to the decision-makers.  Did you read this

19   before today.

20             MR. NUWESRA:  Did I over the weekend.  I had to do a

21   whole bunch of other things as well preparing for the rest of

22   the day.  I just want to make sure I understand it correctly.

23   With regard to causation, page 23.

24             THE COURT:  The word impermissibly should be

25   mistakenly in the third paragraph.

Caf4mar4a

1        MR. NUWESRA:  The last full sentence, the reason they

2   fired her was the fact because she was Honduran rather than

3   Filipina.

4        THE COURT:  She brought a case alleging there was

5   discrimination against her because she was Honduran; that's the

6   case.

7        MR. NUWESRA:  27.

8        THE COURT:  That has to stay in because the

9   termination is on two different theories.  It should be, it's

10  national origin/ethnic discrimination and retaliation.

11       MR. NUWESRA:  Race and color should go out.

12       THE COURT:  It should say, I remind you that Ms.

13  Martinez is seeking to hold the defendant liable for her

14  termination under two separate theories of recovery, national

15  origin/ethnicity and retaliation.  She doesn't get to recover

16  twice for the same injury.  She is only entitled to be

17  compensated for damages one time.  She doesn't get duplicate

18  damages if they find for her on two different theories.  I

19  don't like the way this is phrased.

20       MR. NUWESRA:  May I propose language.

21       THE COURT:  No.  Plaintiff is not entitled to recover

22  double damages for the same injury.  All right.

23       MR. NUWESRA:  Punitive damages.

24       THE COURT:  I have never been so on the fence whether

25  to charge punitive damages.  I am not going to charge punitive

Caf4mar4a

1    damages.  I have your exception to that.  There is on this

2    record nothing that qualifies, that's sufficiently outrageous

3    to warrant an award of punitive damages as a matter of law.  I

4    am not charging punitive damages.

5            MR. NUWESRA:  I respectfully ask they at least be

6    charged with regard to the New York City Human Rights Law which

7    is a different standard than Title VII.

8            THE COURT:  Yes.

9            MR. NUWESRA:  I am asking protectively for the record.

10            THE COURT:  Make your argument.  Give me a citation,

11    give me a Second Circuit case.  Bring these cases in the New

12    York State Supreme Court if what you are really proceeding

13    under is the New York Human Rights Law.

14            MR. NUWESRA:  I have proposed for the court's

15    convenience, one which I will give.

16            THE COURT:  I need you to move quickly.  I have to be

17    somewhere in 3 minutes and the defendant has not had an

18    opportunity yet.  I think it's inappropriate for counsel to be

19    obviously reading the charge through rather than having

20    prepared objections in advance.

21            Can I hear your objections to the charge please,

22    Mr. Garland.

23            MR. GARLAND:  I will try to be quick recognizing your

24    schedule.  First one, page 12, the only reason I raise, it's a

25    typo, you want to hand it out to the jury, very last word says

Caf4mar4a

1    defendants, obviously it's only one defendant.

2            THE COURT:  We will correct that typo.

3            MR. GARLAND:  Page 21, third paragraph, the sentence

4    starts with the word obviously, it's people who fired Ms.

5    Martinez.  In this says case it's undisputed it was just one

6    person.

7            THE COURT:  I am not changing it.

8            MR. GARLAND:  Page 24, a typo, second to last line of

9    that paragraph.

10           THE COURT:  Which paragraph.

11           MR. GARLAND:  The first paragraph, second to last

12   line, the word was, she had complained.

13           THE COURT:  The word was is a typo.  Thank you.

14           MR. GARLAND:  Compensatory pages, page 26, I don't

15   think they should be getting compensatory damages on

16   discrimination other than discharge.

17           THE COURT:  I hear you.

18           MR. GARLAND:  I want to raise, during the final

19   pretrial you said you were going to give the jury a limiting

20   instruction on the letters from Mr. Nuwesra to counsel so they

21   understood they came in for a limited purpose only.

22           THE COURT:  You are absolutely correct.  I completely

23   overlooked that.  There are exhibits, Plaintiff Exhibits 2 and

24   3, that came in for a limited purpose.  That purpose was to

25   indicate --

Caf4mar4a

1    MR. NUWESRA: That she had continued interest in her

2    job.

3    THE COURT: That plaintiff continued to have interest

4    in her employment. That's the only reason you may consider it;

5    you may not consider it for any other purpose.

6    MR. GARLAND: Those letters contain allegations of

7    discrimination. I want to be clear they are not to consider

8    that.

9    THE COURT: Absolutely not to be considered for any

10   other purpose. OK.

11   MR. GARLAND: I think that's all I have, your Honor.

12   THE COURT: OK. I am not charging punitive damages in

13   this case. Under any law I do not believe this is a punitive

14   damages case. I do not. OK. See you after lunch.

15   (Lunch recess)

16   (Continued on next page)

17

18

19

20

21

22

23

24

25

Caf4mar4b

| | |
|---|---|
| 1 | AFTERNOON SESSION |
| 2 | (1:45 p.m.) |
| 3 | (Jury not present) |
| 4 | THE COURT:  Mr. Garland, how long do you have. |
| 5 | MR. GARLAND:  I think it will be half an hour, 40, 45 |
| 6 | minutes. |
| 7 | THE COURT:  I think a half hour would be adequate. |
| 8 | But OK.  Mr. Nuwesra how long do you have. |
| 9 | MR. NUWESRA:  45 minutes to an hour. |
| 10 | THE COURT:  Keep it on the short side. |
| 11 | MR. GARLAND:  One question about the verdict sheet. |
| 12 | THE COURT:  Yes. |
| 13 | MR. GARLAND:  On section 3, the damages piece. |
| 14 | THE COURT:  I don't have the copy in front of me. |
| 15 | MR. GARLAND:  On section 3, the way it's structured |
| 16 | right now, there is a single question for compensatory damages. |
| 17 | THE COURT:  That's the way it will stay.  You have |
| 18 | your objection. |
| 19 | MR. GARLAND:  Can I explain. |
| 20 | THE COURT:  The objection is you want separate damages |
| 21 | for termination and discrimination; I am not giving them to |
| 22 | you. |
| 23 | MR. GARLAND:  Thank you, your Honor. |
| 24 | THE COURT:  I know what the reason is I am a great |
| 25 | lover of general verdicts.  They are less susceptible of being |

Caf4mar4b

1   attacked on motion afterwards.

2           MR. GARLAND:  I would like to refer to the verdict

3   questionnaire and read the questions.

4           THE COURT:  You are perfectly free to do that.  I will

5   tell the jury if you all talk about the law and I say saying

6   different about the law, what I say controls.

7           MR. GARLAND:  Thank you, your Honor.

8           THE COURT:  Let's get the jurors.

9           (Jury enters courtroom)

10          THE COURT:  Ladies and gentlemen, we are now going to

11  listen to the closing arguments of counsel.  During these

12  arguments the lawyers are going to explain to you why they

13  think the evidence favors their client's respective positions

14  in this case.  What the lawyers say to you is not evidence,

15  just as what I said to you during the trial is not evidence.

16          The lawyers will ask you to draw conclusions from the

17  evidence as they recollect it and paint the issues for you.  If

18  you find that any lawyer or a lawyer is asking you to draw an

19  inference that is warranted by the evidence that you find to be

20  credible, when I say warranted I mean is the inference rational

21  and logical and follows from the evidence, then you are free to

22  adopt the lawyer's suggestion that you draw that inference.

23          If on the other hand a lawyer asks you to draw an

24  inference that you think is not rational and not credible, not

25  supported by, doesn't flow logically from the evidence that you

1    find to be worthy of belief, then you should just reject the

2    lawyer's suggestion that you draw that inference and draw your

3    own inference, make your own conclusion on the basis of the

4    evidence that you find to be believable and persuasive.

5            The lawyers are not witnesses so they are not supposed

6    to tell you what they think or what they believe.  The problem

7    is I think or I believe has become a ubiquitous phrase in our

8    language.  We frequently begin sentences with it.  What the

9    lawyers are really saying to you is I submit the following

10   thought for your consideration.  It only matters in the end

11   what you think and what you believe.

12           By the same token, the only memories of the evidence

13   that matter are your memories of the evidence.  The lawyers are

14   going to be arguing to you from the evidence.  They have a

15   memory, a recollection of the evidence.  Their recollections of

16   the evidence may differ.  In the end the only recollection of

17   the evidence that matters is your recollection of the evidence.

18   If you need to have your recollection refreshed, remember how

19   to do it.  You send out a note to me asking the court reporter

20   to read back or possibly to provide you, we have a transcript,

21   with pages of the transcript that will help to refresh your

22   memory.

23           There are rules that lawyers have to follow during

24   summations.  If one thinks the other lawyer is not following

25   the rules, the lawyer gets up and objects.  There is nothing

Caf4mar4b

1    wrong with the lawyer making objections during summations.  The

2    lawyer is simply calling to my attention the possibility that

3    his opponent has broken one of our courtroom rules.  I will

4    rule on the objection and I remind you that my ruling on

5    objections is not a signal to you that I think one side is

6    right or one side is wrong or this guy has the better argument

7    that guy has worser argument.  It's only an umpiring decision;

8    ruling on the rules.

9         I will caution the lawyers not to jump up and object

10   on the grounds that's not what the evidence shows.  Because

11   that of course would be an improper objection.  I don't get to

12   tell you what the evidence shows.  You will decide what the

13   evidence shows.  If there is difference in recollection among

14   the lawyers, you all will resolve that and if you can't resolve

15   it without resort to the evidence itself, the evidence will be

16   read back to you.

17        I told you about the burden of proof and the fact that

18   the plaintiff who has the burden of proof in this case will go

19   last so I am going to ask Mr. Garland if he will close on

20   behalf of his client St. Barnabas Hospital.

21        MR. GARLAND:  I would like to set up, turn on the

22   projector.

23        (Pause)

24        MR. GARLAND:  Let me begin by thanking you on behalf

25   Mr. Fullerton and myself, on behalf of St. Barnabas Hospital

1    for listening these past now four days of trial.  When I stood

2    before you, must have been last Tuesday, I believe, I then

3    asked you to please listen carefully to the evidence, look at

4    the exhibits, look at the witnesses, listen to what they have

5    to say.  I want to thank you again now for having gone through

6    that process for your doing that.

7        When I got up last week, it was really to present a

8    bit of a roadmap of what was to come.  Now as I am here before

9    you this afternoon what I would like to do is the following.  I

10   want to explain to you what's going to come, once I am done,

11   the judge will do that some more later, but I want to take you

12   through what I submit the evidence did show, that you did hear

13   and what you did see, and then when you retire to the jury room

14   and you have the opportunity to finally discuss the case among

15   yourselves and look at the evidence and talk about the evidence

16   among yourselves, I want to take you through some of what I

17   submit was presented to you during the last four days.

18       The judge will explain this later.  One of the things

19   that is going to happen later on is that she is going to give

20   you what's called a verdict sheet.  The verdict sheet is going

21   to have some questions on it.  I want to flag two of the

22   questions for you.  I am going to be talking mostly about those

23   two questions.

24       The first question is:  Did plaintiff prove by a

25   preponderance of the evidence that defendant discriminated

1   against her in the terms and conditions of her employment by

2   making decisions about her position and duties based in whole

3   or in part on her national origin/ethnicity.  You as a jury

4   will be asked to decide that question, answering it yes or

5   answering it no.  I submit to you the evidence supports

6   answering that question no.  We will go through that evidence.

7            The second question I want to talk to you about is the

8   following:  Did plaintiff prove by a preponderance of the

9   evidence that defendant terminated plaintiff's employment in

10  retaliation for engaging in activity protected by federal,

11  state and/or city antidiscrimination laws, namely, complaining

12  about alleged national origin/ethnicity discrimination.  You

13  will have the opportunity to answer that question yes or no.  I

14  submit again the evidence that was presented to you during the

15  course of this trial should lead you to to answer that question

16  no.

17           Let me talk about some of the evidence.  When I stood

18  before you last week I said to you that nurse Martinez's

19  performance before September 14, 2009 is not in issue in this

20  case.  You heard witnesses from the hospital come before you

21  and talk about how she was a good nurse or how she was an

22  excellent nurse.  As I said to you, that's not in dispute.

23  What's in dispute is what you heard evidence about was what

24  happened starting on September 14, 2009 and following.

25           Using the PowerPoint, I would like to take you through

1    some of that evidence.  What I submit the evidence has shown is

2    that St. Barnabas terminated nurse Martinez's employment after

3    the following:  An investigation concluded that a missing

4    nonprescribed morphine was in the urine of a patient under her

5    care, patient N.  She changed another nurse's entry on a

6    narcotics control sheet.  You saw that control sheet.  We will

7    go through it in detail.  Lastly, that she did not respond to

8    the repeated requests of the senior hospital official Cathy

9    Graham to meet with her about what happened.

10        Let's go through some of this evidence that you heard

11   in some more detail.  You may remember when I was asking Ms.

12   Martinez questions, I asked her is making a mistake on a

13   narcotic a big deal in any hospital and she agreed that it was.

14        Then you met, heard from Patty Byrne, Patricia Byrne

15   who used to be an employee at St. Barnabas who worked in the

16   pharmacy.  She explained to you why a missing narcotic in a

17   hospital is a big deal.  She explained to you that a hospital

18   has to maintain control over its narcotics from cradle to

19   grave.  She explained what that was.  She explained that any

20   discrepancy in the count of narcotics must be reported to the

21   New York State Bureau of Narcotics Enforcement.  She explained

22   that also the Federal Drug Enforcement Agency has control over

23   the narcotics, jurisdiction over the narcotics in the hospital.

24        I want to stop here for one moment.  Ms. Byrne does

25   not work for the hospital anymore.  She like so many other

1    witnesses who were involved in what happened on the 14th and

2    the 15th, there is absolutely no evidence I would submit to you

3    that was presented to you to show that she had any bias for any

4    reason against Ms. Martinez.  She explained to you what her

5    interest was, that was finding out what happened to her missing

6    narcotics.

7           You had an opportunity to go through as we considered

8    the evidence the chronology, the timeline, narcotics control

9    sheet.  You heard from nurse Libiran who testified about

10   receiving morphine from the pharmacy at noon on September 14

11   and recording it on her narcotics control sheet.  There was no

12   evidence by the way that nurse Libiran I would submit had any

13   bias against Ms. Martinez for any reason.

14          The narcotic control sheet shows what she wrote, what

15   was written by the pharmacy tech when that delivery was made.

16   There were 22 tubexes of morphine sulfate 2 milligrams.  You

17   see it here.  You will see the timeline on the 14th.  There was

18   evidence that patient N was under Ms. Martinez's care then, the

19   afternoon and early evening of September 14.  There is evidence

20   in the record I would submit that you saw that on September 14,

21   at 1630 military time, 4:30 p.m., there had been a drug screen,

22   urine screen that showed no opiates in patient N's system, 4:30

23   on the 14th.

24          You also heard testimony then that at 5:00, 5:00,

25   nurse Martinez went into the medication room and she recorded

1  that she took out 3 tubexes of Ativan and recorded on the

2  narcotics control sheet.  You also heard testimony that around

3  6:00 p.m. patient N became agitated and her blood pressure fell

4  to 80 over 40 and a MRI was canceled.  At 7:00, the testimony

5  was, nurse Libiran had gone back into the medication room to

6  get medication, morphine, and noticed and noticed that there

7  were three missing tubexes of the morphine sulfate 2

8  milligrams.  She made some entries in the narcotic control

9  sheet to reflect that.

10        So when she left the medication room there could have

11 been 21 tubexes but she counted there were only 18; there were

12 3 missing.  You heard her testimony.  She went to others, her

13 co-workers in district 3, the ICU where they worked, to ask did

14 anyone know what happened to the morphine.  She called the

15 pharmacy to confirm there should be 22 tubexes of morphine in

16 the medication cabinet.  She then contacts the nursing

17 supervisor Ms. Ondoy about the missing morphine.

18        You heard testimony from Ms. Ondoy.  I would submit

19 there is no absolutely no evidence in this record that

20 Ms. Ondoy was biased for any reason against Ms. Martinez.  She

21 confirmed that the 3 tubexes of morphine were missing.  Then

22 she informed Pauline Lattery and Cathy Graham, both of whom you

23 heard from today.  I submit there is no evidence in the record

24 to show that either Ms. Frances-Lattery or Cathy Graham had any

25 bias for any reason against Ms. Martinez.  I think you heard

1    them both say she was a really good nurse, words to that

2    effect.

3           You also heard testimony about some empty tubexes

4    being found in the garbage.  You heard testimony about the

5    statements being taken from the different nurses who worked

6    that evening.  You have seen those statements.  Nurse Panes'

7    statement, nurse Fischer's statement, you heard testimony from

8    nurse Fischer, nurse Gonzalez, her statement, you will have

9    that in the jury room, nurse DeJesus' statement, you will have

10   that, and nurse Martinez's statement, you will have that, as

11   well as nurse Libiran's statement.  I would submit that there

12   was no evidence in this record that any of those nurses who

13   provided statements about what they knew had happened that

14   evening, no evidence that any of them had any bias against Ms.

15   Martinez for any reason.

16          You will also, I believe you saw in evidence you will

17   see when you retire to the jury room, the control drug shortage

18   investigation form filled out on the evening of the 14th.  You

19   heard from Ms. Ondoy that she checked the records of other

20   patients transferred out of the ICU to see in morphine had been

21   administered to them.  You heard testimony that all the nurses,

22   the nurses who happened to be from the Philippines and Ms.

23   Martinez, were all subject to the same treatment, all searched

24   before they could leave that evening.

25          You saw in evidence, you will have in the jury room,

 1  the memo that Ms. Ondoy prepared for Ms. Graham, also sent to

 2  Ms. Frances-Lattery explaining what it was that she had done on

 3  on the evening of September 14 to try to find out what

 4  happened.  You will have that in the jury room with you.  Those

 5  are the all documents that then were provided to Ms. Graham and

 6  Ms. Lattery; Ms. Ondoy's memo, the written statements,

 7  controlled drug investigation form, all provided to both

 8  Ms. Graham and Ms. Frances-Lattery.

 9       Let's go back to Patty Byrne.  We will move to

10  September 15.  You heard from Ms. Byrne last Thursday what she

11  did when she came to work that day.  She started to look for

12  the missing morphine because she and her department has to

13  submit a report to the New York State Bureau of Narcotics

14  Enforcement.  She looked for the missing morphine; she couldn't

15  find it.  She discovered an entry in the narcotics control

16  sheet, I believe the second page of the two in your exhibit

17  book, that showed the time of 6:00 p.m. had been changed to

18  5:00 p.m. by someone.

19       Then she explained to you, Ms. Byrne explained the

20  interviews that took place that day on the 15th.  She explained

21  to you who sat in on the interviews, two people from the

22  pharmacy and two people from nursing.  You have seen, you will

23  have the evidence with you the written notes and reports

24  prepared by Ms. Byrne going through what she learned during the

25  course of the investigation.

1      One note, nurse Libiran noted that Ms. Martinez

2  announced returning the Ativan that had not been used by the

3  doctor for the MRI.  You may remember, I believe the evidence

4  was Ms. Martinez actually took out 4 of the tubexes of Ativan,

5  only recorded 3.  Here at trial nurse Martinez admitted she

6  shouldn't have done that.  I submit she also testified that she

7  was not disciplined for that.

8      Continuing with same report of Patty Byrne, another

9  interview, this is related to what Ms. DeJesus was saying.

10  Ms. DeJesus, another one of the nurses, reported to Ms. Byrne

11  during these interviews that Ms. Martinez was in a rush to get

12  the keys back after she had already been in the medication

13  room.  You heard some testimony about that.  You heard

14  Ms. Fischer according to Ms. Byrne admitting that she was the

15  one who made the change from 6 to 5.

16      You heard Ms. Byrne talk about what Ms. Martinez said

17  when she was interviewed by Byrne, Gatto, Frances-Lattery and

18  Lucero.  She reported what was said.  First she asked Ms.

19  Martinez who did she get the keys from.  Ms. Martinez responded

20  she couldn't recall anybody.  When she showed Ms. Martinez the

21  change on the narcotics control sheet from 6 to 5, Ms. Martinez

22  said she is the one who did that but she also didn't mention in

23  the interview she had taken 4 tubexes of Ativan as opposed to

24  3.  I submit to you at trial Ms. Martinez admitted that she

25  shouldn't have taken out the 4 tubexes of Ativan without

1    recording it.

2          Sticking with Ms. Byrne's report and what she was

3    concluding, she noted that the only other controlled drug that

4    was removed 3 at a time was Lorazepam.  So perhaps there had

5    been an error by Ms. Martinez; she mistakenly took out the

6    Ativan as opposed to, she mistakenly took out the morphine as

7    opposed to the Ativan.  Ms. Byrne also note it was unusual her

8    mind that a patient would be agitated and have blood pressure

9    too low after getting Lorazepam or Ativan but it wouldn't be

10   unusual if the patient had gotten morphine.  So Ms. Byrne

11   shared with you last week what her working theory was as she

12   was going through this investigation.  Her working theory was

13   nurse Martinez had mistakenly administered morphine to patient

14   N instead of administering the Ativan to her.

15         You also met Mervyn Richardson last week.  I submit

16   there was no evidence in this record to suggest Mervyn

17   Richardson had a bias against nurse Martinez for any reason

18   whatsoever.  He testified that morphine could be detected in a

19   patient's urine for two to three days after it was

20   administered.  You also heard from Dr. Adler, the acting head

21   of ICU back in 2009.  I would submit there was no evidence in

22   this record to suggest that he was biased in any way against

23   Ms. Martinez.  You heard the testimony he gave.  He verbally

24   gave orders that patient N's urine be sent for a tox screening,

25   to see whether or not there was morphine in her system.

1          You heard some testimony, morphine opiates, the

2     testimony I would submit to you was that morphine is an opiate,

3     and that the only evidence in the record was that patient N was

4     not prescribed morphine, she should not have been given

5     morphine, and there was nothing to suggest that she was

6     prescribed any opiate.  Also in the record are three different

7     pages of the drug screens, urine screen results.  Dr. Adler had

8     ordered this particular test on September 15, still on

9     September 15, and when you look at that record, the results

10    came out of the lab around 1357, little before 2:00 p.m.  They

11    showed that patient N had opiates in her system.

12         Dr. Adler also testified that he looked at patient N's

13    medical record and chart and saw that on September 11, when she

14    first came to ICU, that she tested negative for opiates and

15    benzodiazepine or which could have been Ativan.  Then the test

16    on the right was after she had been prescribed Ativan, that's

17    4:30 test on September 14 before she goes for the MRI later in

18    the day, she tested negative for opiates and positive or

19    benzodiazepine.  It's also in the record I would submit that

20    Ativan was recorded as having been administered to patient N

21    for the first time on September 12.  Dr. Adler confirmed that

22    patient N had not been prescribed morphine.

23         So going back to Patty Byrne's report which you will

24    have with you in the jury room, she concluded in her notes, no

25    morphine-like meditation was ordered for this patient but the

1    patient's result was positive.  Some of the questions she is

2    asking herself, what happened to the Ativan.  Her conclusion is

3    that nurse Martinez mistakenly administered morphine to patient

4    N and then may have returned to the medication cabinet and

5    removed Ativan.

6          Also you heard testimony that nurse Martinez was

7    suspended indefinitely at the end of the day on September 15.

8    You will have that suspension notice with you in the jury room

9    that explains the basis for the suspension.  Conflicting story,

10   stated she changed the time on the narcotics sheet.  There is

11   evidence of positive opiates in patient in 527A who was

12   understand her care, scheduled procedure for this patient was

13   not done, the patient's blood pressure had dropped 80 over 40.

14         At the time you your heard that nurse Fischer was

15   suspended.  Again, she was telling a conflicting story; who

16   made the change on the narcotic control sheet from 6:00 to

17   5:00, that she was not telling the truth; she said she was the

18   one who changed the time on that record.

19         You've got Ms. Fischer, nurse Fischer and nurse

20   Martinez both suspended on September 15, both treated in the

21   same way.  Nurse Fischer told you she is from the Philippines.

22   Nurse Martinez was not.  Both treated in the same way.  Then

23   what happened after that.  You heard testimony I would submit

24   that nurse Fischer was asked to come meet with Cathy Graham.

25   She did.  You heard that testimony this morning that

1    Ms. Fischer came in and met with Cathy Graham.  You heard the

2    testimony from Ms. Fischer about what she said, from Ms. Graham

3    what she said to Ms. Fischer, that she decided working through

4    it that she would suspend Ms. Fischer for three days, but

5    Ms. Fischer came in and she met with Ms. Graham.

6         Ms. Martinez was also asked to come and meet with

7    Ms. Graham.  Unlike, unlike Ms. Fischer, however, Ms. Martinez

8    did not respond to the request to come in.  So you heard

9    testimony, you heard testimony not from one person, from two,

10   from Ms. Graham and then Lisa Greene, the union rep, that Cathy

11   Graham had asked Lisa Greene, please bring in Ms. Martinez, I

12   want to speak with her.  Now, I mention Lisa Greene.  There is

13   no evidence I would submit in this record that Lisa Greene was

14   biased against Ms. Martinez for any reason at all.  You heard

15   Ms. Greene's testimony.  Ms. Greene, yes, she is a nurse

16   employed by St. Barnabas, but she talked to you about wearing

17   two hats.  She also represents the nurses as the union contract

18   administrator.

19        She testified how she tried to reach Ms. Martinez on a

20   number of occasions to try to get her to come in to meet with

21   Cathy Graham.  She testified that Ms. Martinez did not respond

22   to that request to come in.  You also heard her testimony that

23   when there was no response from Ms. Martinez to the earlier

24   requests, that she sent a letter, she sent a letter to Ms.

25   Martinez asking her to contact her.  You will have this letter

1    with you in your jury deliberation room.  The letter's pretty

2    simple; please contact me immediately concerning your

3    employment at St. Barnabas Hospital.  It gives the direct dial

4    of Ms. Graham so that Ms. Martinez can call her.

5         I would submit you heard testimony from Ms. Martinez,

6    well, that letter was sent certified, I didn't get it right

7    away.  Her testimony I would submit was that she got it, she

8    got it by October 20.  I would submit to you that is what her

9    testimony was.  When she got it and read it and saw the phone

10   number, she still did not call Cathy Graham.  She did not

11   respond to the letter.  What you heard today from Ms. Graham,

12   that's when she decided to go ahead and terminate Ms.

13   Martinez's employment.

14        She also testified today, wasn't a question I asked, a

15   question Mr. Nuwesra asked, Ms. Graham, if she had come in, if

16   Ms. Martinez had come in, what would you have done.  Well, she

17   testified she wanted to speak with her to see what she had to

18   say.  She wanted to be able to speak with her because as she

19   said, written statements alone don't tell the whole story.  She

20   wanted to get it directly from Ms. Martinez.  So when she was

21   asked that question today by Mr. Nuwesra, what would you have

22   done, she said I don't know because she never gave me the

23   chance to speak with her.

24        Ladies and gentlemen, I would submit what's going on

25   here is that Ms. Martinez is looking to blame everybody else,

1    everybody else, all the people I put up there, all these folks

2    in the hospital, people who don't work in the hospital anymore,

3    Patty Byrne.  She is looking to blame the union.  She brought

4    her sister in to testify that Lisa Greene is with the union

5    said something different than what Lisa Greene said she

6    actually said.  She is looking to blame everybody else.

7         I would submit, ladies and gentlemen, the blame if it

8    goes anywhere should be on Ms. Martinez, because she was given

9    opportunity to come in, because as the nurse, the hospital

10   said, she was a really good nurse, and she did not take

11   advantage of that opportunity.  You also heard Lisa Greene the

12   union representative say that Cathy Graham told her that she

13   only decided to terminate Ms. Martinez's employment after she

14   failed to respond to her.

15        You will also have in evidence a couple other letters,

16   perhaps didn't talk about during trial, they will be in

17   evidence with you.  One is letter, first this is the

18   termination letter, you did see that, the termination letter

19   from Mr. Wolf, director of HR, to Ms. Martinez saying that on

20   October 21, her employment was being terminated, effective

21   September 15.  Then you are going to see a couple other letters

22   in evidence.  One is a letter from the union saying they are

23   going to grieve the termination.  Another is a letter from

24   Mr. Wolf which says that neither the union nor Ms. Martinez

25   actually showed up to pursue the grievance.

1      Another document we didn't spend any time talking

2  about during the course of trial but which you will have in

3  evidence in the jury room is the employee handbook.  The

4  employee handbook talks about the fact that there need not be

5  what was referred to as progressive discipline.  The hospital

6  in certain circumstances can move immediately to discharge the

7  employment of one of its employees.

8      Also you will see in that handbook the policy of St.

9  Barnabas against discrimination in the workplace which I

10  mentioned when I gave you the roadmap at the outset.  You will

11  see also the St. Barnabas policy against retaliation in the

12  workplace.  You will see the medication error policy.  You

13  heard the purpose of the policy was to get nurses to report

14  medication errors so patient safety can be attended to, that

15  the policy was referred to as a nonpunitive policy.

16      (Continued on next page)

17

18

19

20

21

22

23

24

25

1         MR. GARLAND:  And the reason for that is to get

2    somebody to come forward and say they made an error.  If you

3    come forward and make an error, there's no punishment.  Well,

4    in this case, Ms. Martinez never came forward.  She never came

5    forward.  She didn't respond to Cathy Graham.  And as you'll

6    see in the policy, "The senior vice president for nursing

7    reserves the right to institute immediate disciplinary action,

8    including termination."

9         Now, before I sum up, there's a couple of things that

10   I want to mention to you.  When counsel are done making

11   arguments and Judge McMahon has the opportunity, she's going to

12   explain the law to you.  And what she says trumps whatever

13   Mr. Nuwesra and I say.  She's the authority on the law.  But I

14   want to mention just a couple of things, highlight a couple of

15   things that I think you're going to hear during the course of

16   the instructions, which is why, I submit to you, should cause

17   you to answer those two questions I told you about at the

18   beginning with the answer "No."

19        First, let's talk about the discrimination claim, this

20   discrimination, the allegation, the claim, that Ms. Martinez

21   was discharged because she wasn't Filipino.  The Judge is going

22   to explain to you about the preponderance of the evidence and

23   the plaintiff having the burden.  And she's going to explain to

24   you that your verdict must be for the defendant unless

25   plaintiff proves that the hospital took adverse employment

1    actions because she was not Filipino.

2        Now, ladies and gentlemen, we went through that whole

3    time line of what happened on September 14th and 15th.  And I

4    would submit to you that that time line shows, when you

5    consider it, there was never the slightest thought about what

6    country Ms. Martinez might be from.  The whole focus was:

7    Where's the missing medication?

8        And you might say, well, maybe I would have done that

9    differently.  Maybe I wouldn't have done what the hospital

10   decided here or maybe somebody will remember giving a verbal

11   order for a medication and somebody else thought they got the

12   order from somebody else.  Well, ladies and gentlemen, none of

13   that, none of that, I submit to you, is enough, is anywhere

14   near enough, to satisfy the burden that Ms. Martinez has, as

15   the Judge is going to outline it to you.

16       The Judge is going to explain to you that it's not

17   your job to judge the wisdom of the hospital's actions.  So

18   you'll hear more from her on that, but I also want to explain

19   to you because we've got this discrimination claim that she was

20   discharged because of her national origin and she has this

21   second question where she was discharged because she was

22   retaliated against.  Again, the Judge is going to outline the

23   law here and what Ms. Martinez has to prove.

24       But, in part, you should be deciding for the hospital

25   unless she can prove that the real reason that the hospital

1    fired her -- or at least part of the real reason that it fired

2    her was the fact that she complained about discrimination

3    against her because she was Honduran rather than Filipino.

4    And, again, going through that entire time line, what happened

5    on September 14th and 15th, there was never any suggestion from

6    any of the witnesses that they were concerned about anything

7    other than where's the missing Morphine?

8            Now, before I conclude, I want to mention one other

9    thing, and that is that there's been some-- there was some

10   suggestion during the course of the trial by Ms. Martinez that

11   somehow she was denied some opportunities during the course of

12   her employment.  And she says it must have been because she

13   wasn't Filipino.

14           Again, I would submit to you that the evidence doesn't

15   support that at all.  Yes, the hospital has a number of

16   Filipino nurses, and you heard why and the history behind that.

17   But that doesn't mean, doesn't prove, doesn't suggest that she

18   was denied an opportunity because she wasn't Filipino.  You

19   heard she is a member of the union, was governed by the

20   agreement, the collective bargaining agreement, between the

21   union and the hospital.  And that what mattered in many of

22   these decisions, who got what assignment and how, was who had

23   seniority?  Who was working at the hospital longer?

24           And you heard the testimony from Ms. Frances-Lattery

25   about how, when charge nurses were selected in 2008, they

1    selected 64 who were the most senior of the nurses, nurses who

2    had been there 20 and 30 years.  And you know from the evidence

3    that Ms. Martinez started in 2002 and so was there about seven

4    years when her employment ended.

5           So let me just conclude by saying what I think the

6    evidence has shown you during the course of this trial.

7    Ms. Martinez's national origin or ethnicity had nothing to do,

8    nothing to do, with the hospital's decision to terminate her

9    employment.  I would submit to you the evidence shows that the

10   hospital did not, did not, retaliate against her when it

11   terminated her employment.

12          And, lastly, I would submit to you that based on the

13   hospital's investigation and Ms. Martinez's failure to speak

14   with Cathy Graham, that's what brought about the end of her

15   employment at the hospital.

16          So, again, I thank you for being patient throughout

17   the course of the trial and through the course of this

18   presentation this afternoon.

19          Thank you, your Honor.

20          THE COURT:  Okay.  Thank you very much.

21          Mr. Nuwesra.

22          MR. NUWESRA:  May it please the Court.  Good

23   afternoon, Counsel.  Good afternoon, ladies and gentlemen.

24          I, like Mr. Garland, would like to thank you on behalf

25   of myself and my client, Ms. Martinez, for being very observant

1   and taking your time in listening to all the evidence and

2   making sure that, before you deliberate, all the evidence is

3   in.

4          As I promised when I first stood here before you, I

5   told you that that was going to be my first opportunity and I

6   will have this other opportunity to do the same, which is

7   today.  The only difference is this is my last opportunity to

8   be here and speak on behalf of my client as she views the

9   evidence that actually were submitted for your consideration,

10  ladies and gentlemen.  Before I start with her version of how

11  she sees the evidence that were submitted to you, I would like

12  to take maybe five minutes or so to just address a few issues

13  or arguments that were raised by St. Barnabas.

14         Before concluding, Mr. Garland said to you that the

15  only reason that the hospital -- or one of the main reasons

16  that the hospital disciplined my client is because they wanted

17  to know, in sum and substance, what happened to the missing

18  medication.  Now, I thought that they already decided what

19  happened to the medication as of 9/15/2009, when they suspended

20  my client and Ms. Fischer.  They already decided that my client

21  perhaps may have misadministered by mistake the missing

22  Morphine rather than the Ativan.

23         This reminds me, and it may remind some of you who are

24  a little bit closer to my age, that Wendy's used to have a

25  commercial where this female spokesperson on behalf of Wendy's

1    would come on TV and say "Where's the beef?"  I submit to you,

2    ladies and gentlemen, that St. Barnabas in this case has no

3    beef.

4           Let me go briefly and address some other issues that

5    were raised by Mr. Garland.  Of course, we disagree with

6    St. Barnabas and we feel that when you do get the verdict

7    sheet, that you should find for my client in both of her

8    claims.  And we will talk-- I will talk to you about it in a

9    little bit more detail why we believe that is the only fair

10   verdict in this case.

11          Mr. Garland told you that my client's issue only deals

12   with what happened on September 14th and going forward.  I

13   submit to you that unless I was in a different courtroom, that

14   is not the case.  My client had testified -- and I believe

15   credibly to you -- that she initially started complaining about

16   some of what she felt was discriminatory back in 2009, early

17   on, and she recalls it was at least as of April of 2009, after

18   she got that certification or that recognition, which is in my

19   blue binder there.  Please take a look at it and that will give

20   you the time frame of what she believes it was then.

21          Defendant tried to give you the impression that my

22   client did do charge nurse duties.  If you'll recall, they had

23   Ms. Libiran.  Now, remember, Ms. Libiran is very important.

24   They suggested to you that she has no bias against my client.

25   I disagree.  We disagree.  And if you'll recall, when my client

1    initially complained about not having those appointments of

2    being the charge nurse, she compared herself to Ms. Libran.

3    Remember?  They claim that it goes by seniority initially, and

4    then they changed the theory and now they're claiming that

5    there is a committee -- and I will get into all that -- the

6    committee that Ms. Lattery earlier this morning said consisted

7    of herself, Ms. Graham and Dr. Adler.

8         You heard Ms. Graham when I asked her, Did you ever,

9    in sum and substance, not recommend her for this?  She said no.

10   Also, when I questioned her, I did not ask her the way

11   Mr. Garland phrased the question with regard to if my client

12   had contacted her.  My question to her -- and your memory is

13   your memory-- but as I recall, since I asked the questions, I

14   asked her, Had my client called you after receiving this letter

15   of October 12th, 2009, would you have taken her back to work

16   like you did with Ms. Fischer?  And her answer was then, Well,

17   I don't know.  I could not tell.  So that gives you her state

18   of mind at least as of October 12th, or thereabouts, of 2009.

19        Let's talk about Dr. Adler and this investigation that

20   took place which, in my opening statement, as you'll recall, I

21   termed it as being perfunctory.  Now, they tried-- defendant

22   tried to say that my client-- and I believe it was in their

23   opening statement.  They changed their tune because the

24   evidence doesn't show that.

25        They said two things in their opening statement that

1    comes to mind:  One is that it is Ms. Byrne who thought it was

2    a good idea to test Patient N for Morphine.  That is not the

3    evidence that was here before you when I asked Ms. Byrne

4    whether she had anything to do with it, and she said, no, she

5    did not.  As a matter of fact, my recollection of her facial

6    expression was kind of "I don't know what you're talking about.

7    This is the first I hear of it."

8         Now, Ms. Lattery said today that Dr. Adler only got

9    involved at the conclusion of all the interviews of the

10   different nurses that were involved, including my client.  Now,

11   my client is -- I'm positive that he told you that she did not

12   get to go up and be interviewed until about between 2 and 3

13   p.m.  Ms. Lattery tried to give you the impression it was

14   earlier, but when she was questioned about the recognition date

15   and what would be -- where would the nurses be?  Would they be

16   caring for the patients?  She adjusted a little bit.  And she

17   had to admit that she really didn't recall when it was

18   finished.

19        My client recalled when she was interviewed because --

20   let me share this with you.  My client has been living in a

21   twilight zone since that day, which is the 15th of September,

22   2009, so she would remember what happened.  She would be in

23   the best position to remember when it happened and why it

24   happened.

25        So why are they adjusting their time line?  I'll tell

1   you why they are adjusting their time line.  Ms. Fischer

2   unquestionably said that on the 15th of September, she came--

3   she started working.  At around 8:45, maybe 9:00, she received

4   Patient N.  Within 15 minutes to half an hour, she was told,

5   not by Dr. Adler as he testified, but by nurse manager/educator

6   Lucero who told her that she needed to take and make sure that

7   there was a test done on Patient N's urine for toxicological

8   purposes.  If you look at the report itself, it says that it

9   was-- now, Ms. Fischer, who did the collection herself, said it

10  was about 9:15, 9:30.  The document that they submitted for

11  your review said the collection happened at 12:51.

12          Dr. Adler said that it was he who asked her to take

13  the collection.  Well, then, she knew who asked her.

14  Ms. Fischer knew who asked her.  Then, based on Ms. Lattery's

15  belated testimony earlier today, she said Dr. Adler had no

16  involvement whatsoever until they interviewed all the

17  questioned-- or the nurses that were in question.  This is very

18  important.  This is very important for the ability of who is

19  more likely than not telling the truth to you, ladies and

20  gentlemen.  I submit it's really my client.

21          Now, let me talk to you a little bit before I go into

22  my client's recitation and testimony that she gave you under

23  oath here.

24          Ms. Greene.  Let's talk about Ms. Greene.  If you'll

25  recall Ms. Greene, she came in the first day and she said that

1    she talked to my client; that then there was a cutoff of

2    communication.  But by her own estimation, she said that if

3    there was any cutoff in communication, it had to have happened

4    towards the end of September or early October.  And I'll tell

5    you why.  She remembered, after my client's suspension, which

6    started on 9/16/2009 -- and you'll recall her, she said that

7    she talked to my client hours at a time.  Hours.  And I asked

8    her to tell me how often, and she said, "I don't know.  More

9    than 15 times."  So if you add 15 to September 16, you'll come

10   up to the end of September or early October.

11            Now, there is no question that at one point my

12   client -- and it's conceded, felt, after talking to her union

13   people, that they were conflicted because they were taking the

14   side of Ms. Fischer over her because they both-- which is

15   understandable.  There was a conflict.  So that they had two

16   different members and the two different members were pointing

17   at each other with regard to the changing or the correction of

18   the narcotic sheet.  And I'll get to that, too, in a minute or

19   so.

20            Now, it's understandable why the union, perhaps, would

21   choose to take Ms. Fischer, who has more seniority than my

22   client; who has been contributing her dues a lot more.  You

23   know, it was their call.  But they should not have left my

24   client in the cold and thrown her under the bus, as they did.

25            Now, let me now tell you my client's recitation of the

1    evidence before you.  There is no question that my client had

2    good performance.  You heard Dr. Stumacher who came, who made

3    it a point of coming here to testify on her behalf.  He was her

4    witness.  After pulling a 24-hour shift, he was here and he was

5    very patient.  And he told you at least two times, in the

6    beginning of his testimony and at the end of his testimony,

7    that my client was an excellent nurse.  He also told you, just

8    like Dr. Richardson, that she was very professional.  She had

9    good work ethics and good work manners.

10        My client, in the very beginning, in my open

11   statement, said that she had no issue with Ms. Byrne.  She

12   understands that Ms. Byrne wasn't one of the people that she

13   complained to; that she was there representing the pharmacy and

14   the pharmacy's interests.  That was conceded in my opening

15   statement.  So there is no need for St. Barnabas to come here

16   and start mixing apples and oranges.

17        This is what my client testified to, and I believe

18   this is what the evidence shows unquestionably.  My client

19   started in July of 2002.  She was an excellent worker.  She had

20   no issues whatsoever with the hospital until sometime after

21   2007.  And why do I say sometime after 2007?  You'll recall her

22   testifying that she received a special certification in I.C.U.

23   training.  Not only that, but in 2008 she began a master's

24   program.

25        Remember, she told you that she's the proud single mom

1    of a teenager who at that time period was starting high school.

2    She was happy working for St. Barnabas.  And the most ludicrous

3    thing that she heard during this whole case, and especially

4    during the testimony in this court, was that she had no

5    interest in her job, ladies and gentlemen.  When she was

6    questioned, what did she say to you?  Of course I have an

7    interest in my job.  I was a single mom.  I needed my job.  My

8    son, who goes to a private Catholic school, needed the support.

9    I was earning in the upper 90s -- I believe she gave you two

10   figures:  One almost 100 and one almost 97.  And this is in the

11   evidence, ladies and gentlemen, as Exhibit 6, her tax returns

12   for those three years.

13          Now, you can call my client, figuratively speaking,

14   anything that you want, but my client is not ignorant and she

15   is not stupid.  She knew that she had something good when she

16   had it.  Not only that, but it was her goal to help and give

17   back to her local community, which is the South Bronx.  And she

18   liked working I.C.U.  Do you recall when she testified that she

19   was hoping that at least she can become a manager?  Just like

20   Ms. Lucero, just like Ms. Ondoy.  Just like all the other

21   Filipinos that were there working with her.  She wanted that.

22   Just like Ms. Lattery, who was here today.

23          Now, sometime in 2009, after she received this special

24   recognition, she's feeling good and she goes and she approaches

25   her immediate supervisor, Manager Lattery.  And she says to

1   her, Look, I've been here for so long.  I don't get any charge

2   nursing assignments.  I don't see why is that.  And they give

3   her the excuse that it goes by seniority.  But, like I said,

4   she's not ignorant and she's not stupid.  She is midway in her

5   master's.  And she starts observing and she sees who, out of

6   all the people, doing charge nursing admittedly?  Ms. Libiran.

7        Now, the funniest thing is that defendant tried to

8   show that my client did do charge nursing.  And who do they

9   ask?  Ms. Libiran.  Ms. Libiran says, Oh, yeah, when I first

10  joined the unit and worked with Ms. Martinez, she was the

11  charge nurse.  But she had forgotten that earlier on in my

12  direct, she had told us that she started in surgical and then

13  she went about a year or so later to I.C.U and for eight months

14  she worked the night shift, 7 p.m. to 7 a.m.

15       Guess what shift my client was working at that time

16  and throughout her tenure?  7 a.m. to 7 p.m.  And then I said,

17  well, maybe they overlapped for four months.  I gave her the

18  opportunity and I asked her, Can you please tell us, when did

19  you switch from the medical-surgical to I.C.U.?  She said, Oh,

20  I can't remember.  I said, Give me a season.  She said about

21  May, maybe April, not earlier.  If you add eight months from

22  May or April, you only come up to December of '05 or January of

23  '06.  She never worked with my client on the same shift during

24  that time period.  So there is another fallacy.  There is

25  another incredible testimony.

1          Now, would Ms. Libiran have a bias against my client?

2     Absolutely.  Because it was Ms. Libiran that she complained to

3     Ms. Lattery and further to Ms. Ondoy.  That's her testimony.

4     And furthermore, sometime in September, August/September, when

5     she sat down for her annual performance evaluation and she

6     revisited the issue with Ms. Lattery, where Ms. Lattery invited

7     her to talk to Ms. Graham herself, remember what Ms. Graham

8     said?  She has an open door policy.  She was proud to share

9     that with us.

10          Well, guess what?  My client took advantage of that

11     open door policy and she went and she spoke to Ms. Graham.

12     What did she tell Ms. Graham?  Your memory is your memory, but

13     as I recall her testimony, she complained about discrimination,

14     not the opportunity of having to work charge nursing.  She

15     complained to Ms. Ondoy.  They said, Why would Ms. Ondoy have a

16     bias to her?  Why would Ms. Lucero have a bias to her?  Because

17     Ms. Ondoy and Ms. Lucero told her she could not speak Spanish

18     on the floor, yet they spoke the Filipino dialect and they

19     allowed their other Filipino staff to speak the Filipino

20     dialect with no issues.

21          Nobody came here and denied that.  Did you notice

22     that?  Nobody came here and denied that.  Ms. Ondoy didn't deny

23     that my client complained to her about discrimination.

24     Ms. Graham didn't deny it today that -- she was there with my

25     client.  She didn't deny that she complained to her about

1   discrimination and retaliation.  Ms. Lattery tried.

2          But I submit to you, ladies and gentlemen, based on

3   the testimony of my client, that's uncontroverted by Ms. Ondoy,

4   Ms. Graham, Dr. Richardson.  Remember, she had complained about

5   the kind of assignments she gets, about the fact that she

6   doesn't work charge nurse.  That's how he termed it.  But it is

7   more preferential treatment that she observed and she

8   experienced that were given to the Filipinos and not to her.

9          So she meets with them at the end of August/early

10  September.  And what happens?  Her nightmare started when she

11  shows up to do what?  Overtime.  Does that sound like this

12  person, Ms. Martinez, wasn't interested in her job, going to

13  work overtime on the 14th of September?  I submit otherwise to

14  you, ladies and gentlemen.

15         And so she works.  No problem.  And what happens that

16  day?  And you have the evidence before you.  I urge you to look

17  at all of it, their exhibits and my exhibits, and to review it

18  in toto, in totality, before you come to a final conclusion.

19  But what does it show?  On the day in question, Ms. Libran is

20  the only one that dealt with the-- regardless of what they

21  claim that my client did, the documentary evidence that they

22  submitted shows that Ms. Libran is the one who received the

23  Morphine for that day.  And she found between six and seven,

24  based on that document, that there were two 2 milligram Tubexes

25  missing.  Does she tell anybody about it?  I didn't hear that

1    she did.

2            Then, remember, there was stipulations of fact.  And

3    the stipulations of fact state that she was supposed--

4    Ms. Libran was supposed to do the counting that evening.  But

5    for some reason that wasn't explained to any of us here, it was

6    Ms. DeJesus, based upon the documentation, and I believe

7    Mr. Panes, the one who was coming on to the evening shift, that

8    did the counting in the evening.

9            And after Ms. DeJesus and Mr. Panes found out that

10   there was some-- and how much there was is even more conflicted

11   based on the evidence that you heard.  And I'll visit it very

12   quickly in just a few seconds.  After Ms. DeJesus found out,

13   then there is another entry after 7 p.m. for one more missing

14   2-milligram Tubex.

15           Where do they found-- where do they find the empty

16   Tubexes of three Morphines?  In the regular garbage.

17   Ms. Graham said that that's a no-no.  I believe Ms. Ondoy said

18   that that's a no-no.  Ms. Libiran testified that she sometimes

19   did that.  She couldn't remember whether she did it on that day

20   or not, but she did it.  Worse, sometimes she even left it

21   right there.  She didn't know what other people did with it.

22   Up until today, I had no idea that they actually had needles in

23   them, so that even makes it worse.

24           Was Ms. Libiran held responsible for that?  Was she

25   disciplined?  No.

1      So my client did the same thing every other one did

2   except for one, Ms. Lucero.  If you'll recall, Ms. Ondoy said

3   that Ms. Lucero did not have to write a statement.  And the

4   only thing that was done for Ms. Lucero, she reached out to her

5   and called her to find out if she used any Morphine when she

6   came to D3 that day and took any Morphine out.  And she told

7   her verbally no, and that was the end of it.

8      Now, my client went through the same thing that the

9   other Filipino nurses went through.  She gave a statement when

10  she was asked to; she met with the committee when she was asked

11  to; she cooperated.

12     Now, somehow through this case, defendant,

13  St. Barnabas, is saying, oh, you know, it was the hospital who

14  found out that there was a change or a correction with regard

15  to Ms. Fischer's 6 p.m. to 5 p.m. of September 14th.  But if

16  you look at the same document, I believe it's DX-12, it's the

17  narcotics sheet.  Maybe DX-13.  Yeah, DX-13.  Anybody can see

18  that, on the second page, that there was the same penmanship

19  with the same writing at 12 p.m. that was done by Ms. Libiran--

20  by Ms. Fischer, I'm sorry, and that there were others.  So the

21  handwriting just doesn't make any sense to my client, because

22  there was one similar handwriting at 12 noon and another one, I

23  believe, at 1 a.m.  So that just doesn't make any sense.

24     But what really makes sense is my client testified

25  under oath and what has been consistently her position.  Now,

1   make no mistake about it, ladies and gentlemen, my client

2   believes that what she did was wrong.  But did the punishment

3   fit the crime?  Absolutely not.  And she's not asking for any

4   better treatment than the other Filipino nurse that was

5   implicated or the other one that wasn't implicated at all,

6   Ms. Libiran.  All she wanted was equal treatment, even when it

7   came to the discipline.

8          What happened with Ms. Fischer, she was returned after

9   three weeks.  But if you look at the documentations that was

10  submitted with regard to her disciplinary -- suspension

11  disciplinary, it was then, later on, reduced to two days.  And

12  then the language was changed whereby initially they said that

13  future similar-- "future similar misconduct will lead to and

14  including termination," and then that was also changed to take

15  the word "termination" out.  It is in their black evidence

16  book.  Please pay attention to that.

17         Now, the next day she comes in and now they're talking

18  about patient care.  According to them, at least early on on

19  9/15/2009, St. Barnabas suspected that my client had

20  misadministered the medication accidentally, or by mistake, yet

21  they allowed her to work until all the way until 7:00.  Was

22  patient care undermined at the time?  I submit to you this has

23  nothing to do with patient care.  This had to do with a

24  retaliatory motive.  Because my client, as was described by her

25  sister, as you probably observed, is a proud woman who likes to

1    get equal treatment.  Her sister testified and said that she

2    is, and has always been, the strong one in the family.  I

3    submit to you that my client has always and consistently been

4    the strong one because she had to set an example as a single

5    parent for her teenage son and protect him in any way, shape or

6    form.

7            So what happens after that?  Ms. Lattery comes in

8    around 6:30 and tells her, You have to get your union rep

9    because you're going to get discipline the.  She doesn't tell

10   her exactly what it is.  And my client, once again, protests.

11   because at that time -- and if you remember, Ms. Fischer said

12   she wasn't suspended until the next day, the 16th.  She was

13   cross-examined on that.  She insisted that was the second day,

14   the 16th.  My client said this is unfair, in sum and substance.

15   This is unfair, this is retaliatory, this is discriminatory.  I

16   submit to you, to cover their tracks, they decided to also --

17   to also suspend Ms. Fischer the following day.

18           And so my client is on suspension and she hears from

19   Ms. Lisa Greene on or about the 17th or the 18th of September.

20   She testified, and the record indicates, that she never had any

21   similar disciplinary procedure with a union or anybody else

22   before this.  This sounded like mumbo-jumbo to her.  And

23   realizing that she had another educated sibling, Ms. Santiago,

24   she decided to call her up so that she can lend her her ears

25   and see what's happening and walk her through the maze and

1    through the nightmare that was created by St. Barnabas.

2          And what do both of them say?  They say they had a

3    conversation with Ms. Greene.  Ms. Greene corroborates many of

4    what was said and she denies the others.  And, again, I asked

5    Her, well, didn't you feel conflicted?  She says, conflicted,

6    yes, but let me explain, and she went on to explain, to

7    distinguish it.  But you know what?  It is what it is.  She was

8    conflicted.  You have two members of the same unit, they're

9    both pointing at each other.  It's a conflict.  All what it is

10   is a conflict.

11         So during this telephone conversation, what happens?

12   She tells her that the hospital is offering her two options, if

13   that's what you want to call it:  One is resign or, two, under

14   duress resign because otherwise we're going to report you to

15   the State.  And I believe the testimony shows that they did, in

16   fact, at one point report her to the State.  But my client

17   continues to work as a nurse.  And the reason I say that is

18   because you'll recall that she said that sometime in December

19   of 2010, she began to make the same kind of money that she was

20   accustomed to as a nurse.

21         And so conflicted, having no faith in her union, she

22   decides to get a private attorney.  Nothing is wrong with that,

23   is there?  That's her right.  And I asked, in sum and

24   substance, Ms. Greene if that was all right.  Yeah, but, you

25   know, you have to waive this and waive that, but it is,

1    nonetheless, her right.  But -- and the evidence shows, in

2    their own exhibit booklet, that she grieved her suspension,

3    because the union submitted the grievance.

4            And what does Ms. Greene say, right, to try and help

5    the hospital, whom she still works for?  And she's been there,

6    I don't know, 23 or 27 years.  I know she's been 15 years

7    wearing two hats.  Right?  What does she do?  She says that she

8    only gave her three options:  One is she can negotiate the

9    resignation on her behalf, which my client did not want, and

10   the other one is she can grieve it.  I ask her, Isn't that what

11   you wanted?  She has to concede, especially the second day she

12   testified, she had to concede that she did grieve her

13   suspension.  And the union, in fact, did submit a formal

14   grievance procedure on her behalf.

15           Does that mean my client is not interested in her job,

16   ladies and gentlemen?  I think not.  I think she's very

17   interested in her job.  She was willing to do that and then

18   hire an attorney to protect her rights, as well.

19           Now, I asked her whether I was authorized to write to

20   the defendant on her behalf, and she said yes.  And there is a

21   letter from me dated, I believe, towards the end of September

22   somehow there in the record.  And in the letter there should be

23   no question that she continued to seek her job and be

24   interested in her job.

25           And so what happens now?  She has-- she thinks she has

1    two people working on her behalf, or one entity and her lawyer,

2    and that she's good.  So she relies on that and the process

3    takes it place.  And Ms. Graham conceded that at one point she

4    knew that she had hired her own attorney.  She didn't remember

5    whom, but she remembered that she did.  And then Ms. Graham

6    sends her a letter.  It's not cc'd to either her attorney or to

7    the union.  What did Ms. Greene say?  Once you start the formal

8    disciplinary process, grievance process, communication should

9    be through the union.  This is another violation of policy,

10   practice, or whatever, when it came to my client.  There were

11   no cc's to the union.  And it was uncontroverted that my

12   client.  There was nobody who came in here and said, no, it

13   wasn't around the 20th that she received it.  Because,

14   remember, she said she had to go and sign for it so the

15   hospital would have the green sheet that she signed for it.

16   I'm sure it would show when she signed for it.  My client

17   unequivocally stated that she got it on the 20th of October.

18   Remember, there was testimony from her sister that she tried to

19   help her out.  Sometimes she took her Upstate to stay with her,

20   and so on and so on.  So she couldn't sign for it until the

21   20th.

22        She calls her union, because it's the right thing to

23   do.  You're being represented by the union; you want to share

24   it with the union.  And the next day she's terminated.

25        I submit to you, ladies and gentlemen, that there is

1    no question under the totality of circumstances that any, any,

2    reasonable person would find that my client was not subjected

3    to discrimination and retaliation in the terms and conditions

4    of her employment.  And as you know, she had testified, and

5    Ms. Libiran confirmed, she had testified-- I'm sorry, and her

6    sister confirmed that my client had suffered as a result of her

7    treatment by defendant.  And I will get into that in just two

8    or three minutes.

9         Before I do that, just to share with you that the

10   testimony showed that the four other-- four other nurses that

11   were involved were both Filipinos; that everybody between her

12   and Ms. Graham in the chain of command was Filipino except for

13   Ms. Lattery, and that's what the record indicates.  I'm not

14   going to bore you with the names and their titles at this

15   point, as I'm sure you'll recall there was a lot of testimony

16   about that.

17        Now, let me talk to you about the compensatory pain

18   and suffering that my client had suffered and ask that you

19   return a verdict in her favor for both the discrimination that

20   she suffered in the last year or so of her employment, the

21   retaliation she suffered, and then the eventual discriminatory

22   treatment while on suspension when it came to Ms. Fischer

23   versus her and the further retaliatory treatment because she

24   continued to engage in-- she continued to complain of

25   discrimination.

1          As you'll recall, we had Dr. Stumacher, who I believe

2     his words were, when he spoke with her, whenever that was, it

3     was definitely after she was suspended, that she was angry and

4     that she felt that she was mistreated.  She had personally

5     testified that she was depressed, anxious, angry; that she had

6     lost her self-esteem; that she had crying spells; that she lost

7     weight; that she lost sleep; that she saw doctors.  She saw at

8     least two MDs, her primary physician and some specialist.  I

9     think the word is "gastroenterologist."  And that she had

10    heartburn, she had eating issues, and these were related to her

11    stress for which she also sought psychological, mental, help

12    for.

13         She testified that she saw a psychologist from

14    November 2009 to February 11 with a little break.  As you'll

15    recall, the first break was caused by the fact that she lost

16    her insurance with the union.  And the reason that her

17    psychologist/patient relationship was terminated in February

18    2011 was because the psychologist at the time had retired.

19         Now, this was corroborated in part, great part, by her

20    sister, who also testified that they were very close; that she

21    observed her mental anguish, in sum and substance.  I'm not

22    quoting her.  That she had - she would go often and that at

23    times she would even go with her to the doctor.  I'm not going

24    to bore you with more details as you have been here, as I

25    stated before, paying a lot of attention and there was a lot of

1   testimony about that.

2           Just give me one minute, your Honor.

3           THE COURT:  Sure.

4           MR. NUWESRA:  In closing, and before I thank you and

5   sit down, I would like to take a few minutes to urge you,

6   ladies and gentlemen, to go back and deliberate, vote your

7   conscience, and return a verdict for my client in her favor on

8   her claims and award her what a reasonable person in her shoes

9   should be awarded in compensatory damages for pain and

10  suffering.  She has great faith in you.  She does believe in

11  the jury system.  That's why she opted to be judged on the

12  facts by you, members of her community and her peers.

13          In closing, we thank you and we wish you Godspeed.

14  And may God bless you and bless the United States of America,

15  where citizens such as my client, who had come to this country

16  when she was young, has the opportunity, the right, and the

17  privilege to be judged by the peers and members of her

18  community.

19          I thank you.

20          THE COURT:  Folks, what we're going to do is take a

21  five-minute break so that you can stretch and clear your heads.

22  You can leave your notebooks in the back, because you're going

23  to have copies of the charge back in the jury room, so you

24  don't have to take notes during the charge.  At 3:30 I'll give

25  you the charge.  Okay?  Don't discuss the case.  Keep an open

1    mind.

2              (Jury excused)

3              THE COURT:  Okay.  See you in ten.

4              (Recess)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I need counsel to initial that then we

2     will bring in the jury.

3          (Pause)

4          (Jury enters courtroom)

5          THE COURT:  Ladies and gentlemen, now that you have

6     heard the evidence and the arguments of the lawyers, it's my

7     duty to give you the instructions of the law that apply in this

8     case.  It is your duty as jurors to follow the law as stated in

9     these instructions and to apply the rules of law to the facts

10    as you find them from the evidence in the case.  You are not to

11    single out any one instruction as stating the law.  You are to

12    consider the instructions as a whole.  You are also not to be

13    concerned with the wisdom of any rule of law stated by the

14    court.  Regardless of any opinion you may have about what the

15    law ought to be, it would be a violation of your sworn duty to

16    base a verdict on any view of the law other than the one given

17    to you in the instructions of the court.

18         Remember that nothing I say in these instructions is

19    to be taken as any indication that I have an opinion about the

20    facts of the case.  It is not my function to determine the

21    facts of the case.  That duty is yours.

22         You must weigh and consider this case without regard

23    to sympathy, prejudice or public opinion.  In reaching your

24    verdict you must not consider anything other than the evidence

25    that has been presented to you in this action.  Both the

1   parties to the case and the public have the right to expect

2   that you will carefully and impartially consider all the

3   evidence in the case, follow the law as I state it for you, and

4   then reach a just verdict regardless of the consequences.

5           The case should be considered and decided by you as an

6   action between persons of equal standing in the community, of

7   equal worth, and holding the same or similar stations in life.

8   All persons stand as equals before the law and are to be dealt

9   with as equals in a court of justice.

10          As I told you previously it is your function as jurors

11  to decide the issues of fact.  And your decision on the issues

12  of fact is to be based solely on the evidence.  The evidence

13  consists of the sworn testimony of the witnesses and the

14  exhibits that were received for your consideration.  And there

15  is a third form of evidence which is not mentioned here but

16  which will be by the time you see it, there are a number of

17  stipulated facts in this case, a large number of facts that the

18  lawyers agreed could be deemed proved and those are evidence in

19  the case.

20          Remember that nothing I say is evidence; nothing that

21  either of the advocates say is evidence.

22          You have heard objections by the lawyers to certain

23  questions during the course of the trial.  It is the duty of

24  lawyers to object when the other side offers testimony or other

25  evidence if they believe it is not properly admissible.  When I

1    sustained an objection to a question, you as jurors are simply

2    to disregard the question.  You can't draw any inference from

3    the wording of the question and you can't speculate about what

4    the answer would have been if the witness had been permitted to

5    answer.

6         Questions by themselves are not evidence.  Asking a

7    question to which an objection was sustained does not presume

8    the question would favor the party asking the question.

9    Sustaining an objection means only that the question should not

10   have been asked.

11        The court does not, in allowing testimony or other

12   evidence to be introduced over the objection of counsel,

13   indicate any opinion as to the weight or effect of such

14   evidence.  You the jurors are the sole judges of the

15   credibility of all witnesses and the weight and affect of all

16   the evidence in the case.

17        In a civil action like this one the plaintiff, the

18   person who brings the lawsuit, has the burden to prove every

19   essential element of her claim if she is to recover damages

20   from the defendant.  Unless the plaintiff can demonstrate each

21   essential element of her claim by what we call a preponderance

22   of the credible evidence, then your verdict must be in favor of

23   the defendant.

24        The credible evidence means the testimony or exhibits

25   that you find worthy of belief.  The plaintiff has convinced

1    you by a preponderance of the evidence if after you have heard

2    all of the evidence you believe it more likely that some event

3    occurred or some fact exists.  In this case, for example, the

4    plaintiff has to prove by a preponderance of the evidence that

5    she was the victim of discrimination and/or retaliation.  If

6    you believe it more likely than an event did not occur or that

7    a fact does not exist, then the matter has not been proved to

8    you by a preponderance of the evidence.

9           You will remember, I told you at the beginning of the

10   case, if after having heard everything, you find that the

11   likelihood is still evenly balanced 50/50, maybe yes maybe no,

12   then the party having the burden of proof, the plaintiff, did

13   not succeed.  The balance must be tip in favor of your

14   believing that the particular event did occur or the particular

15   fact does exist in order for the plaintiff to meet the burden

16   of proof regard by law.

17          In determine whether something has been proved by a

18   preponderance of the evidence, you may consider the testimony

19   of all of the witnesses regardless of who called them and all

20   exhibits received into evidence regardless of who may have

21   produced them.  A preponderance of the evidence, however, does

22   not mean that greater number of witnesses or how much time

23   either side employed at the trial.  The phrase refers to the

24   quality of the evidence, its weight or its significance, and

25   the effect that it has on your minds.

1          Some of you may have served as jurors at a criminal

2     trial or watched movies or read articles dealing with criminal

3     cases and so you are familiar with the phrase proof beyond a

4     reasonable doubt.  That standard does not apply in a civil

5     trial.  That is the standard of proof that society requires

6     before someone can be found guilty of a crime and lose his or

7     her liberty.  That's a different standard than the standard

8     applicable in a civil lawsuit like this one, so put out of your

9     mind any discussion you may have heard about proof beyond a

10    reasonable doubt.  In a civil case, plaintiff's burden is to

11    prove her claim by a preponderance of the credible evidence as

12    I have just explained that standard to you.

13         Now I know where the stipulations of fact come.  They

14    were back here.  They were here all alone.  Let me remind that

15    a stipulation of fact is an agreement between the parties that

16    a certain fact is true.  That means they are evidence.  You

17    must regard those facts as true but how you use those facts in

18    deciding your verdict is up to you.  You can decide that they

19    are important, that they are not important.  We will have them

20    in writing with you back in the jury room.

21         There are generally speaking two types of evidence

22    from which you may properly find the truth as to the facts of

23    the case.  One is direct evidence, the testimony of an

24    eyewitness being the principal example, easiest example of

25    direct evidence.  The other is indirect or circumstantial

1   evidence, the proof of a chain of circumstances that point to

2   the existence or the nonexistence of certain facts.

3           You should know that the law draws no distinction

4   between direct and circumstantial evidence.  It simply requires

5   that you the jury find the facts in accordance with a

6   preponderance of all the credible evidence in the case, both

7   direct and circumstantial.

8           I have to give you what's called a limiting

9   instruction.  Two of the exhibits that were introduced into

10  evidence are Plaintiff Exhibits 2 and 3.  Those are letters

11  that Mr. Nuwesra sent to representatives of the hospital.

12  There were some discussion about them in closing.  I don't

13  think you heard very much about them before that.  Plaintiff

14  Exhibit 2 and 3 were admitted for a limited purpose.  That

15  means you can only consider them for a limited purpose.  You

16  made consider them for the purpose of deciding whether Ms.

17  Martinez did or did not show continued interest in her

18  employment with the defendant.  That's the only reason why

19  those letters were admitted and you can't think about them in

20  connection with any other issue.

21          You the jurors are the sole judges of the credibility

22  of the witnesses, of the weight that their testimony deserves.

23  You may be guided by the appearance and the conduct of a

24  witness or by the manner in which the witness testified or by

25  the character of the testimony the witness gives or by evidence

1    you find to be credible that's contrary to what the witness

2    testified.

3          But you should carefully scrutinize all the testimony

4    you have heard, the circumstances under which each witness

5    testified, and every matter in evidence that tends to show

6    whether a witness is worthy of belief.  Consider each witness's

7    intelligence, motive, state of mind and demeanor while on the

8    witness stand.  Consider the witness's ability to observe the

9    matters about which he or she testified, whether the witness

10   impresses you with having an accurate recollection of those

11   matters.  Consider any relation each within may bear to either

12   side of this case, the manner in which each witness might be

13   affected by the verdict, and the extent to which if at all each

14   witness's testimony is supported or contradicted by other

15   evidence in the case.

16         Inconsistencies or discrepancies in the testimony of a

17   witness or inconsistencies or discrepancies between the

18   testimony of two different witnesses may or may not cause you

19   to disbelieve what someone has said to you.  Two or more

20   persons witnessing an incident or transaction may see or hear

21   it differently.  An innocent misrecollection like failure of

22   recollection is not an uncommon experience.  So in weighing the

23   effect of a discrepancy, always consider whether it pertains to

24   a matter of importance or to an unimportant detail, and whether

25   you believe the discrepancy results from innocent error or

1   intentional falsehood.

2        After making your own judgment you will give the

3   testimony of each witness such weight if any as you may think

4   it deserves.

5        As parties to the action, some of the witnesses you

6   have heard have an interest in the outcome of the case.  An

7   interest in the outcome may create a motive to testify falsely

8   and may persuade a witness to testify in a way that advances

9   his or her interests.  If you find that any witnesses whose

10  testimony you are considering has an interest in the outcome of

11  the trial, you should bear that factor in mind when evaluating

12  the credibility of his or her testimony.

13       But it does not automatically follow that testimony

14  given by an interested witness should be disbelieved.  There

15  are people who no matter what their interest in the outcome of

16  a case would never testify falsely.  It's for you to decide

17  based on our own perceptions and your common sense to what

18  extent if at all a witness's interest has affected his or her

19  own testimony.

20       If you should find that a witness has testified

21  falsely about a material fact, the law permits you to disregard

22  that witness's testimony in its entirety.  If I can paraphrase

23  that, if somebody lies to you on the witness stand about

24  something that's important to your determination of this case,

25  you are perfectly free to say a person who lies in one thing

1    can't be trusted at all and just disregard that person's

2    testimony entirely.  You are not required to do that, however.

3    You can accept as much of a witness's testimony as you think is

4    true and disregard anything you feel is false.  How you handle

5    the testimony of a witness who lies to you about a material

6    fact is entirely in your discretion.

7           The law does not require a party to call as witnesses

8    all persons who may have been present at any time or place

9    involved in the case or who may appear to have some knowledge

10   of the matters at issue in the trial.  Nor does the law require

11   any party to produce as exhibits every piece of paper or that

12   every thing that relates to this case.  Your job is to decide

13   whether the evidence that has been introduced proves by a

14   preponderance of the evidence that the plaintiff is entitled to

15   recover damages from the defendant.

16          The plaintiff in this case is Ms. Marlen Martinez.

17   She's a black Hispanic female born to Honduras.  She alleges

18   that her former employer, defendant St. Barnabas Hospital,

19   discriminated against her on the basis of her national origin

20   or ethnicity.  Ms. Martinez also alleges that the defendant

21   retailed against her for engaging in what's call protected

22   activity.

23          Specifically, Ms. Martinez contends that she was

24   discriminated against in the terms and conditions of her

25   employment on the basis of her national origin or ethnicity in

1  that Filipina nurses were favored for various promotional and

2  educational opportunities and desirable shift assignments.  She

3  also alleges that she was fired from her job because she was

4  Honduran rather than Filipina, and also because she complained

5  about the discrimination that she believed she had suffered in

6  the past because of her national origin.

7         The defendant denies that it violated Ms. Martinez's

8  rights in any way.  Defendant maintains that employment

9  decisions affecting Ms. Martinez were based on employment

10  criteria unrelated to national origin or ethnicity, and that

11  her termination had nothing to do with her complaints of

12  alleged discrimination.

13         Let's start with the discrimination claim.  Ms.

14  Martinez alleges that she was discriminated against by the

15  defendant because of her national origin or ethnicity, in

16  violation of Title VII of the Civil Rights Act of 1964, the New

17  York State Human Rights Law, and the New York City Human Rights

18  Law.  It is unlawful under all three statutes for an employer

19  to intentionally discriminate against an employee because of

20  the employee's national origin or ethnicity.  The standards for

21  evaluating whether Ms. Martinez has proven her claim are

22  effectively identical under all three laws.  It's just that we

23  have federal, state and city laws that all address the same

24  thing.

25         In order to prevail on her claim national origin or

1    ethnicity discrimination, Ms. Martinez must prove by a

2    preponderance of the evidence four different things.

3         First, Ms. Martinez is from Honduras.  She is alleging

4    discrimination on the basis of her national origin or

5    ethnicity.  She belongs to a protected class.  You need not

6    deliberate on this first element.

7         Second, she has the burden of proving that she

8    performed her job in a satisfactory manner.  The parties have

9    stipulated that Ms. Martinez received her license from the

10   State of New York education department and became registered to

11   practice in the State of New York as a registered professional

12   nurse.  So there is no dispute that she was qualified to be a

13   nurse as St. Barnabas Hospital.  There is also no dispute that

14   Ms. Martinez was performing her job in a satisfactory manner,

15   at least until September 14, 2009, and evening about which you

16   have heard a great deal of disputed testimony.

17        Third, Ms. Martinez must have suffered an adverse

18   employment action.  An adverse employment action is any action

19   that materially changes the terms and conditions of an

20   individual employment for the worst.  Not being promoted, being

21   denied the training necessary to qualify for promotion, being

22   denied more desirable shifts, and being fired, all of those

23   things have been held to be materially adverse changes to an

24   employment.

25        Finally, Ms. Martinez must prove by a preponderance of

1    the evidence that the adverse employment actions about which

2    she complained occurred under conditions giving rise to an

3    inference that they were motivated in whole or in part by her

4    national origin or ethnicity, i.e., that she was Honduran as

5    opposed to Filipina.  She was not Filipina.

6              A plaintiff establishes unlawful discrimination when

7    she demonstrates that some factor prohibited by law, in this

8    case national origin or ethnicity, was at least part of the

9    reason for an employer's decision about some term or condition

10   of employment.  Note that the plaintiff need not prove that her

11   national origin or ethnicity was the only factor motivating an

12   adverse employment decision.  But she must prove that her

13   ethnicity or national origin was a substantial or motivating

14   factor in the employment decisions about which she complains.

15             The hospital argues that reasons other than

16   plaintiff's national origin or ethnicity motivated the alleged

17   adverse employment actions about which Ms. Martinez complains,

18   namely, not being promoted, being denied the training necessary

19   to qualify for promotion, and being denied more desirable

20   shifts.  The defendant also argues that it terminated Ms.

21   Martinez because she committed various infractions of hospital

22   rules and then failed to show interest in retaining her

23   employment when the hospital tried to contact her.

24             The hospital does not have to prove that these were

25   the real reasons for its actions.  Rather the plaintiff has to

1    prove both that they are not the real reasons for the

2    hospital's actions and that at least part of the real reasons

3    why these things happened to her is that she was not Filipina

4    but was Honduran.

5         Even if you do not believe that the hospital took some

6    adverse action against the plaintiff for the reasons it gave

7    you, your verdict must be for defendant unless the plaintiff

8    proves that the defendant took these actions because she was

9    not Filipina.

10        I caution you that it is not enough that the plaintiff

11   is a member of a protected class and that she suffered an

12   employment decision that she believes was adverse.  Put

13   otherwise, the plaintiff does not satisfy her burden of proof

14   simply by asserting, I belong to a protected class, in this

15   case being Honduran, non-Filipina origin, something bad

16   happened to me at work, therefore, defendant discriminated

17   against me.  That's a false syllogism.  The plaintiff must

18   prove that the reason or at least part of the reason why

19   something bad happened to her at work is the fact that she was

20   Honduran rather than Filipina.

21        I caution you that is not your job to judge the wisdom

22   of the defendant's actions.  Keep in mind that an employer has

23   the right to make employment decisions for any reason, good,

24   bad, or no reason at all, as long as the employer does not

25   discriminate in a manner prohibited by law.  You may disagree

1   with an employer's decision about giving certain shifts or

2   benefits or education or promotions or you may disagree with an

3   employer's decision to fire an employee, but unless the

4   plaintiff proves that the decision was motivated by illegal

5   discrimination, you can't question it.

6           I should tell you that when you are thinking about

7   this, you need to think about the different things the

8   plaintiff has alleged individually so that it's very clear that

9   all 8 of you agree either the plaintiff was or was not a victim

10  of discrimination as to the same thing.  If 4 of you thought

11  that she was a victim of discrimination because she didn't get

12  good shifts and 4 of you thought that she was a victim of

13  discrimination in her firing, that's not a unanimous verdict.

14  All 8 of you have to agree on the same thing or things that

15  were discriminatory.

16          In addition to alleging that she was fired because she

17  was Honduran rather than Filipina, this only goes to

18  termination, in addition to alleging that she was fired because

19  she was Honduran rather than Filipina, Ms. Martinez alleges

20  that she was fired in retaliation for complaining about the

21  discrimination she believes she experienced.

22          It is unlawful to retaliate against an employee for

23  complaining about discrimination in the workplace.  Such

24  retaliation is unlawful under all three of those statutes that

25  I already told you about, Title VII of the Civil Rights Act of

1    the 1964, the New York State Human Rights Law, and the New York

2    City Human Rights Law.

3              In order to find for Ms. Martinez on this claim, you

4    must find that she proved each of the following three elements

5    by a preponderance of the evidence.

6              First, Ms. Martinez must have engaged in a protected

7    activity.  Complaining about perceived discrimination on the

8    basis of one's national origin or ethnicity is what we call

9    engaging in a protected activity.  It is illegal to retaliate

10   against, to punish an employee for engaging in protected

11   activity, for complaining about discrimination.

12             You will note that I said complaining about perceived

13   discrimination when I started, and that's because Ms. Martinez

14   is not required to prove that she was in fact the victim of

15   discrimination in order to prevail on her retaliation claim.

16   She must prove, however, that she was acting under a good faith

17   and reasonable belief that the conduct about which she

18   complained was unlawful discrimination.

19             If an employee reasonably and in good faith believes

20   that she experienced national origin or ethnicity

21   discrimination, then complaining about or opposing that

22   discrimination -- let me start that sentence again.

23             If an employee reasonably and in good faith believes

24   that she has experienced national origin or ethnicity

25   discrimination and then she complains about or opposes that

1   discrimination, her employer cannot retaliate against her for

2   complaining.  Protected activity can include actions such as

3   making oral or written complaints to supervisors about

4   perceived discrimination.

5           The plaintiff is also required to prove by a

6   preponderance of the evidence that the supervisors who caused

7   her to be fired, the decision-makers, one or more, it depends

8   on what you find, were aware that she had engaged in protected

9   activity, that she had complained about perceived

10  discrimination.  Obviously, if the person or people who fired

11  Ms. Martinez did not know that she had complained about

12  discrimination, they logically could not have decided to fire

13  her because she engaged in protected activity.

14          Complaints about the work environment that are not

15  related to some factor prohibit by law are not protected

16  activity under the antidiscrimination statutes.  For example,

17  complaining that the workplace is too loud, that's not

18  protected under the antidiscrimination statutes.  But

19  complaints about discrimination based on ethnicity or national

20  origin are protected activity under the relevant laws.

21          Second, Ms. Martinez must have suffered an adverse

22  employment action.  Under federal and state law, retaliation

23  must consist of a materially adverse employment action.  The

24  definition of materially adverse employment action is slightly

25  different in the context of retaliation from the definition I

1  gave you in the context of discrimination.

2          for retaliation purposes, a materially adverse

3  employment action means any action that could dissuade a

4  reasonable employee from making or supporting a charge of

5  discrimination, could dissuade a reasonable employee from

6  complaining about it, from engaging in protected activity.

7          Under New York City law, an employee need only

8  experience an employment action that is adverse not materially

9  adverse.  But under city law, the definition of adverse

10  employment action is actually quite similar to the federal

11  definition of materially adverse employment action.  The

12  retaliatory or discriminatory act complained of needs to be

13  something that is reasonably likely to deter a person from

14  engaging in protected activity.

15          In this case where the allegation is that Ms. Martinez

16  lost her job in retaliation for her complaints, any distinction

17  between federal and local law, any semantic distinction between

18  the two is really inconsequential.  Fear of being fired is both

19  something that could deter a reasonable person from complaining

20  about discrimination and that would be reasonably likely to

21  deter a person from engaging in protected activity.  So you can

22  assume that this element is met under federal, state, and local

23  law.

24          Finally, Ms. Martinez must show by a preponderance of

25  the evidence that she was fired because of her participation in

1   protected activity.  As was true with the claim of

2   discrimination, she need not prove that retaliation was the

3   only or even the principal reason for her termination.  But her

4   complaints about discrimination must have been a substantial or

5   motivating factor in the decision to fire her.

6           In reaching your determination about causation, you

7   should consider not discuss the timing of the alleged adverse

8   employment action but the totality of the evidence bearing on

9   the question of caution.

10          The defendant has argued that reasons other than Ms.

11  Martinez's national origin or ethnicity motivated the decision

12  to end her employment.  Specifically, the defendant argues that

13  it terminated Ms. Martinez because she mistakenly administered

14  morphine to a patient, altered time entries on the patient's

15  state-mandated narcotics control sheet, and then declined to

16  cooperate in the ensuing investigation, thereby indicating a

17  lack of interest in retaining her position.

18          Ms. Martinez disputes that.  You all know that.

19  That's really what you did hear.  That's what 95 percent of

20  this trial was about.

21          The defendant does not have to prove that it fired Ms.

22  Martinez for the reasons I just summarized for you.  The

23  hospital is only required to articulate some legitimate

24  nonretaliatory reason for its actions, and it has done so.

25  That being the case, Ms. Martinez has the burden to prove two

1  separate things.  Plaintiff must proof that the defendant did

2  not fire her for the reason it gave you, i.e., that its reason

3  was pretextual, and plaintiff must also prove that the real

4  reason the hospital fired her, at least part of the real reason

5  the hospital fired her, was the fact that she had in the past

6  complained about discrimination against her because she was

7  Honduran rather than Filipina.

8         Once again I remind you of your role here.  You are

9  not to judge the wisdom of the defendant's actions, remembering

10 that it had a right to discharge Ms. Martinez for a bad reason,

11 a good reason, or no reason at all, so long as it did not

12 discharge her because she complained about discrimination on

13 the basis of her ethnicity and national origin.

14        You may disagree with the reason the hospital gave for

15 firing Ms. Martinez.  You may even disbelieve the hospital when

16 it said it fired Ms. Martinez for reasons relating to the

17 missing morphine incident.  But unless Ms. Martinez proves by a

18 preponderance of the evidence that the hospital fired her

19 because she had complained of discrimination on the basis of

20 her national origin, she cannot prevail on her retaliation

21 claim.

22        If you disbelieve the reasons the defendant gave for

23 its treatment of Ms. Martinez, you may infer the ultimate fact

24 of retaliation, but you are not required to do so.  Remember,

25 the ultimate burden of proof rests with Ms. Martinez, who must

1    demonstrate by a preponderance of the evidence that retaliation

2    for her complaint of national origin or ethnicity

3    discrimination was a substantial or motivating factor in the

4    defendant's decision to fire her.

5         In proving her claim retaliation, Ms. Martinez is not

6    required to produce direct proof of unlawful motive or intent,

7    or design.  You, members of the jury, may infer motive, intent,

8    or design, even if they are not admitted, from the existence of

9    other facts and from conduct of the defendant.

10         I will now instruct you about damages.  You should

11   draw no inference from the fact that I am telling you this that

12   I have concluded that the defendant is liable to Ms. Martinez.

13   That's your decision to make.  If you find that Ms. Martinez

14   has not sustained her burden of proof on her claim of

15   discrimination and retaliation, then there is no need even to

16   consider damages on that claim.  You will simply report a

17   verdict in favor of the defendant on that claim.  But if find

18   that Ms. Martinez has proved all the necessary elements of

19   either/or both of her claims, you will then consider the

20   question of damages against the defendant.

21         Whether damages are actually to be awarded in this

22   case and if so in what amount are matters for you the jury to

23   decide in accordance with my instructions.

24         If you conclude that the defendant violated one or

25   more of Ms. Martinez's legal rights, you must award her such

1    sum of money as you believe will fairly and justly compensate

2    her for any injury you believe she sustained as a direct

3    consequence of that violation.  By injury I mean pain and

4    suffering to date, future pain and suffering, mental anguish,

5    shock or discomfort that you find Ms. Martinez has suffered

6    because of these events.  Pain and suffering can relate to

7    physical pain and suffering or to emotional distress resulting

8    directly from or as a natural consequence of the alleged

9    wrongdoing.

10          You may award actual damages only for those injuries

11   that you find Ms. Martinez has proven by a preponderance of the

12   evidence to have been the direct result of discrimination

13   and/or retaliation against her.  If you find that the plaintiff

14   suffered injury but those damages resulted from an act that did

15   not constitute discrimination or retaliation, then you may not

16   award damages to compensate plaintiff for the injury.

17          Compensatory damages must not be based on speculation

18   or sympathy.  They must be based on the evidence presented at

19   the trial and only on the evidence.

20          Lost earnings are not part of compensatory damages.

21   If you decide that the plaintiff experienced discrimination or

22   retaliation or both, it will be my job to calculate any lost

23   earnings.

24          As part of her compensatory damages, Ms. Martinez

25   seeks damages for pain, suffering and emotional distress.  You

1    may only compensate Ms. Martinez for any pain, suffering and

2    emotional distress as you find was caused by the defendant's

3    conduct.  You may not award such damages for pain, suffering

4    and emotional distress as the plaintiff may have suffered for

5    any other reason.

6          In awarding pain and suffering damages you must be

7    guided by dispassionate common sense.  You must use your sound

8    judgment in fixing an award of damages drawing reasonable

9    inferences from the facts in evidence.  Again, you may not

10   award damages based on sympathy, speculation or guesswork.

11         I remind you that Ms. Martinez is seeking to hold the

12   defendant liable for her termination under two separate

13   theories of recovery: national origin or ethnicity

14   discrimination and retaliation.  She does not get to recover

15   twice for the same injury.  Even if you were to find that the

16   plaintiff prevailed on both of her theories about why her

17   termination was unlawful, she is not entitled to recover double

18   damages for her termination.

19         Now, the verdict that you ladies and gentlemen reach

20   must represent the considered judgment of each of you

21   individually.  In order for you to return a verdict, it's

22   necessary that all 8 of you agree on the verdict.  The verdict

23   must be unanimous.  It is your duty as jurors to consult with

24   one another and to deliberate with a view to reaching an

25   agreement if you can do so without violence to your individual

1   judgment.  You each must decide the questions raised by this

2   case for yourself but you can only do that after impartially

3   considering all the evidence with your fellow jurors.

4          I usually stop here and tell a story about my

5   nightmare trial when one of the jurors went back in the jury

6   room and announced to his fellow jurors, this is the way I see

7   it, my way or the highway basically.  He refused to listen to

8   what other the jurors thought about the evidence.  He was not

9   to talk about it.  Eventually he turned his chair around and

10  faced the wall, opened his newspapers.  Needless to say, that

11  jury did not reach a verdict.  That was not a deliberating

12  jury.  Deliberating jurors share their own views about the

13  evident and then listen to their fellow jurors and listen with

14  an open mind, that's a mind that's capable of being persuaded.

15         In the course of your deliberations don't hesitate to

16  reexamine our own views and change your opinion if you become

17  convinced by the arguments of the other jurors that your

18  original view of the evidence was erroneous.  By the same

19  token, don't surrender your honest conviction about the weight

20  or the effect of the evidence just because your fellow jurors

21  feel differently or merely for the purpose of returning a

22  verdict.

23         Remember at all times you are not partisans; you are

24  judges, judges of the facts.  Your sole interest is to seek the

25  truth from the evidence in the case.

1      When you retire you should elect one of the 8 of you

2  to be your foreperson.  The foreperson will preside over your

3  deliberations whatever that means to you.  I don't know what

4  it's going to mean to you.  Some people are very bossy

5  forepeople who organize things; some people are very catch as

6  catch can.  It means whatever you want it to mean.  The

7  foreperson will speak for you all here in open court.  The

8  foreperson's vote is not entitled to any greater weight than

9  that of any individual juror.

10      If it becomes necessary during your deliberations for

11  you to communicate with me, you will send out a note, signed by

12  your foreperson, or if the foreperson goes on strike, it only

13  happened to me once, a foreperson did one time go on strike, so

14  the other jurors signed the note and that was appropriate, put

15  the date and the time and the signature.  None of you should

16  ever try to communicate with me by any means other than by a

17  signed writing.  I will never communicate with any of you on

18  any subject touching on the merits of this case except in

19  writing or orally here in court.

20      The bailiff in this case is Ben; Ben is your guardian.

21      (Law clerk sworn)

22      THE COURT:  That doesn't mean we are going to keep you

23  here all night, but when you are in the building you are in

24  that room.  You are in that room, no getting out of the room

25  without us knowing about it.  That happened once too.  It was

1   like ants out of the ant farm, we didn't know where anybody had

2   gone, it took us 45 minutes to find everybody.  Please, he is

3   your jailer.  Now, he is not allowed to communicate with you

4   about this case either, so don't try to engage him in any

5   conversation about the case.

6          If you should happen to send me a note, remember not

7   to tell me what the vote is:  Judge, we are 5 to 3 in favor of

8   the defendant on the question of discrimination and we would

9   like to know the following.  No.  I am not supposed to know.  I

10  am really not supposed to know any vote except 8 to nothing.

11  Don't tell me what the vote is please.  If a note is about to

12  go out with a vote recorded, somebody stop it.

13         All the exhibits that were admitted into evidence will

14  be with you in the jury room and the charge will go back with

15  you in the jury room so you can review it during your

16  declarations.  But if you don't understand it, don't just sit

17  there and look at the paper.  Send out a note and say, judge,

18  we need you to explain causation once again and I will.  I will

19  do it.  I have been known to do better the second time than I

20  do the first time sometimes because you jurors frame very

21  precise questions that explain to me what it is that's

22  confusing to you.  So don't assume that because I am sending

23  the charge back with you, you can't ask me for guidance.  You

24  can and I will give it to you to the best of my ability.

25         You know that if you need your recollection refreshed

1    about testimony, the way you do that is to send out a note

2    signed by your foreperson.  And we will do that in one of two

3    ways.  (A) we have the transcript of last week's proceedings,

4    thanks to last week's wonderful court reporters, and we will go

5    through the transcript and we will find the relevant pages.  We

6    will copy them and we will send them back to you.  Or if we

7    don't have a transcript, we will bring you out here and we will

8    have the court reporter read the relevant portions to you.

9         We have to go through the notes or through the

10   transcript with each other, with the court reporter, and that

11   takes some time.  So first of all, don't ask for readback

12   unless you have to.  Don't ask for readback for the fun of

13   watching the court reporter interpret her hieroglyphics which

14   is a miraculous things to watch, it really is.  But don't do

15   that.  Exhaust everybody's recollection of the evidence and

16   then if you have any doubt, any question, send out that note,

17   and we will find the relevant portion of the testimony.

18        I can pretty much guarantee that you will reach that

19   moment and you will send out note right after I sent the

20   lawyers to lunch, just before I have some criminal matter

21   that's going to be taken care.  It always happens that way, but

22   we will get to it rapidly and then we will get you the

23   testimony.

24        You heard reference in the closings to the verdict

25   sheet.  You will record your verdict on the verdict sheet that

1    I am sending back into the jury room with you.  The verdict

2    sheet contains my initials and those of counsel indicating that

3    we all have seen and reviewed it.  Your foreperson should fill

4    it out as you reach your verdict and sign and date it when you

5    are done deliberating.

6            You will note that under the heading labeled

7    discrimination you have to answer two questions.  First you

8    have to decide whether or not the plaintiff experienced any

9    discrimination in the workplace based on her ethnicity or

10   national origin.  Then if and only if your answer to that

11   question is yes, we ask you to write down what adverse act or

12   acts by the hospital were discriminatory.  Write down every act

13   that you conclude by unanimous verdict was motivated by

14   discrimination based on plaintiff's ethnicity or national

15   origin.

16           When you are done deliberating, please send out a note

17   saying we have reached verdict.  Do not send out the verdict

18   sheet with the note.  The foreperson should bring the verdict

19   sheet out into the courtroom when you come to deliver your

20   verdict.

21           I would like to see counsel over at the sidebar with

22   the court reporter.

23           (At the sidebar)

24           THE COURT:  Does the plaintiff have an objections to

25   the charge as delivered.

1            MR. NUWESRA:  Your Honor, on page 5, although you did

2     read it correctly, it's indicated here and/or retaliation.

3            THE COURT:  I have already written it down.  I will

4     give you my copy with the notes.  We are going to change his to

5     her.  Sorry about that; I apologize to your client.

6            MR. NUWESRA:  The only other thing, page 20.  I have

7     it here; this is the case regarding the business exception.

8            THE COURT:  You can argue credibility.  That has

9     nothing to do with this charge.  I am not going to change the

10    charge.  You have your exception.  I am not charging

11    credibility there.  I am charging the law on discrimination.

12    Credibility is yours to argue.  I charged credibility earlier.

13            Anything else.

14            MR. NUWESRA:  No.  It would have been the same thing

15    for 25.

16            THE COURT:  Thank you.

17            MR. GARLAND:  Page 23, the third paragraph, I should

18    have caught this earlier, the third to last line where it

19    starts on the patient's statement.

20            THE COURT:  Page 23, third paragraph begins under New

21    York City Law.

22            MR. GARLAND:  This is under causation, number 3, this

23    is the draft that we have.

24            THE COURT:  You got a new one.

25            THE LAW CLERK:  It's changed a little bit.

1          THE COURT:  What is it.

2          MR. GARLAND:  The paragraph that starts, the defendant

3     has argued, the fourth line says on the patient's

4     state-mandated narcotics control sheet, the word patient

5     shouldn't be there.

6          THE COURT:  You are correct.  I apologize.

7          MR. GARLAND:  Nothing further.

8          THE COURT:  Fine.

9          (In open court)

10          THE COURT:  I have to make one correction on the

11     charge and I will.  When I talked about time entries, I said

12     the patient's state-mandated narcotics control sheet.  It's not

13     the patient's state-mandated narcotics control sheet; it's just

14     the narcotics control sheet.  So forget about the reference to

15     patient there.

16          Deliberate only when all of you are together in the

17     room.  If anybody is out of the room, no reason for you to to

18     be deliberating because you really all need to hear everything

19     that everybody is saying so that in case somebody says the

20     thing that makes the penny drop, you will all be there to hear

21     it.  So, just go ahead and deliberate only when you are all

22     together and wait until everybody, if somebody goes out on a

23     smoking break or somebody has to go to the restroom, wait until

24     everybody is back before you start deliberating again.

25          (Continued on next page)

1          THE COURT:  I have nothing better to do until such

2     time as you reach your verdict than to pay attention to you.

3     So you are my first charge.

4          What I'm going to let you do is go back for 20

5     minutes, half an hour, get organized, select your foreperson,

6     start talking a little bit.  Then we'll break at five for the

7     day, and tomorrow morning you'll be back at 9:30.  Go right to

8     the jury room.  When everybody is there, knock on the door,

9     stick your head out, let Ben know that you're all there, and

10    start.  You don't have to see me.  All right?

11         Okay.  We're going to get everything together and send

12    it back to you.  You are now free to discuss the case.

13              (Jury excused)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1     (In open court; jury not present)

2     THE COURT:  Okay.  Can we make sure that the exhibits,

3     the actual marked exhibits, are ready to go back?  The verdict

4     sheet you have here.

5     MR. GARLAND:  Your Honor, just a couple of-- one

6     question -- one comment on the exhibits.  One, plaintiff's tax

7     returns originally at-- they're in evidence, but I see that

8     they were necessarily not going back with the jury since the

9     Court's decided to address the lost wages issue.

10     MR. NUWESRA:  May I, your Honor?

11     THE COURT:  Do you really want her tax returns to go

12     back?

13     MR. NUWESRA:  Yes, your Honor, because she testified

14     that she was interested in her job.  She was making $99,000,

15     $96,000, and I told them they could look at it.

16     THE COURT:  All right.  They can go back.

17     MR. NUWESRA:  Thank you.

18     MR. GARLAND:  And, second, your Honor, I want to be

19     sure that we send back Defendant's Exhibit 22 --

20     THE COURT:  Your job is to make sure that every

21     exhibit that was admitted into evidence is in a pile, the

22     original exhibits, so that they can go back.  That's your job

23     now.

24     MR. NUWESRA:  Your Honor, DX-22 was never agreed upon.

25     THE COURT:  Excuse me.  Defendant's Exhibit-- give me

1    a copy of Defendant's Exhibit's 22 and point to me in the

2    transcript where I said it was admitted.  That's the

3    determinative factor.  Nothing else matters.  Nothing else

4    matters.

5          MR. GARLAND:  All right, your Honor.  We have to pull

6    out the transcript first.  I believe it's from Thursday,

7    Thursday morning.

8          THE COURT:  I have no memory of it.  Find it in the

9    transcript.  Yes, it should have come in, but find it in the

10   transcript.

11         MR. GARLAND:  Your Honor, while Mr. Fullerton looks,

12   that came up in the discussion when I had said to the Court

13   that nothing should come in on the grievance of the

14   termination.  And then your Honor had said to go ahead-- we can

15   leave it in, the grievance letter, but then you could put in

16   DX 22.  But we'll try to get it.

17         THE COURT:  Okay.

18         MR. GARLAND:  I just wanted to set the stage as I

19   recall it.

20         THE COURT:  Recall means nothing.  First of all, you

21   should look at the transcript of the final pretrial conference,

22   which is when all of the exhibits were to have been admitted.

23   Then there were a few exhibits that were admitted during the

24   trial.  All have you to do is point to something in the

25   transcript.  But once you all rested and closed, I'm not

1    allowing anything that I had not specifically admitted to go to

2    the jury no matter how relevant it is.

3              MR. GARLAND:  Okay.  Your Honor, I am looking at page

4    274 --

5              THE COURT:  Give me a transcript, please.

6              MR. GARLAND:  I'm sorry, it's Thursday, October 11th.

7              THE DEPUTY CLERK:  October 11th?

8              THE COURT:  Page 274.

9              MR. GARLAND:  Right, line 15.

10             THE COURT:  Where does it say that this is Plaintiff's

11   Exhibit 22 we're talking about?

12             MR. GARLAND:  It's Defendant's Exhibit 22.  I did not

13   say --

14             THE COURT:  No, indeed, you referenced Defendant's

15   Exhibit 21.  This conversation I remember vividly.  It was not

16   about that document.  It was Defendant's 21.  Sorry, you

17   screwed up.  It doesn't come in.  You did not-- forget about

18   referencing it specifically --

19             MR. GARLAND:  Your Honor, if I may, respectfully.

20             THE COURT:  You had to tell me the exhibit and the

21   exhibit number.  I was looking at 21.  I had 21 in my hand.  I

22   know exactly what I was ruling at that moment.  I had never

23   seen this letter and I'm not letting it in now.  You have your

24   exception.

25             MR. GARLAND:  Thank you, your Honor.

1          THE COURT:  You did not give me that letter last

2     Thursday.  You gave me 21.

3          MR. GARLAND:  Well, your Honor --

4          THE COURT:  You gave me 21.

5          MR. GARLAND:  You had 21 in front of you, that's

6     correct, your Honor, but what I said was "It was the union's

7     grievance, and at the pretrial we withdrew the exhibit

8     immediately following it."  That's 22.  And then --

9          THE COURT:  Does it say --

10         MR. GARLAND:  That letter --

11         THE COURT:  Excuse me.  Does it say in the transcript

12    that's 22?

13         MR. GARLAND:  No, your Honor, it doesn't.

14         THE COURT:  Too bad.

15         MR. GARLAND:  We were also looking at the pretrial.  I

16    was trying to explain what I was doing --

17         THE COURT:  Too bad.  Too bad.  Too bad.  Doesn't go

18    back.

19         MR. GARLAND:  Thank you, your Honor.

20         THE COURT:  You're supposed to find these things out

21    before you close, not after you close.

22         MR. GARLAND:  Thank you, your Honor.

23         THE COURT:  Not now.  I'm not reopening closings so

24    that he can address that.

25         MR. NUWESRA:  I'm just going to review these so that

1    they can go to the jurors, your Honor.

2            THE COURT:  The actual marked original exhibits.

3            MR. NUWESRA:  Yes, right.

4            THE COURT:  Okay.

5            MR. GARLAND:  Not the binders.

6            THE COURT:  The actual marked original exhibits.

7            MR. GARLAND:  May I ask the Court, do you have-- has

8    the Court read the stipulated facts?

9            THE COURT:  The stipulated facts.  Where are the

10   stipulated facts?  They have to be up here somewhere.  Part of

11   them you had to cut them out of the pretrial order, but they

12   weren't all in there.

13           Here, these two pages, you have to white out this.

14           THE DEPUTY CLERK:  Okay.

15           THE COURT:  Then there's a stipulation with the rest

16   of them because I read-- or we can just photocopy the pages

17   from the transcript actually.  Photocopy the pages from the

18   transcript where I read them.  That will be helpful.

19           (Recess)

20           THE COURT:  Okay.  Case on trial continues.  The

21   parties are present; jurors are not present.  And the jurors

22   want to go home, so let's bring them out.

23           (Continued on next page)

24

25

1           (In open court; jurors present)

2           THE COURT:  Okay.  Have a seat.  Really fast, go home,

3    sleep, rest, refresh yourselves, and we'll work very hard

4    tomorrow.  Don't discuss the case.  Keep an open mind.  When

5    you arrive tomorrow morning, you will be back in the jury room.

6    Remember, as soon as you're all there, knock on the door, let

7    Ben know that you're here, and you should resume your

8    deliberations.  If you need me, I'm here for you.  I'll see you

9    tomorrow.

10          (Jury excused)

11          THE COURT:  Okay.  Hopefully we'll get a verdict

12   sometime tomorrow.  We will go until 4:00 tomorrow.

13          Off the record.

14          (Discussion off the record)

15          (Adjourned to October 16, 2012, at 9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                        Page

3    PAULINE FRANCES-LATTERY

4    Direct The Deputy Clerk . . . . . . . . . . 457

5    Direct By Mr. Garland . . . . . . . . . . . 457

6    Cross By Mr. Nuwesra . . . . . . . . . . . . 480

7    CATHERINE GRAHAM

8    Direct By Mr. Garland . . . . . . . . . . . 490

9    Cross By Mr. Nuwesra . . . . . . . . . . . . 511

10   Redirect By Mr. Garland . . . . . . . . . . 520

11   MARLEN MARTINEZ

12   Redirect By Mr. Nuwesra . . . . . . . . . . 522

13

14

15

16

17

18

19

20

21

22

23

24

25